UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-cv-23429-UNGARO

MITCHELL ROSARIO,

 Plaintiff,

vs.

12425, INC., a Florida for-profit corporation d/b/a
STIR CRAZY, LAURA INSUA, MANUEL
INSUA, and HERIBERTO FLOREZ,

 Defendants.
_____/

**PLAINTIFF'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

 The Plaintiff, Mitchell Rosario, pursuant to Fed.R.Civ.P. 56, files this Motion for Partial Summary Judgment and Memorandum of Law in Support, and says:

**BACKGROUND AND SUMMARY**

 From 2001 to September 21, 2013, the Plaintiff Rosario was employed as a disc jockey ("DJ") at 12425, INC. d/b/a Stir Crazy, (hereinafter "Stir Crazy" or "the club"), an exotic dance club in Miami, Florida. The Plaintiff has brought the instant action against the following Defendants whom the Plaintiff contend were his employers: Stir Crazy; Heriberto "Eddie" Florez, the general manager; Laura Insua, an owner of Stir Crazy; and, Manuel Insua,[1] (hereinafter "Insua Jr."), who owns the building where Stir Crazy operates. The Plaintiff maintains he was misclassified as an independent contractor, and received no wages from Defendants for the DJ work he performed at the club. Instead, he received money only from the exotic dancers at Stir Crazy, and was required to pay $25 per shift to the club. The Plaintiff seeks his unpaid minimum wages and overtime pursuant to the Fair Labor Standards Act,

---

[1] There are two individuals named Manuel Insua. There is Manuel Insua, who is a named Defendant in this case and is the son of Manuel Insua, who is not a Defendant in this case, but is subject to a separate action involving the same issue. See Rosario v. Manuel Insua a/k/a Manuel Insua Sr., CASE NO. 1:14-CIV-21804-LENARD. To avoid confusion, the named Defendant in this case who is the son will be referred to as "Insua, Jr." Manuel Insua who is not a named Defendant and is the father of the Defendant in this case is referred to as "Insua Sr." Such references are also contained in the deposition testimony submitted contemporaneously with this Motion.

1

("FLSA"), 29 U.S.C. §201 *et. seq.*, (Counts I and III).  The Plaintiff also seeks unpaid minimum wages pursuant to the Florida Constitution, Article X, §24 and the Florida Minimum Wage Act, §448.110, (Count II).  Finally, the Plaintiff has asserted a claim for retaliation under the FLSA and Florida minimum wage law, (Count IV), as well as a claim for unjust enrichment based on the $25 per shift he had to pay to the club, (Count V).  Defendants deny the Plaintiff is owed any wages, and instead claim he is an independent contractor.

In the instant Motion, the Plaintiff seeks partial summary judgment in his favor on the following issues: (1) whether the Plaintiff was an "employee" of Stir Crazy as defined by the FLSA and the Florida minimum wage law when he worked there as DJ and therefore entitled to be paid wages; (2) whether Heriberto Florez, the general manager, was the Plaintiff's "employer" subject to individual liability under the FLSA; and, (3) whether Stir Crazy and Florez retaliated against the Plaintiff when Florez informed the Plaintiff he was terminated because the Plaintiff had complained about his wages.

The Plaintiff maintains he is entitled to judgment in his favor as a matter of law as to all of those issues. First, under the applicable "economic realities" test, the Plaintiff was an employee of Defendant Stir Crazy and entitled to be paid wages because all the relevant factors point to economic dependence, and not to an individual in business for himself.  If the Court finds the Plaintiff was an employee, then Stir Crazy has violated the FLSA because it already has admitted it paid the Plaintiff no wages and required *him* to pay the club $25 per shift.  Second, Defendant Florez, as the general manager of the club and the supervisor of the Plaintiff, easily fits the definition of an FLSA employer since, among other things, he was involved in all aspects of the club, involved in payroll, involved in employee supervisions and compensation, hired and fired workers, and even came up with the idea of having the Plaintiff sign an independent contractor agreement.  Third, since the Defendant's general manager Florez has admitted he fired the Plaintiff for complaining about his wages on the same day he learned about the wage complaint, there is no dispute the Defendants Florez and Stir Crazy retaliated against the Plaintiff.

The Defendant Stir Crazy has stipulated that it is covered by the FLSA, (PF ¶7), and therefore, that fact has been established.  The Plaintiff, however, maintains there are disputes of material fact precluding summary judgment on the remaining issues; namely, the liability of the individual Defendants Insua, Jr. and Laura Insua; the amount of damages owed for the overtime,

2

minimum wage, retaliation and unjust enrichment claims; whether Defendants violation was willful; and, entitlement to liquidated damages.

In support of this Motion, the Plaintiff has contemporaneously filed a Statement of Undisputed Material Facts, ("PF"), with attached **Exhibits A** to **H**.

