1           IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2                         MIAMI
                    CASE NO. **13-CV-23429**
3     _____

4     **MITCHELL ROSARIO**,
                    Plaintiff
5          vs.                    Monday, January 26, 2015
      **12425, INC., D/B/A STIR CRAZY**;
6     **LAURA INSUA; MANUEL H. INSUA**;
      **AND HERIBERTO FLOREZ**,
7                    Defendants.

8     _____

9            **VOIR DIRE EXAMINATION - EXCERPT**

10      BEFORE THE HONORABLE **ALICIA M. OTAZO-REYES**,

11      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12    _____

                      A P P E A R A N C E S
13

      FOR THE PLAINTIFF:    **Samara Robbins Bober**, ESQ
14                          **Peter J.M. Bober**, ESQ
                            Bober and Bober, PA\
15                          1930 Tyler Street
                            Hollywood, FL  33020
16                          (954) 922-2298
                            Samara@boberlaw.com
17                          Peter@boberlaw.com

18    FOR THE DEFENDANT:    **DAVID M. McDONALD**, ESQ
                            **JARED McLUSKEY**, ESQ
19                          McLuskey & McDonald
                            8821 SW 69th Ct
20                          Miami, FL  33156
                            (305) 662-6160
21                          Dmcdonald@mmlawmiami.com
                            Jared@mmlawmiami.com
22
      REPORTED BY:          **GIZELLA BAAN-PROULX**, RPR, FCRR
23                          United States Court Reporter
                            400 North Miami Avenue, Suite 8S32
24                          Miami  FL  33128
                            (305) 523-5294
25                          gizella_baan-proulx@flsd.uscourts.gov

1          P R O C E E D I N G S

2          *(The following proceedings were held in open court.)*

3

4    *    *    *    *    *    *    *    *    *    *    *

5          *(Thereupon, proceedings were held but not transcribed.)*

6    *    *    *    *    *    *    *    *    *    *    *

7

8               (Thereupon, the venire panel was sworn in my the

9    courtroom deputy.)

09:35  10          **THE COURTROOM DEPUTY:**  You may be seated.

11          **THE COURT:**  Thank you very much, ladies and

12    gentlemen.  I will now address those of you who raised your

13    hands earlier regarding knowing any of the parties and

14    regarding the nature of the case and the schedule.

09:35  15          Mr. Morales, I believe you indicated that you knew

16    one of the parties or the entities?

17          Let's pass down the microphone.

18          **JUROR TWELVE:**  Good morning.  Yes, I have been to

19    that establishment a couple of times.

09:35  20          **THE COURT:**  All right.

21          **JUROR TWELVE:**  That's all I --

22          **THE COURT:**  Thank you very much.

23          Mr. Ceremy, I think you indicated you had concerns

24    regarding the nature of the case or the schedule?

09:35  25          **JUROR EIGHT:**  Yes, I had sort of an event on

|          |     |                                                                              |
|----------|-----|------------------------------------------------------------------------------|
|          | 1   | Friday.  It starts at 5:00.  It's the Toby Awards, but it's                   |
|          | 2   | for work but if it's mandatory that I'm here, then that will                  |
|          | 3   | be the case, then I would have to be here.  I just wanted to                  |
|          | 4   | see if I would be excused in any kind of way.  But if not --                  |
| 09:36    | 5   | THE COURT:  All right.  And your commitment is on                             |
|          | 6   | Friday at 5 o'clock?                                                          |
|          | 7   | JUROR EIGHT:  Yes.  It's at 5 o'clock.                                        |
|          | 8   | THE COURT:  All right.  Hopefully we will be done                             |
|          | 9   | so you can enjoy the weekend.  (Laughter).                                    |
| 09:36    | 10  | We appreciate that.                                                           |
|          | 11  | JUROR EIGHT:  I was nominated for --                                          |
|          | 12  | THE COURT:  All right.  So you've got to be there.                           |
|          | 13  | JUROR EIGHT:  Right.                                                          |
|          | 14  | THE COURT:  Excellent.  Excellent.                                            |
| 09:36    | 15  | Thank you very much.                                                          |
|          | 16  | You each have been handed a juror questionnaire.  I                           |
|          | 17  | am now going to ask in the order that you're seated that each                 |
|          | 18  | one of you please stand and take the portable microphone and                 |
|          | 19  | answer to the best of your ability the questions that appear                  |
| 09:36    | 20  | on the juror questionnaire.  So you may address me, the                       |
|          | 21  | parties.  Just speak.                                                         |
|          | 22  | JUROR ONE:  My name is Andre Aurelien.  My date of                           |
|          | 23  | birth is 5/22/41.  I'm living at 1355 Northwest 113th                         |
|          | 24  | Terrace, Miami, Florida, 33167.  My current employer is -- I                  |
| 09:37    | 25  | am a minister of Jobs Christ (Inaud.) 2nd Avenue.                             |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Number four, no.  Number five, yes.  I am supervise          |
|       | 2  | some (inaud.)  Number six, my wife she's also (inaud.) --     |
|       | 3  | THE COURT:  I'm sorry, Mr. Aurelien.                          |
|       | 4  | Who is it that you supervise and who is it that              |
| 09:38 | 5  | your wife supervises?                                         |
|       | 6  | JUROR ONE:  Bus stop ticket (inaud.)                         |
|       | 7  | THE COURT:  At the bus stop when they buy the                |
|       | 8  | ticket?                                                       |
|       | 9  | JUROR ONE:  No, the daycare center for the                   |
| 09:38 | 10 | children.                                                     |
|       | 11 | THE COURT:  Oh, a center for children?                       |
|       | 12 | All right.  Daycare.  And your wife?                          |
|       | 13 | JUROR ONE:  My wife --                                        |
|       | 14 | THE COURT:  Same?                                             |
| 09:38 | 15 | JUROR ONE:  Yes.  The same thing yes.                        |
|       | 16 | THE COURT:  Thank you very much.                             |
|       | 17 | JUROR ONE:  Thank you.                                        |
|       | 18 | THE COURT:  All right.  Any other answers?                   |
|       | 19 | Mr. Aurelien, did you answer all of the questions?  I'm      |
| 09:38 | 20 | sorry, I interrupted you.                                     |
|       | 21 | Are you finished?                                             |
|       | 22 | JUROR ONE:  Number seven, already.  Number eight,           |
|       | 23 | no.  Number nine, no.  Number 10, I was on the jury, but they |
|       | 24 | don't pick me but.  Number 11, no.  Number 12, no.           |
| 09:39 | 25 | Thank you.                                                    |

1        THE COURT:  Thank you very much, sir.

2        JUROR TWO:  My name is Robinson Alvarez.  I was

3    born in 1982.  I live by Little Havana area.  I hold a

4    bachelor's degree and I work for the Department of Children

09:39  5    and Family.

6             Number four is no.  And yes, I used to be a

7    supervisor when I used to work in a company (inaud.)

8        THE COURT:  Just speak up.  It's hard to read and

9    speak, but the court reporter, the lady there is the court

09:40  10   reporter.  Stand up so they see your pretty face.  She needs

11   to take down everything that everybody says in court.

12             So slow, clearly, take your time.

13        JUROR TWO:  My wife was also holds a bachelor

14   degree.  I don't have adult kids.  And for number eight is

09:40  15   no.  I have never been to serve to a jury before.

16             What I like to do is exercise and spend time with

17   the family.  And number 12, no.

18        THE COURT:  Thank you very much.

19        JUROR THREE:  Hi.  Good morning, everyone.  My name

09:41  20   is Debra, last name Robinson.  Born in 1966.  I live in

21   Kendall.  I have a bachelor's degree in health sciences.  I

22   currently am employed by Baptist Hospital as a registered

23   respiratory therapist.  Prior to that I was a housewife.

24             Number four, no.  Number five, yes, I do supervise

09:41  25   my weekend staff at the respiratory department.  No spouse or

1    significant other at this time.  Never been -- know anybody

2    that has or been involved in any dispute over payment, no.

3         I have one adult child who is currently in law

4    school at FIU.  This is my first time being on the jury.  My

09:41  5    personal hobbies are cooking and gardening.  And no, I've

6    never been sued or know anybody who has been sued.

7         THE COURT:  Thank you very much.

8         Mr. Security Officer, we're going to switch over to

9    using the cord because this one is giving us technical

09:42  10   difficulties, so let's turn off that one.

11        And would you turn off the portable so there's no

12   interference.

13        THE BAILIFF:  (Complies.)

14        THE COURT:  All right.  Sir, let's go ahead and see

09:42  15   how this one works now.

16        JUROR FOUR:  My name is Abel Ferrer.  I was born in

17   1983.  I am a resident of Westchester.  I am a high school

18   graduate.  I currently am employed at Perry Ellis

19   International.  Number four is no.  Number five is no.

09:42  20   Number six, I do not have a spouse or significant other.  I

21   do not have any adult children.  I've never served on a jury

22   before.  And my hobbies are playing basketball, football,

23   sports, and number 12, is no.

24        THE COURT:  Thank you very much.

09:43  25        Let's see how we're going to do this with the cord.

1    **JUROR FIVE:**  Good morning.  My name is Rosimery

2   Gajer, I born in 1963.  I live in Miami Beach.  I was high

3   school.  My employment is I have a restaurant in Miami Beach.

4    Number four is no.  At this time, number five is

09:43  5   yes.  I have around 12 to 15 employees.  My spouse is work

6   with me.  We work in the restaurant together and still

7   working together.  And he supervises, yes, number seven.

8   Number eight is no.  My children, I have one teenager 17, I

9   don't know if that's adult yet.

09:44  10    **MRS. ROBBINS-BOBER:**  Teenager, probably thinks yes.

11    **JUROR FIVE:**  They think yes.  That one, yes.  So

12   he's in high school, senior.  I have a 19-year-old.  She's in

13   college in Robido (ph.).  She's a pilot, and my old one is 21

14   years old and he's studying in Israel.

09:44  15    Number 10 is no.  My hobbies, take care of my

16   family and my business is the only thing I do.  Number 12,

17   no, no.  Number 12 is no.

18    **THE COURT:**  Thank you very much.

19    **JUROR FIVE:**  Thank you.

09:45  20    **JUROR SIX:**  Good morning.  My name is Victor Marin.

21   I was born 1949.  I have a bachelor's in science from Florida

22   International University.  Currently, I'm retired, but I do

23   international sales for a packaging manufacturer and I also

24   own real estate, so I have employees.

09:45  25    Number four is no.  Number five, yes, I work for an

1  airline for 12 years and I supervise employees, and I

2  currently am the president of the (inaud.) Condominium

3  Association and I have employees, even though it's a non-paid

4  job, but I manage employees.

