```
1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                             MIAMI
                    CASE NO. 13-CV-23429
3       _____

4       MITCHELL ROSARIO,
                          Plaintiff
5            vs.                       Wednesday, January 28,2015
        12425, INC., D/B/A STIR CRAZY;
6       LAURA INSUA; MANUEL H. INSUA;
        AND HERIBERTO FLOREZ,
7                          Defendants.

8       _____

9                   DIRECT EXAMINATION OF PLAINTIFF

10           BEFORE THE HONORABLE ALICIA M. OTAZO-REYES,

11         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12      _____

                        A P P E A R A N C E S
13

14      FOR THE PLAINTIFF:    Samara Robbins Bober, ESQ
                              Peter J.M. Bober, ESQ
15                            Bober and Bober, PA\
                              1930 Tyler Street
16                            Hollywood, FL  33020
                              (954) 922-2298
17                            Samara@boberlaw.com
                              Peter@boberlaw.com

18      FOR THE DEFENDANT:    DAVID M. McDONALD, ESQ
                              JARED McLUSKEY, ESQ
19                            McLuskey & McDonald
                              8821 SW 69th Ct
20                            Miami, FL  33156
                              (305) 662-6160
21                            Dmcdonald@mmlawmiami.com
                              Jared@mmlawmiami.com

22      REPORTED BY:          GIZELLA BAAN-PROULX, RPR, FCRR
                              United States Court Reporter
23                            400 North Miami Avenue, Suite 8S32
                              Miami  FL  33128
24                            (305) 523-5294
25                            gizella_baan-proulx@flsd.uscourts.gov
```

| | P L A I N T I F F ' S   E X H I B I T S | | |
|---|---|---|---|
| NUMBER | | MARKED | ADMITTED |
| 1 | | 11 | 12 |
| 2 | | 55 | 55 |
| 4 | | -- | 22 |

1      **P R O C E E D I N G S**

2          *(The following proceedings were held in open court.)*

3          Thereupon,

4                         **MITCHELL ROSARIO,**

5      having been duly sworn by the courtroom deputy, testified as

6      follows:

7              THE WITNESS:  I do.

8              THE COURTROOM DEPUTY:  You may be seated.  Please

9      state your full name for the record and spell your last name.

03:25  10              THE WITNESS:  My name is Mitchell Rosario,

11      R-O-S-A-R-I-O.

12

13                     ***DIRECT EXAMINATION***

14      BY MRS. ROBBINS-BOBER:

03:25  15      Q.  Good afternoon.

16      A.  **Good afternoon.**

17      Q.  For the period of 2001 to September 21st, 2013, where did

18      you work?

19      A.  **Stir Crazy.**

03:26  20      Q.  So you worked at Stir Crazy for about 12 years?

21      A.  **About 12 years.**

22      Q.  And can you tell me a little bit about your family

23      background?  Are you married?

24      A.  **For 21 years, yes.**

03:26  25      Q.  Do you have any kids?

ROSARIO (Direct Examination)

1    A.   **I have four.**

2    Q.   When were they born?

3    A.   **January 27, 1998.**

4    Q.   So they just had a birthday?

03:26  5    A.   **Yesterday.**

6    Q.   What are the ages of your kids currently?

7    A.   **Seventeen.**

8    Q.   Well, you said you had four kids.

9    A.   **I have quadruplets.  They're all 17.**

03:26  10   Q.   So when you started working at Stir Crazy, how old were

11   your four children?

12   A.   **They were around three.**

13   Q.   Can you tell me a little bit about your educational

14   background?

03:27  15   A.   **Didn't finish high school all the way.  I got my GED.**

16   Q.   And just going back to your kids, in 2008, how old would

17   they be?

18   A.   **2008, I'd say about eight or nine.**

19   Q.   Did they keep you pretty busy at that age?

03:27  20   A.   **Very busy.**

21   Q.   How would you describe yourself as a father?  Were you

22   hands-off or hands-on?

23   A.   **Very hands-on.  I did a lot of cooking, a lot of**

24   **cleaning, a lot of butt wiping; all of that.**

03:27  25   Q.   I would like to ask you about just the part of the time

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | you worked for Stir Crazy from September 2008 to September --                |
|       | 2  | I'm sorry, from September 23rd, 2008 to September 21st, 2013.                 |
|       | 3  | What was your job position at Stir Crazy?                                     |
|       | 4  | A.  **I was a deejay.**                                                       |
| 03:28 | 5  | Q.  Just so we're clear, the remainder of my questions will                  |
|       | 6  | relate to that time period unless I say otherwise.                           |
|       | 7  | A.  **Okay.**                                                                |
|       | 8  | Q.  Can you tell the jury why you're here today?                             |
|       | 9  | A.  **I'm here to seek my wages, my back wages from that time**              |
| 03:28 | 10 | **period, and overtime.**                                                    |
|       | 11 | Q.  So minimum wages and overtime?                                           |
|       | 12 | A.  **Yes, ma'am.**                                                          |
|       | 13 | Q.  And you seek minimum wages for five years from the date                  |
|       | 14 | you filed your lawsuit?                                                       |
| 03:28 | 15 | A.  **Correct.  Yes.**                                                       |
|       | 16 | Q.  And overtime from three years from the date you filed?                   |
|       | 17 | A.  **Yes, ma'am.**                                                          |
|       | 18 | Q.  Are you also seeking returning of the $20 shift fee?                     |
|       | 19 | A.  **Yes.  It was $25.**                                                    |
| 03:28 | 20 | Q.  As a deejay for Stir Crazy, did you have scheduled                       |
|       | 21 | shifts?                                                                       |
|       | 22 | A.  **Yes, ma'am.**                                                          |
|       | 23 | Q.  Which shift did you work?                                                |
|       | 24 | A.  **It varied, years.  It was Tuesday through Saturday,**                  |
| 03:29 | 25 | **Wednesday through Saturday, Saturday, Sunday, Monday,**                    |

1    **Tuesday, daytime Saturday and Sunday.  In the beginning,**

2    **Monday, Tuesday, the slowest shifts because I was the new**

3    **guy.**

4    Q.  And let me just remind you, and I'm just concerned with

03:29    5    September 2008 to September 2013.

6    A.  **Right.**

7    Q.  Did you -- did you typically work the day shifts or the

8    night shifts?

9    A.  **Typically was the night shift, but I worked day shift**

03:29    10    **whenever they needed me to cover.**

11    Q.  And you were working four to five shifts per week,

12    correct?

13    A.  **Four to five, yes.**

14    Q.  And each shift was eight-and-a-half hours?

03:29    15    A.  **Yes.**

16    Q.  So the weeks you worked four shifts, that would be 34

17    hours a week?

18    A.  **Yes.  Approximately, yes.**

19    Q.  And the weeks you worked five shifts, that would be 42.5

03:30    20    hours per week.

21    A.  **Yes, ma'am.**

22    Q.  And you seek minimum wages for each of those hours?

23    A.  **I do.**

24    Q.  And overtime going back three years for the hours over

03:30    25    40, correct?

ROSARIO (Direct Examination)

1    A.   Yes, ma'am.

2    Q.   How were you made aware of the deejay schedule?

3    A.   How was I made aware of the deejay schedule?  When you

4    were hired they explained it to you.  Joe Roppo, Eddie.

03:30   5    Q.   Was the deejay schedule posted anywhere in the Stir

6    Crazy --

7    A.   Two places.  It was in the deejay booth and in the

8    office.

9    Q.   How was a deejay schedule determined?

03:30   10   A.   All the deejays would get together and we would pick the

11   days or we were assigned the days because some of us worked

12   certain days.  Some of us, through experience and seniority,

13   and then it was brought to Eddy from Joe to be approved.

14   Q.   Were the posted schedules, were they always accurate or

03:31   15   were they sometimes inaccurate with respect to stating which

16   shifts you worked?

17   A.   Well, depending on if you picked up a shift from someone

18   or if someone was sick, I personally wouldn't change anything

19   on the schedule.  Joe wasn't there, so it wouldn't get

03:31   20   changed and the one in the office wasn't always accurate.  It

21   was rarely accurate.

22   Q.   Prior to working at Stir Crazy, had you been hired to

23   work as a deejay before?

24   A.   No, ma'am.

03:31   25   Q.   What made you want to become a deejay?

ROSARIO (Direct Examination)

1    A.  Well, when I was security guard at Treasure Island, the

2    deejays there they said I had a great voice and a great

3    personality and I should try it, it's more money for your

4    children, and so that's why.

03:32    5    Q.  Was there anything about working the day shift versus the

6    night shift that appealed to you in terms of being a deejay?

7    A.  Well, working the night shift I was able to be home with

8    the kids.  Send them off to school in the mornings before I

9    went to bed, and be home when they got home, cook dinner for

03:32   10    them, be there.  Right before going to bed, I would go to

11    work.

12    Q.  When you first sought a job at Stir Crazy, can you tell

13    me about how you obtained that job?

14    A.  One of the managers and the bouncer left Treasure Island,

03:32   15    and they went to Stir Crazy and Stir Crazy was looking for a

16    deejay, and they called me, they said, "Hey, they're looking

17    for a deejay over here.  Come and apply."