## MEMORANDUM OF LAW

### I. SUMMARY JUDGMENT STANDARD

Rule 56 Summary judgment "requires the movant to establish the absence genuine issues of material fact, such that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. See Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the movant meets its initial burden, then "the non-moving party must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. B.P. Oil Co., Inc., 32 F.3d 520, 524 (11th Cir. 1994) (citation omitted). On summary judgment, the court must view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A court must not "weigh the evidence or determine the truth of the matter. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

### II. THE PLAINTIFF WAS AN EMPLOYEE OF STIR CRAZY UNDER THE FLSA

The FLSA, 29 U.S.C. §§206 and 207 require the payment of overtime and minimum wages. The FLSA, however, applies only to employees. Freund v. Hi-Tech Satellite, Inc., 185 Fed.Appx. 782 (11th Cir. 1986) (unpublished). The FLSA defines an employer broadly to "include any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. §203(d). The FLSA defines the term "person" as "an individual**,** partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C. §203(a) (emphasis added). The FLSA defines an employee as "any individual employed by an employer," 29 U.S.C. § 203(g). A company employs an individual under the FLSA, when it simply "suffers or permits" that individual to perform work. Id. The Florida Minimum Wage Amendment, Art. X, §24(b) adopts the meaning of employer and

3

employee under the FLSA and its implementing regulations. The FLSA defines employment with "striking breadth" to accomplish its remedial purpose. Nationwide Mutual Insur. Co. v. Darden, 503 U.S. 318, 326 (1992) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 728 (1947)); Antenor v. D & S Farms, 88 F.3d 925, 933 (11th Cir. 1996) (stating the FLSA is a remedial statute that must be construed broadly).

When determining whether a company is an employer under the FLSA, courts look not to the common law definition of employment, but rather to the "economic reality" of whether the putative employee is economically dependent upon the alleged employer or a contractor in business for himself. See Rutherford Food Corp., 331 U.S. at 728-30. The determination of an employment relationship "does not depend on . . . isolated factors but rather upon the circumstances of the whole activity." Rutherford Food Corp., 331 U.S. at 730; Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1160 (11th Cir. 2008) (citation omitted).

In applying the "economic reality" test for the purpose of determining whether a company is an FLSA employer, the Eleventh Circuit is guided by several factors:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> (4) whether the service rendered requires a special skill;
> (5) the degree of permanency and duration of the working relationship;
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

Freund, 185 Fed.Appx. at 783 (citing Sec'y of Labor v. Lauritizen, 835 F.2d 1529, 1535 (7th Cir. 1987)). "'No one of these considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges consideration of the dominant factor-economic dependence.'" Id. (quoting Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1311 (5th Cir. 1976)). The determination of who is an employer under the FLSA is a question of law, but the subsidiary findings are questions of fact. Id. (citing Patel v Wargo, 803 F.2d 632, 634 n.1 (11th Cir. 1986)).

In applying the economic realities test, the *intent* of the parties to create an employment relationship is "irrelevant." Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 470-471 (11th Cir. 1982) (citation omitted). See also Freund, 185 Fed.Appx. at 783 (not listing an individual's

4

subjective belief about her employment status as a factor that guides an inquiry in this Circuit into the economic reality of a work relationship). Likewise, merely *labeling* an individual as an employee or an independent contractor is not dispositive. Santelices v. Cable Wiring et al., 147 F. Supp. 2d 1313, 1318 (S.D. Fla. 2001). See also Ansoumana v. Gristede's Operating Corp., 255 F.Supp.2d 184, 190 (S.D. N.Y. 2003) ("An employer's characterization of an employee is not controlling ... for otherwise there could be no enforcement of any minimum wage or overtime law."). "Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act." Rutherford Food Corp., 331 U.S. at 729.

Moreover, an individual's characterization for tax purposes is not relevant to the issue of employee status. Harrell v. Diamond A Entm't, Inc., 992 F.Supp. 1343, 1353 (M.D. Fla.1997). See also, Gordilis v. Ocean Drive Limousines, Inc., 2014 WL 2214289 (S.D. Fla. 2014) (King, J.) ("label workers use for the IRS is irrelevant); Robicheaux v. Radcliff Material, Inc., 697 F.2d 662 (5th Cir. 1983) (welders were "employees" even though they signed contract stating they were independent contractors, furnished their own equipment and insurance coverage, were self-employed on their tax returns and had their own business cards). An employee's right to overtime and a minimum wage under the FLSA is *nonwaivable*. Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 740 (1981).

As set forth in more detail below, all six of the factors under the economic reality test weigh in favor of finding the Plaintiff was an employee of Stir Crazy.

### 1. *Defendants Exercised Significant Control Over Plaintiff's Work*

Here, the testimony of the Stir Crazy's corporate representative and others shows Defendant Stir Crazy exercised significant control over the Plaintiff's work. For example, the Plaintiff was required to promote over the microphone the club's upcoming events and drink specials. (Plaintiff's Statement of Undisputed Material Facts, (hereinafter "PF"), ¶14). DJ's were told to find another place to work if they broke club rules. (PF ¶¶15-6). Stir Crazy required DJ's to arrive 15 to 20 minutes prior to the start of their shift, (PF ¶25), and required that Rosario and other DJ's show up for their shifts and arrive on time, (PF ¶41).