09:45  5      My spouse has a college education.  She has

6  supervised employees also.  Number eight, no.  Number nine,

7  yes, I have four children.  My oldest one is taking the bar

8  exam in February.  My second one has got an MBA, works for

9  Florida Power & Light.  My two daughters, one has a master's

09:46  10  degree in education, but she's a registered nurse now and my

11  youngest one is a registered nurse, too.  They work at

12  Baptist.

13      I have been called for jury duty, but I never

14  served.  My hobbies, I do voluntary work for the Department

09:46  15  of Elections, I do volunteer work for the tennis tournament.

16  I love to play tennis and I play soccer.  And number 12 is

17  no.

18      Thank you.

19      **THE COURT:**  Thank you very much, Mr. Marin.

09:46  20      **JUROR SEVEN:**  Good morning.  My name is Lucille

21  Smith Jones.  I was born in 1960.  Area of location is Miami

22  Gardens, where I currently live.

23      Educational background is college education.

24  Currently employed at Broward County Schools and past work

09:47  25  history is Broward County Schools.  Ever held a job where I

1   was not paid the minimum wages, yes.  When I first came to

2   Miami, Florida I worked as a warehouse seamstress sewing

3   clothes where I was paid at minimum wages.

4           No, I've never supervised.  My spouse currently is

09:47   5   military, worked at AT&T, and now he's retired.  No for

6   number eight and number nine.  I have two children currently.

7   One is in legal, she is a police officer.  And the other is

8   military and also a Corrections.

9           Have I ever served on a jury before?  No, I've been

09:48   10   called but never served.  And briefly my hobbies are bowling,

11   music and taking care of my grandchildren.

12           Yes, I had a family member currently is suing.

13           **THE COURT:**  Thank you very much.

14           **JUROR EIGHT:**  Good morning.  My name is Jeff

09:49   15   Ceremy.  I was born in the year of '88, February.  I live in

16   the Northwest Miami-Dade area.

17           Educational background, I have an AA in electrical

18   engineering and I'm also certified to be an a fire fighter

19   and EMT.  Current employment, I work as an operating engineer

09:49   20   at 600 Brickell.

21           Never had a dispute over pay or overtime.  I have

22   been a supervisor before.  Significant other, she's currently

23   studying at FIU, hospitality.  She's also a supervisor for

24   Disney Cruise Line.  No disputes over minimum wage or

09:50   25   overtime.

1       No children, number 10.  Never served.  I've been

2   called but never served as a juror before.

3       Hobbies, free writing, reading, music, athletics of

4   that sort.  And no family or myself involved in any lawsuits

09:50   5   that I would know of.

6       **THE COURT:**  Very good.  Thank you, Mr. Ceremy.

7       Mr. Losada.

8       **JUROR NINE:**  My name is Mark Losada.  I live in

9   Coral Gables.  I have a background in fire fighting, retired

09:50   10  fire fighter.  College degree in fire fighting.  Work history

11  I've already answered.  No.

12      Yes, I've held jobs where I've been paid less than

13  minimum wage.  No, never supervised anybody.  My wife owns a

14  business, supervises about 15 people.

09:51   15      Educational background, University of Miami degree.

16  Never been in any dispute over minimum wage or payment.  Two

17  children, one in college, one working at our business and

18  both have degrees.  One has a degree in marine sciences, the

19  other one has a degree in education.

09:51   20      I have served on a jury before.  Was not the

21  foreperson.  Bike riding, diving, boating, general.  Yes,

22  I've been involved in a lawsuit.  I sued City of South Miami.

23  That's it.

24      **THE COURT:**  Thank you very much, Mr. Losada.

09:52   25      **JUROR TEN:**  My name is Yvonne Miranda.  I was born

```
 1    in 1987 and I live in West Kendall.  Educational background,
 2    I have a master's degree in international education and
 3    development.  Currently I'm a middle school teacher.  I
 4    haven't had any problems with minimum wage.  I've never
 5    supervised anyone.  No spouse or significant other.
 6          Never been involved in a dispute.  No adult
 7    children.  Never served on a jury.  Hobbies is traveling, and
 8    I've never been in a lawsuit or have anyone close to me
 9    involved.
10          THE COURT:  Thank you, Ms. Miranda.
11          JUROR ELEVEN:  My name is Clayton Angus.  I was
12    born in 1955.  I live in Hialeah.  I have an associate's
13    degree in fire science and one in emergency medicine.
14          I recently retired 33 years with the Hialeah Fire
15    Department.  In the old days we used to work 56 hour weeks.
16    I supervised when I retired 259 people on the fire
17    department.  My wife is retired from Publix.  She was a
18    manager.  She supervised other people.
19          Number eight, no.  Number nine, my daughter is a
20    bookkeeper with college.  My son is a plumber.  No on number
21    10.  Number 11 is grand-kids, diving and fishing and boating.
22    And number 12 is no.
23          JUROR TWELVE:  Hello, my name is Raymond Morales.
24    I was born in 1975.  I live in Homestead.  I have two years
25    of college.  No legal training.  I currently work as an actor
```

09:52 — line 5
09:52 — line 10
09:53 — line 15
09:53 — line 20
09:53 — line 25

1    for Telemundo.  Previously graphic design.

2         Never had a dispute over minimum wage.  Never

3    supervised any employee.  I am single.  Never in a dispute

4    over minimum wage also.  No adult children.  No children.  I

09:54    5    served on a jury before.  That was a couple of years ago to

6    the date.  I was not the foreperson.  I reached a verdict.

7         Hobbies, horseback riding, traveling and, yes, my

8    mom and my step-dad were part of a class action lawsuit about

9    three years ago.  The case was that famous Chinese drywall in

09:54   10    South Dade, and they won the case.

11         That's it.  Thank you.

12         **THE COURT:**  Thank you very much, Mr. Morales.

13         **JUROR THIRTEEN:**  Abigail Watts-Fitzgerald, born in

14    1952.  Live in Coral Gables.  I have a BA, an MA and a JD.

09:55   15    Work history, Arnold & Porter in D.C. when I got out of law

16    school, Steel, Hector & Davis, Hunton & Williams and

17    currently with my own small firm.  Left big law.

18         Four, no.  Yes, I have supervised employees over

19    the years.  My spouse is an assistant district attorney,

09:55   20    prior occupation he was Coast Guard academy.  Coast Guard put

21    him through law school, we met in law school.  He's got a JD,

22    and as I said, he's an assistant attorney since 1985.  He

23    does supervise employees.

24         I have not been in a dispute over overtime wages

09:55   25    but anyone close, my clients, I have advised clients on FLSA,

1    so my clients are close to me.

2           Three adult children.  My eldest got her JD and is

3    working at the U.S. Patent and Trademark office.  My girl-boy

4    twins, he's a senior data scientist, has an engineering

09:56    5    degree, master's, and she just got her master's from Columbia

6    and is working with the Environmental Protection Agency.

7           I have been called to jury duty, but I haven't

8    served.  Hobbies, athletics, skiing, SCUBA diving, boating.

9           Other than class action lawsuits, no, I've not been

09:56   10    involved in or no one close to me.

11           THE COURT:  Thank you, Ms. Watts-Fitzgerald.

12           JUROR FOURTEEN:  My name is Charles Betancourt.  I

13    was born October 23, 1987 in Westchester.  That's where I

14    live right now.  My educational background, I have an AA in

09:56   15    nuclear medicine, technologist.  Graduated from high school.

16    I am currently employment in Casino Miami as accounting

17    clerk, counting the money for the casino.

18           I have never had a dispute with minimum wage or

19    overtime.  I have never supervised anybody.  I do not have a

09:57   20    significant other, so therefore, number seven is no.  Number

21    eight, no.  I do not have any children.

22           Number 10, I've never served on a jury before, I've

23    been called but never served.  Number 11, my hobby would be

24    I'm a musician, and number 12 is no, I've never been in a

09:57   25    lawsuit.

1        **THE COURT:**  Thank you, Mr. Betancourt.

2        **JUROR FIFTEEN:**  Good morning.  My name is Dora

3   Taleno.  I was born in 1969 and I live in West Kendall.  I

4   have an AA in business.  I work full-time for an insurance

09:57   5   company.  I've been there for about 21 years.  About 15 years

6   ago the company was owned by a different company and there

7   was an issue involving overtime.  And we were paid a lump sum

8   because there was no formal recording of the hours that we

9   were working.  We were paid a lump sum afterwards after a

09:58   10   review.

11        Yes, I have supervised employees.  My husband's

12   currently in IT and he does have some college background as

13   well.  I have two minor kids.  And I've been called to jury

14   duty, the most recent was in June of last year.  But I have

09:58   15   not served on a jury.

16        And hobbies is baking basically, and yes, we do

17   have a close friend who is involved in a lawsuit right now

18   against the city.

19        **THE COURT:**  Thank you very much, Ms. Taleno.

09:58   20        **JUROR SIXTEEN:**  Good morning.  My name is Phillip

21   Kierschke.  I was born in 1974.  I live in the upper east

22   side of Miami.  I have some college and I have a certificate

23   of travel and tourism.

24        I'm employed by American Airlines as a flight

09:59   25   attendant.  I've been there for 16 years.  And before that I

1    was in other travel jobs.

2         Never in -- I've never had a job where I wasn't

3    paid at least minimum wage.  I have supervised employees.  No

4    spouse, no children.  I guess that brings us down to number

09:59  5    10.  I have served on a jury before, I was chosen.  It was a

6    murder case and about three days into the trial, it was

7    cancelled, so we didn't have to make a verdict.

8         My hobbies are music and travel.  Well, I guess

9    that's work, too, but -- and I have been in a lawsuit against

09:59  10   Miami-Dade County and Johnson Controls, something to do with

11   the airport.  That's it.

12        **THE COURT:**  Thank you very much.

13        **JUROR SEVENTEEN:**  Good morning.  My name is Moses

14   Murray.  I was born in 1969.  I currently live in the Miami

10:00  15   Gardens area.  High school.  I work currently as a valet.

16        Number four, no.  Number five, no.  My wife

17   currently owns her own business.  College education.  Yes,

18   she supervise, number seven.  Number eight, no.

19        Yes, I got four kids, 25, 21, 20 and 17.

10:01  20        **THE COURT:**  Nice.

21        **JUROR SEVENTEEN:**  High school, university, college

22   graduate, teacher, studying law.  Number 10, no, I was

23   selected but never served.  Hobbies, not really.  And number

24   12, no.

10:01  25        **THE COURT:**  Thank you, Mr. Murray.

1          **JUROR SEVENTEEN:**  You're welcome.

2          **THE COURT:**  Last, but not least.