18    Q.  And did you go and apply?

19    A.  I sure did.

03:33   20    Q.  And what was the application process?

21    A.  Well, you had to audition.  I auditioned with Joe Roppo

22    and get the approval from Eddy and the other managers.

23    Q.  Who hired you, if you know?

24    A.  Eddy.

03:33   25    Q.  Did Stir Crazy require you to have any degree?

ROSARIO (Direct Examination)

1   A.   **No, ma'am.**

2   Q.   I mean, like musical degree or anything like that?

3   A.   **No.**

4   Q.   And as a deejay at Stir Crazy, can you tell me what types

03:33   5   of tasks or job duties you were required to perform?

6   A.   **Bringing the girls up to the stage, calling them up,**

7   **playing the music, making the announcements, answering the**

8   **phone, keeping an eye on the cameras, putting the -- saying**

9   **the specials and talking about the food, anniversaries**

03:34   10   **coming, parties, those type of things.**

11   Q.   Now, when you talked about saying promotions and food

12   specials, would that include liquor sales?

13   A.   **Sure.**

14   Q.   Approximately, how often would you make promotional

03:34   15   announcements?

16   A.   **Every time we brought up a girl to the stage I would do**

17   **that.  So if it was, like, one song was the first song you**

18   **brought her up, so you make your announcement there, play the**

19   **second song and then bring up the next girl, and make the**

03:34   20   **announcements at that moment.**

21   Q.   What type of announcements did you have to make about the

22   dancers?

23   A.   **Spoke about how lovely she was and how much fun she is**

24   **and how pretty she danced and typical things like that.**

03:35   25   **Promoting the girl so she can solicit business.**

ROSARIO (Direct Examination)

1  Q.  Would you remind the customers to do anything with

2  respect to the dancers?

3  A.  **Sure.  Get dances.**

4  Q.  Would you remind the customers to pay the dancers tips?

03:35  5  A.  **Yes, ma'am.**

6  Q.  Did you have any responsibilities in terms of documenting

7  the arrival times of the dancers?

8  A.  **Yes.  We had to -- when the girl came up to the deejay**

9  **booth, she told me, "I'm ready," I'd write the time and her**

03:35  10  **name.**

11  Q.  And why did you have to write down the time?

12  A.  **Well, the times was because sometimes if girls came in --**

13  **the girls that came in early, they would usually pay less of**

14  **a house fee.**

03:36  15  Q.  And did writing down the times, did it also help you with

16  respect to the rotation?

17  A.  **It did somewhat, but it was, you know, in order.  So --**

18  Q.  It was in order of their arrival?

19  A.  **Of their arrival.**

03:36  20  Q.  Being ready to work?

21  A.  **Right.  Right.**

22  Q.  And when you wrote down that information, were you

23  required to do anything -- did Stir Crazy management require

24  you to do anything with that information?

03:36  25  A.  **I would have to e-mail it to the owner at the end of the**

ROSARIO (Direct Examination)

1    night.

2    Q.  I'd like you to take a look at the trial notebooks

3    sitting next to you.

4    A.  **(Complies.)  Let me get my glasses.**

03:36    5    Q.  And if you'll, when you're ready, please turn to the tab

6    that's tabbed as Plaintiff's Exhibit 1.

7    A.  **Excuse me, say that again.**

8    Q.  Plaintiff's Exhibit 1.  Please turn to Tab 1.

9              (Thereupon, the aforementioned exhibit was

03:37    10   introduced.)

11   BY MRS. ROBBINS-BOBER:

12   Q.  You can take a look at that exhibit.

13   A.  **Yes, ma'am.**

14   Q.  Can you identify what that is?

03:37    15   A.  **That's an e-mail I would send to the owner.**

16   Q.  And are there -- is it just one e-mail or how many

17   e-mails are -- I mean, how -- is it a number of e-mails in

18   that exhibit?

19   A.  **Just one.**

03:37    20   Q.  Can you tab through?

21   A.  **(Complies.)  It's one per day but there is tons of**

22   **e-mails.  It was something that was done every day.**

23   Q.  And who's the author of those e-mails?  Who are those

24   e-mails from?

03:37    25   A.  **From whatever deejay worked that night or even the day**

1   shift.

2   Q.  But are those your e-mails that you sent?

3   A.  **Most likely, yeah.  I worked the majority of the**

4   **evenings, so a lot of these are mine.**

03:38   5          MRS. ROBBINS-BOBER:  I'd like to offer Plaintiff's

6   Exhibit 1 for admission.  There's been no objection on the

7   Exhibit list.

8          MR. McDONALD:  Can I just confer with counsel

9   before --

03:38   10         THE COURT:  Yes.

11         (Thereupon, there was a brief discussion off the

12  record.)

13         MR. McDONALD:  No objection, Your Honor.

14         THE COURT:  All right.  Plaintiff's Exhibit 1 will

03:38   15  be admitted.

16         (Thereupon, the aforementioned exhibit was admitted

17  into evidence.)

18         THE WITNESS:  Your Honor, I just noticed that my

19  name is on all these pages.  So these are all mine.

03:38   20         MRS. ROBBINS-BOBER:  Thank you for clarifying that.

21         THE COURT:  All right.

22  BY MRS. ROBBINS-BOBER:

23  Q.  Can you tell me a little bit about that document.  When

24  would you usually send e-mails to Manny?  I'm sorry, you said

03:38   25  the e-mails are authored by you.  Who are they sent to?

ROSARIO (Direct Examination)

1    A.    **Manny.**

2    Q.    Manny, Junior?

3    A.    **Uh-huh.   (Nodding affirmatively).**

4    Q.    What type of information is in those e-mails?

03:39  5    A.    **The times the girls arrived and the name of the girl.**

6    Q.    Are you required, does Stir Crazy management require you

7    as part of your job duties to send Manny, Junior those

8    e-mails or do you just do that because you want to?

9    A.    **No.  It's a requirement.**

03:39 10    Q.    What, if anything, would happen if you forgot to send an

11    e-mail to Manny, Junior?

12    A.    **Well, you'd either get an e-mail --**

13          MR. McDONALD:  Objection.  Lack of foundation.

14          THE COURT:  All right.  You need to lay the

03:39 15    foundation.

16    BY MRS. ROBBINS-BOBER:

17    Q.    Have you ever forgotten to send an e-mail to Manny,

18    Junior?

19    A.    **Yes, ma'am.**

03:39 20    Q.    And when that has occurred, what has happened?

21    A.    **You'd get an e-mail from Manny or you would get a -- you**

22    **would get spoken to by Eddy.  Your job would be threatened.**

23    Q.    What, if any, responsibilities did Stir Crazy impose on

24    you with respect to the house phone at Stir Crazy?

03:40 25    A.    **You had to answer it.**

ROSARIO (Direct Examination)

1    Q.   What did you have to do when you answered it?

2    A.   **I would answer it, "Good evening, Stir Crazy, this is**

3    **Mitch, how can I help you," and we would answer whatever**

4    **question would come through.**

03:40    5    Q.   And would you have to, like, route calls?

6    A.   **If there was a call for the manager I would get on the**

7    **mic and call the manager to the deejay booth.**

8    Q.   What types of issues would you deal with when you picked

9    up the phone?

03:40    10   A.   **Customer asking for directions, customer checking to see**

11   **that we're open, girls to see who was deejaying or who was**

12   **managing, times, hours of operation, purveyors would call**

13   **looking for Eddy, you know, liquor purveyor or whatever.  Any**

14   **and all calls.**

03:41    15   Q.   Would the phones ring -- would the phone ring regularly?

16   A.   **Yes, ma'am.**

17   Q.   And you would have to answer it?

18   A.   **Yes.**

19   Q.   How many -- do you know how many cameras there are at

03:41    20   Stir Crazy?

21   A.   **What I know is there is at least 14 cameras because**

22   **that's the number of monitors -- not monitors, but camera**

23   **pictures on the monitors from each camera.  There was about**

24   **14, I thought, but I know there was more.**

03:41    25   Q.   And you're referring to a monitor.  Where is that monitor

ROSARIO (Direct Examination)

1 located?

2 A.  **In the deejay booth right above the mixer.**

3 Q.  What, if anything, did Stir Crazy's management require

4 you to do with respect to the video monitors in the deejay

03:41  5 booth?

6 A.  **Well, we would have to check the monitors constantly in**

7 **case something was happening, if there was an altercation**

8 **outside or someone that we didn't like come into the club was**

9 **standing outside, girls that would come in that we were**

03:42  10 **waiting for or needed to come in.**

11       **If the bouncer needed something, he would flash his**

12 **light into the camera lens.  I would see the flash and I**

13 **would call the management out there.**

14       **Anything.  Any suspicious act outside or in the**

03:42  15 **club, anything.  If I saw on one of the cameras something**

16 **going on, I would have to, you know, call the manager or call**

17 **the security.**

18 Q.  And how would you -- when you communicated with the --

19 well, did Stir Crazy management require you to contact them

03:42  20 if you saw something suspicious?