Only DJ's were allowed in the DJ booth. (PF ¶26). Stir Crazy required DJ's to call the dancers on stage in the order which the dancers arrived at work. (PF ¶27). Stir Crazy required DJ's to wear collar shirts and look well-groomed. (PF ¶29). DJ's were limited to playing two

5

songs per dancer, and the songs could not be too long. (PF ¶30). Stir Crazy set the $10 amount the dancers paid to the DJ's, required the DJ's to pay $25 to the club, and determined no wages would be paid to the Plaintiff. (Pf ¶¶ 8-11). The Plaintiff and other DJ's also were required to email Defendant, Manuel Insua Jr. a list of dancers working on each shift and their arrival times. (PF ¶24). The Plaintiff was required to answer the club's phone and route calls. (PF ¶28). The Plaintiff was required to submit an application to be a DJ. (PF ¶20).

DJ's were texted to come into work if needed. (PF ¶17). Florez, the general manager, prepared the schedule on the computer. (PF ¶19). Florez had final approval of the DJ's schedule, including the Plaintiff's schedule, approved the number of days Rosario worked per week, could take a DJ off the schedule, asked DJ's to cover shifts, and wanted certain DJ's to work with certain crowds. (PF ¶19, 41). During the time he worked at Stir Crazy, Rosario was removed from the schedule on two occasions. (PF ¶31). The Plaintiff also was terminated. (PF ¶74).

Club management could discipline DJ's for many reasons such as having others in the DJ booth, playing more than two songs for a dancer, calling dancers on stage in the wrong order, using the internet too much, having a wandering mind, or doing something that a manager did not like. (PF ¶¶ 26, 27, 32). Stir Crazy also set the $10 fee the dancers were required to pay to the DJ. (PF ¶¶ 33-34). Managers would resolve arguments between DJ's and dancers. (PF ¶89).

Management at Stir Crazy also exerted control and influence over music the DJ's played in the club. The Plaintiff met with Florez and other managers regarding the type of music to play, DJ attitudes, what management wanted done, promoting the club, and how to do things better. (PF ¶21). Stir Crazy also made DJ's attend Responsible Vendors meetings. (PF ¶21). Stir Crazy required the music to be high energy to keep people awake, ensure a good time, and attract people to the club. (PF ¶22). It was important that the club had a high energy mood, and different types of music attract different crowds. (PF ¶22). If the general manager Florez did not like a song the DJ was playing, he would request a change, tell that DJ to stop playing the song altogether, or he would tell a manager to speak to the DJ. (PF ¶23). Florez did not like Latin music played too much, and does not think customers would like it either. (PF ¶23).

The Defendants may argue that Plaintiff and other DJ's had a choice regarding what type of music to play, and needed to play songs that the customers wanted to hear so the club would be more profitable. However, all businesses on some level have a goal of pleasing their customers and implementing their request, so the act of a worker implementing such customer

6

requests does not turn the worker into an independent contractor. "An employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under the F.L.S.A., by granting him some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have him operate." Mednick v. Albert Enters., Inc., 508 F.2d 297, 303 (5th Cir. 1975) (applying the economic reality test to determine worker was an employee).  See also Harrell v. Diamond A Entm't, Inc., 992 F.Supp. 1343, 1349 (M.D. Fla. 1997) ("The mere fact that [the club] has delegated a measure of discretion to its dancers does not necessarily mean that its dancers are elevated to the status of independent contractors").

The aforementioned facts, showing the control over the Plaintiff's work, weigh in favor of finding the Plaintiff was an employee of Stir Crazy under the FLSA.

### 2. *Defendant Stir Crazy Determined Plaintiff's Opportunity for Profit or Loss*

Here, the Plaintiff's ability to earn money was dependent on Stir Crazy, and his managerial skill had no bearing on his earnings.  Stir Crazy required dancers to pay the Plaintiff $10 per shift for him being a DJ, Rosario was required to pay $25 per shift to the club, and Stir Crazy paid him no wages. (PF ¶¶ 8-12, 84). Rosario did *not* get a percentage of the club's profits and had no ownership interest in the club. (PF ¶45, 46).  Stir Crazy's general manager controlled the number of dancers working on each shift, (PF ¶55), which affect the number of $10 tip outs he received per shift since the dancers paid the DJ $10 per shift, (See PF ¶9). The more dancers there were, the more profitable the club tended to be.  (PF ¶54).  Stir Crazy management allowed one DJ per shift, decided the number of hours on each shift, and the club's hours of operation. (PF ¶¶ 37, 55). Being a DJ did not require managerial skill. (PF ¶ 36).