3          **JUROR EIGHTEEN:**  Good morning.  My name is Gerry

4     Dale.  I live in West Miami-Dade.  I have a master's degree

10:01  5     in business.  Currently I'm employed with the Department of

6     Defense.  And also my wife works for the Department of

7     Defense.  And currently neither one of us is supervising.  We

8     have in the past.

9          We have no disputes with minimum wage.  Never had

10:02  10    worked for less than minimum wage.  No children.

11          I have served on a jury before, I have been called.

12    We did make a verdict, but I was not the foreman.

13          Hobbies, I enjoy golf, SCUBA, woodworking.  And

14    none of my family members are involved in a lawsuit or ever

10:02  15    went to law school.

16          Thank you.

17          **THE COURT:**  Thank you very much.

18          Mr. Losada, we heard that you had served on a jury

19    not a foreperson, but did the jury reach a verdict?

10:02  20          **JUROR NINE:**  I served twice.

21          **THE COURT:**  All right.

22          **JUROR NINE:**  I served twice.  Once the verdict was

23    not guilty.  It was a criminal trial.  And once the verdict

24    was guilty and that was a civil trial.

10:02  25          **THE COURT:**  All right.

 1          **JUROR NINE**:  Don't ask me specifics.

 2          **THE COURT**:  No.  Not at this time.

 3          **JUROR NINE**:  My memory is not that good.

 4  (Laughter).

10:03  5          **THE COURT**:  Thank you very much.

 6          Yes, sir.  You have a question?  Wait for the --

 7          **JUROR ONE**:  I was the first one answering the

 8  question.  Looks like I missed two of them.  Number two, I am

 9  bachelor degree and minister.  Number nine, I have two

10:03 10  children, one boy, one girl.  The boy right now he's engineer

11  in Microsoft and my daughter, she's lawyer, and she working

12  in Washington, D.C.

13          Thank you for allowing me.

14          **THE COURT**:  Thank you very much.

10:03 15          Thank you very much, ladies and gentlemen, for your

16  participation.  I now have some general questions for you.

17  Please listen carefully.

18          If you are selected to sit on this case, will you

19  be able to render a verdict solely on the evidence presented

10:04 20  at the trial and in the context of the law as I will give it

21  to you in my instructions, disregarding any other ideas,

22  notions or beliefs about the law that you may have

23  encountered in reaching your verdict?

24          Is anyone unable to do this?  Seeing no hands.

10:04 25  Thank you very much.  I take it that everyone will be able to

1    do this.

2           Second question, is there any member of the jury

3    panel who has any special disability, language barrier or

4    problem that would make serving as a member of the jury

10:04    5    difficult or impossible?  You need not publically state any

6    such difficulty, just if you do, raise your hand, and we will

7    address it privately.

8           (Juror Number One raised his hand.)

9           **THE COURT:**  All right.  Thank you very much.

10:05    10          Does any other reasons suggest itself to you as to

11   why you could not sit on this jury and render a fair verdict

12   based on the evidence presented to you and in the context of

13   the Court's instructions to you on the law?  Any other reason

14   why you could not sit in this jury?

10:05    15          I see no hands.  Thank you very much.

16   Mr. Aurelien, would you like come to side-bar and speak

17   privately?

18          **JUROR ONE:**  Yes.

19          **THE COURT:**  All right.  You would like to speak

10:05    20   privately?

21          **JUROR ONE:**  Privately, yes.

22          (Thereupon, there was a side-bar conference outside

23   the presence and hearing of the prospective jurors.)

24          **THE COURT:**  All right.  The noise is so no one else

10:06    25   will hear.  So go ahead and state your issues, sir.

1    **JUROR ONE:** All right. The reason why I couldn't,

2  I don't speak English clearly, you know, because my sometimes

3  (inaud.)

4    **THE COURT:** You do not speak too much English, you

10:06  5  might miss something?

6    **JUROR ONE:** Yes, exactly.

7    **THE COURT:** All right, sir. Any other concerns?

8    **JUROR ONE:** No.

9    **THE COURT:** Just the language?

10:07  10    **JUROR ONE:** Yes. Because I don't want to miss

11  something perfectly on it.

12    **THE COURT:** I appreciate that, sir. Thank you very

13  much.

14    **JUROR ONE:** Thank you.

10:07  15    **THE COURT:** Take your seat.

16    **JUROR ONE:** (Complies.)

17    (Thereupon, the side-bar conference was concluded.)

18    **THE COURT:** All right. Thank you very much, ladies

19  and gentlemen, for your participation.

10:07  20    At this time, counsel will be permitted to ask

21  additional questions of you. I have limited the time that

22  they have for this. And I am sure that they will appreciate

23  your close attention.

24    Mr. Bober?

10:07  25

1        ***VOIR DIRE EXAMINATION***

2              MR. BOBER:  Good morning.

3              THE JURY:  Good morning.

4              MR. BOBER:  I wanted to ask whether anyone in the

10:08    5   jury panel has ever had the ability to hire or fire anybody

6        as part of their job?

7              (Several hands up).

8              MR. BOBER:  Starting over here since you went last

9        before, Mr. Dale.

10:08   10             JUROR EIGHTEEN:  Yes.

11             MR. BOBER:  Can you tell me about that?

12             JUROR EIGHTEEN:  It was -- part of my

13       responsibility was doing the hiring and the firing.

14             MR. BOBER:  What was your position, sir?

10:08   15             JUROR EIGHTEEN:  At that time, program manager.

16             MR. BOBER:  Program manager.  Thank you very much,

17       sir.

18             Who else raised their hand.  I'm sorry.

19       Ms. Taleno.

10:08   20             JUROR FIFTEEN:  Yes, I was working as a call center

21       manager and I was hiring the staff and, unfortunately, we had

22       to let go of some people as well.

23             MR. BOBER:  Thank you very much.  I appreciate it.

24             And who else had their hand up?  Okay.  I'm sorry,

10:09   25       is it Ms. Watts-Fitzgerald?

1      **JUROR THIRTEEN:**  Yes, I'm currently in a firm of

2   which I'm co-owner and I, therefore, have the ability to hire

3   and fire.

4      **MR. BOBER:**  Okay.  Thank you.

10:09   5      Yes, sir, Mr. Clayton.

6      **JUROR ELEVEN:**  Yes, I was -- as the fire chief for

7   Hialeah, that was the final decision rested on me.

8      **MR. BOBER:**  Thank you, sir.  And I think there was

9   someone else.  Yes, sir, Mr. Ceremy.

10:09   10      **JUROR EIGHT:**  I was at the time director of

11   security for one of the buildings downtown so, as he said,

12   that was part of my responsibility as well.

13      **MR. BOBER:**  Super.  Thank you so much.  And?

14      **JUROR SIX:**  Yes.  When I worked for an airline, I

10:09   15   was able to interview and hire people, and also as I had been

16   an interpreter, I went to New Orleans after the hurricane and

17   I bought homes and I had people working for me, and I hire

18   and fire.

19      And now as a president of the condominium

10:10   20   association, I hire and fire employees, too.

21      **MR. BOBER:**  Thank you very much, sir.

22      Ms. Gajer.

23      **JUROR FIVE:**  Yes.  We have a restaurant in Miami

24   Beach and the restaurant business is very rotative, so I have

10:10   25   to hire and fire all the time.

1       **MR. BOBER:**  Thank you very much.  Is there anybody

2  in the front row?  Okay.  Thank you so much.

3       Now, as part of this case, Mr. Rosario is seeking

4  damages, money damages.  Is there -- does anybody on the jury

10:10  5  panel have an objection to awarding him damages, money in

6  this case, if the law says he's entitled to it?  Would anyone

7  have a problem doing that if that's what the law says you

8  have to do?

9       Okay.  Does anyone disagree with the idea that if

10:11  10  someone works more than 40 hours a week, they have to be paid

11  overtime for it if the law requires it?  Anyone have a

12  problem with that?  Okay.

13       Does anyone disagree with the idea that an employer

14  must pay employees a minimum wage if they do work and the law

10:11  15  requires it?  Anyone have a problem with that?  Okay.

16       I'd like you to -- anyone on the panel to raise

17  their hand if you ever worked somewhere where your boss

18  called you an independent contractor.  Did anyone ever have

19  that happen to them or anything like that, instead of calling

10:11  20  them an employee or anything like that?

21       **JUROR FIFTEEN:**  My husband.

22       **MR. BOBER:**  Ms. Taleno, would you like to tell me

23  about that?  Thank you.

24       **JUROR FIFTEEN:**  My husband was working for a law

10:12  25  firm and instead of -- even though he was working over 40

1   hours, he was working about 70 to 80 hours a week, they just

2   considered him as an independent contractor the whole time at

3   the end of the year.  And he ended up like getting a 1040 or

4   something form.

10:12   5   **MR. BOBER:**  1099 form.

6   **JUROR FIFTEEN:**  1099 form, which was more costly to

7   us because of all the taxes and everything that we had to do

8   at the end of the year.

9   **MR. BOBER:**  Thank you so much.  Anyone else?

10:12   10   Super.  Thank you, Ms. Taleno.

11   Has anybody had a job where they worked and they

12   only received tips, no pay, just tips, as part of their work?

13   Anyone ever have that experience?

14   Has anyone had a job where they got tips as part of

10:13   15   their wages?  Okay.  I'll start up here.

16   Ms. Gajer.

17   **JUROR FIVE:**  Yes.

18   **MR. BOBER:**  Where were you working when that

19   happened?

10:13   20   **JUROR FIVE:**  I have a restaurant.  They have a

21   minimum wage, plus the tips.  They working for the salary

22   plus the tips.  It's not only tips, if I understand your

23   question.

24   **MR. BOBER:**  Right, so you're saying that you have

10:13   25   employees who get tips?

1          JUROR FIVE:  Yes.

2          MR. BOBER:  In addition to what you pay them?

3          JUROR FIVE:  Yes.

4          MR. BOBER:  Do you mind if I ask you and come back

10:13   5   to you, since you own a restaurant where you have tipped

6   people working for you, how do you feel about the minimum

7   wage laws seeing as how you have to pay minimum wage to those

8   workers?

9          JUROR FIVE:  Well, it's a part of the job.  If they

10:13   10   do a good job they get more tips, so the minimum wage for the

11   tip hours is very low.  So in that case, in my case, so if

12   they have a good job they get a better salary which is the

13   tips.  And I agree with that.

14          MR. BOBER:  And how do you feel as an employer

10:14   15   about having to pay your employees the minimum wage as

16   opposed to just letting them keep the tips and you're not

17   paying them anything?

18          JUROR FIVE:  It's about the law.  You have to

19   follow the law.  The law says you have to pay the hourly plus

10:14   20   the tips.