21 A.  **Sure.  Security or them, whoever was needed the most.**

22 **But as soon as you got on the mic and said, "Security, front**

23 **door," manager would know what's going on.  They would hear**

24 **you, you're on the mic.**

03:42  25 Q.  Did you have to stay in the deejay booth during your

1   shift?

2   A.   No.   No.   Many times if there was an altercation I would

3   come down myself.   I guess, because I was a big guy, I would

4   go down and smooth things out.   Never wanted a fight in the

03:43   5   club.   Calm the girls down, whatever, and just go about my

6   business.   Go back and change the song before it ended.

7   Q.   If you were in the deejay booth and you saw something

8   suspicious, how would you communicate back to the managers?

9   A.   Mostly over the microphone, but we had a radio also that

03:43   10   we used if they heard it.   Most of the time with the music

11   being so loud, they didn't hear it.

12   Q.   Were you able to describe on the radio what was happening

13   or did you have like a certain, some sort of code word if you

14   needed to speak with the manager?

03:43   15   A.   I would say sound check to the manager, and they would

16   come up and check the sound.   I'm the sound.   So they would

17   come and see me.

18   Q.   So if you said sound check the managers would know that

19   you needed to speak with them -- -

20   A.   Correct.

21   Q.   -- and they would come to the deejay booth?

22   A.   Yes, ma'am.

23   Q.   Do you know whether Manny, Junior was able to view the

24   video camera images when he's not in the club?

03:44   25   A.   Sure.   Called me several times.

ROSARIO (Direct Examination)

1    Q.   How do you know that Manny, Junior can see the security

2    cameras?

3    A.   Well, he would ask, what's that guy doing outside?  Why

4    is the bouncer not doing his job?  Why there's no girls on

03:44    5    stage, things like that, that you would only see through the

6    camera.  You can't just guess over the phone.

7    Q.   So he would call you from a location separate from Stir

8    Crazy?

9    A.   Yes, ma'am.

03:44    10    Q.   And he would ask you in real-time what was happening?

11    A.   Yes.

12    Q.   If there was an issue he saw?

13    A.   Yes.

14    Q.   What would you do if Manny called and complained about an

03:45    15    issue?

16    A.   I tried to straighten it out.

17    Q.   Is that what you felt like he expected you to do?

18    A.   I don't know if that's what he expected me to do.  He

19    expected the situation to get taken care of.  Sometimes it

03:45    20    was a friend or a bouncer that was -- you know, and I would

21    warn him and tell him, "Hey, you know, they're watching you,

22    do what you're supposed to be doing."  Didn't want to see him

23    get in trouble.

24    Q.   So if he brought something to your attention, either you

03:45    25    would fix it or you would get the appropriate person --

1  A.  **Right.**

2  Q.  -- to resolve the issue?

3  A.  **Right.  I mean, he was calling me.  He wasn't calling the**

4  **manager on the cell phone.  He called me.  So --**

03:45  5  Q.  But his expectation was that you would resolve it?

6  A.  **To get it taken care of, yes.**

7  Q.  How would you describe your work as a deejay at Stir

8  Crazy?

9  A.  **Well, you know, it's a little monotonous, you call up the**

03:45  10  **girls, constantly same job over and over.  You do your spiel.**

11  **You do the announcements.  Answer the phone.**

12  Q.  So it was a lot of repetition?

13  A.  **Yes, ma'am.**

14  Q.  What, if any, managerial skill was required to be a

03:46  15  deejay at Stir Crazy?

16  A.  **It was -- there was really no managerial skill.  You just**

17  **followed the rules that they set and ran the show.**

18  Q.  Did you supervise any of the dancers or other workers at

19  Stir Crazy?

03:46  20  A.  **No, ma'am.**

21  Q.  Did you hire and fire anyone?

22  A.  **No.**

23  Q.  When you were hired, did you have a conversation with

24  anyone in management at Stir Crazy as to whether you were --

03:46  25  whether you would like to be paid as an employee, whether you

ROSARIO (Direct Examination)

1    had -- did they give you that choice?

2    A.  **No, no.**

3    Q.  Did Stir Crazy management have any rules regarding the

4    deejay booth?

03:47  5    A.  **No one was allowed in the deejay booth.**

6    Q.  And why was that?

7    A.  **They didn't want people hanging around in the deejay**

8    **booth.  They wanted the deejay to focus on his job and make**

9    **sure nothing would get spilled on the equipment.  And just --**

03:47  10   **that was pretty much it.**

11   Q.  Was there ever an occasion where Manny, Junior called you

12   regarding who was in the deejay booth with you?

13   A.  **Sure.**

14   Q.  Can you describe that?

03:47  15   A.  **He called asking, you know, why is that person in the**

16   **deejay booth?  I shouldn't have that person in the deejay**

17   **booth and if I can't do my job, they will find somebody else**

18   **to get it done.**

19   Q.  Now, you previously mentioned a rotation with respect to

03:47  20   the dancers.  Can you tell me what would happen if you broke

21   the dancer of rotation and took a dancer out of turn ahead of

22   another dancer?

23   A.  **I would get in trouble.  The girls were quick to tell on**

24   **you if you did that.**

03:48  25   Q.  Would it cause tension between not only you and the girls

ROSARIO (Direct Examination)

1    but also among the dancers?

2    A.  **Yes.  Among the dancers definitely.**

3    Q.  Do you think that tension among the workers at Stir

4    Crazy, would that be good for business or bad for business?

03:48  5    A.  **Bad for business.**

6    Q.  Would breaking the rotation, would that make the other

7    dancers happy or unhappy?

8    A.  **Mostly unhappy except for the girls that, you know,**

9    **wanted to get skipped or brought up to the stage.**

03:48  10    Q.  Did you break the rotation of dancers?

11    A.  **Sometimes I would have to.  I would have to.  And most of**

12    **the time I would get permission.  I would have to run to**

13    **Augusto, ask him if it was okay, if I can skip this girl, do**

14    **you want me to put her to the next rotation or do you want me**

03:49  15    **to put her up now, because I didn't wanted to get in trouble**

16    **for a little tip that you would get from a girl and**

17    **jeopardize my job.  It wasn't worth it.**

18    Q.  Did Stir Crazy impose any rules regarding how many songs

19    you could play for each dancer?

03:49  20    A.  **Yes, it was a two song set.**

21    Q.  And were there any rules regarding deejay's use of the

22    internet?

23    A.  **We weren't to be on the internet.  As little as possible**

24    **they wanted us on the internet.**

03:49  25    Q.  What was your understanding of what would happen if you

ROSARIO (Direct Examination)

1   didn't follow Stir Crazy's rules?

2   A.   **You would get reprimanded.**

3   Q.   And did that include termination?

4   A.   **Always included termination.  That was part of the lingo.**

03:49  5   Q.   Are you aware of any deejay who was terminated because of

6   insubordination to management?

7   A.   **Yes.**

8   Q.   Who was that?

9   A.   **A gentleman by the name of Todd.**

03:50  10  Q.   What, if any, guidance did you receive from club

11  management about how to perform your deejay work?

12  A.   **High energy, positive attitude, call the girls, play what**

13  **the girls like that is something that I always heard, do all**

14  **the announcements, all the deejay typical.**

03:50  15  Q.   In terms of the type of music that you could play at Stir

16  Crazy, were there any rules that Stir Crazy imposed on you?

17  A.   **That they didn't want a lot of hip-hop, and also they**

18  **didn't want a lot of rock.  But, then again, they would tell**

19  **you to play what the girls liked.**

03:51  20  Q.   And I'd like you to turn to Plaintiff's Exhibit 4.

21  A.   **All right.**

22  Q.   Can you identify that exhibit?

23  A.   **Yes, ma'am.  It's a text that I received from one of the**

24  **managers, Rolly.**

03:51  25  Q.   And when you say Rolly, who are you referring to?

1    A.   **Rolando.**

2    Q.   What's his last name?

3    A.   **I really don't -- can't remember his also name.**

4    Q.   Is it Rolando García?

03:51    5    A.   **Rolando García?**

6    Q.   Right.

7    A.   **No.**

8    Q.   I'm sorry, Rolando Quevedo?

9    A.   **Quevedo.  Yes.  Yes.  He was the other manager.**

03:51    10         **MR. BOBER:**  At this time, Plaintiff offers

11   Plaintiff's Exhibit 4 on my exhibit list for admission.

12         **MR. McDONALD:**  No objection, Your Honor.

13         **THE COURT:**  All right.  Plaintiff's 4 will be

14   admitted.

03:52    15         (Thereupon, the aforementioned exhibit was admitted

16   into evidence.)

17   **BY MRS. ROBBINS-BOBER:**

18   Q.   And can you tell me what -- that's a text from Rolando

19   giving you song suggestions?

03:52    20   A.   **Yes.  Yes.**

21   Q.   And when you received that text, did you disregard it or

22   did you follow it?

23   A.   **I had to follow it.  He was one of the night managers.**

24   Q.   Can you tell me, was there a certain type of music that

03:52    25   Stir Crazy did not want you to play?