Stir Crazy, not the Plaintiff, had control over the determinants of customer volume.  For example, Stir Crazy was responsible for bringing in customers, paid for and made decisions about the club's marketing, promotions, advertising, special events, and billboard.  (PF ¶¶38-39, 43-44, 48). Stir Crazy hires dancers, controls how dancers perform their lap dances, decides how many dancers work per shift, and controls the atmosphere of the club such as lighting and how the club looks.  (PF ¶¶ 49-50, 55).  Since Stir Crazy had control over the determinant of customer volume, Stir Crazy exercised a high degree of control over the opportunity for profit and loss. See Reich v. Circle C Investments, Inc., 998 F.2d 324, 328 (5th Cir. 1993) (finding club

7

exercised "high degree of control over a dancer's opportunity for 'profit'" because controlled "determinants of customer volume"); Clincy v Galardi South Enterprises, Inc., 808 F.Supp.2d 1326, 1345-46 (N.D. Ga. 2011) (finding exotic dancers did not have significant control over their opportunity for profit and loss relative to the adult night club and citing numerous cases finding the same in the adult nightclub context).

Even if a DJ plays great music, DJ's at Stir Crazy cannot control what a customer is going to spend or the number of customers who come into the club, as some days the club is slow, some customers to do not leave big tips, or some dancers do not approach customers. (PF ¶53). Defendants may argue that the Plaintiff could be tipped more if the dancers made more money, but as one court has recognized all commissioned employees earning gratuities earn more money when they show more initiative and hustle. Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1050 (5th Cir. 1987). As far as the Plaintiff's initiative, much of it was circumscribed by Stir Crazy in terms of playing high energy music, playing only two songs per dancer, and by Stir Crazy's control over the number of dancers and the determinants of customer volume. As such, the Plaintiff was ". . . far more closely akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investments." Id. at 1051. Moreover, given the club's investment, as discussed more fully below, the risk of loss was much greater for the club than for the Plaintiff. Cf. Clincy, 808 F.Supp.2d at 1346 (citing cases finding the same in the adult entertainment context).

Thus, the money the Plaintiff received from the dancers for his DJ work was not similar to a return on a risky capital investment. The Plaintiff did not control the key determinants of profit and loss of Stir Crazy. The Plaintiff's own managerial skill had no bearing on his own profits or losses. Thus, this factor also weighs in favor of Plaintiff being classified as an employee.

### 3. *Plaintiff's Investment Was Negligible Relative to Defendants' Investment in Operating the Club*

Here, Stir Crazy obviously had a significant investment in operating the club compared to the Plaintiff who could perform his DJ duties using only Stir Crazy's equipment. (PF ¶68). Specifically, it is undisputed the Plaintiff's laptop computer was not necessary for the Plaintiff to perform his DJ work. (PF ¶68). Defendant Insua Jr. owned the facility where Stir Crazy operated. (PF ¶57). The Plaintiff did not hire any employees to work under him at the club. (PF ¶62).

In contrast to the Plaintiff, the Defendant's investment in the business was considerably higher. Stir Crazy owned the DJ sound booth, and sound booth computer. (PF ¶56). Stir Crazy supplied the equipment for music played in the club, including a house computer with thousands of songs, a sound mixing board, microphone amplifier, equalizer and speakers, hard wiring, and a lighting system. (PF ¶58). Stir Crazy's supplied the sound equalizer system preset with a specific harmony, and keeps it locked up. (PF ¶58). Stir Crazy pays the music licensing fees for club music. (PF ¶59). Stir Crazy spent $10,000 to rewire the club's sound system, to renovate the club, to install a new amplifier, and to renovate very expensive speakers. (PF ¶60). Stir Crazy paid for specialized computer software that downloads and plays music on the house computer. (PF ¶61). Stir Crazy pays all the bills for the business, including liquor, licenses, electric, water, liquor, phone bill and all utility bills. (PF ¶63). If something expensive in the club broke and needed to be repaired, Florez would speak to the Insua family about it. (PF ¶64). Stir Crazy management buys the lights, takes care of having the club cleaned, and arranges for food and beverage service. (PF ¶50-52).

Plaintiff's negligible investment in an optional laptop computer and his lack of employees, relative to Stir Crazy's substantial investment in the club's operations, including the DJ equipment, also weigh heavily in favor of finding employee status. Cf. Clincy, 808 F.Supp.2d at 1347 (finding exotic dancer's investment in exotic dancing to be small compared to defendant's investment in the club).

### 4. Plaintiff's Work as a DJ Did Not Require a Special Skill

Work as a DJ does not require a special skill. The work of a DJ at Stir Crazy consists of paying music, announcing dancers in a pre-determined rotation, announcing drink specials and party promotions determined by Florez. (PF ¶27, 65). The work was repetitious and akin to an assembly line. (PF ¶65). No special license or degree was required to be a DJ at Stir Crazy. (PF ¶66). The Plaintiff was hired with no prior DJ experience. (PF ¶67). Indeed, even the club bouncer could be a DJ. (PF ¶68). Martin v. Circle C Investments, Inc., 1991 WL 338239, *3 (W.D. Tx. Mar. 27, 1991) (unreported) (finding that DJ's were "unskilled laborers who perform the essential everyday chores of [the club's] operation"). The Plaintiff did not demonstrate the type of skill or initiative indicative of a person in business for himself. Thus, this factor also cuts in favor of dependence and employee status.