21          MR. BOBER:  Thank you very much.  I appreciate it.

22   I know -- yes, Ms. Watts-Fitzgerald, if you could tell me

23   about your experience with that.

24          JUROR THIRTEEN:  Yes, I put myself through college

10:14   25   and my master's program working as a waitress and got minimum

1   wage and tips.

2          MR. BOBER:  Okay, thank you very much.  I saw there

3   were a few other hands.  Okay.  Mr. Kierschke.

4          JUROR SIXTEEN:  I just worked as a waiter tip

10:14   5   position.

6          MR. BOBER:  And when you were working as a waiter

7   you were paid tips from customers?

8          JUROR SIXTEEN:  Yes.

9          MR. BOBER:  And your boss also paid you a minimum

10:14   10   wage?

11         JUROR SIXTEEN:  Yeah.

12         MR. BOBER:  Super.  Thank you, sir.  Were there any

13   other hands?  Yes, sir.  Mr. Betancourt?

14         JUROR FOURTEEN:  Same thing, I used to work at

10:15   15   Bennigan's and I got tips through college, same thing, but I

16   didn't have any problems with it.  It was fine.

17         MR. BOBER:  And they paid you minimum wage?

18         JUROR $14:  Yeah, minimum wages and tips.  It was

19   fine.

10:15   20         MR. BOBER:  Any other person that I missed?  Great.

21   Thank you so much.

22         I'm going to give you a hypothetical example.  I'd

23   like to see what you think about this.

24         Imagine you're a waiter and you work at a

10:15   25   restaurant and you do make a lot of money in tips, maybe $200

1    a night.  If you make that kind of money in tips working on a

2    single night, does anybody think that because you are making

3    that kind of money of tips, your boss should have to pay you

4    nothing as wages?

10:15   5         Does anyone think that the employer should have to

6    pay nothing if the person is making good tips?

7         (No hands raised).

8         MR. BOBER:  Now, one question I have for you is if

9    the law says that you have to look at the reality of a

10:16   10   working relationship in a business between the employer and

11   the employee, and there's the label of independent contractor

12   that the parties may call it, would you be able to follow the

13   law if that would say it doesn't matter what the parties

14   called the relationship, it's important what the law calls

10:16   15   the relationship?  Does that make sense?

16        Does anyone have a problem following what the law

17   says you have to do regardless of what the parties may have

18   called themselves?  Anyone object to that?

19        JUROR SIX:  Does that mean employee to employer

10:16   20   relations?

21        MR. BOBER:  Let me give you an example.  For

22   example, sir, if you work in a place and your boss calls you

23   an independent contractor, let's assume you worked there for

24   a long time, and you call yourself an independent contractor,

10:17   25   do you think that that means you are employed as an

| | |
|---|---|
| 1 | independent contractor just because your boss says you are? |
| 2 | What do you think about that? |
| 3 | **JUROR SIX:** No. |
| 4 | **MR. BOBER:** You think that -- would everyone agree |
| 10:17 5 | to follow what the laws says you have to call that |
| 6 | relationship regardless of what the employee-employer call |
| 7 | it? Does anyone have a problem following what the law |
| 8 | requires as far as that? |
| 9 | **MR. McDONALD:** Sorry, I couldn't see who answered |
| 10:17 10 | that last question. |
| 11 | **THE COURT:** Mr. Losada, do you have any other? |
| 12 | **JUROR NINE:** Yes, I have a problem with the line of |
| 13 | questioning that you're coming up with because it almost |
| 14 | seems like you're presenting the trial at this point and |
| 10:17 15 | you're asking questions that I see as a defendable position |
| 16 | by either party. |
| 17 | So I'd rather not answer it in a general form. I |
| 18 | saw that as a problem. |
| 19 | **MR. BOBER:** Okay. I understand. Well, as I think |
| 10:18 20 | I made the Judge explained before, in every case, every case |
| 21 | is different and not every juror is right for every trial |
| 22 | based on maybe biases, and one of the things that we're doing |
| 23 | here today is to figure out maybe you have a bias or you |
| 24 | think certain laws are unfair and you think that things |
| 10:18 25 | should be done differently. That's what we're trying to do, |

1    and after I sit down, the defense attorney will ask probing

2    questions to try to figure out whether this is the right jury

3    for you based on your experiences, based on your biases,

4    maybe prejudices and maybe a different jury might be right

10:18   5    for you.  That's why I was asking those questions.

6           **JUROR NINE:**  Fair enough.

7           **THE COURT:**  One moment, Mr. Bober, I already asked

8    the jury panel if they could follow the law.  And I saw that

9    all of them sort of responded yes, by not raising their hand

10:18  10    that they had any difficulties.

11           So I appreciate Mr. Losada's concern.  I think that

12    maybe, Mr. Bober, what he's trying to explain is more the

13    experiences of the jurors and how they are -- they see things

14    in a more detailed way than the general question that I

10:19  15    asked.

16           I have been assured by all of you that you can put

17    aside your personal ideas and follow the law as I instruct it

18    to you.  So I think maybe it's not so much the question of

19    bias as more of life experiences.  And I think maybe to

10:19  20    assist in clarifying what Mr. Bober was saying is just in

21    general, a question just like he was asking the questions, if

22    the law requires that you pay minimum wage, do you agree with

23    that, those kinds of things.

24           Here, basically his question is more along the

10:20  25    lines of if the law says something must be a certain way, are

1    you willing to follow the law regardless of what people are

2    calling that relationship.

3          So I think that you all assured me that you were

4    able to follow the law in general ways, so maybe in this

**10:20**  5    specific instance, are you willing to follow the law

6    regarding relationships regardless of what the parties to

7    those relationships designate them, regardless of the label

8    that the parties to the relationship put on it?

9          Does that maybe assuage your concerns, Mr. Losada?

**10:20**  10    **JUROR NINE:**  We will see.

11    **THE COURT:**  All right, sir.  Thank you very much.

12          All right.  Mr. Bober, so you can move on now.

13    **MR. BOBER:**  Thank you, Mr. Losada.  In this case,

14    it involves someone called a disk jockey.  Anyone not heard

**10:21**  15    the term disk jockey before or the phrase?  Does anyone here

16    not know what a deejay is?  Everyone understands what that

17    means?

18          **THE JURY:**  (Nodding affirmatively).

19    **MR. BOBER:**  Now, this case involves someone who was

**10:21**  20    a deejay who worked at a strip club.  Now certain people may

21    have certain feelings about strip clubs, good, bad.

22          Does anybody here have any feelings one way or the

23    other about strip clubs that would prevent them from being

24    fair and impartial to both the plaintiff and the defendants?

**10:21**  25          Anyone maybe have an experience that was positive

1   or negative that they think might influence them one way or

2   another for our side or their side that they would like to

3   raise their hand and tell me about?

4          **THE COURT:**  And again, without in any way impinging

10:22   5   on your privacy.  If there are any general concerns

6   regarding -- and this kind of goes to the nature of the case

7   in general, if there are any concerns regarding that, you may

8   ask to speak to us privately.

9          (No hands raised.)

10:22   10          **MR. BOBER:**  Okay.  Very good then.  Is there

11   anything about this case maybe that you've heard so far that

12   the Judge told you or some of the questions I've been asking

13   that would make you hesitate to want to sit on this

14   particular jury and maybe think, maybe I'm not right for this

10:22   15   jury, maybe I'm right for another jury?

16          Anyone feel that way in the last few minutes that

17   this may might not be the right case for you based on

18   anything that was said?

19          (No hands raised.)

10:23   20          **MR. BOBER:**  One other question I'd like ask is,

21   have either you or a family member ever been fired for

22   complaining about a legal violation or asserting your legal

23   rights to your boss?  Anyone been fired or know someone who

24   has been fired for complaining to their boss and asserting

10:23   25   their rights on some particular issue?  That ever happen to

anybody?  Okay.  Thank you.

　　　　　Does anybody in this room think that there are just simply too many lawsuits and that it's taking up too much time and clogging our court system and people are just trying to go to court to get free money?  Any type of thought like that?

　　　　　Does anybody feel that way that the court systems are just clogged with people trying to get something for nothing?  I saw three hands, and if anybody thinks that they might -- they're kind of on the fence and change their mind and want to raise their hand, that's okay, too.

　　　　　So let me start with Mr. Ceremy.

　　　　　**JUROR EIGHT:**  Yes, I do believe that these days a lot of people are just trying to sue just for a come-up.  No particular reason.

　　　　　There are reasons why people do come to court and, you know, they fight their case for a particular reason.  That is ideal and correct, I would say for a good reason, but there is also another reason, which is not for the right cause.  They're just doing it to come up on some money or something.

　　　　　**MR. BOBER:**  You think a lot of people make up things that don't exist and then go to court?

　　　　　**JUROR EIGHT:**  Right.

　　　　　**MR. BOBER:**  Very good.  Thank you, sir.  Ms. Watts-

1    Fitzgerald, I think you had your hand up as well.

2            JUROR THIRTEEN:  I've been a corporate lawyer for

3    36 years.  I act as outside general counsel for a variety of

4    companies.  So I see litigation all the time which I find

5    utterly absurd.

6            Also, in my personal life I once had a nanny who

7    was drinking, tripped on the sidewalk and sued the city and I

8    just have seen a lot of ridiculous lawsuits out there.  So I

9    have no tolerance.

10           MR. BOBER:  I know that you mentioned before,

11   Ms. Watts-Fitzgerald, that you give advice to people

12   regarding the FLSA.  Was that companies or employees?

13           JUROR THIRTEEN:  Employers.

14           MR. BOBER:  Thank you very much.  Thank you.

15           And Mr. Angus.

16           JUROR ELEVEN:  Yes.  I don't think I'll have a

17   problem being fair following the law, but 17 years on a

18   rescue truck dealing with emergency rooms, and I got to be

19   honest with you, I think it's crazy.  I think in my opinion

20   that's why the cost of medicine in this country has

21   skyrocketed because doctors have to CYA and they're afraid of

22   lawsuits, and I personally think that that has affected the

23   cost of medicine in this country because everybody does --

24   they don't try to do healing medicine.  They're doing

25   preventing being sued medicine.

1           But at the same point, I don't think I would have a

2     problem being fair and impartial.

3           **MR. BOBER:**  Thank you very much.  Thank you for

4     your honesty, sir.

10:26    5           Anybody else who had -- Ms. Jones.

6           **JUROR SEVEN:**  I agree with him.  There is a lot of

7     people who don't want to work and they're trying to find a

8     quick fix to get a dollar.  That bothers me.

9           Now I have to stop my job to come here and that

10:26   10    bothers me.  And then I have to drive from way North Miami

11    through a whole bunch of traffic where you got these people

12    who don't know how to drive, and I'm trying to get here.