ROSARIO (Direct Examination)

1    A.  **It was definitely rap, heavy hip-hop, sometimes**

2    **Reggaeton, but most of Rolly's suggestions were Reggaeton.**

3    Q.  Were there certain managers who told you to play one kind

4    of music and other managers who told you to play a different

03:53  5    kind?

6    A.  **Sure.**

7    Q.  Did you have to kind of juggle depending on which

8    managers was on the shift?

9    A.  **Always.  Always.**

03:53  10   Q.  You mostly worked night shift.  Was there occasion where

11   you worked day shifts?

12   A.  **Yes, ma'am.**

13   Q.  And was there a difference in the type of music that Stir

14   Crazy management wanted you to play on the day shift versus

03:53  15   the night shift?

16   A.  **Yes.  They accommodated more to the girls, I felt, during**

17   **the day.  But you had to also be leery of the customers and**

18   **you have to throw in some old rock or, you know, some old 80s**

19   **music to accommodate everyone.  So it was --**

03:53  20   Q.  Was the difference between the type of music you had to

21   play, was that because were there different crowds during the

22   day and at night?

23   A.  **Definitely different crowds.  Different girls.  It was**

24   **totally different from the nighttime.**

03:54  25   Q.  Are you aware of any instances where a manager told the

ROSARIO (Direct Examination)

1  deejay to stop playing a song?

2  A.  **Sure.**

3  Q.  Can you give me an example?

4  A.  **I was told to stop playing music certain -- several times**

03:54  5  **from Augusto, the nighttime manager.  As an example, he would**

6  **run up to the deejay booth and tell me not to play that**

7  **music.**

8  Q.  When, if ever, were you disciplined for playing or not

9  playing a certain type of music?

03:54  10  A.  **Well, one time I lost my shifts, the best shifts I've**

11  **had, Wednesday, Thursday, Friday, Saturday.  I was told by**

12  **Augusto, play what the girl likes.  So I was playing what**

13  **this certain girl liked.  It was kind of, you know, romantic**

14  **music, not too slow, but it was a little low beat, and Manny**

03:55  15  **walks in and he took away my shifts.  Augusto never even told**

16  **him that it was him that told me to play what the girl**

17  **wanted.**

18  Q.  Why, if at all, would -- why would -- so you had some

19  shift taken away from you?

03:55  20  A.  **Yes, ma'am.**

21  Q.  Were you -- did you lose the shifts all together?  Were

22  you moved to the day shift?

23  A.  **I was moved to the slowest shifts you can get.  That's**

24  **when Cruz took over my schedule.**

03:55  25  Q.  If a shift is slow, how would that negatively affect you?

ROSARIO (Direct Examination)

1    A.   **Less money.**

2    Q.   And would there be more girls or less girls working on

3    the slow shifts?

4    A.   **Less girls.  Lesser quality of client that would come in**

03:56    5    **because it's slower nights.**

6    Q.   And if you had -- if there were less girls working on a

7    shift, would you get less $10 fees tips?

8    A.   **Definitely.  Sometimes I wouldn't get tipped.**

9    Q.   You did earn some money working at Stir Crazy, correct?

03:56   10    A.   **Yes.**

11    Q.   And where did that money come from?  Did it come from

12    Stir Crazy?

13    A.   **No, Stir Crazy never paid me.  It was through the girls.**

14    **They tipped me.**

03:56   15    Q.   Now, you said that the dancers, who you also referred to

16    as the girls, sometimes they would pay you less than $10 per

17    shift, correct?

18    A.   **Yes.**

19    Q.   Why would they do that?

03:56   20    A.   **They didn't make any money.  They didn't make what they**

21    **expected to make.  Their clients that they were waiting for**

22    **didn't come in.**

23    Q.   So if there weren't enough customers, customer volume

24    wasn't high enough, they wouldn't make enough money and that

03:57   25    would affect you?

```
 1  A.   Yes, it would.  And many times if I didn't play the music
 2  that they liked because I couldn't play it, that would affect
 3  my tip.
 4  Q.   And the reason you couldn't play it was why?
03:57  5  A.   Because of what management, the rules that they put.
 6  Q.   Were you ever tipped more than $10 per shift by a dancer?
 7  A.   Yes.  It was rare.  But yes.  It happened.
 8  Q.   Did you have any control over the number of dancers who
 9  worked on one of your shifts?
03:58 10  A.   No, ma'am.
11  Q.   Who decided how many dancers worked on your deejay shift?
12  A.   Management.
13  Q.   And were you required to pay the Stir Crazy a fee to be
14  able to work on a shift at Stir Crazy?
03:58 15  A.   Yes.  $25.
16  Q.   Was that something that was optional?
17  A.   No, it was no option.
18  Q.   You weren't given a choice?
19  A.   No.
03:58 20  Q.   What did Stir Crazy call that payment?
21  A.   A house.
22  Q.   Did you pay the $25 to the club -- where did you pay --
23  what did -- where did the $25 come from that you would turn
24  over to the club?
03:58 25  A.   From what the girls would give me.  The dancers, what
```

ROSARIO (Direct Examination)

1    they would give me.

2    Q.  Did you share in the club's profits?

3    A.  No, ma'am.

4    Q.  Did you have any ownership interests in the club or its

03:59  5    equipment?

6    A.  None.

7    Q.  Can you tell the ladies and gentlemen of the jury how, if

8    at all, you were important to the club's operations?

9    A.  I had importance due to the fact that I needed to play

03:59  10    the music for the dancers to come up and solicit and keep the

11    energy up.  It was something that was needed.

12    Q.  Could the club run smoothly if you weren't there to call

13    the girls on the rotations?

14    A.  No.  It wouldn't.

03:59  15    Q.  So they couldn't just turn on an iPod and let the music

16    run itself; is that right?

17    A.  No.  Unless the iPod could call each girl.

18    Q.  And that was some day in the future?

19    A.  Yeah, we're not there yet.

04:00  20    Q.  In addition to the rotation, what other important part of

21    the club's operations did you help with in terms of, like,

22    the promoting things?

23    A.  Well, definitely had to promote the specials, the

24    dancers, friction dancers, the anniversary party, Christmas

04:00  25    party, Halloween party, beer specials.  Any specials that

ROSARIO (Direct Examination)

1    were going on I had to be the voice.

2    Q.  Did you -- was having good music, did that have an effect

3    on the customers?

4    A.  **Somewhat.  If you had to play music that the girls liked,**

04:01   5    **in turn they would make the customer happy.  But you had to**

6    **keep the atmosphere, you know, upbeat and happy and --**

7    Q.  If you -- if the customers were happy, would they tend to

8    stay longer and spend more money at the club?

9    A.  **Sure.**

04:01   10   Q.  Did you use any of your own equipment to perform your

11   deejay work at Stir Crazy?

12   A.  **All I brought was my laptop, my personal laptop, and a**

13   **microphone.**

14   Q.  How much did the microphone you brought cost you?

04:01   15   A.  **Standard mic, I'd say about 50 bucks.**

16   Q.  Was that something you brought because Stir Crazy didn't

17   provide a microphone or was that just a preference?

18   A.  **Yes.  They had a microphone.**

19   Q.  And so why did you bring your own?

04:01   20   A.  **Because that one was nasty.  I didn't want to put my lips**

21   **on that.**

22   Q.  Is there -- besides the microphone, you mentioned that

23   you brought your own personal laptop; is that correct?

24   A.  **Yes, ma'am.**

04:02   25   Q.  How would you use your laptop to perform your deejay

ROSARIO (Direct Examination)

| | |
|---|---|
| | 1 | work? |
| | 2 | A.  Well, I had songs on there that I would use.  I had songs |
| | 3 | that girls liked that other deejays didn't have.  And I |
| | 4 | also -- there was a backup.  Once in a while, you know, the |
| 04:02 | 5 | computer would go down or the power would go out and you have |
| | 6 | to have a backup, and that's mainly -- mainly, for me, that's |
| | 7 | what I used it for. |
| | 8 | Q.  If you chose not to bring your own computer or you |
| | 9 | brought your laptop, would you still be able to do your |
| 04:02 | 10 | deejay work at Stir Crazy? |
| | 11 | A.  Yes, ma'am. |
| | 12 | Q.  What type of equipment did they provide you? |
| | 13 | A.  Well, they had the computer with all the songs on it. |
| | 14 | The internet.  You had the amplifiers, the mixer, light |
| 04:03 | 15 | switch for all the different lights.  Everything was there. |
| | 16 | Microphone if you needed it. |
| | 17 | Q.  The computer you brought to work at Stir Crazy, did you |
| | 18 | use that only for Stir Crazy or did you also use it as your |
| | 19 | personal laptop? |
| 04:03 | 20 | A.  That was my personal laptop. |
| | 21 | Q.  When you were working at Stir Crazy, for the period of |
| | 22 | September 2008 to September 2013, the alleged liability |
| | 23 | period for the wages, did you perform deejay work at any |
| | 24 | other clubs, deejay work? |
| 04:03 | 25 | A.  Full-time deejay work?  No. |