### 5. *The Plaintiff's Working Relationship Was Permanent and of Long Duration*

The Plaintiff worked for the Defendant Stir Crazy from 2001 to September 21, 2013, (PF ¶ 2). While the Plaintiff contends he worked more hours, Defendants do not dispute the Plaintiff generally worked at least four shifts of 8.5 hour each per week, (PF ¶13). The Plaintiff worked as a DJ only for Stir Crazy. (PF ¶69). The Plaintiff anticipates that the Defendants may argue that the Plaintiff *could* have worked for other clubs, but this argument is irrelevant. "It is not significant how one 'could have' acted under the contract terms. The controlling economic realities are reflected by the way one actually acts." Usery v. Pilgrim Equip Co., 527 F.2d 1308, 1312 (5th Cir. 1976).

Moreover, while the Plaintiff obtained mortgage license and worked on three occasions at an auction, (PF ¶69), that does not diminish his status as an employee of Stir Crazy. This would be true even if the Plaintiff had worked at other DJ clubs or had other jobs. In an analogous case involving dancers, a court has explained:

> "[t]hat dancers were free to work at other clubs or in other lines of work, and that they were not permanent employees, do not distinguish them from countless workers in other areas of endeavor who are undeniably employees under the FLSA-for example, waiters, ushers, and bartenders." *Hart,* 2013 WL 4822190, at *14. In light of the other factors, this alone cannot nudge the Plaintiffs out of the protective sphere of the FLSA. *See Reich,* 998 F.2d at 328-29 ("The transient nature of the work force is not enough here to remove the dancers from the protections of the FLSA. In analyzing the ... factors, we must not lose sight of economic reality.").

Stevenson v. Great American Dream, Inc., 2013 WL 6880921, *5 (N.D. 2013) (footnote omitted).

Thus, the extremely long duration and permanency of the working relationship between the Plaintiff and Defendant Stir Crazy points directly to employee status.

### 6. *The Plaintiff's DJ Duties Were Integral to Defendant's Business*

The extent to which the work performed by the alleged employees was integral to the business of the employer is a factor in determining economic dependence. Aimable, 20 F.3d at 444 (citing Rutherford, 331 U.S. at 730); Antenor, 88 F.3d at 925 (same). Here, having a DJ play music, announce the dancers, and make other club announcement was indeed important to Stir Crazy' operation. The nature of Stir Crazy's business model is that of an exotic dance club that plays music for dancers to dance to, and for customers to watch. (PF ¶3). The Plaintiff

performed his work as a DJ in the club, side by side with other employees at the club, not at some remote location. Playing music is an integral part of operating an exotic dance club, and without good music, a club cannot be successful because the music keeps the customers and the dancers happy. (PF ¶¶70). It would not make sense for dancers to dance without music being played, and Stir Crazy needed music in order for dancers to dance. (PF ¶71). Significantly, Stir Crazy had a DJ on *every* shift, (PF ¶37), which is further evidence that the DJ's work was integral to the club's operation. Moreover, Stir Crazy's significant investment in the music, sound system, specialized computer software, sound booth, sound mixing board, microphone amplifier, equalizer, speakers, wiring, and house computer, (PF ¶56, 58, 60), further indicates that the DJ position was integral to the club.

The Plaintiff also paid a $25 per shift house fee to the club, (PF ¶10), thus contributing to the money the club made. The Plaintiff also performed other tasks for Defendants to help run Stir Crazy, which were unrelated to playing music, such as emailing Defendant, Manuel Insua Jr. a list of the number of dancers working on each shift and their arrival time, as well as answering the house phone and routing calls. (PF ¶24, 28). While these tasks were unrelated to his DJ work, they were of benefit to Stir Crazy (i.e. keeping track of dancers and answering the phone), and assisted in the club's operations.

While Stir Crazy may argue that having a DJ play music for the exotic dancers was not integral because the club also sells food and drinks to attract customers, that does not diminish the fact that having a DJ playing music on *every* shift, announcing dancers, and making other club announcements was an integral part to the success of Stir Crazy. Cf. Hart v. Rick's Cabaret Intern., Inc., 967 F.Supp. 901, 921 (S.D.N.Y. 2013) (in concluding that exotic dancers were FLSA employees of exotic dance club, court reasoned that argument that exotic dancers were not essential was "totally unpersuasive," that no reasonable jury could conclude dancers were not integral, and noting that dancers were not like shoe-shine employees at an airport).

In light of the foregoing, the Plaintiff's work as a DJ was integral to Stir Crazy's business model for its exotic dance club, thereby weighing in favor of employee status.