13          **MR. BOBER:**  So let me ask you this question,

14    Ms. Jones.  And, obviously, you're right, everybody here did

10:27   15    take time away from what they normally would have done today.

16          **JUROR SEVEN:**  Exactly.

17          **MR. BOBER:**  Inconvenienced definitely.  Do you feel

18    that because you didn't really want to be here, that will

19    that prevent you in some way from being fair and impartial if

10:27   20    you are seated on this jury?

21          **JUROR SEVEN:**  Well, legally I'm going to do what I

22    need to do because I'm just that type of a person.  But

23    inconvenience, yes.  Don't want to be here?  No, I don't want

24    to be here.  But legally, I have to do what I need to do.

10:27   25          **MR. BOBER:**  Do you think that that might impact the

1   way you hear the evidence, the fact that you don't want to be

2   here?  Is that going to affect you in how you listen to one

3   side versus the other side?

4          **JUROR SEVEN:**  No, I don't think that it will.  No.

10:28   5          **MR. BOBER:**  Thank you, Ms. Jones.  Thank you for

6   your honesty.

7          **THE COURT:**  Thank you, Ms. Jones.  I appreciate

8   your last answer.  I think we all do.

9          As I stated at the beginning, voting and serving on

10:28   10   a jury obviously disrupts people's daily lives and are

11   inconveniences, but all you need to do is turn on the news

12   and see the people who risk their lives to vote and risk

13   their lives to live in a democratic society.

14          So we are all inconvenienced and I wholeheartedly

10:28   15   agree with you regarding the traffic in Miami.  It is

16   terrible.  I just came back from Los Angeles.  If you can

17   believe it, it's worse over there.

18          So thank you for your answers and your honesty.

19          **MR. BOBER:**  Thank you.  Now I think that there were

10:29   20   a few of you that answered questions about your hobbies and

21   some of you said that one of your hobbies is music, I think

22   there might have been two or three people that had an

23   interest in music.  Who were those folks?

24          Can you tell me -- is it Mr. Betancourt, right?

10:29   25   Can you tell me about your hobby with music.

1              JUROR FOURTEEN:  I'm a drummer for a band and I

2    play live shows sometimes, but not strip clubs.

3              MR. BOBER:  Thank you for your honesty.

4              JUROR FOURTEEN:  But no, we just play music so I'm

10:29    5    in the scene, I guess you can say.

6              THE COURT:  Thank you very much.  Mr. Kierschke.

7              JUROR SIXTEEN:  I just studied music in high school

8    and college and I play instrumental music.

9              MR. BOBER:  Super.  Thank you, sir.

10:30   10              Now, a number of you were asked on the page that

11    you got of the different questions about whether you were a

12    supervisor or you had a spouse that was a supervisor.

13              For the people who raised their hand or said that

14    they were supervisors, is there anything about your work as a

10:30   15    supervisor that you think might make you more sympathetic to

16    an employer versus an employee?  Anyone have that experience

17    where you think maybe an employer is more likely to be in the

18    right in a particular situation if it's a he said-she said

19    type of case, for example, that the employer is more likely

10:30   20    to be telling the truth or more likely to be right because

21    it's management, it's the employer.  Anyone think that?

22              I think that was it Mr. Marin.  I think you said

23    you had supervised.  Would that affect you, do you think?

24              JUROR SIX:  No, not at all.

10:31   25              MR. BOBER:  And Mr. Angus, having worked in public

1     service for so many years as a manager?

2                  **JUROR ELEVEN:**  Right.  No, I have no problem.

3                  **MR. BOBER:**  And I think there were several other.

4           Mr. Ceremy, anything like that with you?  I know

10:31  5     you did some supervisory work.

6                  **JUROR EIGHT:**  Right, but I believe that all bosses

7     are different.  All supervisors are different.

8                  **MR. BOBER:**  Very good.  Does anybody know anybody

9     either in their family or a friend who was fired for

10:31 10    something that they thought the employer had done in

11    violation of the law?  They were fired maybe because they

12    complained or they were fired because of something that the

13    employer did that broke the law?  Anything like that?  Family

14    member, close friend?  Any terminations like that?  Okay.

10:32 15           (No hands raised.)

16                 **THE COURT:**  Mr. Bober I think you're coming up to

17    your 20 minutes.

18                 **MR. BOBER:**  Well, then I'll end it right there.

19    Thank you.  Thank you.

10:32 20           **THE COURT:**  Mr. McDonald?

21

22                 ***VOIR DIRE EXAMINATION***

23                 **MR. McDONALD:**  Good morning, ladies and gentlemen.

24    Again, my name is David McDonald and when I sit there

10:32 25    sometimes I can't see everyone because of the podium.  So

1    when I got up for Mr. Marin, for example, I heard a voice,

2    but I couldn't see the face so -- as you see, and I know

3    Ms. Watts-Fitzgerald probably knows the answer to this

4    question.  I'm going second today and will throughout the

10:33   5    trial.

6         Does anyone else know other than -- I'm assuming.

7    Ms. Watts-Fitzgerald you know.  Anyone else know why I'm

8    going second?

9         Well, because I'm the Defendant.  I'm the

10:33   10    Defendant.  We are the ones being sued.  We're not doing the

11    suing.  And as the Defendant, we have to defend the claim.

12    The Plaintiff has to come here and present and prove their

13    case, that what they're saying is correct.  So the reason I

14    bring this up is because we all have different personality

10:33   15    types.  Some of us hear something and make a decision right

16    away.  Others will leave it -- wait until the end to make a

17    decision, and hear things and then the last thing they hear

18    is what they decide.  Some people, it's the first thing they

19    hear is what they decide.

10:33   20         Does anyone in here have that quick decisionmaking

21    type of personality?

22         (No hands raised.)

23         **MR. McDONALD**:  Now, how many people -- has anyone

24    here already started to make up their mind about the case

10:34   25    even though we haven't put on any evidence?  Is there anyone

```
         1    who has sort of had -- maybe already leaning one way or

         2    another?

         3              You all agree with me that hearing all the evidence

         4    in a case before making up their mind is important, to

10:34    5    everyone, but especially to me as the person who goes second?

         6              Mr. Aurelien, do you understand why that's

         7    important and do you think you can keep an open mind

         8    throughout the whole trial if you're selected on the jury?

         9              JUROR ONE:  No.

10:34   10              MR. McDONALD:  I'm sorry, no?

        11              JUROR ONE:  No.

        12              MR. McDONALD:  Why not?  Do you think you're going

        13    to make up your mind quickly at some point before you hear

        14    all the evidence?

10:34   15              JUROR ONE:  Yes, I have to take --

        16              MR. McDONALD:  I'm sorry, I apologize.

        17              JUROR ONE:  I said I have to take some time to

        18    understand it.

        19              MR. McDONALD:  Okay.  How about you, Mr. Alvarez?

10:35   20    Do you think hearing -- waiting until all the evidence comes

        21    in before making up your mind, is that something you can do

        22    in a case like this?

        23              JUROR TWO:  Yes.  Yes.

        24              MR. McDONALD:  And do you understand the

10:35   25    significance of that with each witness, sometimes there's a
```

1   new twist?

2            JUROR TWO:  Yes.

3            MR. McDONALD:  How about, Ms. Robinson, do you also

4   agree?

10:35   5            JUROR THREE:  Yes.

6            MR. McDONALD:  Mr. Ferrer?

7            JUROR FOUR:  Yes.

8            MR. McDONALD:  Yes, I tend to wander.  I apologize.

9   And rather than going one by one, the second row, anyone else

10:35  10   agree that they can wait until all the evidence comes in,

11   hear the whole case before deciding the case?

12            I mean, I know sometimes in a movie you'll watch

13   the whole movie and at the end you see something and it

14   catches you by surprise, and you say, wow, I was thinking it

10:36  15   was going to go a different way.  And the same in the back

16   row.

17            And I appreciate it, Mr. Aurelien, that you told us

18   that because we're trying to pick who will be the best jury

19   for us.  So your candor is very appreciated.

10:36  20            JUROR ONE:  Thank you.

21            MR. McDONALD:  Anyone in the back row that thinks

22   they're going to have that type of personality, then shuts

23   off to everything else?

24            Ms. Watts-Fitzgerald, how about yourself?  Do you

10:36  25   tend to be a quick decisionmaker or do you think you can hear

1    all the evidence before coming to a decision if you're

2    selected on the jury.

3            JUROR THIRTEEN:  I would certainly hope I would

4    wait for all the evidence.

10:37  5        MR. McDONALD:  Any question or concern that you

6    wouldn't be able to do that?

7            JUROR THIRTEEN:  No.

8            MR. McDONALD:  Now, your practice, does it include

9    advising clients on things like the Fair Labor Standards Act?

10:37 10        JUROR THIRTEEN:  As I indicated, I act as outside

11   general counsel for a variety of companies over the last 36

12   years.  Acting as outside general counsel, you basically act

13   as a conduit between senior management as your client, and

14   they come to you with their problems and you find the

10:37 15   solutions, whether you have them yourself or somebody else in

16   the firm.

17            So I've had a lot of FLSA.  FLSA has been very hot,

18   shall we say, in the last few years, so there have been a lot

19   that have crossed my desk coming from my clients on a variety

10:38 20   of issues.  So I'm familiar with the area of the law.

21            MR. McDONALD:  So you do a lot of advising to

22   clients in that area?

23            JUROR THIRTEEN:  (Nodding affirmatively).

24            MR. McDONALD:  And if at the end of the trial the

10:38 25   Judge reads the law to you --

1      JUROR THIRTEEN:  I've read it.

2      MR. McDONALD:  And if perhaps what the Judge reads

3   as the law, you may interpret differently, would you be able

4   to follow the Judge's instructions versus -- will you be able

10:38   5   to separate what she tells you versus maybe what your own

6   personal knowledge is about the law?

7      JUROR THIRTEEN:  I would hope so, Your Honor, but

8   I've been practicing 36 years.  But I would hope that I would

9   follow Her Honor.

10:38   10      THE COURT:  Well, let me just make a comment.

11   Everyone in the jury is equal.  So everyone obviously is

12   under the duty to follow the laws, and the instructions on

13   the law as I provide them.  Just like everybody is required

14   to put aside their ideas and their inclinations.  So --

10:39   15      JUROR THIRTEEN:  I can certainly set aside

16   inclinations and ideas.  My legal training I don't know that

17   I can, but I would certainly defer to Your Honor.

18      THE COURT:  Well, as a seasoned attorney I would

19   think that it's something that you would obviously endeavor

10:39   20   to do.