ROSARIO (Direct Examination)

```
         1    Q.  Was there a period where you trained at another club?

         2    A.  Yeah, it was just training.  I was trying to see if I

         3    could find something that I could add to my income.  And I

         4    went to a club called Dean's Gold.  And I trained, and they

04:04    5    trained me for training because they paid their deejays an

         6    hourly wage and half of that was paid for training.

         7    Q.  How long did you train at Dean's Gold?

         8    A.  It was really just one day.  I got paid for one day.

         9    Should have been two, but I didn't push the issue.  They sent

04:04   10    me a check and --

        11    Q.  Do you recall how much you were paid?

        12    A.  Fifty dollars.

        13    Q.  And do you recall what year that occurred?

        14    A.  It was 2013.

04:05   15    Q.  And were you previously unsure whether it was 2013 or

        16    2012?

        17    A.  Right.  I found a W-2 recently and I saw that it was

        18    2013.

        19    Q.  So did you work for Dean's Gold at any time in 2012?

04:05   20    A.  No.  Training, that was it.  Didn't get on the mic and

        21    make any money, any tips or anything like that.

        22    Q.  And what type of business is Dean's Gold?

        23    A.  It's a gentleman's club.

        24    Q.  So it's a similar type of club?

04:05   25    A.  It's a high end.
```

ROSARIO (Direct Examination)

```
     1    Q.   Higher end strip?

     2    A.   Yes, ma'am.

     3    Q.   And why did it not work out at Dean's Gold?  Why couldn't

     4    you work at Stir Crazy and Dean's Gold at the same time?

04:05  5    A.   There was a conflict of the schedule.  Plus I was going

     6    to be the new guy.  I'm used to being the top guy.  So I just

     7    figured I'd just stay where I was at.

     8    Q.   Would it have been okay to work at Stir Crazy and work at

     9    Dean's Gold?

04:06  10   A.   No.  You couldn't work at both.  No, ma'am.

     11   Q.   You talked about you had seniority at Stir Crazy and you

     12   didn't have it at Dean's Gold?

     13   A.   Right.

     14   Q.   Would that affect the type of shifts you would be able to

04:06  15   work?

     16   A.   Yes.  Yes.

     17   Q.   So if you -- at Stir Crazy you were given the night

     18   shift, correct?

     19   A.   Uh-huh.  (Nodding affirmatively).

04:06  20   Q.   And would you have been able to get that at Dean's Gold?

     21   A.   I would have been able to get it at Dean's Gold, but it

     22   was going to conflict with Stir Crazy.  And I would not be

     23   able to work both clubs at the same time.  It was against the

     24   rules.

04:07  25   Q.   But you would have been also the low man on the totem
```

ROSARIO (Direct Examination)

1  pole?

2  A.  **That also.**

3  Q.  And where did you get the understanding that working at

4  two clubs would conflict with what Stir Crazy wanted?

04:07  5  A.  **It was a rule.  A rule that I knew for years, the 12**

6  **years that I was working there.  That was something that no**

7  **one could do.**

8  Q.  Did Stir Crazy require you to have flexibility with

9  respect to your schedule to fill in shifts if a deejay needed

04:07  10  a shift off?

11  A.  **Yes, ma'am.**

12  Q.  And were there -- during the time period of September '08

13  to September 2013, were there times where there were only

14  three deejays on a shift?

04:08  15  A.  **Yes.  Three deejays on the whole -- in the whole building**

16  **so if one got sick, you had to cover.**

17  Q.  So if one deejay worked a day shift and the other deejay

18  was -- couldn't work the night shift, you would fill in?

19  A.  **You would -- it would be a priority.  One of the rules**

04:08  20  **were you couldn't work double shifts day and night, so there**

21  **had to be another deejay to fill in.**

22  Q.  Is that because if you worked a double shift, you would

23  be working like a 17-hour day?

24  A.  **Pretty much.**

04:08  25  Q.  Now, you talked about whether you worked as a deejay

1    anywhere else from September 8th, 2000 -- September 2008 to

2    September 21st, 2013.  Can you tell me if you worked anywhere

3    else besides Stir Crazy during that period in any other

4    capacity?

04:09  5    A.  **Besides deejays?**

6    Q.  Right.

7    A.  **I was a mortgage -- well, the mortgage broker ended in**

8    **2007, so, and I had a trailer, a food trailer.  And that was**

9    **a big loss of money.  That was a loss.  Didn't make any money**

04:09  10   **there.**

11         **I also had -- I was going to do a courier service.**

12   **My brother-in-law was going to help me.  That didn't pan out.**

13   **Didn't even get to purchase anything really on that or do**

14   **anything.**

04:09  15        **And, but I got my auctioneer's certificate, and I**

16   **helped a buddy out that had a company doing auctions and**

17   **benefits and I did a few benefits with him.**

18   Q.  And let's go through those one by one.  With respect to

19   the auctioneer work that you did, that's something you did

04:10  20   regularly or was this like a --

21   A.  **It was a once in a while thing.  I was a floor man.  I**

22   **wasn't the auctioneer.  So if there was a bid on, someone**

23   **would raise -- make a sign for putting in a bid I would be**

24   **the one to signal the auctioneer.  It's called the floor man.**

04:10  25   Q.  So just a few times you --

ROSARIO (Direct Examination)

1    A.   **Yeah, just a few times.**

2    Q.   During that period?

3    A.   **I'd say about two.**

4    Q.   And can you tell me about this courier service?  You

04:10    5    mentioned that it didn't pan out.  Can you tell me why?

6    A.   **Well, it's supposed to be through my brother-in-law's**

7    **printing company that he worked for.  He was going to use me**

8    **to pick things up and deliver them, but he wasn't able to**

9    **sign myself in there to be one of the couriers.  So it just**

04:11   10    **didn't pan out.**

11    Q.   Now, you had -- you were trying to do that while working

12    at Stir Crazy, correct?

13    A.   **Yes.  All those gigs that I was doing, the other jobs**

14    **that I was doing were separate from my shifts.  The courier**

04:11   15    **was daytime.  The auctioneering was on a Sunday, usually I**

16    **had Sundays off, and the trailer was a daytime lunch style**

17    **trailer.**

18    Q.   So you tried to do something with like a courier service.

19    And you had responsibilities, you were working either four or

04:11   20    five 8-and-a-half hour shifts at Stir Crazy, correct?

21    A.   **Yes, ma'am.**

22    Q.   And you also had responsibilities at home; is that

23    correct?

24    A.   **Yes, ma'am.**

04:11   25    Q.   Your kids in 2008 were about -- did you say 9 or 10 years

ROSARIO (Direct Examination)

1    old?

2    A.  **Around there.**

3    Q.  So during that time entire time period, your kids were

4    between 9 and 14 or 10 and 15, something like that?

04:11  5    A.  **Yes.**

6    Q.  Is that a demanding time with kids?

7    A.  **Big time, yes.**

8    Q.  The teenage years?

9    A.  **Oh, yeah.  Oh, yeah.**

04:12  10   Q.  So did that affect your ability to make the courier

11   service work?

12   A.  **It was tough on the family, you know, the wife was -- she**

13   **was working and I was trying to do two jobs at once.  One in**

14   **the day, one at night and the kids, you know, they come home**

04:12  15   **from school, and it was a responsibility.  It was a tough**

16   **thing to accomplish.**

17   Q.  And now moving to the food truck, why did that not work

18   out?

19   A.  **I guess it was the wrong time.  It was like a year or two**

04:12  20   **before the food truck thing exploded here in Miami and I just**

21   **didn't have the location.**

22       **The rules for having a -- it was called -- it was**

23   **like having a place to wash the pots and pans, and store the**

24   **food, that was very difficult to accomplish to get a spot to**

04:13  25   **do that, so I just couldn't do it and I was paying a fee of**

ROSARIO (Direct Examination)

1   rental to the owner of the food truck, and it just was a big

2   loss.

3   Q.   So in terms of how you paid your bills at home, where did

4   the income come to pay the bills?

04:13   5   A.   Stir Crazy.

6   Q.   And not from Stir Crazy in particular, but your work

7   there, correct?

8   A.   Yes, ma'am.

9   Q.   From the money?

04:13   10   A.   Not from the company.  They never paid me.  It was

11   working and getting my money from the dancers.

12   Q.   Now, I'd like you to turn to Plaintiff's Trial Exhibit

13   notebook again, if you'll turn to tab number 8.

14   A.   (Complies.)  All right.

04:14   15   Q.   And can you identify that document?

16   A.   This is an application from Stir Crazy.

17   Q.   Can you tell me the -- is that your name on that

18   agreement?

19   A.   My name.  My position.

04:14   20   Q.   I'm sorry, can you turn to Plaintiff's Number 8?  Are you

21   on Number 8?

22   A.   Yes, the license agreement.

23   Q.   Is that your name on there?

24   A.   That is my name.

04:14   25   Q.   Is that your signature on the document?

ROSARIO (Direct Examination)

1    A.   That is my signature, but the -- whoever filled it out,

2    that wasn't me.

3    Q.   And so you didn't fill out the date or anything?

4    A.   No, ma'am.

04:15    5    Q.   If you can recall, do you know whether it sounds about

6    right that it was towards the end of August that you filled

7    this application out?