> 7. *Other Courts and the Department of Labor Have Found Workers in the Adult Entertainment Business to Be Employees*

Numerous courts have addressed employee status in the adult entertainment club context and found employee status. For example, in a factually similar case brought by the Secretary of

Labor,[2] against an adult entertainment club, the court found, after a bench trial, that the DJ's, among others, were employees of the club and entitled to FLSA protection. Martin v. Circle C Investments, Inc., 1991 WL 338239, *4-6 (W.D. Tx. 1991). The court explained that DJ's were "unskilled laborers who perform the essential everyday chores of (Circle C's) operation." Id. at *3. The Martin court also found the defendants exercised a "great deal of control over the . . . disc jockeys . . . ." because defendants determined the work schedule, fined for absences and tardiness, called at home to come to work, fined for infringing numerous rules promulgated by defendants, required employees to tip out, and regulated the music played. Id. at *3-4. The Martin court also mentioned that the DJ's did not have any ownership interest in the facilities, and there was no mention of property owed by the DJ's. Id. at *4. This Court should follow the persuasive and well-reasoned Martin decision.

Similarly, where courts have addressed the question of whether exotic dancers are employees under the FLSA, "[n]early '[w]ithout exception, these courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage.'" Hart v. Rick's Cabaret Intern., Inc., 967 F.Supp.2d 901, 912 (S.D.N.Y. 2013)(holding on summary judgment that exotic dancers were employees under FLSA under economic realities test) (citing Harrell v. Diamond A Entm't, Inc., 992 F.Supp. 1343, 1347-48 (M.D. Fla. 1997). See also, Clincy v. Galardi S. Enters., Inc., 808 F.Supp.2d 1326, 1343 (N.D. Ga. 2011) (finding that exotic dancers were employees on summary judgment); Thorton v. Crazy Horse, Inc., 2012 WL 2175753 (D. Alaska June 14, 2012) (finding that dancers at an adult establishment were employees); Thompson v. Linda and A. Inc., 779 F.Supp.2d 139, 151 (D.D.C. 2011) (finding that exotic dancers were employees on summary judgment); Morse v. Mer Corp., 2010 WL 2346334, at *6 (S.D. Ind. 2010); see also Doe v. Cin-Lan, Inc., 2008 WL 4960170 (E.D. Mich. Nov. 20, 2008) (granting entertainer's motion for preliminary injunction, holding that entertainer was substantially likely to succeed on claim that she is an employee under FLSA); Reich v. Circle C. Invs., Inc., 998 F.2d 324 (5th Cir. 1993) (finding topless dancers were employees under the FLSA); Reich v. Priba Corp., 890 F.Supp. 586 (N.D. Tex. 1995) (finding after bench trial that entertainers at adult club were employees); Martin v. Priba Corp., 1992 WL 486911 (N.D. Tx. Nov. 6, 1992) (denying employer's motion for summary

---

[2] The Secretary of Labor heads the Department of Labor, an agency responsible for administering, interpreting, and enforcing the FLSA.

judgment regarding employee status of topless dancers); Jeffcoat v. Alaska Dep't of Labor, 732 P.2d 1073 (Alaska 1987) (finding dancers to be employees under state labor laws modeled on FLSA).  But see  Matson v. 7455, Inc., 2000 WL 1132110 (D. Or. Jan. 14, 2000) (unreported) (applying economic reality test that did *not* include analysis of whether exotic dancer was integral to adult club, and stating the independent contractor agreement dancer signed was "the most telling indicator of her status as an independent contractor"); Hilborn v. Prime Time Club, Inc., 2012 WL 9187581, *4 (E.D. Ark. July 12, 2012) (unreported) (summary judgment finding exotic dancers were not employees with less than 2 pages of discussion, without a single citation to the record and almost no factual analysis).

Based on the foregoing facts and law, this Court must find as a matter of economic reality that the Plaintiff was an employee of Stir Crazy when he worked there as a DJ.

### III. FAILING TO PAY A DIRECT WAGE TO PLAINTIFF VIOLATES THE FLSA

Since Plaintiff is an employee of Stir Crazy under the FLSA, he is entitled to be paid the full minimum wage for all hours he worked, and overtime wages for any hours worked over forty.  See 29 U.S.C. §§206 and 207.  Stir Crazy, however, paid the Plaintiff no wages.  (PF ¶8).  Where, as here, an employee receives only tips and no direct wage from the employer, the employee is entitled to the *full* minimum wage for all hours worked.  Department of Labor Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act, available at http://www.dol.gov/whd/regs/compliance/whdfs15.pdf.