21      JUROR THIRTEEN:  Absolutely.

22      MR. McDONALD:  And Ms. Watts-Fitzgerald, you would

23   understand why that's important to both parties?

24      JUROR THIRTEEN:  Absolutely.

10:39   25      MR. McDONALD:  Traveling under a set of laws that

1    the expectation that the jurors are going to follow what the

2    law that the Judge instructs versus perhaps somebody's own

3    judicial knowledge?

4         **JUROR THIRTEEN:**  My interpretation of it.  I

10:40  5    understand that.

6         **MR. McDONALD:**  Now, I know a number of you raised

7    your hand -- a number of you raised your hand about having --

8    working for tips, having a -- getting -- a waitress or a

9    waiter getting a partial minimum wage, and then working for

10:40  10   tips and I know a lot of hands went up.

11        And Ms. -- is it Ms. Gajer?

12        **JUROR FIVE:**  Gajer.

13        **MR. McDONALD:**  Gajer, I'm sorry.  I'm going to talk

14   to you because, one, I could see you very well and I saw your

10:40  15   hand go up.

16        You have waiters and waitresses in your restaurant?

17        **JUROR FIVE:**  Yes, sir.

18        **MR. McDONALD:**  And you said I pay them a partial

19   wage, correct?

10:40  20   **JUROR FIVE:**  No partial wage.  It's a minimum wage

21   for tip hours.

22        **MR. McDONALD:**  And you understand, you said that's

23   the law?

24        **JUROR FIVE:**  I'm sorry?

10:41  25   **MR. McDONALD:**  You do it because that's the law,

1    correct?

2         JUROR FIVE:  I follow the law, of course.

3         MR. McDONALD:  And the law is clear and established

4    for in the restaurant world that waiters and waitresses are

10:41    5    given a wage and then earn tips on top of that, correct?

6         JUROR FIVE:  Yes, sir.

7         MR. McDONALD:  And I know a number of others of you

8    have raised your hands for the same thing.  This case doesn't

9    involve waitresses and waiters.

10:41   10         JUROR FIVE:  Sit?

11         MR. McDONALD:  Yes.  Thank you.

12         And if the law is not clear, if the law is what the

13    Judge instructs and what you decide based on the facts, can

14    you separate your roles as waiter or waitress or hiring

10:41   15    waiter or waitress and listen to the facts of this case and

16    this working relationship and separate that from your

17    knowledge of how waiters and waitresses are compensated in a

18    restaurant environment?  You think you can do that?

19         JUROR FIVE:  Of course.

10:42   20         MR. McDONALD:  Now has anyone here -- anyone ever

21    served as a disk jockey?  Has anyone hired a disk jockey?

22    Nobody?  Had a party, a *Quince* or a Sweet 16 or a wedding,

23    Bar Mitzvah, something where you may have brought a disk

24    jockey?

10:42   25         How about those of you -- have you ever been to a

1    party where there's a disk jockey?

2         JUROR:  Everybody.

3         MR. McDONALD:  Well, third time is a charm.  Do you

4    agree that the disk jockey can make or break a party?

10:42    5    They're essentially the entertainment at the party.  They can

6    keep the party going, they can get the crowd energized.

7         Mr. Ceremy.

8         JUROR EIGHT:  Ceremy.  Yes.

9         MR. McDONALD:  Ceremy, sorry.  What's your

10:43   10   experience with disk jockeys and where have you come across

11   them?

12        JUROR EIGHT:  I would say parties.  I've been to --

13        MR. McDONALD:  House or club?

14        JUROR EIGHT:  Club as well.  They set the mood.  I

10:43   15   would say the ambience.  And, yeah, if the music isn't right,

16   if you're not feeling it, no matter what type of -- it gives

17   you that feeling.  If you are not in that feeling with the

18   music, then chances are you may want to go home.

19        MR. McDONALD:  So you think the disk jockey,

10:43   20   they're kind of the master of ceremonies at an event when

21   you're at a club or at a party, like a wedding?

22        JUROR EIGHT:  Not totally a hundred percent, but

23   they do play a major role in any event that you go to if

24   music is present.

10:43   25        MR. McDONALD:  Have you been to events where

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | there's disk jockeys who you didn't think were very good or             |
|       | 2  | didn't keep that energy level going?                                    |
|       | 3  | JUROR EIGHT:  Of course.                                                |
|       | 4  | MR. McDONALD:  And what usually happens?                                |
| 10:44 | 5  | JUROR EIGHT:  The feeling kind of -- it depletes,                       |
|       | 6  | it's goes down.  It's like your morale in whatever party                |
|       | 7  | you're at or club you're in.                                            |
|       | 8  | MR. McDONALD:  So you agree that there's a certain                      |
|       | 9  | talent associated with being a disk jockey?                             |
| 10:44 | 10 | JUROR EIGHT:  I believe so.                                             |
|       | 11 | MR. McDONALD:  Anyone else hearing what Mr. Ceremy                      |
|       | 12 | said, anyone else have a different experience as far as disk            |
|       | 13 | jockeys or musicians?  I think Mr. Kierschke, you play an               |
|       | 14 | instrument, correct?                                                    |
| 10:44 | 15 | JUROR SIXTEEN:  Yeah.                                                   |
|       | 16 | MR. McDONALD:  Have you ever done it where you were                     |
|       | 17 | hired?                                                                  |
|       | 18 | JUROR SIXTEEN:  No.  I wish.                                            |
|       | 19 | MR. McDONALD:  Are you -- does anyone here know                         |
| 10:45 | 20 | anyone who works as a disk jockey or as a musician who hires            |
|       | 21 | themselves out for work?  I'm going to -- so I'll go back to            |
|       | 22 | you, Mr. Angus.                                                         |
|       | 23 | JUROR ELEVEN:  Angus.                                                   |
|       | 24 | MR. McDONALD:  What's your experience with that?                        |
| 10:45 | 25 | THE COURT:  If you can stand, Mr. Angus.                                |

1    **JUROR ELEVEN:**  A lot of fire fighters I work with

2    on their days off, they are disk jockeys, and they hire

3    themselves out for events.

4    And like you say, I think, especially in a club,

**10:45**  5    they're probably a major part of the club that if the people

6    don't like the music, there is a hundred other places they go

7    to.

8    **MR. McDONALD:**  Have you ever gone with any of your

9    friends who hire themselves out, help them set up or anything

**10:45**  10   like that?

11   **JUROR ELEVEN:**  No.  Not helping them, no.

12   **MR. McDONALD:**  Do you ever talk to them about how

13   they're paid?

14   **JUROR ELEVEN:**  No, sir.

**10:46**  15   **MR. McDONALD:**  And you say they work -- one day

16   they're at one party, the next day they're at another event,

17   and they're free to go wherever they want.

18   **JUROR ELEVEN:**  Correct.

19   **MR. McDONALD:**  Thank you very much.  I appreciate

**10:46**  20   that.

21   How many people have heard the expression taking

22   the Fifth Amendment and know what it is?  By a show of hands?

23   And -- well, let me, in the first row, who knows

24   what that means, I take the Fifth?  Sometimes it's an

**10:46**  25   expression you hear people say.

|   |   |
|---|---|
| | 1 |

```
              THE COURT:  Pass the microphone.  Remember

         ladies -- one moment.  One moment.  Break.

              Remember, my court reporter needs to take down

         everything that is said.  So people have to wait for the

10:46    question to be asked and then if they're going to speak,

         please wait for the microphone.

              All right.  Thank you.  Now, go ahead.

              MR. McDONALD:  Thank you, Your Honor.

              THE COURT:  Ms. Robinson, you had an answer.

10:47         JUROR THREE:  It's the same as pleading the Fifth?

              MR. McDONALD:  It is.  What is your understanding

         of that?

              JUROR THREE:  No, I don't understand what it means.

              MR. McDONALD:  But you've heard the expression?

10:47         JUROR THREE:  I've heard it, yes.

              MR. McDONALD:  But you don't know what it means and

         how --

              JUROR THREE:  Exactly, no.

              MR. McDONALD:  Is there anyone here who does know

10:47    what it means or at least think they know what it means?

              Mr. -- in the end here.  No, past -- the young lady

         on the end.  Actually, I apologize, it's Ms. Miranda.

              JUROR TEN:  Yes.  If I believe I understand

         correctly, you have the right not to speak because anything

10:47    you say would be used in court when you're arrested.
```

1      **MR. McDONALD:**  So you might say something that

2  would incriminate yourself and, therefore, by taking the

3  Fifth you don't have to talk.

4      **JUROR TEN:**  Exactly.

10:47   5      **MR. McDONALD:**  Because you might -- by talking you

6  might implicate yourself to some type of crime.

7      **JUROR TEN:**  Right.

8      **MR. McDONALD:**  Has anyone here had to -- sometimes

9  -- and this is not a criminal trial -- sometimes the -- in

10:48  10  certain settings witnesses don't want to testify.

11      Does anyone have any -- if somebody refuses to

12  testify about a subject matter, such as taking the Fifth,

13  would that -- essentially saying you wouldn't talk because it

14  might cause you or implicate you in some manner, do you think

10:48  15  that would have any -- any positive or negative impact on you

16  as you sit here right now without hearing the topic, without

17  hearing the testimony, but just if a witness took the Fifth,

18  would that cause you to have some -- perhaps not listening or

19  maybe have some negative feelings towards a person who did

10:49  20  that?

21      Ms. Watts-Fitzgerald?

22      **JUROR THIRTEEN:**  Yes.

23      **MR. McDONALD:**  You would?

24      **JUROR THIRTEEN:**  Unfortunately, I would feel they

10:49  25  were hiding something.  I know I'm a lawyer and I'm supposed

1    to be up on the Constitution, but if somebody takes the

2    Fifth, my immediate reaction is there's something that

3    they're hiding.

4         MR. McDONALD:  And your husband is an assistant

10:49   5    United States Attorney; is that right?

6         JUROR THIRTEEN:  Yes, but I'm sure he doesn't

7    subscribe to my views.

8         MR. McDONALD:  But I'm sure he encounters that a

9    fair amount in his practice?

10:49  10        JUROR THIRTEEN:  Yes, he does.  I don't.  I'm a

11   corporate lawyer.  I don't litigate.  My gut reaction.

12        MR. McDONALD:  So this is a civil case, not a

13   criminal case.  But -- and I appreciate that.  I appreciate

14   the candor because there's -- it's how we know who would be a

10:49  15   good juror and who wouldn't.

16        Has anyone hired themselves out as an independent

17   contractor?  Mr. Angus, what have you done or what have you

18   hired yourself out as an independent contractor, and the next

19   question will be has anyone hired somebody who is an

10:50  20   independent contractor?