8    A.   Yes.

9            MR. McDONALD:   I'm sorry, can we get the full date?

04:15   10            MRS. ROBBINS-BOBER:   Sure.

11   BY MRS. ROBBINS-BOBER:

12   Q.   Can you read the date on the -- not the application, I

13   misspoke.   Can you read the full date on Plaintiff's Exhibit

14   8 which you've identified as a license agreement?

04:15   15   A.   August 30th, 2013.

16   Q.   But you didn't write that date in there, right?

17   A.   No.

18   Q.   You can't confirm that that was the exact date, correct?

19   A.   No, I didn't write that.

04:15   20   Q.   Can you tell me -- can you describe the circumstances

21   that you -- that surrounded signing this document?

22   A.   It was brought to me at about 3:30 in the morning on one

23   of my shifts.   And they wanted me to sign it.

24   Q.   Do you recall who handed you the document?

04:16   25   A.   It was Rolly, Rolly that -- Rolando who brought it to me.

ROSARIO (Direct Examination)

1    **I was a little nervous because it said I was a professional**

2    **dancer.  I thought maybe I had to take off my clothes.**

3    Q.  Now, the fact that it says that you're a professional

4    dancer on this agreement --

04:16    5    A.  **Yes.**

6    Q.  -- does that mean that you are a professional dancer?

7    A.  **No, ma'am.**

8    Q.  And you've never done that type of work, correct?

9    A.  **No.  No.**

04:16   10    Q.  Was there a point when you spoke to an individual named

11    Cruz Hernandez?

12    A.  **Yes.**

13    Q.  And did -- can you tell me about that conversation?

14    A.  **I spoke to Cruz after I signed this piece of paper here**

04:17   15    **and he informed me that I was --**

16              MR. McDONALD:  Object to hearsay.

17              THE COURT:  Yes.  I know it's difficult,

18    Mr. Rosario, but you can only testify as to what you yourself

19    said or what happened between the two of you, not as to what

04:17   20    he said.

21              MRS. ROBBINS-BOBER:  Your Honor, can I have a brief

22    side-bar regarding this issue so I can let you know the

23    purpose?

24              THE COURT:  Yes, you may.

04:17   25              (Thereupon, there was a side-bar conference outside

ROSARIO (Direct Examination)

```
 1    the presence and hearing of the jury.)

 2             THE COURT:  You're putting everybody to sleep.  You

 3    have to --

 4             MRS. ROBBINS-BOBER:  I'll stop speaking in

 5    monotone.

 6             MR. McDONALD:  I think it's the plaintiff, but

 7    okay.

 8             THE COURT:  Both.  It's totally the opposite of

 9    Mr. Bober and Mr. Insua.  It's the --

10             MR. McDONALD:  The two personalities that clash.

11             MRS. ROBBINS-BOBER:  So we can do this testimony

12    separately.  I'm not offering it for the truth of the matter.

13    I'm offering it to show his state of mind.  I don't know if

14    the Defendants are still doing the -- the estoppel or that's

15    been resolved by the Court.

16             MR. McDONALD:  What does that have to do?  That had

17    to do with representations made in bankruptcy back in 2009

18    and tax returns.

19             MRS. ROBBINS-BOBER:  It has to do with whether he

20    knew at the time he signed this agreement whether he was an

21    independent contractor.  And it has to do with -- it has to

22    do whether he knew at the time he signed the bankruptcy

23    documents that he was an employee or independent contractor,

24    and I anticipate his answer would be that he didn't know at

25    the time he signed those documents that he was an employee or
```

1  independent contractor.  That he didn't know at the time he

2  signed the bankruptcy documents that he was an employee or

3  independent contractor, that he first realized he had those

4  legal rights when Mr. Hernandez spoke to him.

04:19   5       MR. McDONALD:  My only concern is he's about to say

6  everything that Mr. Hernandez said.  I mean, Mr. Hernandez

7  might have shared things he found on the internet so now

8  we're getting hearsay within hearsay.  That's my concern is

9  now he's going to start saying what the law and all those

04:20  10  things.  I mean --

11       MRS. ROBBINS-BOBER:  This has to come in with

12  respect to the bankruptcy issue which is an issue only for

13  the Court.  So if you wanted to --

14       THE COURT:  If it's only for the Court, you don't

04:20  15  want the jurors to hear about it.  So you don't need that.

16       Why don't you caution him at this point in time,

17  like keep my caution standing, only to say what he said.  And

18  if there's any -- I appreciate your thing about not for the

19  truth of the matter but for how he asked it, but we don't

04:20  20  know how he acted yet.

21       Are you saying that that influenced him saying that

22  the license agreement --

23       MRS. ROBBINS-BOBER:  Yeah, he spoke with

24  Mr. Hernandez after he signed the licensing agreement.

04:20  25       THE COURT:  All right.  So how does what he hear

1    from Mr. Hernandez affect his state of mind?

2          MRS. ROBBINS-BOBER:  Because he's going to testify

3    that when he spoke with Mr. Hernandez and Mr. Hernandez

4    informed him of his legal right that he may be legally

04:21   5    entitled to wages.

6          THE COURT:  All right.

7          MRS. ROBBINS-BOBER:  And that's when he first

8    realized that he was entitled to wages as opposed to what

9    defendants are arguing.

04:21   10          THE COURT:  And then what did he do?

11          MRS. ROBBINS-BOBER:  Well, it's -- it's the

12    knowledge.  They're arguing that he was -- that he made a --

13    he made an intentional misstatement in his bankruptcy

14    documents because he knew at the time he signed the documents

04:21   15    that he was an independent contractor and this goes to show

16    that he didn't realize that legally he was an employee until

17    he spoke with Cruz.

18          MR. McDONALD:  May I make --

19          THE COURT:  Yeah, I think the timing issue has to

04:22   20    be really put down because are you saying that when he found

21    out the self-employed papers was before he spoke to --

22          MRS. ROBBINS-BOBER:  Yes.

23          THE COURT:  And then how -- so then when he spoke

24    to Hernandez is when he found out he was not self-employed?

04:22   25          MRS. ROBBINS-BOBER:  Correct.

1          THE COURT:  I mean, the words there are not

2    independent contractor.  They're either self-employed or

3    they're not.

4          MRS. ROBBINS-BOBER:  The words what?

04:22  5          THE COURT:  It's self-employed.

6          MRS. ROBBINS-BOBER:  Right.

7          THE COURT:  It's not independent contractor.  It's

8    self-employed.

9          MRS. ROBBINS-BOBER:  It's one in the same thing.

04:22  10          THE COURT:  Not necessarily.  Not necessarily.  You

11    know, you can be self-employed and not be working for

12    anybody.

13          MRS. ROBBINS-BOBER:  Right.  Right.  But that I

14    need him to -- he never filled out a document after he spoke

04:23  15    to Cruz that was the -- he never filled out any further

16    documents that he's self-employed.  I need to establish that.

17    That's where he gained the knowledge because he's going to

18    say he was lying on the documents.

19          THE COURT:  You can ask him after he spoke to Cruz

04:23  20    Hernandez what was his understanding of his employment.  That

21    would not be hearsay.

22          MR. McDONALD:  You can ask him when they spoke.

23    I'm not trying to help her here but she can ask him when.

24          THE COURT:  And that way you're avoiding the

04:23  25    hearsay.

1          MR. McDONALD:  As opposed to what did he say.

2          THE COURT:  Exactly.  Because if you're after his

3  state of mind, what do you care what he told him?

4          MRS. ROBBINS-BOBER:  Thank you.

04:23  5          THE COURT:  All right.

6          MR. McDONALD:  Your Honor, I just wanted to -- I

7  assume you still have more to go?

8          THE COURT:  You're going to --

9          MR. McDONALD:  I have some video equipment to set

04:23  10  up, too, so that's why it was going to take me a few minutes,

11  not just a few minutes.  Probably like 10.

12          MRS. ROBBINS-BOBER:  I'm endeavoring to finish this

13  afternoon.

14          MR. McDONALD:  I have things that I want to put

04:24  15  some documents up on the screen, so I need to get my

16  projector.

17          THE COURT:  Well, we won't start.  We won't start

18  the process.

19          MR. McDONALD:  That's what I was going to say.

04:24  20          THE COURT:  Correct.

21          MRS. ROBBINS-BOBER:  Your Honor --

22          THE COURT:  You can go to the direct.

23          MRS. ROBBINS-BOBER:  Okay.  But --

24          THE COURT:  But regard -- we're going until 5:00,

04:24  25  regardless of where she's at.  All right.

1          MR. McDONALD:  That's how we'll do it.

2          MRS. ROBBINS-BOBER:  Thank you, Your Honor.

3          (Thereupon, the side-bar conference was concluded.)

4    BY MRS. ROBBINS-BOBER:

04:24    5    Q.   So Mr. Hernandez [sic], with respect to Plaintiff's

6    Exhibit Number 8, you said you spoke to Cruz Hernandez after

7    you signed this document; is that correct?

8    A.   **Yes, ma'am.**

9    Q.   And before -- after you signed this document, okay, so

04:25   10    when you -- after you spoke to Cruz Hernandez what was

11    your -- what did you learn about your wage rights?