### IV. DEFENDANT, HERIBERTO FLOREZ, WAS AN FLSA EMPLOYER

As set forth above, the FLSA creates a private right of action against any "employer" who violates its minimum-wage or overtime provisions. FLSA, 29 U.S.C. §216(b). "The Act defines the term "employer" broadly to include "both the employer for whom the employee directly works as well as 'any person acting directly or indirectly in the interests of an employer in relation to an employee.'" Lamonica v. Safe Hurricane Shutters, 711 F.2d 1229, 1309 (11th Cir. 2013) (citation omitted) (determining that corporate supervisors other than officers may be personally liable under the FLSA, and clarifying the degree and type of operational control that will support individual liability). The FLSA contemplates imposing liability upon individuals. Lamonica, 711 F.2d at 1313 (11th Cir. 2013).  "[N]on-officers may be held personally liable under the FLSA." Id.  For an individual to qualify as an employer under the FLSA, he "must

either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee." Patel v. Wargo, 803 F2d 632, 638 (11th Cir. 1986). [T]here must be control over "significant aspects of [the company's] day-to-day functions, including compensation of employees or other matters in relation to an employee." Lamonica, 711 F.2d at 1313 (citation omitted). *"[S]uch control need not be proved directly. For example, the jury may infer such control from the exercise of general supervisory powers or the exercise of control over other employees*." Id. (emphasis added). Even control "exercised only occasionally does not diminish its existence." Id. (citation and quotation omitted). Whether an individual fits the definition of an FLSA employer "does not depend on technical or isolated factors but rather on the circumstances of the whole activity." Id. at 1310 (citation omitted).

Here, Defendant Florez, who is the general manager of the club, (PF ¶6), easily fit within the FLSA's definition of an employer subject to individual liability. Florez authorized firing the Plaintiff, makes personnel decisions, and hires and fires workers at the club. (PF ¶¶81-82, 94). Florez' duties involve everything at the club: the day-to-day operations, how to make the club more profitable, telling people what to do, and supervising everyone at the club, including managers, the DJ's and the Plaintiff. (PF ¶82-83). Florez decided to have dancers pay a house fee to the club. (PF ¶84). Florez gives schedules to the managers for the managers, bartenders and DJ's. (PF ¶¶19, 85). Florez makes the schedules on the computer, and had final approval of the schedules. (PF ¶86). Florez can remove DJ's from the schedule. (PF ¶87). Florez supervises workers, makes sure the dancers are dancing, that music is playing, and that customers are drinking. (PF ¶88). Florez resolves arguments between a DJ and a dancer, and enforces dancer's payments to DJ's. (PF ¶89-90). Florez purchases liquor for Stir Crazy, meets with managers about the club specials, about what the club is going to do, and prepares for parties. (PF ¶91). Florez pays bills for the club such as licenses, electric, water, liquor, phone bill and all utility bills. (PF ¶91). Florez discusses the club's bank statements with the club's owners. (PF ¶96). Florez prepares the club's daily and weekly sales reports and emails them to the Insua family (Manuel Insua, Sr., Manuel Insua, Jr., and Laura Insua). (PF ¶97). Florez discusses the weekly financial reports with the club's owner. (PF ¶98). Florez discusses with the club's owners, the number of dancers working at the club. (PF ¶99). Florez meets with Manuel Insua, Sr. to discuss what is best for the club to make it more profitable. (PF ¶101), and meets with Defendant, Insua Jr. to discuss problems with workers such as DJ's managers and cleaners. (PF ¶100).

Florez also is involved in employee compensation and maintaining employment records. It was Florez' idea for DJ's sign to an independent contractor agreement. (PF ¶92). Florez writes Stir Crazy's payroll checks and reports to a payroll company how much each employee worked and how much they should be paid. (PF ¶93). He does not report anything to the payroll company for Stir Crazy's DJ's, as they are paid by the dancers. (PF ¶93). Florez is involved in discussions and decisions of compensation to workers. (PF ¶95).

This Court should follow numerous other courts finding FLSA liability of supervisors. For example, in <u>Brock v. VAFLA Corp</u>., 668 F.Supp. 1516, 1517, 1519 (M.D. Fla. 1987), the court held a bench trial in an FLSA case, and imposed personal liability on an amusement park general manager who oversaw the operation of the park on a day-to-day basis, determined the duties of employees, set the wage rates of new employees, occupied an office in which payroll records and work hours records were maintained, and discussed personnel matters with the corporation's directors. The <u>Brock</u> court concluded that it was clear the individual manager defendant "acted directly and indirectly in the interest of defendant [ ] Corporation in relation to its employees." <u>Id.</u> Similarly, in <u>Arean v. Central Florida Investments, Inc.</u>, 2012 WL 1191651, *1, *12 (M.D. Fla. Apr. 10, 2012), the court denied summary judgment to a supervisor/property manager in light of the FLSA's expansive definition of an employer, statute's remedial purpose, and because defendant "supervised the day-to-day operations of [the corporate defendant], prepared the weekly time sheets upon which payroll was based, issued disciplinary warnings to employees including Plaintiffs, exercised control over Plaintiffs' work hours, and directly supervised Plaintiffs."