21        JUROR ELEVEN:  Yes.  Again, a lot of the firemen on

22   the days off and a bunch of us we used to work at all the

23   horse tracks running the first aid room, and we were

24   considered independent contractors.

10:50  25        MR. McDONALD:  And anyone else -- thank you.

|  |  |  |
|--|--|--|

1    Anyone else has -- and, obviously, plumbers and things like

2    that who come in, but has anyone else hired independent

3    contractors on a more regular basis?

4         JUROR FIVE:  Yes, there's always something broken

10:50    5    in the restaurant business.  So I have plumbers, electricity

6    and air conditioning people who comes and do the job.  I

7    don't have a contract with them, writing contract, but they

8    come and, basically, when I have something broken I call the

9    same people, but I don't have a contract in the contract.

10:51    10         MR. McDONALD:  Why do you call the same people?

11         JUROR FIVE:  Because I trust them.  They come and

12    do a good job and a good price.  You're always looking for

13    price, of course, and I always use the same people.

14         MR. McDONALD:  Do they -- do you ask them when they

10:51    15    should come or do you give them times when they should come

16    if you're having a problem?

17         JUROR FIVE:  Well, it's just when I have an

18    emergency I have to call them.  Otherwise, they come like

19    once a month to do -- the air conditioning people, they come

10:51    20    once a month for the maintenance.

21         MR. McDONALD:  So you have a regular contract with

22    an air conditioning company, and they come every month?

23         JUROR FIVE:  Exactly.  The roof, the machine after

24    they grill, they come and to clean also the filters.  And the

10:52    25    drape, they come and clean everything.

1        So it's like basically three or four companies we

2   have used so those years, but no contract contract.

3        MR. McDONALD:  I don't know your business hours but

4   do they come when -- do you ask them to come at a certain

10:52   5   time?

6        JUROR FIVE:  Yes.

7        MR. McDONALD:  Why?

8        JUROR FIVE:  Because they can't clean when the

9   business is open.  It smells a little strong.  And those

10:52   10   people come in early morning.  So it's nobody over there.

11   Just, you know, my chef sometimes goes to open the door for

12   them.

13       MR. McDONALD:  Are you there when they -- do they

14   check in with anyone when they come or do they just go and do

10:53   15   their job?

16       JUROR FIVE:  Well, we have to open the business,

17   yes.  Somebody have to be with them.

18       MR. McDONALD:  And that's about once a month this

19   happens?

10:53   20       JUROR FIVE:  The air conditioning, yes.  The grid

21   strip trap is after six months, I guess, or three months.

22   And -- well, it's basically time by time so we have the

23   contractors time by time.  I'm not sure about the time.

24       MR. McDONALD:  Are these people then on your

10:53   25   payroll or you just pay them for the service that they

|       |    | provide?                                                     |

1   provide?

2            JUROR FIVE:  I pay them for the service.  They're

3   not in my payroll.

4            MR. McDONALD:  Anyone have a scenario, other than

10:53  5   Ms. Gajer, where you have or you work in a situation -- in a

6   shop or business where you have some independent contractors

7   and you have some payroll employees, and they're working

8   together within the same -- under the same roof?

9            Anyone have that type of work environment where

10:54  10   there is a mixture of both?

11            JUROR NINE:  Losada.

12            MR. McDONALD:  Losada, yes.

13            THE COURT:  Mr. McDonald, we'll be wrapping up with

14   that.

10:54  15            MR. McDONALD:  I have one last question after that.

16            THE COURT:  Almost there, 20 minutes.

17            JUROR NINE:  My wife, we own our own business so we

18   have regular employees and we have independent outside

19   contractors that come in on a regular basis.

10:54  20            MR. McDONALD:  But those outside contractors are

21   what generally?

22            JUROR NINE:  Electricians, plumbers, the usual.

23   Carpenters, anybody we need for whatever service.

24            MR. McDONALD:  And Mr. Marin, you had something you

10:54  25   wanted to add?

1          **JUROR SIX:**  I do hire independent contractors.  I'm

2     the president of an association, condominium association.

3     And I also hired an employee as an independent contractor for

4     his convenience, because he owe money to -- for child support

10:55   5     and he didn't want to get his wages garnished so he requested

6     to be hired as an independent contractor to avoid to give him

7     a 1099 at the end of the year.

8          **MR. McDONALD**:  So he was happy with that working

9     relationship?

10:55   10          **JUROR SIX:**  That's what he wanted because he said

11    they were taking from child support, like half of his salary,

12    and he said he couldn't live on that.  So he made special

13    arrangements with the Children's Department to make payments

14    on what he owed.

10:55   15          **MR. McDONALD:**  And the last question I have --

16    thank you very much -- is my client is a bar that's located

17    in Pinecrest, Florida on U.S. 1.  It's an adult entertainment

18    club.  It's been there since the eighties.  There are naked

19    women that dance there.  Men and women go there.

10:56   20          That fact, that's -- that sometimes evokes strong

21    feelings in people.  Some people don't like that type of

22    establishment.  Some people think they want them closed.

23          Does anyone here hold, because of the fact that my

24    client runs and has run that business for almost 30 years,

10:56   25    that that will cause you to not be able to listen to all the

|  |  |
|---|---|
| | 1 |

                    1    evidence and not be able to give them an equal opportunity to
                    2    -- in front of you during this trial?
                    3           Anyone have any strong feelings one way or the
                    4    other about adult entertainment clubs?  It's okay if you do.
        10:56       5    I mean, there's people that do but, and, in fact, everyone
                    6    who is in this trial, the parties, all work in that
                    7    environment.
                    8           The fact that everyone in this, the plaintiffs, the
                    9    defendants all work in that environment, does that have any
        10:56      10    influence on your ability to sit here and listen to this
                   11    case?
                   12           How about Ms. -- I am going to pick on you,
                   13    Ms. Gajer, again.
                   14           **JUROR FIVE:**  No, I don't have any problem.
        10:57      15           **MR. McDONALD:**  You're okay with it?
                   16           **JUROR FIVE:**  Yeah.  No problem.
                   17           **MR. McDONALD:**  You understand that it's important
                   18    that you may hold personal feelings about whether they should
                   19    -- where they should be located and how, but this would not
        10:57      20    be the time to exercise that political thought that you may
                   21    have about them, that you can decide this case based on, you
                   22    know, wage and hour law as opposed to those issues of what
                   23    the business actually does and who works there?
                   24           Anyone think you can't, anyone think that's going
        10:57      25    to be -- now, Mr. Robinson?

1        **THE COURT:**  I'm sorry, Mr. McDonald.  You need to

2   wrap up, sir.

3        **MR. McDONALD:**  Thank you, Your Honor.

4        Thank you, ladies and gentlemen.  I appreciate your

10:57   5   time.

6        **THE COURT:**  All right.  I did limit the time and

7   that was the reason I wanted to keep it fair, both sides the

8   same amount of time.  Thank you very much, ladies and

9   gentlemen, for your participation in the voir dire process.

10:58  10        We are now going to take a short break to allow

11   counsel to go over their notes.  And then I will ask counsel

12   to come to side-bar to exercise their challenges outside of

13   your hearing.

14        For that purpose, we're going to put white noise in

10:58  15   the audio system as you heard, I think, before.  During this

16   time, you may converse quietly among your neighbors.  If need

17   be, you may utilize the restrooms that are in the jury room,

18   which you have access to directly through that passageway

19   right there.

10:58  20        I will give you a very strong instruction at this

21   time, and please listen carefully.  You may not discuss the

22   case among each other.  First of all, you don't really know

23   much of anything about the case yet.  You know what I have

24   told you, you know the questions and the statements that

10:59  25   counsel have given you.  But you have not yet heard the first

1    bit of evidence in the case.  And you have not been

2    instructed in the law.

3         So at this point in time, I recommend that you talk

4    about traffic in Miami.  I noticed quite a few of you are

10:59   5    athletic which is wonderful.  The marathon was just on

6    Sunday.  I don't know if any of you participated.  There's

7    plenty of topics.  Just don't talk about the case.

8         Very well?  And we will be back with you.  So just

9    relax.  You can stay here, some of you, you can go to the

11:00  10    jury room, some of you, however you feel comfortable.

11         All right?  All right.  I am going to -- ten

12    minutes.

13         MR. McDONALD:  Sure.

14         Can he use the restroom in the lobby?

11:00  15         THE COURT:  Yes, the parties may use the restroom.

16         (Thereupon, a brief recess was taken from 11:00

17    a.m. to 11:15 a.m.)

18         THE COURT:  All right.  Counsel, you may come up to

19    side-bar.

11:15  20         (Thereupon, there was a side-bar conference outside

21    the presence and hearing of the jury.)

22         THE COURT:  Okay.  All right.  Challenges for

23    cause?

24         MRS. ROBBINS-BOBER:  Well, number one I think

11:15  25    should be excused for cause because of language.

1              THE COURT:  And then he reasserted that when

2    Mr. McDonald --

3              MR. McDONALD:  No objection to that.

4              THE COURT:  So he's for cause.

11:15    5         All right.  Any other challenges for cause at this

6    time?

7              MRS. ROBBINS-BOBER:  Yes.  Number --

8              THE COURT:  All right.  Ms. Robbins-Bober, go

9    ahead.

11:16   10              MRS. ROBBINS-BOBER:  Mr. Marin, he had indicated

11   that he had made an independent contract person, switched him

12   to an independent contractor.  He was an employee to avoid

13   paying child support and he may have concerns -- I have

14   concerns that he would -- because he himself may have

11:16   15   violated the law that he may have a leaning one way or

16   another towards one of the parties.

17              THE COURT:  Okay.  Let me hear from Mr. McDonald.

18              MR. McDONALD:  Judge, there's no -- because you

19   can't make a determination from what we heard that he

11:16   20   violated the law or not.  He told us about a scenario and to

21   strike him for cause because we have predetermined that he

22   violated the law, I don't think that's a valid reason to

23   strike him for cause.  He's answered all the other questions

24   positively that he can listen to the evidence, he can be

11:17   25   fair, you know, he can do all the things that a jury is

1    supposed to do.

2         THE COURT:  He was not somebody that I had in mind

3    for cause.  I think that he has expressed, you know, his

4    fairness and ability to follow the law, and it sounds like he

11:17  5    did this just to accommodate the person.  And it's in a role

6    as president of a condominium association.  It's not even his

7    own business.  So I will respectfully decline that request.

8         Anybody else?

9         MRS. ROBBINS-BOBER:  Yes, Ms. Jones.  Number -- she

11:18  10   stated that she did believe there were too many lawsuits.  My

11   client is the person who brought the lawsuit.  I think it

12   indicates that she will be biased against people who bring

13   lawsuits.  And she also stated that she did not want to be

14   here which may prejudice her willingness to listen to the

11:18  15   case and decide fairly because of that -- because she feels

16   so negatively about having to come to the courtroom.