12    A.   **Well, I realized that I should have been paid as an**

13    **employee.  I realized that I wasn't an independent**

14    **contractor.**

04:25   15    Q.   And after you -- after you spoke with Cruz Hernandez, did

16    you ever sign another document after that indicating you were

17    self-employed or an independent contractor?

18    A.   **No, ma'am.**

19    Q.   What involvement did Mr. Flórez have in operating the

04:26   20    club?

21    A.   **He was the general manager.**

22    Q.   He was involved in all aspects?

23    A.   **All aspects of the club.**

24    Q.   And do you know who Laura Insua is?

04:26   25    A.   **Yes.**

```
        1   Q.   From working at the club?

        2   A.   Yes.

        3   Q.   Did you ever have an occasion to see her at the club?

        4   A.   Yes.  During the day.  Day shifts she would be in the
04:26   5   office speaking to Eddy.

        6   Q.   Did you -- and you say you typically work night shifts?

        7   A.   Correct.

        8   Q.   So if you worked the night shift you would haven't an

        9   opportunity to see her in the day club if you worked the
04:26   10  night, correct?

        11  A.   Yes.

        12  Q.   And when you saw her come into the club, did -- what was

        13  your understanding of why she was there?

        14  A.   Well, through Eddy --
04:26   15          MR. McDONALD:  Objection, Your Honor.

        16          MRS. ROBBINS-BOBER:  It's a party statement.

        17          THE COURT:  I'm sorry, what's the objection?

        18          MR. McDONALD:  What is your understanding of why

        19  she was there?
04:26   20          MRS. ROBBINS-BOBER:  He's about to talk about Eddy

        21  Flórez.

        22          THE COURT:  All right.  Hold on just a second.

        23          You should rephrase it.  Did management explain to

        24  you, and it's a party opponent.
04:27   25          MRS. ROBBINS-BOBER:  Thank you, Your Honor.
```

ROSARIO (Direct Examination)

1    BY MRS. ROBBINS-BOBER:

2    Q.   Did management at Stir Crazy say anything to you

3    regarding what Mrs. Insua's purpose was for being at the

4    club?

04:27   5    A.   **Yes.**

6    Q.   And what was that?

7    A.   **To pick up the house money.**

8    Q.   As a deejay, you're not part of the club management,

9    right?

04:27  10    A.   **No.**

11    Q.   So would Laura Insua be someone who you would have

12    contact with as a deejay?

13    A.   **No.**

14    Q.   That would -- if there were any issues -- who was your --

04:27  15    who was the person who you would go to?

16    A.   **Manager.  Any of the managers.**

17    Q.   What involvement did Manny, Junior have with respect to

18    Stir Crazy?

19    A.   **He was the owner.  He was involved in all aspects also.**

04:28  20    Q.   With respect to Mr. Flórez, did Mr. Flórez ever talk

21    about what Manny wants or --

22    A.   **Constantly.**

23    Q.   What would he say?

24    A.   **Manny said whatever the situation was.  What we had to**

04:28  25    **do.**

1    Q.  What was your impression of what Manny, Junior's role was

2    at the club?

3    A.  **He ran the club.  He was the owner.**

4    Q.  Where is it you get that impression that he was the

04:29    5    owner?

6    A.  **Through management and through Manny.**

7    Q.  Manny would refer to himself as the owner of Stir Crazy?

8    A.  **He didn't tell me, hey, I'm the owner, but everyone knew**

9    **that he was the man.  He was the owner.  He was the man.**

04:29    10    Q.  So you had interaction with Manny, Junior personally,

11    correct?

12    A.  **Yes.**

13    Q.  And that's how he referred to himself to you?

14          MR. McDONALD:  Objection.

04:29    15    A.  **That's how it was.**

16          MR. McDONALD:  Mischaracterizes his last statement.

17          THE COURT:  Actually, the question is not clear.

18    And that's how he referred to himself to you.  But the

19    witness said he didn't say he was the owner.  So I will

04:29    20    sustain the objection.

21          You may re-ask in a way that comports with the

22    testimony.

23    BY MRS. ROBBINS-BOBER:

24    Q.  How did Manny, Junior refer to himself with respect to

04:30    25    his relationship to Stir Crazy?

ROSARIO (Direct Examination)

1  A.  **He was the owner and he oversaw and whatever rule he**

2  **said, you had to do it.**

3  Q.  Did he actually call himself the owner?

4  A.  **I'm pretty sure he did.  That's a definite.  He was the**

04:30   5  **one that had control.  Eddy followed whatever Manny said.**

6  Q.  Now -- now you mentioned that Stir Crazy had you sign a

7  licensing agreement around the end of August, sometime around

8  the end of August, 2013; is that correct?

9  A.  **Yes.**

04:30  10  Q.  And you previously stated you were terminated on

11  September 21st, 2013; is that right?

12  A.  **Yes.**

13  Q.  Prior to being terminated, you contacted an attorney

14  about your wage claim, correct?

04:31  15  A.  **Correct.**

16  Q.  Please don't go into anything you discussed with your

17  attorney.  I'm just trying to establish the timing.  On

18  September 13th, 2014, did your attorney send a letter to the

19  attorney for Stir Crazy notifying them of your wage claim?

04:31  20  A.  **Yes.**

21  Q.  And after the letter was sent were you, in fact,

22  terminated?

23  A.  **I sure was, yes.**

24  Q.  Can you tell me about how -- describe how the termination

04:31  25  occurred, how you were told your services were no longer

ROSARIO (Direct Examination)

1   needed.

2   A.  **I was walking through the parking lot, going to work, and**

3   **Eddy and Augusto were waiting outside for me.**

4   Q.  They were -- was this daytime or nighttime?

04:32  5   A.  **It was at night.**

6   Q.  And so you were arriving to start your night shift?

7   A.  **Saturday night shift.**

8   Q.  And so Augusto was there, correct?

9   A.  **Yes.  Yes.**

04:32  10  Q.  And what, if anything, did they say to you?

11  A.  **Augusto asked me in Spanish, do you have a case against**

12  **the club?**  *Un caso*, **is what he said.**

13  Q.  Did you respond?

14  A.  **I said yes.**

04:32  15  Q.  And what was said next, if anything?

16  A.  **Augusto said, "Well, then you can't work here."**

17  Q.  Was anything else said?

18  A.  **Eddy patted me on the shoulder and they both walked away.**

19  Q.  Did they say something like, this is the end?

04:32  20  A.  **Pretty much.**

21  Q.  Did you notice any type of expression on Mr. Flórez's

22  face when this conversation occurred when you were fired?

23  A.  **It was kind of a good-bye smirk is what I got from it.**

24  **Typical Eddy fashion.**

04:33  25  Q.  When you were scheduled to work on -- when you were

ROSARIO (Direct Examination)

1    terminated on September 21st, do you remember what day of the

2    week that was?

3    A.  **It was a Saturday night.**

4    Q.  Were you scheduled to work that shift?

04:33  5    A.  **Yes, ma'am.**

6    Q.  And you were terminated before your shift began, correct?

7    A.  **Correct.**

8    Q.  Were you able to -- you were not able to work that shift,

9    of course, correct?

04:33  10   A.  **Yes.  Correct.**

11   Q.  Did you lose any money by not being able to work that

12   Saturday night?

13   A.  **Sure.**

14   Q.  How much would you typically make on a Saturday night?

04:33  15   A.  **I'd say one to two hundred bucks.**

16   Q.  And that would be money from the dancers, correct?

17   A.  **Yes.**

18   Q.  When you were terminated from Stir Crazy, what, if

19   anything, would lead you to believe that Eddy Flórez knew

04:34  20   that you'd been complaining about your wages?

21          MR. McDONALD:  Objection.  It's leading.  This

22   witness hasn't testified that something gave him any

23   indication.

24          MRS. ROBBINS-BOBER:  I can rephrase it.

04:34  25          THE COURT:  You can rephrase it.  You can introduce

ROSARIO (Direct Examination)

          1    what Mr. Flórez said to him.

          2              MR. McDONALD:  Your Honor, he's already testified

          3    that --

          4              THE COURT:  Well, she can probe a little bit more.

04:34     5    BY MRS. ROBBINS-BOBER:

          6    Q.  What -- would anything lead you -- would anything lead

          7    you to believe -- what, if anything -- do you know why --

          8    what would lead you to believe that Mr. Flórez terminated you

          9    because of your wages?

04:35    10              MR. McDONALD:  Objection, Your Honor.  There has

         11    been no testimony that he was led to believe anything.

         12              THE COURT:  Right.  It suffers from the same

         13    deficiency.  You need to lay a predicate.

         14    BY MRS. ROBBINS-BOBER:

04:35    15    Q.  Did you have an impression as to -- do you know why you

         16    were terminated?

         17    A.  **Because of the claim that I put into the club about my**

         18    **wages.**

         19    Q.  Are you aware that another deejay had previously before

04:35    20    you complained to the club about wages?

         21    A.  **I was aware.**

         22    Q.  And so when you were terminated, this other deejay had

         23    already complained to the club; is that correct?