Based on the above facts and applicable law, the must find as a matter of law that Florez is an FLSA employer.

## V. DEFENDANTS STIR CRAZY AND FLOREZ RETALIATED AGAINST THE PLAINTIFF FOR ASSERTING HIS FLSA AND FMWA WAGE RIGHTS

The Plaintiff seeks summary judgment in his favor and against Defendants Florez and Stir Crazy as his retaliation claim. Section 215(a)(3) provides in relevant part: "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint." For a plaintiff to establish the elements of an FLSA retaliation claim, he must prove: (1) he engaged in statutorily protected activity; (2) he suffered adverse action by his employer; and (3) this adverse action occurred as a

consequence of her protected activity. Wolf v. Coca–Cola Co., 200 F.3d 1337, 1342–43 (11th Cir. 2000).

First, with respect to protected activity, the FLSA protects from retaliation employees who make oral or written complaints to their employer about FLSA violations. Kasten v. Saint–Gobain Performance Plastics Corp., 131 S.Ct. 1325 (2001) (holding that the phrase "filed any complaint" in the anti-retaliation provision of the FLSA includes oral as well as written complaints). Although the filing of a complaint under § 215(a)(3) need not be in the form of an official complaint, see E.E.O.C. v. White & Son Enters., 881 F.2d 1006, 1011 (11th Cir. 1989), or even be in writing, some degree of formality is required in order that the employer has "fair notice" that an employee is lodging a grievance. Kasten, 131 S.Ct. at 1334–36.

First, the Plaintiff complained by letter to his employer about the non-payment of minimum wages and overtime. (PF ¶72). Thus, the Plaintiff engaged in protected activity under the law.

Second, there is no dispute that the Plaintiff suffered adverse employment action. Defendants Stir Crazy and Florez admit the Plaintiff was terminated. (PF ¶¶ 2, 74, 79). When the Plaintiff was terminated, he was not able to work the shift for which he had shown up to work. (PF ¶76), resulting in him not making any money for that shift, (PF ¶80), and thereafter.

Third, to establish a causal connection between an employee's protected activity and an employer's adverse employment action, the employee must show he "would not have been fired but for his assertion of FLSA rights." Wolf, 200 F.3d at 1343. At the prima facie stage of the case, this standard requires the employee to show that his protected activity and the adverse employment action are not completely unrelated. See Pennington v. City of Huntsville, 261 F.3d 1262 (11th Cir. 2001). Here, Defendants Florez and Stir Crazy testified the Plaintiff was terminated the same day Florez learned of the Plaintiff's wage complaint. (PF ¶74). Indeed, Florez has testified he learned of the complaint around noon and terminated the Plaintiff when the Plaintiff came in for his 8:30 pm shift. (PF ¶¶73, 74, 76). The temporal proximity is strong circumstantial evidence of a causal connection since the Plaintiff was terminated. But here, there also is direct evidence of retaliation. After learning of the Plaintiff's wage grievance, Florez and Stir Crazy determined that Rosario could not be in the club any more. (PF ¶73). At the time Florez terminated Rosario, Florez knew Rosario had complained about his wages, and Florez was disappointed. (PF ¶77). Florez put his hand on Rosario's shoulder and responded,

"Mitch, I guess this is the end." (PF ¶78).  Florez said there was nothing more to say, Rosario then left, and Florez and Augusto went back into the club. (PF ¶78). Rosario's name was scratched off the schedule because his services were terminated. (PF ¶78).

Thus, there is no dispute of material facts that the Defendants Florez and Stir Crazy retaliated against the Plaintiff by terminating him after learning of his wage grievance.  Thus, the Plaintiff is entitled to judgment as a matter of law as against those two Defendants as to his retaliation claim. The amount of damages the Plaintiff suffered as a result of the retaliatory conduct, however, is an issue for trial since the Plaintiff disputes whether the Defendants subsequently offered him his job back at some point after Plaintiff's termination.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter partial summary judgment and find the Plaintiff was an employee of Stir Crazy, Defendant Florez was an FLSA and FMWA employer subject to individual liability, that the Defendants Florez and Stir Crazy retaliated against the Plaintiff, and grant Plaintiff such further relief as the Court deems just.

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

BOBER & BOBER, P.A.
Attorneys for Plaintiff
1930 Tyler St.
Hollywood, FL 33020
Phone: (954) 922-2298
Fax: (954) 922-5455
peter@boberlaw.com
samara@boberlaw.com

By: /s. Peter Bober
PETER BOBER
FBN: 0122955
SAMARA ROBBINS BOBER
FBN:0156248

**SERVICE LIST**

David M. McDonald, Esquire
dmcdonald@mmlawmiami.com
Florida Bar No. 613241
McLUSKEY & McDONALD, P.A.
Attorneys for Defendants
The Barrister Building
8821 S.W. 69th Court
Miami, FL 33156
(305) 662-6160 Telephone
(305) 662-6164 Fax
Counsel for Defendants