17        THE COURT:  Mr. McDonald?

18        MR. McDONALD:  I imagine a lot of the jurors don't

19   want to be here, and she did raise it, but again, if we

11:18  20   struck for cause jurors that don't want to be here we

21   wouldn't have a jury panel.

22        Yes, she had reservations about the lawsuits and

23   the court system, but so did six or seven other jurors and

24   they weren't talking about this case, they were talking about

11:18  25   in general and I think they do.

1       THE COURT:  I do note that after I addressed her,

2    she did express understanding of fulfilling her duty and said

3    that she would fulfill her duty.  I do not find that she

4    should be struck for cause.

11:19    5       MRS. ROBBINS-BOBER:  Mr. Morales, he's number 12, I

6    believe, indicated that he had been to the club, so he may

7    taint, you know, that outside knowledge, and I am afraid it

8    would bias him since he knows -- he obviously knows one of

9    the parties, the corporation.  He's one of the customers.

11:19   10       THE COURT:  He said he had only been there once or

11    twice.  He didn't indicate anything about being a frequent

12    visitor.  That's my understanding.

13       Let me hear from Mr. McDonald.

14       MR. McDONALD:  Again, actually, I forgot to ask him

11:20   15    many questions about that.  So we don't really know what his

16    views are on that.  He didn't say that that impacted him.

17       Now, the Plaintiff himself worked there playing the

18    music, so he may actually have a fondness for the deejays.  I

19    don't know.  I think we never really explored his, if any,

11:20   20    bias.  Nothing came out one way or another.  So I would say

21    he's -- I don't see --

22       THE COURT:  He's the one that said he's an actor

23    for Telemundo?

24       MR. McDONALD:  Yes.

11:20   25       THE COURT:  Yeah.  No.  Just on the fact that he

visited the club a couple of times, I am not going to excuse

him for cause.  Basically that would mean if there was a

lawsuit against Publix, anybody who ever shopped at Publix

would be excused.

11:20    5       I don't find sufficient grounds for cause.  And the

way that he addressed it sounded to me like it was just like

maybe once or twice, was my understanding.  All right.

Who else?

**MRS. ROBBINS-BOBER:**  Ms. Watts-Fitzgerald.  She

11:21  10  expressed the views that she thought there were too many

lawsuits.  She expressed views regarding the Fifth Amendment,

that if someone takes the Fifth she thinks they would be

hiding something and that her husband, who is a prosecutor,

would have the opposite opinion.

11:21  15       She also had said she has extensive knowledge,

works defending regarding the FLSA which is the statute this

lawsuit is brought under.  When she was asked if --

**MR. McDONALD:**  Actually, I don't think she's

appropriate for this lawsuit either.  I think it's just not

11:21  20  her, I'm concerned --

**THE COURT:**  It's very unfortunate.

**MR. McDONALD:**  -- that she interrupted you on the

instructions.

**THE COURT:**  It is very unfortunate that an attorney

11:21  25  was not capable of setting a good example on following the

```
         1    law, and I was honestly embarrassed for her.
         2            MR. McDONALD:  I was shocked to hear that.
         3            THE COURT:  All right.  So we all agree on that
         4    one.
11:22    5            MR. McDONALD:  We agree.
         6            THE COURT:  All right.  Anyone else?
         7            MR. BOBER:  I think that's --
         8            THE COURT:  That's all.
         9            MR. McDONALD:  I don't have any others.
11:22   10            MR. BOBER:  I have one.  Mr. Ceremy, number 8.
        11    Mr. Ceremy mentioned he won that award.  And we believe this
        12    trial will go four or five days.  I'm concerned that he has
        13    to be out of here at 5:00, which is potentially when the jury
        14    might be deliberating.  That's going to cause a problem.  I
11:22   15    could easily see this case going on the fifth day.
        16            THE COURT:  And him being under pressure.
        17            MR. BOBER:  To get out of here.
        18            THE COURT:  What's your sense of that,
        19    Mr. McDonald?
11:22   20            MR. McDONALD:  That's the only thing I heard.
        21    Otherwise, I didn't hear any reason he couldn't be fair.
        22            THE COURT:  No, no, he definitely sounds like a
        23    good juror.  There is a concern regarding -- I would be, you
        24    know, I said, and I said it kind of in gist, that we would
11:23   25    hope that we'd be out of here by Friday, but you're right,
```

1    his concern about leaving might start getting him antsy at

2    the time that the jurors are deliberating.  So I am --

3         **MR. McDONALD:**  It's a possibility.

4         **THE COURT:**  I'm going to excuse him just to be on

11:23  5    the safe side.  I want to hear from the parties about

6    Mr. Losada.  There was an exchange there that I tried to

7    cure, but it gave me concern that Mr. Losada became a little

8    bit antagonistic towards Mr. Bober.

9         **MR. BOBER:**  I was going to mention that, Your

11:23 10    Honor.  I mentioned to my law partner here.  He did not love

11    the voir dire process, the fact that we were trying to screen

12    to find the right jurors for the right jury and he was

13    particularly vocal about it and, I mean, I don't want to say

14    he poisoned the well, but he -- it was -- I think -- that's a

11:24 15    perfectly good reason because he clearly objects to the

16    system of picking.

17         **THE COURT:**  Well, I think beyond that what really

18    concerns me is that he seemed to put himself in an

19    antagonistic position towards Mr. Bober the way he addressed

11:24 20    him, and that's what made me jumpy, and it just did not sit

21    well with me.

22         I'll hear from Mr. McDonald on this.

23         **MR. McDONALD:**  He said he didn't want -- he felt he

24    was being asked what his decisions would be based on a

11:24 25    question that he was asked and he said why don't we wait.  I

1    agree it's a bold comment from a juror, but I don't think

2    that's for cause.  I think he just didn't want to answer the

3    questions.

4           **THE COURT:**  Right.  I would not normally make that

11:25  5    for cause except that I did notice a certain animosity in him

6    in his reaction to Mr. Bober.  That's what concerned me.  And

7    that's why I jumped in to cure it, so he would not poison, my

8    word, the other jurors.

9           I really was very concerned about his reaction.

11:25  10   Obviously, I don't have challenges of my own but I have to

11   protect the integrity of the jury selection process and he --

12   he was -- his reaction took me by surprise because he's been

13   a foreperson before.  He's gone through this before.  And it

14   seemed to be almost like a gut reaction in a combative sort

11:26  15   of way.  So that is my rationale.

16          I really am concerned that he will carry out that

17   type of behavior into the jury room.  So I am going to excuse

18   him.

19          All right.  So those are the cause excuses.  So

11:26  20   let's get started.

21          **MR. McDONALD:**  We're going to pick how many, again?

22   I apologize.

23          **THE COURT:**  We pick eight.  Plaintiff takes three

24   challenges per side.

11:26  25          Plaintiff will exercise first and then the next go-

1   around the Defendant will exercise first.

2           So Mr. Robinson, plaintiff?

3           **MRS. ROBBINS-BOBER:**  He's acceptable.

4           **THE COURT:**  All right.  Mr. McDonald?

11:26   5   **MR. McDONALD:**  Accept.

6           **THE COURT:**  All right.  So he's juror number one.

7           All right.  Now Mr. McDonald, Ms. Robinson?

8           **MR. McDONALD:**  We will strike her, Your Honor.

9           **THE COURT:**  So that's your first strike.

11:27   10  Mr. Abel Ferrer?

11          **MRS. ROBBINS-BOBER:**  Accept.

12          **THE COURT:**  Mr. McDonald?

13          **MR. McDONALD:**  Accept.

14          **THE COURT:**  That's juror number two.

11:27   15  Mr. McDonald, Ms. Gajer?

16          **MR. McDONALD:**  Accept.

17          **THE COURT:**  Ms. Bober?

18          **MRS. ROBBINS-BOBER:**  Accept.

19          **THE COURT:**  Juror number three.

11:27   20  Ms. Bober, Mr. Marin?

21          **MRS. ROBBINS-BOBER:**  We will strike.

22          **THE COURT:**  That's your first strike.

23          Mr. McDonald, Ms. Jones?

24          **MR. McDONALD:**  Accept.

11:28   25  **THE COURT:**  Ms. Bober?

|   |   |   |
|---|---|---|
|   | 1 | **MRS. ROBBINS-BOBER:**  We will strike her. |
|   | 2 | **THE COURT:**  All right. |
|   | 3 | **MR. McDONALD:**  Who is this, Jones? |
|   | 4 | **THE COURT:**  That's your second strike.  All right. |
| 11:28 | 5 | The next two are cause. |
|   | 6 | So now we have Ms. Miranda.  Ms. Bober? |
|   | 7 | **MRS. ROBBINS-BOBER:**  Accept. |
|   | 8 | **THE COURT:**  Mr. McDonald?  Accept.  That's juror |
|   | 9 | number four. |
| 11:28 | 10 | Mr. McDonald, Mr. Angus? |
|   | 11 | **MR. McDONALD:**  Oh, accept. |
|   | 12 | **THE COURT:**  Ms. Bober? |
|   | 13 | **MRS. ROBBINS-BOBER:**  Strike. |
|   | 14 | **THE COURT:**  All right.  That's your third strike. |
| 11:29 | 15 | Mr. Morales, Mr. McDonald? |
|   | 16 | **MR. McDONALD:**  Accept. |
|   | 17 | **THE COURT:**  He's juror number five. |
|   | 18 | Mr. Betancourt, Mr. McDonald? |
|   | 19 | **MR. McDONALD:**  Accept. |
| 11:29 | 20 | **THE COURT:**  He's juror number six. |
|   | 21 | Ms. Taleno? |
|   | 22 | **MR. McDONALD:**  Are all of them to decide? |
|   | 23 | **THE COURT:**  They all decide.  That's the rule. |
|   | 24 | **MR. McDONALD:**  I will strike Ms. Taleno. |
| 11:30 | 25 | **THE COURT:**  That's your second strike. |

1          Mr. Kierschke?

2          **MR. McDONALD:**  That will be my third strike.

3          **THE COURT:**  All right.  So then juror number seven

4     will be Mr. Murray, and juror number eight will be Mr. Dale.

11:30    5          And we just made it.  All right.  Very good.  Thank

6     you very much.  All right.

7

8

9       (Thereupon, the above portion of the trial was concluded.)

10

11                          *          *          *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  **C E R T I F I C A T E**

2

3        I hereby certify that the foregoing is an accurate

4   transcription of the proceedings in the above-entitled

5   matter.

6

7      2-9-2015

8   _____     _____

9   DATE COMPLETED     GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25