         24    A.  **Yes.**

04:36    25    Q.  How did you feel when you were terminated?

ROSARIO (Direct Examination)

1    A.  Well, after 12 years of loyalty, you know, it was

2    humiliating, it was upsetting.  I was fearful for my family.

3    That's the first thing that really hit me was what about my

4    kids and my wife and, you know, that was a big hit.

04:36    5    Q.  Were you worried about having to pay your bills?

6    A.  Yes, ma'am.

7    Q.  Was there anything about the way in which they fired you

8    that was disturbing to you?

9    A.  Sure.  Out in the parking lot, you know, it was

04:37   10    upsetting.  It was horrible.

11    Q.  In the months leading up to your termination, how much

12    were you making on average per week?

13    A.  Well, from the dancers I was making at least five hundred

14    a week, between four and five days that I -- nights that I

04:37   15    worked.

16    Q.  And in the time leading up to your termination, you were

17    working five shifts a week or four shifts a week, correct?

18    A.  Yes, correct.

19        MRS. ROBBINS-BOBER:  Your Honor, I would like the

04:38   20    Court to take judicial notice of the minimum wage rates for

21    2008 through 2013.

22        THE COURT:  There is going to have to be a

23    stipulation that is submitted to the jury.

24        MRS. ROBBINS-BOBER:  Do you have any objection?

04:38   25        MR. McDONALD:  I need a paper.  You haven't shown

```
  1   it to me.  Does it have to be done now?

  2              MRS. ROBBINS-BOBER:  It can -- (complies.)

  3              MR. McDONALD:  For the question?

  4              (Thereupon, there was a brief discussion off the

04:39   5   record.)

  6              MR. McDONALD:  No objection, Your Honor.

  7              THE COURT:  All right.  You want to publish those

  8   rates at this time?

  9              MRS. ROBBINS-BOBER:  Pardon?

04:39  10              THE COURT:  Do you wish to publish those rates at

 11   this time?

 12              MRS. ROBBINS-BOBER:  Yes, I would.

 13              THE COURT:  All right.

 14              MRS. ROBBINS-BOBER:  And the minimum wage rate in

04:39  15   2008, that was $6.79.  From January 1st, 2009 to July 23rd,

 16   2009, the minimum wage rates were $7.21.

 17              From July 24th, 2009 to May 31st, 2011, the minimum

 18   wage rates were $7.25.  From June 1st, 2011 to December 31st,

 19   2011, the minimum wage rate was $7.31.  In 2012, the minimum

04:40  20   wage rate was $7.67.  And in 2013, the minimum rate was

 21   $7.79.

 22   BY MRS. ROBBINS-BOBER:

 23   Q.  If Stir Crazy had paid you the minimum wage, in overtime

 24   for hours that you worked, do you have an amount that you

04:40  25   would have been entitled to?
```

1      **MR. McDONALD:**  Your Honor, let me object.  This is

2   not -- this is not expert testimony or she's asking him to do

3   the math.

4      **THE COURT:**  It's not expert testimony.  It's his

04:40   5   testimony as to the amount of damages that he's seeking in

6   terms of minimum wage pay and overtime pay.

7      Is there a calculation that has been done?

8      **MRS. ROBBINS-BOBER:**  Yes, there is.  All of that

9   actually is in evidence because the rates are the rates, and

04:41  10   they have stipulated as to the number of hours worked.  So

11   that's fine.

12      **THE COURT:**  Let me see counsel at side-bar for a

13   moment.

14      (Thereupon, there was a side-bar conference outside

04:41  15   the presence and hearing of the jury.)

16      **THE COURT:**  Generally, the way this is done is in

17   closing argument counsel presents these calculations.

18      **MRS. ROBBINS-BOBER:**  That's fine.

19      **MR. McDONALD:**  That's what I've seen it is in the

04:41  20   jury instructions.

21      **MRS. ROBBINS-BOBER:**  All right.  Thank you.

22      (Thereupon, the side-bar conference was concluded.)

23   BY MRS. ROBBINS-BOBER:

24   Q.  Did you -- you had to pay a $25 shift fee for each week

04:42  25   you worked; is that correct?

1    A.  **Yes.**

2    Q.  And I'd like you to turn to the trial exhibit notebook

3    again.  And if you can turn to Plaintiff's Exhibit 2.

4             (Thereupon, the aforementioned exhibit was

04:42  5    introduced.)

6    A.  **(Complies.)  All right.**

7    BY MRS. ROBBINS-BOBER:

8    Q.  Can you please identify that document?

9    A.  **It was a text I received from Joe -- excuse me, from**

04:42  10   **Rolly.**

11           **MRS. ROBBINS-BOBER:**  At this time I'd like to offer

12   Plaintiff's Exhibit 2 into evidence.

13           **MR. McDONALD:**  No objection.

14           **THE COURT:**  All right.  Plaintiff's 2 will be

04:43  15   admitted.

16           (Thereupon, the aforementioned exhibit was admitted

17   into evidence.)

18   BY MRS. ROBBINS-BOBER:

19   Q.  And this is a text message from Rolly you said.  What's

04:43  20   his position there?

21   A.  **Manager.**

22   Q.  And that's Rolando Quevedo?

23   A.  **Yes.**

24   Q.  And it's telling you to attend a mandatory meeting; is

04:43  25   that correct?

1    A.   **Yes.**

2    Q.   And if you could turn to Plaintiff's Exhibit 3.

3    A.   **Okay.**

4    Q.   Can you identify that?

04:43   5    A.   **Text from Eddy.**

6    Q.   Is that something you had on your cell phone?

7    A.   **Yes.**

8    Q.   And what is this text, what was the reason for this text?

9    A.   **I guess one of the deejays, one of the deejays called in**

04:44   10   **sick, and he texted me to come in.**

11   Q.   I'm sorry, you might be looking at the wrong exhibit.

12   Plaintiff's Exhibit 3, that's a June 29th, 2011 text message.

13   Have you been able to look at that exhibit?

14   A.   **Number 3 is this one here (indicating).**

04:44   15   Q.   And is that a text message that you received from Eddy

16   Flórez?

17   A.   **Yes.**

18   Q.   And can you explain that -- which -- there is green and

19   gray.  Who is the green from, if you know?

04:45   20   A.   **The green is from me.**

21   Q.   And you -- can you describe what that is?

22   A.   **I sent a text message to Eddy, "Waiting for my wife.  I**

23   **might be ten minutes late."**

24   Q.   So you were letting management at Stir Crazy know that

04:45   25   you might be late to show up for your shift?

ROSARIO (Direct Examination)

1    A.   **Sure.**

2    Q.   If you will turn to Plaintiff's Exhibit 4.

3    A.   **(Complies.)**

4    Q.   Have you located that?

04:46   5    A.   **Yes, I did.**

6    Q.   Can you tell me what that is?

7    A.   **Text from Rolando, the manager, about what type of music**

8    **he suggests I play.**

9    Q.   And that was a text from him to you?

04:46  10    A.   **Yes.**

11            MRS. ROBBINS-BOBER:  I would like to offer

12    Plaintiff's 4 into evidence.

13            THE COURT:  It's already been offered and admitted.

14    According to my notes, it's already been offered and

04:46  15    admitted.

16            MR. McDONALD:  I believe it has also, but again, we

17    don't have any objection.

18            THE COURT:  All right.  It's been admitted already,

19    Ms. Bober.

04:46  20            MRS. ROBBINS-BOBER:  Thank you, Your Honor.

21    BY MRS. ROBBINS-BOBER:

22    Q.   So this is a text message from Rolando, and what was the

23    purpose of this text from a member of management at Stir

24    Crazy?

04:46  25    A.   **The kind of music he wanted me to play.**

ROSARIO (Direct Examination)

1   Q.   On your deejay shift?

2   A.   **On my shift.**

3   Q.   And did you disregard -- feel like you could disregard

4   this or did you follow his directions regarding the music?

04:47   5   A.   **He is my boss.  I had to follow his direction.**

6   Q.   Can you please turn to Plaintiff's Exhibit 5?

7   A.   **Got it.**

8   Q.   Can you tell me about that exhibit, please?

9   A.   **The text I received from Eddy.  "Call me please.  Need**

04:47   10   **you tonight," and I responded with, "Okay."**

11   Q.   So was this a text where Eddy was asking you to fill in

12   for a shift?

13   A.   **Yes.**

14   Q.   And if you can now turn to Plaintiff's Exhibit 11,

04:48   15   please.

16   A.   **(Complies.)  Got it.**

17   Q.   Can you tell me what that document is?

18   A.   **The deejay schedule in the deejay booth.**

19   Q.   And are you on the schedule?

04:48   20   A.   **Yes.**

21   Q.   It's a number of documents, correct?

22   A.   **Yes.**

23   Q.   And the designations, the D and the N, what does that

24   stand for?

04:48   25   A.   **Day shift for D.  Night shift, N.**

1

# C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an accurate

4   transcription of the proceedings in the above-entitled

5   matter.

6

7      2-17-2015

8   _____          _____

9   DATE COMPLETED        GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25