```
1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                              MIAMI
                       CASE NO. 13-CV-23429
3    _____

4    MITCHELL ROSARIO,
                         Plaintiff
5          vs.                            Monday, January 26, 2015
     12425, INC., D/B/A STIR CRAZY;
6    LAURA INSUA; MANUEL H. INSUA;
     AND HERIBERTO FLÓREZ,
7                        Defendants.

8    _____

9          EXAMINATION OF HERIBERTO FLÓREZ - EXCERPT

10        BEFORE THE HONORABLE ALICIA M. OTAZO-REYES,

11      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12   _____
                       A P P E A R A N C E S
13
     FOR THE PLAINTIFF:    Samara Robbins Bober, ESQ
14                         Peter J.M. Bober, ESQ
                           Bober and Bober, PA\
15                         1930 Tyler Street
                           Hollywood, FL  33020
16                         (954) 922-2298
                           Samara@boberlaw.com
17                         Peter@boberlaw.com

18   FOR THE DEFENDANT:    DAVID M. McDONALD, ESQ
                           JARED McLUSKEY, ESQ
19                         McLuskey & McDonald
                           8821 SW 69th Ct
20                         Miami, FL  33156
                           (305) 662-6160
21                         Dmcdonald@mmlawmiami.com
                           Jared@mmlawmiami.com
22
     REPORTED BY:          GIZELLA BAAN-PROULX, RPR, FCRR
23                         United States Court Reporter
                           400 North Miami Avenue, Suite 8S32
24                         Miami  FL  33128
                           (305) 523-5294
25                         gizella_baan-proulx@flsd.uscourts.gov
```

1                    I N D E X

2

3                   *DIRECT*   *CROSS*    *REDIRECT*    *RECROSS*

4    HERIBERTO FLÓREZ      3        --         --          --

5

6

7

8

9

10

11

12

13              P L A I N T I F F ' S   E X H I B I T S

14

15    NUMBER                MARKED          ADMITTED

16    7                      15              15

17    10                     17              18

18    3                      45              --

19    5                      46              47

20    14                     64              65

21    9                      --              71

22    11                     73              73

23

24

25



1        **P R O C E E D I N G S**

2        *(The following proceedings were held in open court.)*

3

4    *    *    *    *    *    *    *    *    *    *    *

5        *(Thereupon, proceedings were held but not transcribed.)*

6    *    *    *    *    *    *    *    *    *    *    *

7            Thereupon,

8                    **HERIBERTO FLÓREZ,**

9    having been duly sworn by the courtroom deputy, testified as

01:48  10   follows:

11            **THE WITNESS:**  Yes, I do.

12            **THE COURTROOM DEPUTY:**  You may be seated.  Please

13   state your full name for the record and spell your last name.

14            **THE WITNESS**:  My name is Heriberto Flórez.  Last

01:48  15   name is F-L-O-R-E-Z.

16

17                    ***DIRECT EXAMINATION***

18   BY MRS. ROBBINS-BOBER:

19   Q.   Good afternoon, Mr. Flórez, and good afternoon ladies and

01:48  20   gentlemen of the jury, and Your Honor.

21            Mr. Flórez, did you go by the nickname of Eddy?

22   A.   **Eddy.**

23   Q.   And where are you employed?

24   A.   **12425 DBA Stir Crazy.**

01:49  25   Q.   What is your current job position there?

FLOREZ (Direct Examination)

1   A.   **I'm the general manager of the club.**

2   Q.   And how long have you been employed at Stir Crazy?

3   A.   **For approximately the last 20, 30 years.**

4   Q.   Since about 1986, 1987, does that sound right?

01:49   5   A.   **That's correct.**

6   Q.   And are you here today to testify on behalf of yourself

7   and also on behalf of Stir Crazy?

8   A.   **Yes.**

9   Q.   And you have been named as a Defendant in this case,

10   correct?

11   A.   **I'm sorry?**

12   Q.   You have been named as a Defendant in this case, correct?

13   A.   **Correct.**

14   Q.   Can you tell me what type of business Stir Crazy is?

01:49   15   A.   **It's a nightclub adult entertainment.**

16   Q.   Do you agree that the business model or theme is an

17   exotic dance club where customers come to watch music --

18   watch dancers strip to music?

19   A.   **Yes.**

01:50   20   Q.   Can you tell me the types of positions for the people who

21   work at the dance club?  What were the different positions,

22   job titles?

23   A.   **Okay.  Managers, securities, bartenders, deejays, and**

24   **dancers.**

01:50   25   Q.   Did you ever have a cleaning person?

FLOREZ (Direct Examination)

1    A.  **Cleaning person, too.**

2    Q.  And I'm going to ask you a number of questions today and

3    when I do I'm referring to the period of September 24th, 2008

4    through September 21st, 2013, which is five years from the

01:50    5    date Mr. Rosario filed his lawsuit.  Unless I refer to

6    another date, you can assume those are the dates I'm

7    referring to.

8            Who is the president and corporate director and

9    owner of Stir Crazy?

01:51   10    A.  **Laura Insua.**

11   Q.  Does Laura Insua have a husband?

12   A.  **Yes.**

13   Q.  And what is his name?

14   A.  **Manuel Insua.**

01:51   15    Q.  Does Laura Insua's husband help her make decisions

16   regarding Stir Crazy?

17   A.  **I'm sorry, I don't understand the question.**

18   Q.  Does Laura Insua's husband Manuel Insua help her make

19   decisions regarding Stir Crazy?

01:51   20    A.  **Yes.**

21   Q.  And do Laura and Manuel Insua have a son?

22   A.  **Correct.**

23   Q.  And what is his name?

24   A.  **Manuel Insua.  Middle name is H.**

01:51   25    Q.  And do people refer to Manuel H. Insua, the son, do they

FLOREZ (Direct Examination)

1  refer to him as Manny?

2  A.  **Manny.**

3  Q.  And so to avoid confusion between the father and the son,

4  I'm going to refer to Manuel H. Insua, who is a Defendant in

01:52  5  this case, as Manny, Junior, and I'll refer to his father as

6  Manuel, Senior.

7          Now, I've previously taken your deposition before

8  and you referred to three individuals, Manuel Insua, Manuel

9  H. Insua, Manny, Junior and Laura Insua.  And you referred to

01:52  10  them as consisting of -- being the Insua family; is that

11  correct?

12  A.  **That's correct.**

13  Q.  So just to be clear, when I refer in my questions to the

14  Insua family, I'm referring to Manny, Junior, Manuel, Senior,

01:52  15  and Laura Insua.

16          Do you consider Manny, Junior a close friend?

17  A.  **Yes.**

18  Q.  Do you also have a close personal relationship with

19  Manny, Junior's parents, Manuel Insua and Laura Insua?

01:53  20  A.  **Yes.**

21  Q.  Do you get together with them socially?

22  A.  **Yes.**

23  Q.  During the period from September 2008 to September 2013,

24  what was Manny, Junior's official title in relation to Stir

01:53  25  Crazy?

FLOREZ (Direct Examination)

1   A.   **We use as a consultant.**

2   Q.   Does Manny, Junior own the building where Stir Crazy

3   operates?

4   A.   **Yes.**

01:53   5   Q.   And where is the club located?

6   A.   **It's in Pinecrest, 12425 South Dixie Highway.**

7   Q.   And what year was Stir Crazy first established?

8   A.   **I guess 1986.**

9   Q.   Have you been working for Stir Crazy since it first

01:53   10   opened?

11   A.   **Yes.**

12   Q.   When Stir Crazy first opened, was Manny, Junior the sole

13   owner of the club?

14   A.   **Yes.**

01:54   15   Q.   So was it Manny, Junior who created and built up the

16   business?

17   A.   **Yes.**

18   Q.   How did you come to get your job at Stir Crazy?

19   A.   **Through his father.**

01:54   20   Q.   And how did you know his father?

21   A.   **I worked for some uncle and computer business.  So I meet**

22   **Mr. Insua, Senior there.**

23   Q.   Were you initially working at the liquor store?

24   A.   **Yes.**

01:54   25   Q.   Were you working at Stir Crazy when it became an exotic

FLOREZ (Direct Examination)

1    dance club?

2    A.   **At the beginning it was liquor store and sports bar.**

3    Q.   And you were there during that transition from a liquor

4    store/sports bar to adding the exotic dance club component?

01:55  5    A.   **Yes.**

6    Q.   And how long had you been the general manager of Stir

7    Crazy?

8    A.   **I don't remember.  Ten or 15 years.**

9    Q.   What are the hours of operation for Stir Crazy?

01:55  10    A.   **We open at 12:00 o'clock in the afternoon until 5:00 in**

11    **the morning.**

12    Q.   Are the deejays who work at Stir Crazy, are their

13    shifts -- how do their shifts work?  Are they broken up into

14    day and night?  How is that?

01:55  15    A.   **They work days and they work nights, too, yeah.**

16    Q.   And the day shift was from when to when?

17    A.   **12:00 to 8:30.**

18    Q.   And the night shift would be?

19    A.   **8:30 or 9:00 to 5:00 in the morning.**

01:55  20    Q.   Was Stir Crazy open seven days a week?

21    A.   **Seven days.**

22    Q.   So there would be about 14 deejay shifts per week?

23    A.   **Yes.**

24    Q.   What were your work hours?  Did you work a particular

01:56  25    shift?

FLOREZ (Direct Examination)

1    A.   **No.  I'm available all the time.**

2    Q.   When were you usually at the club?

3    A.   **During the day.**

4    Q.   So -- and you were the general manager.  Did you have

01:56   5    other managers under you?

6    A.   **Yes.**

7    Q.   And what were their names?

8    A.   **Today we have Ricardo Negron.**

9    Q.   Let me just interrupt you.  Again, I'm only referring to

01:56   10   September 2008 to September 2013.

11   A.   **Oh, we got different managers but, you know, they left**

12   **and they come back.**

13   Q.   Was Cesar Sayoc one of the managers?

14   A.   **Yes, ma'am.**

01:56   15   Q.   Rolando Quevedo?

16   A.   **Yes.**

17   Q.   And he's no longer working there, correct?

18   A.   **Correct.**

19   Q.   Augusto García?

01:56   20   A.   **Yes.**

21   Q.   Any others that you recall during that period?

22   A.   **Ricardo Negron.**

23   Q.   Are those managers called shift managers or how do you

24   designate them?

01:57   25   A.   **Managers.**

FLOREZ (Direct Examination)

1    Q.  With respect to the deejays, is there a head deejay?

2    A.  **We hire somebody we call head deejay.**

3    Q.  And who is that?

4    A.  **Joe Roppo.**

01:57    5    Q.  How long has Mr. Roppo been working as the head deejay?

6    A.  **He's working with the company for the past 20, 21 years**

7    **but, you know, the name commence with the time.**

8    Q.  Does it sound about right, maybe since 1993?

9    A.  **Could be.**

01:57    10    Q.  Who -- during the time period I'm referring to, who were

11    the other deejays who worked at Stir Crazy?

12    A.  **Mitch, Mr. Mitch.  We got somebody Cruz, I don't remember**

13    **his first name.  And Andy, Andres.  That's it.  We had**

14    **different deejays, but I don't recall the whole names of**

01:58    15    **everyone.**

16    Q.  And those deejays, they didn't work there during that

17    entire five year period that I'm referring to, right?  For

18    example, Cruz Hernandez --

19    A.  **He worked for a couple years only.**

01:58    20    Q.  And Andrew Garces, did he work since 2008?

21    A.  **I'm not sure.**

22    Q.  Was there a time when Stir Crazy had only three deejays

23    during that period?

24    A.  **I don't know.**

01:58    25    Q.  So during that five year period there is a total of about

FLOREZ (Direct Examination)

1    five deejays you can list who worked at the club?

2    A.   **Five, four.**

3    Q.   To cover the 14 shifts per week?

4    A.   **Correct.**

01:59    5    Q.   For the period of September 2008 to September 2013, what

6    were your job duties at Stir Crazy?

7    A.   **General manager.**

8    Q.   Can you go into some of the things that you had to do

9    during the day?

01:59    10    A.   **Purchase liquors, do the schedule.**

11    Q.   I'm sorry, what was the first thing you said?

12    A.   **Order the liquor.**

13    Q.   Did you and other managers supervise other workers to

14    make sure that the dancers were dancing, the music was

01:59    15    playing, the customers were drinking?

16    A.   **The other managers.**

17    Q.   And you as well?

18    A.   **Yes, ma'am.**

19    Q.   Do you do accounting work for the club?

01:59    20    A.   **Too.   Yes.**

21    Q.   And are you involved in Stir Crazy's day-to-day

22    operations?

23    A.   **That's correct.**

24    Q.   Does your accounting work include preparing daily sales

02:00    25    report?

FLOREZ (Direct Examination)

1   A.   **Yes.**

2   Q.   How much time per day do you spend preparing the daily

3   sales report?

4   A.   **Doing the daily report?  Couple hours.**

02:00   5   Q.   Do you hire and fire people?

6   A.   **Yes, ma'am.**

7   Q.   Were you responsible for getting more dancers to work at

8   Stir Crazy?

9   A.   **All the managers.**

02:00   10   Q.   Including yourself?

11   A.   **Yes.**

12   Q.   So that was something management did was make sure you

13   had an adequate number of dancers; is that correct?

14   A.   **Yes.**

02:00   15   Q.   If you make a decision as a general manager, do the shift

16   managers under you have to implement it?

17   A.   **Can you repeat the question?**

18   Q.   If you tell a manager to do something, does that manager

19   have to follow your orders?

02:01   20   A.   **Yes.**

21   Q.   Is one of your jobs to make the club more profitable?

22   A.   **Yes.**

23   Q.   And you mentioned you purchased liquor.  Do you also pay

24   the bills?

02:01   25   A.   **Yes.**

FLOREZ (Direct Examination)

```
 1   Q.  Do you watch the club?  When you're not in the club, you

 2   mentioned you were usually there just during the day shift.

 3   When you're not there do you watch -- do you have access to

 4   the club via video monitors on your phone?

 5   A.  Yes.

 6   Q.  And you're able to watch what's going on there?

 7   A.  Yes.

 8   Q.  So just to sum up, you're involved in the day-to-day

 9   operations and supervision of employees, right?

10   A.  Yes, ma'am.

11   Q.  And you have agreed that if the jury finds that

12   Mr. Rosario is an employee, then you, too, would be

13   Mr. Rosario's employer, correct?

14   A.  Yes.

15   Q.  I now would like to talk to you about the Plaintiff,

16   Mr. Mitchell Rosario, and his work at Stir Crazy.

17           Can you please point Mr. Rosario out in the

18   courtroom?

19   A.  Yes, (indicating).

20   Q.  And let the record reflect that Mr. Flórez has pointed to

21   the Plaintiff.

22           You have testified that Mitchell Rosario worked at

23   Stir Crazy as a deejay, correct?

24   A.  Yes.

25   Q.  And what were his dates of employment?
```

02:01   5
02:01   10
02:02   15
02:02   20
02:02   25

FLOREZ (Direct Examination)

1  A.  **I do not remember.  It was back, like, 12 years.**

2  Q.  About 12 years, since about 2001; does that sound,

3  correct?

4  A.  **Yeah.**

02:02  5  Q.  Were the deejays at Stir Crazy on payroll?

6  A.  **No.**

7  Q.  So, and if workers are not on payroll, does that mean the

8  worker is not paid any wages?

9  A.  **Which workers?**

02:03  10  Q.  Like a deejay or a dancer.

11  A.  **We got a payroll, but the deejay is not on payroll.**

12  Q.  Did Stir Crazy pay Mr. Rosario any wages?

13  A.  **No.**

14  Q.  Did Mr. Rosario have to audition for the deejay position?

02:03  15  A.  **I'm sorry?**

16  Q.  Did Mr. Rosario have to audition to become a deejay at

17  Stir Crazy?

18  A.  **I guess, yes.**

19  Q.  Do you know who interviewed or was there at Mr. Rosario's

02:03  20  audition?

21  A.  **Mr. Joe Roppo.**

22  Q.  And Mr. Roppo, he's what you've referred to as the head

23  deejay?

24  A.  **Yes.**

02:03  25  Q.  Is it true that when Mr. Rosario applied for a job to be

FLOREZ (Direct Examination)

```
 1   a deejay at Stir Crazy he had to fill out an application?
 2   A.  Yes.
 3   Q.  Did you have Mr. Rosario fill out more than one form
 4   called an application during his employment to update his
 5   information?
 6   A.  That's correct.
 7         MRS. ROBBINS-BOBER:  I'd like to offer into
 8   evidence, it's been identified on plaintiff's exhibit list as
 9   Plaintiff's Exhibit 7, and that's Mr. Rosario's job
10   application.
11         (Thereupon, the aforementioned exhibit was
12   introduced.)
13   BY MRS. ROBBINS-BOBER:
14   Q.  And you have a notebook in front of you that has some
15   tabs in there.  If you can open it up and take a look.
16   A.  This one?
17   Q.  Plaintiff's job application which is tabbed as
18   Plaintiff's Exhibit 7.
19   A.  (Complies.)
20         MRS. ROBBINS-BOBER:  Your Honor, I'd like to offer
21   that exhibit into evidence.
22         MR. McDONALD:  No objection.
23         THE COURT:  Plaintiff's Exhibit 7 will be admitted.
24         (Thereupon, the aforementioned exhibit was admitted
25   into evidence.)
```

02:04  5
02:04  10
02:04  15
02:05  20
02:05  25

1    **BY MRS. ROBBINS-BOBER:**

2    Q.  This document has a date of August 30th, 2013, a few

3    weeks before Mr. Rosario was fired.  But you agree that

4    that's not Mr. Rosario's start date, correct?

02:05   5    A.  **Correct.**

6    Q.  If you'll take a look at the application, which is in

7    smaller print towards the bottom, it indicates that the

8    application requires deejays to abide by all the club rules

9    and policies.  Do you see that?

02:05  10    A.  **No.**

11    Q.  In small print it's the second paragraph.  "I further

12    recognize that if I'm hired, I will abide by all the club

13    rules and policies."

14    A.  **I don't see it.**

02:06  15    Q.  Do you see that?

16    A.  **Yes.**

17    Q.  So Stir Crazy required Mr. Rosario to abide by those

18    rules; is that correct?

19    A.  **Yes.**

02:06  20    Q.  Do you know which rules that this document is referring

21    to?

22    A.  **Yes.**

23    Q.  And what are those?

24    A.  **No prostitution and no illegal drugs in the club and no**

02:07  25    **soliciting alcohol.  And also, they are responsible for their**

FLOREZ (Direct Examination)

1   own taxes and report the taxes to the IRS.

2   Q.   Would you agree that it requires them to abide by all of

3   Stir Crazy's rules and policies?

4   A.   Yes.

02:07   5   Q.   Did Mr. Rosario need a license or a degree to work at

6   Stir Crazy?

7   A.   No.

8   Q.   Do you recall if Mr. Rosario had any prior deejay

9   experience when he came to work at the club?

02:08   10   A.   You know, to apply to be a deejay he has to have some

11   kind of type experience in that performance.

12   Q.   But do you have personal knowledge or does the company

13   have of any deejay experience that Mr. Rosario has?  And if

14   you don't know you can answer you don't know.

02:08   15   A.   I don't know if he have any.

16   Q.   Have the bouncers at the club at times filled in as a

17   deejay?

18   A.   I'm sorry, say again?

19   Q.   Have the bouncers at the club, at Stir Crazy at times

02:08   20   filled in as a deejay?

21   A.   No.

22   Q.   You don't recall?

23   A.   I don't recall.

24   Q.   I'd like you to turn to Plaintiff's Exhibit 10.

02:09   25          (Thereupon, the aforementioned exhibit was

FLOREZ (Direct Examination)

1    introduced.)

2    A.   **(Complies.)**

3    BY MRS. ROBBINS-BOBER:

4    Q.   It's titled rules and procedures.

02:09   5    A.   **Yes.**

6    Q.   Have you located that document?

7    A.   **Yes, ma'am.**

8              MRS. ROBBINS-BOBER:  I would like to offer what's

9    identified on plaintiff's exhibit list as Plaintiff's Exhibit

02:10  10    10, I would like to offer that into evidence.

11             MR. McDONALD:  No objection, Your Honor.

12             THE COURT:  All right.  Plaintiff's Exhibit 10 will

13    be admitted.

14             (Thereupon, the aforementioned exhibit was admitted

02:10  15    into evidence.)

16    BY MRS. ROBBINS-BOBER:

17    Q.   And that document, it's entitled, Stir Crazy show girls,

18    bar back security rules and procedures; is that correct?

19    A.   **That's correct.**

02:10  20    Q.   Did any of those rules apply to deejays?

21    A.   **No.**

22    Q.   And some of the things in there are talking about being

23    neat, clean, clean-shaven, drugs, no weapons.

24    A.   **Correct.**

02:10  25    Q.   Are those some of the things that also would apply to

FLOREZ (Direct Examination)

| | 1 | deejays? |
| | 2 | A.  **Yes.** |
| | 3 | Q.  I'd like to discuss with you some of Mr. Rosario's job |
| | 4 | duties and requirements.  Did you -- did Stir Crazy have a |
| 02:11 | 5 | rule that deejays had to call the dancers in the order that |
| | 6 | they arrived for a shift? |
| | 7 | A.  **Yes.** |
| | 8 | Q.  Is that called -- what's the name for that? |
| | 9 | A.  **For what?** |
| 02:11 | 10 | Q.  Is there a special name for -- is that called a rotation? |
| | 11 | A.  **It's a rotation.** |
| | 12 | Q.  That's what you referred to it? |
| | 13 | A.  **Yes.** |
| | 14 | Q.  Did Mr. Rosario have to keep track of the dancers when |
| 02:11 | 15 | they arrived so they can comply with the rotation rule? |
| | 16 | A.  **Yes.** |
| | 17 | Q.  Do you recall if Mr. Rosario was ever disciplined by |
| | 18 | management at Stir Crazy for giving preference to dancers, |
| | 19 | like what's called breaking the rotation? |
| 02:11 | 20 | A.  **Yeah, he break the rotation on the girls.** |
| | 21 | Q.  But was he ever disciplined or counselled? |
| | 22 | A.  **No.** |
| | 23 | Q.  That he shouldn't -- |
| | 24 | A.  **No, but we know that he do that.  But we don't do** |
| 02:12 | 25 | **nothing.** |

FLOREZ (Direct Examination)

1    Q.  Also, next to the trial exhibit notebook I've placed your

2    deposition that -- where you previously sat for your

3    deposition.  Now there's two books there.  One says

4    supplemental.  The one you have in your hand is correct.  And

02:12   5    I'd like you to turn to page 245 of your deposition.

6    A.  **(Complies.)**

7         **THE COURT:**  You need to start out by asking him do

8    you recall your deposition and then give the date, please,

9    for the record.

02:12   10        **MRS. ROBBINS-BOBER:**  Yes, Your Honor.

11   **BY MRS. ROBBINS-BOBER:**

12   Q.  Do you recall sitting for a deposition on April 10th,

13   2014?

14   A.  **Yes.**

02:13   15   Q.  And you swore to tell the truth?

16   A.  **Yes.**

17   Q.  And if you could please turn to page 245.

18   A.  **(Complies.)**

19   Q.  And if you'll start at question -- do you have page 245?

02:13   20   If you will look at line number 2.

21   A.  **(Complies.)  Yes.**

22   Q.  And do you recall being asked, referring to Mr. Rosario:

23   "He gave preference to the dancer," and what was your

24   response?

02:13   25   A.  **"Correct."**

FLOREZ (Direct Examination)

1    Q.  Why was the night manager complaining about -- why was

2    the night manager complaining about -- can you read your

3    response?  Can you read the response to the jury?

4    A.  **Yeah, I'm reading.**

02:14  5    Q.  Okay.

6           **THE COURT:**  That would be up to you to publish the

7    question and the answer.  And then ask him.

8    **BY MRS. ROBBINS-BOBER:**

9    Q.  Your response was, "No, he talked to Mitch that don't do

02:14  10   it anymore because we got another girl that we got to keep in

11   the rotation as we do.  But because he receives money, the

12   girl, you know, boom, go first."

13          So would you agree that when you had your

14   deposition taken previously, that Mr. Rosario was counselled

02:14  15   by management for breaking the rotation?

16   A.  **Yes.**

17   Q.  Was Mr. Rosario required to e-mail Manny, Junior and the

18   other -- I'm sorry.  Was Mr. Rosario required to e-mail

19   Manny, Junior about the number of dancers on a shift and the

02:15  20   time that the dancers arrived?

21   A.  **At the beginning when Mr. Insua was handling the**

22   **business, he required to the deejays to send that**

23   **information.  He continue doing, but he's not required.**

24   Q.  Let me take you back -- referring back again to the April

02:15  25   10th, 2014 deposition.  If you'll please turn to page 191,

FLOREZ (Direct Examination)

         1    line 4 through 25.

         2    A.   **191?**

         3    Q.   Yes.

         4    A.   **What line, ma'am?**

02:16    5    Q.   You can start on line 15.  And I'm going to read the

         6    question if you'll please read the response.

         7              "Do you know whether or not deejays on each shift

         8    would e-mail Manny, Junior about the number of girls working

         9    on their shift?"

02:16   10              And your response?

        11    A.   **"Long time ago they do that."**

        12    Q.   You don't know whether they still do that?

        13    A.   **They don't do that.  I mean, they do it before when**

        14    **Mr. Insua was the owner of the bar, but we don't request to**

02:17   15    **do anymore.  If he continue doing on his own, but --**

        16    Q.   So you're saying Mr. Rosario e-mailed Manny, Junior the

        17    arrival times of the dancers just because Mr. -- why would

        18    Mr. Rosario want to do that?

        19    A.   **They used to do that before, so they continued and I**

02:17   20    **guess that's some important information for Mr. Insua.**

        21    Q.   So Mr. Rosario did continue to -- was e-mailing Manny,

        22    Junior the arrival times of the dancers; is that correct?

        23    A.   **Correct.**

        24    Q.   Did the -- what -- do you know what Manny, Junior did

02:17   25    with that information?

1    A.   **I'm sorry, say again?**

2    Q.   Did Manny, Junior want to know the arrival times of --

3    what -- okay.

4         Could Manny, Junior tell whether an adequate number

02:18   5    of dancers were at Stir Crazy by the e-mails which listed the

6    number of dancers at Stir Crazy on a shift?

7              MR. McDONALD:  Objection.  Calls for speculation.

8              THE COURT:  Are you asking for what Mr. Flórez

9    thought Mr. Manny, Junior thought?

02:18   10             MRS. ROBBINS-BOBER:  Let me rephrase the question,

11   Your Honor.

12             THE COURT:  Yes, please.

13   BY MRS. ROBBINS-BOBER:

14   Q.   Could the e-mails with the number of dancers and their

02:18   15   arrival times, would that be helpful for determining whether

16   an adequate number of dancers worked on a shift?

17   A.   **I don't know.  That's -- that's important information for**

18   **the owners.**

19   Q.   That is important information for the owners?

02:19   20   A.   **Yeah, to know how many girls are in the building, in the**

21   **club.**

22   Q.   And the e-mails would be helpful because it provided

23   information regarding how many dancers there are.  It would

24   be helpful for them to know whether there were, in fact, an

02:19   25   adequate number, correct?

1    A.   **I don't know.**

2           THE COURT:  One moment.  What was your answer, sir?

3           THE WITNESS:  I don't know.  That's -- they send

4    the information to him, not to me.

02:19   5    THE COURT:  It's just that it didn't come through.

6           THE WITNESS:  Okay.

7           THE COURT:  All right.

8    BY MRS. ROBBINS-BOBER:

9    Q.   Did the arrival times of the dancers, did that have any

02:19  10    effect on how much their -- how much of a fee they would have

11    to pay to the club to work there?

12    A.   **Yes.**

13    Q.   So how would that work?  The dancers did, in fact, pay a

14    house fee to work at the club; is that correct?

02:20  15    A.   **Correct.**

16    Q.   And how much was that fee?

17    A.   **25 dollars.**

18    Q.   And depending on their arrival times, could it be more or

19    less than that?

02:20  20    A.   **No.**

21    Q.   Could it be less than that?

22    A.   **Could be less.**

23    Q.   Could be -- so the arrival times of the dancers would be

24    used to determine -- could be used to determine how much of a

02:20  25    house fee each dancer had to pay; is that correct?

FLOREZ (Direct Examination)

1    A.  **And how much the deejay is going to make, too.**

2    Q.  And why would the arrival time of a dancer affect how

3    much the deejay is going to make?

4    A.  **Not the arrival time.  It's how many dancers we have that**

02:20    5    **night on that particular shift.  If we got 20 dancers, the**

6    **deejay is going to make a lot of money.**

7    Q.  And can you explain that, how that the whole house fee

8    structure worked?  The dancers had to pay a fee to the

9    deejays; is that correct?

02:21   10    A.  **I'm not understanding your question.  But the dancers pay**

11   **minimum $10 to the deejay.  They pay $25 sometimes, $30,**

12   **depends on the business that night.  But the minimum is $10.**

13   Q.  So they pay $10 to the deejay?

14   A.  **Exactly.**

02:21   15   Q.  And they pay $25 to Stir Crazy?

16   A.  **Correct.**

17   Q.  And the deejays pay what you call a house fee?

18   A.  **A rental fee.**

19   Q.  What you call -- well, the deejays pay $25 to Stir Crazy

02:21   20   for each shift that they work?

21   A.  **Yes.**

22   Q.  Did the dancers typically use the tips they received from

23   customers to pay the deejays and the house fee; is that

24   correct?

02:22   25   A.  **Correct.**

FLOREZ (Direct Examination)

```
         1    Q.   Did -- who shared in the house fee that the deejays paid
         2    to Stir Crazy?
         3    A.   Okay.  This is like a two business, business inside the
         4    business.  Our business is sell liquor and the deejay and the
02:22    5    dancers are the entertainment.  So they, the dancers, shares
         6    the money with the deejay.
         7    Q.   Right.  But how -- when the deejay paid the $25 to Stir
         8    Crazy, who got a piece -- who got a part of that $25 house
         9    fee?
02:22   10    A.   I don't understand your question, ma'am.
        11    Q.   The house fee --
        12    A.   Okay.
        13    Q.   -- the deejays paid to Stir Crazy, they handed over $25,
        14    correct?
02:23   15    A.   Correct.
        16    Q.   Who took that $25?  Did it go --
        17    A.   The manager.
        18    Q.   The manager, and then --
        19    A.   That goes to the bank.
02:23   20    Q.   It goes to whose bank?
        21    A.   To the bank, the Stir Crazy bank, I mean, the Stir Crazy
        22    account.
        23    Q.   And it's deposited in the bank?
        24    A.   Correct.
02:23   25    Q.   Does Manny, Junior take any part of the house fee?
```

FLOREZ (Direct Examination)

|  |  |  |
|---|---|---|
|  | 1 | A.  **No.** |
|  | 2 | Q.  Does Laura or Manuel Insua? |
|  | 3 | A.  **No.** |
|  | 4 | Q.  Are the house fees paid in all cash? |
| 02:23 | 5 | A.  **Yes, ma'am.** |
|  | 6 | Q.  Going back to the e-mails, have you had -- we discussed |
|  | 7 | how the information on the e-mails regarding the number of |
|  | 8 | dancers could -- would help indicate whether there were an |
|  | 9 | adequate number of dancers at the club, correct? |
| 02:24 | 10 | A.  **Correct.** |
|  | 11 | Q.  Have you had discussions with Manny, Junior about the |
|  | 12 | number of dancers working on shifts? |
|  | 13 | A.  **No.** |
|  | 14 | Q.  I'll refer back to your deposition from August -- from |
| 02:24 | 15 | April 10th, 2014, page 47, starting at line 17. |
|  | 16 | A.  **Page 87?** |
|  | 17 | Q.  47.  It says -- |
|  | 18 | **THE COURT:**  Ma'am, Ms. Bober, please remember, do |
|  | 19 | you recall being asked this question and giving this answer. |
| 02:25 | 20 | **BY MRS. ROBBINS-BOBER:** |
|  | 21 | Q.  I'm sorry, can you actually go to page 48? |
|  | 22 | A.  **Okay.** |
|  | 23 | Q.  Line 1.  It asks, "Why have you discussed the number of |
|  | 24 | girls that work at the club with the three Insuas?" |
| 02:25 | 25 | And your answer starts on line 8.  Can you please |

FLOREZ (Direct Examination)

1   read that?

2   A.   Okay.   **"Say not happened too often, but numbers of girls**

3   **are low.   They asked me why I don't have too many girls.   You**

4   **don't, you know, that's one of the questions that they say."**

02:26  5   Q.   So would you like to change your response that you have

6   discussed the number of girls with Manny, Junior?

7   A.   **I don't say here this Manny, Junior.   It says the Insuas.**

8   Q.   Well, it says the three Insuas.

9   A.   **Three Insuas, Insua, Junior.**

02:26  10   Q.   Who are the three Insuas?

11   A.   **The family of the mother, the father and the son.**

12   Q.   And the son?

13   A.   **Yeah, but --**

14   Q.   Who is the son?

02:26  15   A.   **The son is Mr. Insua sitting there.**

16   Q.   Manny, Junior?

17   A.   **Manny, Junior.**

18   Q.   So when you say that -- when the question asked the three

19   Insuas, it refers -- it includes Manny, Junior, correct?

02:26  20   A.   **Yeah, but if you go through the deposition, you're going**

21   **to see that I referred to the Insuas, not in particular him.**

22   Q.   But it includes him?

23   A.   **That includes the Insuas.**

24   Q.   When you refer to the three Insuas in the Insua family,

02:27  25   it includes Manny, Junior?

FLOREZ (Direct Examination)

1    A.   **Correct.**

2    Q.   Correct?

3    A.   **But I'm not directly to Manny, Junior.**

4    Q.   Has Manny, Junior noticed a time there were too few --

02:27   5    determining whether there were an adequate number of dancers,

6    was that helpful to managing the club's operations?  Weren't

7    the dancers the key to the club?

8    A.   **I didn't understand the question.  Say again.**

9    Q.   Was it important to the club's operations that there were

02:28   10   an adequate number of dancers?

11   A.   **Correct.**

12   Q.   Was Mr. Rosario required to make announcements into the

13   microphone about Stir Crazy drink specials, parties and

14   promotions?

02:28   15   A.   **Yes.**

16   Q.   With respect to the promotions that Mr. Rosario was

17   required to announce, who decided what promotions to offer at

18   Stir Crazy?

19   A.   **The managers.**

02:28   20   Q.   And how was Mr. Rosario made aware of what promotions

21   Stir Crazy would be running?

22   A.   **We got a bulletin board outside the -- not bulletin**

23   **board, a board, billboard, so we post whatever we got on**

24   **special that week or anything that we're going to do.**

02:29   25   Q.   And in addition to the billboard outside of Stir Crazy,

1    did you communicate with Mr. Rosario and the other deejays in

2    any other way regarding club promotions?

3    A.   **We post in the deejay what we announce outside and the**

4    **deejay announce by the microphone what the special that day.**

02:29    5    Q.   Did you ever -- did you -- was it a practice to also

6    write the promotions on a piece of paper and give it to

7    Mr. Rosario and the other deejays regarding club promotions?

8    A.   **Like I say, we post in the deejay, so they see what's the**

9    **special that week.**

02:29   10    Q.   So you post, you have something posted in the deejay

11    booth?

12    A.   **Yes.**

13    Q.   Regarding the promotions?

14    A.   **Correct.**

02:29   15    Q.   And then the deejays are required to announce those

16    promotions that are posted?

17    A.   **They're not required, but they announce.**

18    Q.   Did they all announce the promotions?

19    A.   **Yes.**

02:30   20    Q.   So that was something that all of the deejays did?

21    A.   **Yes.**

22    Q.   How often would Mr. Rosario announce the club promotions,

23    if you know?

24    A.   **I don't know.**

02:30   25    Q.   Because usually you worked the day shift; is that right?

FLOREZ (Direct Examination)

         1    A.  **I usually work day shift.**

         2    Q.  And Mr. Rosario usually worked the night shift, correct?

         3    A.  **That's correct.**

         4    Q.  Why would Stir Crazy want deejays to announce club

02:30    5    promotions?

         6    A.  **We don't -- it's not a requirement that they announce the**

         7    **promotions.**

         8    Q.  Were club promotions designed to bring new customers into

         9    the club and to make current customers --

02:31   10    A.  **Yes.**

        11    Q.  -- come back?

        12    A.  **Yes.**

        13    Q.  By giving away free food, or is that -- was that one of

        14    the promotions, free food?

02:31   15    A.  **No.  We don't give free food.**

        16    Q.  Did you have, like, liquor specials?

        17    A.  **Liquor specials.**

        18    Q.  Beer specials?

        19    A.  **Yes.**

02:31   20    Q.  Did you have specials on food?

        21    A.  **No.**

        22    Q.  With respect to the part of the job where Mr. Rosario had

        23    to call the dancers to the stage and in a rotation, would you

        24    describe that as like running an assembly line?

02:31   25    A.  **Not necessary, but yes, kind of like that.**

FLOREZ (Direct Examination)

```
           1   Q.  And can you describe for the jury exactly how the
           2   rotation worked in terms of calling dancers?
           3   A.  Okay.  They come in different times, so they go and check
           4   with the deejay and they give you a list of the songs that
02:32      5   they want to dance and the deejay start putting the piece of
           6   paper who come in, so that's the rotation.
           7   Q.  So the deejay, in addition to e-mailing Manny, Junior
           8   regarding the arrival times and the number of dancers on a
           9   shift, keeping track of which dancers on a shift and when
02:32     10   they arrived was also important so that they could comply
          11   with the rotation of dancers; is that correct?
          12   A.  Yes.
          13   Q.  Did Stir Crazy have a rule regarding who could be in the
          14   deejay booth?
02:32     15   A.  Yes.
          16   Q.  And what was the rule?
          17   A.  Because there have been so many things in the deejay, so
          18   we required to only the deejay.
          19   Q.  So only the deejay is allowed in the booth?
02:33     20   A.  Yes.
          21   Q.  And is that rule there because there -- Stir Crazy has a
          22   lot of expensive equipment?
          23   A.  Yes.
          24   Q.  And you don't want the equipment to get messed up?
02:33     25   A.  Correct.
```

FLOREZ (Direct Examination)

1   Q.  And did that rule have any effect on Stir Crazy's

2   license?

3   A.  **I don't understand the question.**

4   Q.  Was it a rule that you needed to impose regarding Stir

02:33   5   Crazy's operational license?

6   A.  **I don't know if I can explain, but we have a situation**

7   **there at the deejay.**

8           THE COURT:  Yes.  Would you like to come to side-

9   bar?

02:33   10          MR. McDONALD:  Yes.  If we could.

11          THE COURT:  All right.

12          (Thereupon, there was a side-bar conference outside

13   the presence and hearing of the jury.)

14          THE COURT:  Before you do that, let me take this

02:34   15   opportunity, at least three or four times I explained to you

16   on the impeachment for the prior testimony.  You give, do you

17   recall taking your deposition on this and such a date.  Do

18   you recall being asked this question and giving this answer?

19   Question.  And then you publish the question and answer.  Do

02:34   20   you recall that.  And that's your impeachment.  If he just

21   testified opposite, that's his impeachment.

22          MRS. ROBBINS-BOBER:  Yes, Your Honor.  I apologize.

23          THE COURT:  That's all right.  You're under stress

24   and I understand that, but keep it in mind.  I hate to call

02:35   25   your attention in front of the jury and -- but at the same

1   time I need to preserve the record properly.

2          Mr. Flórez'S English's is not that fluent so I kind

3   of had the confusion on top of not being the proper way to do

4   it.

02:35   5          Now, with that being said, I want to caution you on

6   something else.  It's afternoon, after lunch.  You have a

7   very soft voice.  You have very long questions.  And I keep

8   glancing over to the jury to make sure that they're not

9   falling asleep.  I'm going wait until quarter to 3:00 to take

02:35   10   the break so the last session is not too long, but you may

11   just want to pick up, like they're saying with the deejay,

12   pick up the energy.  All right.

13          Now the issue about this question?

14          **MR. McDONALD:**  Well, I think he was about to talk

02:35   15   about, he said we had an incident and you were talking about

16   why he doesn't want people in the deejay booth, and he was

17   going to say there was an incident where Mr. Rosario was

18   selling marijuana from the deejay booth.

19          Now this was the subject of a motion in limine and

02:36   20   Judge Ungaro ruled that if they open the door, he can testify

21   to it.  And we agreed that -- I don't want a mistrial so I

22   want to, you know, I don't know if that -- I think he was

23   about to talk about that and that's why I got concerned is I

24   didn't want to mis-try the case.  I don't know if that is --

02:36   25   I don't know if she has opened the door.  I would suggest

1    she's getting there.

2          THE COURT:  It's kind of a little crack in the

3    door.  Maybe.  Maybe you can make your question more specific

4    in terms of rules and regulations and be careful.

02:36  5          MRS. ROBBINS-BOBER:  Okay.

6          THE COURT:  Because I have observed the Hispanic

7    custom is to explain things a lot.  And that seems to be what

8    happens sometimes that the witnesses go into a lot more than

9    they're being asked.  So maybe you need to control it a

02:37 10   little bit more.  I hope Mr. McDonald's concern, if you do

11   open the door, obviously it will be, but it does not seem to

12   me that you were going there right now.

13         MR. McDONALD:  One of the reasons why they don't

14   want people congregating in the deejay booth is they don't

02:37 15   want illegal activity going on and I think that's what he's

16   going to talk about now.

17         Maybe he's just going to talk about it in general,

18   I don't know, that's why I got up.

19         THE COURT:  Well, it seemed to me that there was a

02:37 20   reason they don't want people in the deejay booth which makes

21   sense.

22         MR. McDONALD:  And I may ask him that in a general

23   way, but not in a specific way.

24         THE COURT:  Well, but then the witness you have to

02:37 25   control what they answer.  So let's resume and then we'll go

FLOREZ (Direct Examination)

```
       1    for about another 10 minutes and then we'll break.
       2              (Thereupon, the side-bar conference was concluded.)
       3              THE COURT:  Thank you very much, ladies and
       4    gentlemen.  This was one of those instances where we put
02:38  5    noise and we have a conversation outside of your hearing.
       6    Take no notice and make no conclusions for that.  That is a
       7    very common occurrence in trials.
       8              Let's proceed.
       9    BY MRS. ROBBINS-BOBER:
02:38  10   Q.  Did Mr. Rosario have to do anything with respect to the
       11   club's phones?
       12   A.  If we want -- we got a phone in the club where the girls
       13   call.  It's not his duty to answer the phone.  Just the phone
       14   is there available for anybody who wants to call or make a
02:38  15   call.
       16   Q.  Are you saying that Mr. Rosario does not have to, as part
       17   of his job as a deejay, he doesn't have to answer the club's
       18   phones?
       19   A.  He don't have to.
02:39  20   Q.  Did he, in fact, do that?
       21   A.  I'm sorry?
       22   Q.  Did he answer the club's phones?
       23   A.  Yes.
       24   Q.  Did other deejays helped answer the club's phones?
02:39  25   A.  I don't understand the question.
```

1    Q.   Other deejays also helped to answer the club's phones?

2    A.   **The phone, yeah, it's available for anybody.  Anybody can**

3    **use it.**

4    Q.   When answering the club's phones, did Mr. Rosario help

02:39  5    route the calls?

6    A.   **I don't know.**

7    Q.   Why would people call on the phone?  Would it be to get

8    directions to Stir Crazy?  Are those some of the calls that

9    Stir Crazy got, some of the questions that Stir Crazy

02:40  10   received when people called on the phone?

11   A.   **Yes.**

12   Q.   They asked about directions to the club?

13   A.   **Yes.**

14   Q.   Confirmed the hours of operation?

02:40  15   A.   **Correct.**

16   Q.   Asked maybe if a particular dancer was working that day?

17   A.   **Yes.  We have two phones.  One in the office for the**

18   **manager and one for the deejay.  So for the manager it would**

19   **be easy in the floor go to the deejay, answer the phone, but**

02:40  20   **the phone is not for the deejays.  They're there if they want**

21   **to make a call, they're free to do it, if they want to answer**

22   **the phone, they're welcome to answer the phone, but that's**

23   **not his duties.**

24   Q.   But the deejays did, in fact, answer the phone.  There

02:40  25   was a phone in the deejay booth?

FLOREZ (Direct Examination)

```
        1    A.   Yeah, that's for the manager.

        2    Q.   Pardon?

        3    A.   It's for the managers.

        4    Q.   But was there a phone in the deejay booth?

02:40   5    A.   It would be easy -- let me explain you.  It's easy for

        6    the manager when the manager is on the floor go to the deejay

        7    and answer the phone instead of going to the office which is

        8    far away.

        9    Q.   So you're saying the managers, when the phone rang the

02:41  10    managers would go to the deejay booth?

       11    A.   Answer the calls, yes.

       12    Q.   And are there phones anywhere else in the club?

       13    A.   In the office.

       14    Q.   So only the deejay booth and the office?

02:41  15    A.   Yes, ma'am.

       16    Q.   How would a manager know that the phone is ringing if

       17    he's not in the deejay booth with the deejay?

       18    A.   When he's there, he answer the phone.  When he's there he

       19    answer the phone, but right now, you know, everybody have

02:41  20    cellular so that's useless because the communication is under

       21    cellular phone right now.

       22    Q.   Right.  But the phone in the deejay booth, that was the

       23    phone line for the public to call in, correct?

       24    A.   Yes.

02:41  25    Q.   And only one deejay -- only the deejay could be in the
```

FLOREZ (Direct Examination)

| | | |
|---|---|---|
| | 1 | deejay booth, correct? |
| | 2 | A.  **And the managers, of course.** |
| | 3 | Q.  So would a manager be hanging out in the deejay booth? |
| | 4 | A.  **Yes, ma'am.** |
| 02:41 | 5 | Q.  When the deejays did answer the phone and give the |
| | 6 | information we have just discussed to the public, calling in, |
| | 7 | would that be helpful to Stir Crazy's operations? |
| | 8 | A.  **Yes.** |
| | 9 | Q.  Was there any type of dress code requirements for |
| 02:42 | 10 | deejays? |
| | 11 | A.  **You know, normal, normal, you know, pants and shirt** |
| | 12 | **presentation.** |
| | 13 | Q.  They were required to look professional? |
| | 14 | A.  **Not, professional but some presentation, yes.** |
| 02:42 | 15 | Q.  Well-groomed? |
| | 16 | A.  **I'm sorry?** |
| | 17 | Q.  Well-groomed, a collared shirt, those sort of things? |
| | 18 | A.  **Yes.** |
| | 19 | Q.  Were deejays required to arrive on time for their shift? |
| 02:42 | 20 | A.  **Yes.** |
| | 21 | Q.  Do you recall if there is a dispute that arose between a |
| | 22 | deejay and a dancer would the issue be brought to your |
| | 23 | attention to resolve? |
| | 24 | A.  **To the managers, yes.** |
| 02:43 | 25 | Q.  To the managers.  So if a dancer and a deejay had some |

FLOREZ (Direct Examination)

1    sort of issue, it would be the manager who resolved it,

2    correct?

3    A.   **Correct.**

4    Q.   Was deejay Joe Roppo, was he ever disciplined for using

02:43    5    the internet too much at work?

6    A.   **Not disciplined, but we told him don't be on the internet**

7    **all the time, but they're free to use it any time.**

8    Q.   But not too much?

9    A.   **Not too much.**

02:44   10    Q.   Would you ever speak to deejays regarding whether you

11    liked the music being played?

12    A.   **No.**

13    Q.   I'm going to refer to the deposition from April 10th,

14    2014, page 148, line 19 to 22.

02:44   15    A.   **149?**

16    Q.   148.  And when -- you recall having your deposition

17    taken, correct?

18    A.   **Yes.**

19    Q.   And the attorney asked, "So, if you hear music that you

02:45   20    like, you tell a deejay to play it more?"

21           And you responded, "I don't say play more, but I

22    say I like the music."

23    A.   **What line is that, ma'am?  I'm lost.**

24    Q.   It's page 148, line 19 to 22.

02:45   25           **MR. McDONALD:**  Excuse me, Your Honor.  Objection to

FLOREZ (Direct Examination)

1    read the whole answer, not just half of it.  It's improper

2    impeachment.

3             THE COURT:  All right.  Is there a continuation to

4    that answer, Ms. Bober?

02:45  5  BY MRS. ROBBINS-BOBER:

6    Q.  "You were talking about the rap.  For me rapper kind of

7    music, not interested in that too much.  I'm not deejay, I'm

8    not an expert in music, just listening to music that I listen

9    at the club.  I know that we got different music, but I am

02:46 10   not a deejay.  Joe Roppo can give you different visual aspect

11   about deejay, but not me."

12            THE COURT:  That was the complete answer to the

13   question?

14            MR. McDONALD:  Yes, Your Honor.

02:46 15          THE COURT:  All right.

16  BY MRS. ROBBINS-BOBER:

17   Q.  Does Stir Crazy care about the music being played in the

18   club?

19            MR. McDONALD:  We object.

02:46 20          THE COURT:  Yes, Mr. McDonald.

21            MR. McDONALD:  She read the question and the answer

22   but there was no followup to that.

23            THE COURT:  All right.  Well, there does not

24   necessarily need to be a followup, but if the witness wants

02:46 25   to explain his answer, he may do so.

FLOREZ (Direct Examination)

|      |    |                                                              |
|------|----|--------------------------------------------------------------|
|      | 1  | BY MRS. ROBBINS-BOBER:                                        |
|      | 2  | Q.  Now that you've read the deposition, would you agree that |
|      | 3  | you have spoken to a deejay regarding whether you like the   |
|      | 4  | music being played?                                          |
| 02:46 | 5 | A.  **Let me see.  (Reading).  You know, they are the deejays,** |
|      | 6  | **and they know the music they have to play.  The thing that I** |
|      | 7  | **say that I like the music does not mean they have to play the** |
|      | 8  | **music, just my personal opinion.**                         |
|      | 9  | **They know what kind of music they got to play and** |
| 02:47 | 10 | **what kind of songs the dancers required to dance.  Not me.** |
|      | 11 | Q.  But my question was, would you ever speak to the deejays |
|      | 12 | whether you liked the music being played?                    |
|      | 13 | A.  **High energy music.**                                   |
|      | 14 | Q.  So you have spoken to deejays?                           |
| 02:47 | 15 | A.  **Once in a while.**                                     |
|      | 16 | THE COURT:  Is this a good point to break?                   |
|      | 17 | MRS. ROBBINS-BOBER:  Yes.                                    |
|      | 18 | THE COURT:  Thank you very much.  We're going to            |
|      | 19 | take our afternoon break at this time, 15 minutes.  There is |
| 02:47 | 20 | coffee.                                                       |
|      | 21 | THE COURTROOM DEPUTY:  I'll make more.                       |
|      | 22 | THE COURT:  She'll make more coffee and I think             |
|      | 23 | that you might be able to make some hot chocolate, also.     |
|      | 24 | THE COURTROOM DEPUTY:  Yes.                                  |
| 02:48 | 25 | THE COURT:  She'll make sure that you have some             |

FLOREZ (Direct Examination)

1    refreshments in there and so we'll be until -- you'll be in

2    the jury room until 3 o'clock.  It's just under a 15 minute

3    break.  Very well.

4              Thank you very much.

02:48  5              THE COURTROOM DEPUTY:  All rise.

6              (Thereupon, the jury was escorted out of the

7    courtroom.)

8              THE COURT:  All right.  We'll be in recess until

9    3:00.  Thank you.

10             (Thereupon, a brief recess was taken from 2:49 p.m.

11   to 3:04 p.m.)

12             THE COURTROOM DEPUTY:  All rise.  The Court is

13   again in session.

14             THE COURT:  Thank you.  Please bring in the jury.

03:04 15             (Thereupon, the jury was brought into the

16   courtroom.)

17             THE COURT:  Thank you very much.  Ladies and

18   gentlemen, please be seated.

19   BY MRS. ROBBINS-BOBER:

03:05 20   Q.  Okay Mr. Flórez?

21             THE COURT:  Go ahead, Ms. Bober.

22             RIGHT:  Thank you.

23   BY MRS. ROBBINS-BOBER:

24   Q.  Did you ever send Mr. Rosario any text messages?

03:05 25   A.  **Not that I recall.**

FLOREZ (Direct Examination)

1    Q.  I would like to direct you back to the exhibit notebook,

2    plaintiff's exhibit if you'll go to the Tab 3.

3    A.  **(Complies.)  Okay.**

4            MRS. ROBBINS-BOBER:  And I'd like to offer this

03:06   5    exhibit into evidence.  It's a text message dated June 29th,

6    2011.  It's been identified on plaintiff's exhibit list as

7    Plaintiff's Exhibit 3.  And I believe we are on trial exhibit

8    number 3; is that correct?

9            THE COURT:  Yes, that would be the third one.  Any

03:06   10   objections?

11           MR. McDONALD:  No objection, Your Honor.

12           THE COURT:  So Plaintiff's Exhibit Number 3 will be

13   admitted.

14           (Thereupon, the aforementioned exhibit was admitted

03:06   15   into evidence.)

16   **BY MRS. ROBBINS-BOBER:**

17   Q.  Can you take a look at that text message?  Is that a text

18   message that appears to be between you and Mr. Rosario?

19   A.  **Yes.**

03:06   20   Q.  Do you recall sending that?

21   A.  **I don't send the message to him.  He send it to me.  He**

22   **said, "Eddy, waiting for my wife.  I may be there ten minutes**

23   **late, I guess."**

24   Q.  So with respect to this text message, he's letting you

03:07   25   know that he would be late for his shift?

FLOREZ (Direct Examination)

1   A.   **Yes.**

2   Q.   Is that something he needed to do so Stir Crazy could

3   plan to make sure that they had deejay coverage for Stir

4   Crazy?

03:07   5   A.   **No.  But he send me a text message.  I don't require to**

6   **send me a text message.**

7   Q.   He's not -- are you saying that the deejays are not

8   required to communicate with management if they're going to

9   be late for their shifts?

03:07   10   A.   **They would be late for the shift, the other deejay cover**

11   **for him.  But if you see in this text message I don't send to**

12   **him.  He send to me.**

13   Q.   Thank you for correcting me.  So but Mr. Rosario sent you

14   a text message letting you know that he would be late for his

03:08   15   shift; is that correct?

16   A.   **That's correct, and this could be the only text message**

17   **that he send me saying this.  Because I don't recall text**

18   **message from him.  You can see that I don't recognize who**

19   **sent me the text message, when I say, "Who is this," he say,**

03:08   20   **"Mitch."  So this is not happen every day, it's not normal.**

21   Q.   Okay.  If you'll turn to Plaintiff's Exhibit 5.

22        (Thereupon, the aforementioned exhibit was

23   introduced.)

24   A.   **(Complies.)  Okay.**

03:09   25   BY MRS. ROBBINS-BOBER:

```
       1   Q.  This exhibit has been identified on plaintiff's exhibit

       2   list as Plaintiff's Exhibit 5.

       3               MRS. ROBBINS-BOBER:  I would like to offer this

       4   into evidence as Plaintiff's Trial Exhibit Number 4.

03:09  5               THE COURT:  Oh, I think that's going to cause a lot

       6   of confusion.  Why don't we just stick to the numbers?

       7               MRS. ROBBINS-BOBER:  Absolutely.

       8               THE COURT:  And if some numbers are skipped, that

       9   will be fine.

03:09 10               MR. McDONALD:  No objection.

      11               THE COURT:  All right.  So that's going to be

      12   Number 5.

      13               MRS. ROBBINS-BOBER:  Plaintiff's Number 5.

      14               THE COURT:  All right.  It's admitted.

03:09 15               (Thereupon, the aforementioned exhibit was admitted

      16   into evidence.)

      17   BY MRS. ROBBINS-BOBER:

      18   Q.  Do you recall ever texting Mr. Rosario to fill in on a

      19   shift that you needed him?

03:09 20   A.  Hold on, please.

      21   Q.  Sure.  I'm sorry.

      22   A.  Yes.  He said, "Call me, please.  We need you tonight."

      23   If you see the first --

      24               THE COURT:  You may sit down, Mr. Flórez.

03:10 25   A.  Okay.  (Complies.)  If you see the date on the first text
```

FLOREZ (Direct Examination)

1     message that I received from Mitch is June 29th, 2011.  And

2     the other message is like four months later.  So that's what

3     I said.  It's not that I texted him often.

4     BY MRS. ROBBINS-BOBER:

03:10  5   Q.  Would you -- you didn't text with him often?

6     A.  Correct.

7     Q.  Is that just an example of a text message, is that what

8     you're saying?

9     A.  Yes.

03:10  10  Q.  And you were communicating -- you, as manager, were

11    communicating with him because there was a scheduling issue

12    regarding the deejays, correct?

13    A.  Correct.  Can I explain something?

14    Q.  Absolutely.

03:11  15  A.  The reason that we call him tonight is because one of the

16    cases is that one of the deejays are sick, so we call him to

17    fill in the position that night.

18    Q.  Did you require the deejays to be flexible with their

19    schedule because, for example, one of the issues you just

03:11  20  mentioned if a deejay is sick or has some sort of family

21    issue?

22    A.  They come in and cover for the night.

23    Q.  But did the deejays have to be flexible with their

24    schedule to cover if a deejay was not able to work a shift?

03:11  25  A.  Okay.  The way that we did it is they communicated with

FLOREZ (Direct Examination)

 1    the head deejay, which is Joe Roppo.  If they can't contact

 2    Joe Roppo, they call me so I can do the call.

 3    Q.  So if someone doesn't communicate with Mr. Roppo, then

 4    you would contact the deejay directly; is that what would

03:12  5    happen?

 6    A.  Yes.

 7    Q.  If a deejay needed to -- regarding the music, did Stir

 8    Crazy require that the music the deejays played be high

 9    energy?

03:12 10    A.  Yes.

11    Q.  Why did Stir Crazy want the deejays to play high energy

12    music?

13    A.  This is a nightclub and entertainment, so we like to have

14    good energy in the club.

03:12 15    Q.  So having high energy music, that was important to the

16    club's operations and the type of entertainment?

17    A.  Yeah.  It's part of the business.

18    Q.  Did the type of music Stir Crazy played, was that

19    designed to attract customers to the club?

03:13 20    A.  Yes.

21    Q.  And the kind of music that Stir Crazy's deejays played,

22    that would determine whether customers would be attracted to

23    the club, correct?

24    A.  Yes.  The music and the dancers, too.

03:13 25    Q.  Would you agree that different types of music attract

FLOREZ (Direct Examination)

```
        1   different crowds or types of customers?

        2   A.  Yes.

        3   Q.  Was the type of customer who came during the day

        4   different from the customers who came at night?

03:13   5   A.  Yes.

        6   Q.  And can you explain how?

        7   A.  Daytime customer is, you know, middle-aged, 50.  And the

        8   nighttime is younger people.

        9   Q.  So was there a difference between the type of music Stir

03:14  10   Crazy wanted deejays to play during the day versus at night

       11   because of the different crowds?

       12   A.  Yeah.  The deejays they pick the music, the right music

       13   for the right crowd so --

       14   Q.  Did Stir Crazy want different, kind of a different type

03:14  15   of music played during the day versus during the night?

       16   A.  Not exactly Stir Crazy.  The deejay is -- performs the

       17   music required by the dancers, so they play the music.

       18   Q.  Is it true that you did not want the deejays to play too

       19   much Latin music at the club?

03:14  20   A.  We mixed all the music, not only Latin, we got different

       21   kind of music.  I'm not good for music but can you imagine

       22   all day listen to Latin music?  They're going to -- we're not

       23   going to have a business there.

       24   Q.  So you didn't want too much --

03:15  25   A.  No, we mixed the music, we wanted mixed music.
```

FLOREZ (Direct Examination)

| | |
|---|---|
| 1 | Q.   Is it correct that Stir Crazy did not want the deejays to |
| 2 | play too much hip-hop and rap music? |
| 3 | A.   **They played whatever they want.** |
| 4 | Q.   Were certain deejays better with certain crowds? |
| 03:15  5 | A.   **Yes.** |
| 6 | Q.   If there is good music at the club and a lot of dancers, |
| 7 | would customers tend to stay longer? |
| 8 | A.   **Yes.** |
| 9 | Q.   And if customers stayed longer, would the club make more |
| 03:16  10 | money? |
| 11 | A.   **I don't understand the question.** |
| 12 | Q.   If customers stay longer at Stir Crazy, would that tend |
| 13 | to indicate that Stir Crazy would be more profitable? |
| 14 | A.   **Probably.** |
| 03:16  15 | Q.   Were there times that you didn't like -- you did not like |
| 16 | music that a deejay was playing and you told him not to play |
| 17 | it or have a manager tell him? |
| 18 | A.   **Yes.  Can I explain?** |
| 19 | Q.   Yes. |
| 03:16  20 | A.   **You know, some kind of songs they got too many bad words** |
| 21 | **I don't like to be playing in the business.** |
| 22 | Q.   Was it -- so you're saying the only time that you |
| 23 | would -- |
| 24 | A.   **Once in a while.** |
| 03:16  25 | Q.   And that was if it had too many bad words? |

FLOREZ (Direct Examination)

         1    A.   **Correct.   And it's inappropriate for the customers.**

         2    Q.   Were there some other reasons you might --

         3    A.   **No.**

         4    Q.   You or a manager might tell a deejay not to play a

03:17    5    certain song?

         6    A.   **No.**

         7    Q.   You also -- Stir Crazy didn't want deejays to play songs

         8    that were too long, correct?

         9    A.   **No.   I'm not sure.**

03:17   10    Q.   Could a deejay play an 8-minute long song during the

        11    dancer rotation?

        12    A.   **No.**

        13    Q.   So the songs couldn't be too long, correct?

        14    A.   **We set some time for the music, but they handle it very**

03:17   15    **well so --**

        16    Q.   And what were the time parameters?

        17    A.   **I don't recall right now.**

        18    Q.   You don't recall?

        19    A.   **No, because that's more the deejay, not me.**

03:17   20    Q.   But one of the things that Stir Crazy wanted the deejays

        21    to do was not play songs that were too long?

        22    A.   **Yeah.**

        23    Q.   And would you agree that the exotic dancers dancing on

        24    the stage to music provides an important part of the

03:18   25    entertainment at the club and the overall exotic dance theme

FLOREZ (Direct Examination)

1    at the club?

2    A.   **I don't understand your question.  Say again.**

3    Q.   Would you agree that playing music at the club and having

4    the dancers dance to that music is part of -- is an important

03:18    5    part of the overall theme of the exotic dance club that Stir

6    Crazy runs?

7    A.   **Yeah, it's part of the entertainment, you know, the**

8    **dancer and the music and our business sell the liquor.**

9    Q.   And so that helps to sell the liquor, correct, having

03:18   10    that type of entertainment?

11    A.   **It's part of the entertainment.**

12    Q.   It's an important part, correct?

13    A.   **Yes.**

14    Q.   Would you agree that the exotic dancers would not be able

03:19   15    to dance without music being played?

16    A.   **Correct.**

17    Q.   Would a deejay who did not work well with the dancers or

18    played the wrong type of music, would that negatively affect

19    Stir Crazy's business?

03:19   20    A.   **Yes.**

21    Q.   And would you agree that the deejay serves an important

22    function in calling the dancers to the rotation that the club

23    requires and making other announcements for the club?

24    A.   **I don't understand.**

03:19   25    Q.   No problem.  Let me rephrase it.

1          Is it -- when the deejay calls the dancers to the

2   stage and makes announcements regarding promotions, is that

3   an important part of the club's operations?

4   A.  **Yes.**

03:20   5   Q.  For the period of September 2008 to September 2013, the

6   period we're discussing, was Mr. Rosario's only position as a

7   deejay at Stir Crazy?

8   A.  **Yes.**

9   Q.  Are you aware that Mr. Rosario hired any workers to help

03:20   10   him work as a deejay at Stir Crazy?

11   A.  **No, he's not allowed to hire nobody.**

12   Q.  Was Mr. Rosario required to -- I think you mentioned

13   this.  He was required to pay Stir Crazy a $25 fee --

14   A.  **Yes.**

03:20   15   Q.  -- to work at the club.  Would deejays at times complain

16   to you because a dancer had not paid them the $10 the dancers

17   had to pay to the deejays?

18   A.  **Could you please rephrase the question?**

19   Q.  Has a dancer -- well, deejays -- the dancers had to pay

03:21   20   $10 per shift to the deejays, each dancer, correct?

21   A.  **Correct.**

22   Q.  Did any of the dancers ever complain to you that -- I'm

23   sorry, did any of the deejays ever complain to you that a

24   dancers had not paid them the $10?

03:21   25   A.  **That did not happen too often, but when that happened,**

FLOREZ (Direct Examination)

1    the deejay bring it to the attention to the manager and we

2    cover that portion of the money, Stir Crazy money give it to

3    the deejay so the deejay make his money that night.

4    Q.  So if there was an issue regarding whether a dancer is

03:21  5    not paying the deejay the house fee, the managers would

6    resolve that issue?

7    A.  But that happened once in a while, not on a daily basis.

8    Q.  When it did, though, the managers resolved it?

9    A.  When it happened, the Stir Crazy paid the deejay from

03:22  10   Stir Crazy money.

11   Q.  Did Stir Crazy keep any record of the dancers, the $10

12   fee that dancers paid to Mr. Rosario?

13   A.  No, we don't have records, but we have records of girls

14   every day, so that's easy to calculate how much the deejay.

03:22  15   Say we got 35 girls, the deejay is going to be in his pocket

16   is minimum 350, $400.

17   Q.  Do you have any personal knowledge based on a personal

18   observation of the dancers paying Mr. Rosario more than $10

19   per shift?

03:23  20   A.  According to the other manager, yes.

21   Q.  I'm not asking what the other manager told you.  I'm

22   asking whether you, yourself, personally observed a dancer

23   paying Mr. Rosario more than $10?

24   A.  Remember that he worked most of the daytime and during

03:23  25   the day, so I don't have that information.

FLOREZ (Direct Examination)

1   Q.  But you said you could obtain an approximate amount how

2   much Mr. Rosario made per shift by just multiplying the

3   number of dancers by $10?

4   A.  **Correct.**

03:23   5   Q.  So if there were 10 dancers it would be $100 per shift?

6   A.  **Minimum.**

7   Q.  If there were 15 dancers, it would be 150?

8   A.  **If it's 35 girls, he's going to make $350.**

9   Q.  And how many dancers typically worked per shift?

03:24   10   A.  **Usually we got a lot of girls in the nighttime, between**

11   **20 and 40 girls.**

12   Q.  And I'm talking about the period from September 2008 to

13   2013?

14   A.  **Yes.**

03:24   15   Q.  You're telling me there were 40 girls per shift?

16   A.  **Maximum 40, minimum 20, 25.  Sometimes 18, but the**

17   **maximum was 40.**

18   Q.  And the management controlled how many girls worked per

19   shift?

03:24   20   A.  **I'm sorry?**

21   Q.  Management controlled how many girls were working per

22   shift?

23   A.  **No.  They come in.  We got a schedule, probably we**

24   **schedule 40 dancers and could be show 25, 30.  We don't**

03:25   25   **control that.**

FLOREZ (Direct Examination)

1   Q.   But managers made the schedule regarding dancers?

2   A.   **Correct.**

3   Q.   And sometimes some of them didn't show up?

4   A.   **Sometimes we got 20 on the schedule and they show 30.**

03:25   5   Q.   The deejays did not do the schedule regarding the

6   dancers; is that right?

7   A.   **No.**

8   Q.   Did Mr. Rosario share in any of the club's, Stir Crazy's

9   profit?  Did he have a profit-sharing agreement?

03:25   10   A.   **The money that he made?**

11   Q.   No.  The money that Stir Crazy made from liquor sales and

12   the house fees.

13   A.   **No.**

14   Q.   And food sales as well?

03:25   15   A.   **I'm sorry?**

16   Q.   He didn't share in any of the sales profits that Stir

17   Crazy made?

18   A.   **No.**

19   Q.   What types of expenses does Stir Crazy pay to run the

03:25   20   club?

21   A.   **The regular expenses, electricity, water, insurance,**

22   **license.**

23   Q.   Liquor bills?

24   A.   **Liquor bills, of course.**

03:26   25   Q.   Phone bills?

FLOREZ (Direct Examination)                    57 of 107

|   |    |                                                              |
|---|----|--------------------------------------------------------------|
|   | 1  | A.  **Phone bills.**                                         |
|   | 2  | Q.  Does Stir Crazy pay for the marketing and advertising for |
|   | 3  | the club?                                                     |
|   | 4  | A.  **Yes.**                                                 |
| 03:26 | 5  | Q.  And did the deejays or club management make decisions |
|   | 6  | regarding marketing and advertising?                         |
|   | 7  | A.  **Not deejays.  The deejays don't have nothing to with it.** |
|   | 8  | Q.  Who makes the decisions regarding marketing?             |
|   | 9  | A.  **The managers.**                                        |
| 03:26 | 10 | Q.  Who else?                                             |
|   | 11 | A.  **Nobody else.**                                         |
|   | 12 | Q.  Did the deejays pay any of the Stir Crazy bills for      |
|   | 13 | operating the club?                                          |
|   | 14 | A.  **No.**                                                  |
| 03:27 | 15 | Q.  How much on average did it cost to run Stir Crazy in |
|   | 16 | terms of expenses and payroll per month?                     |
|   | 17 | A.  **I don't have that number with me.**                    |
|   | 18 | Q.  Can you give me an approximate?                          |
|   | 19 | A.  **I don't want to guess.**                               |
| 03:27 | 20 | Q.  What type of equipment did Stir Crazy provide for the |
|   | 21 | deejays to perform their duties?                             |
|   | 22 | A.  **All the necessary to run a nightclub, computers,**     |
|   | 23 | **amplifiers, all the kind.**                                |
|   | 24 | Q.  I'm sorry, what did you say?                             |
| 03:27 | 25 | A.  **Computers, music, lights.**                        |

FLOREZ (Direct Examination)

```
 1    Q.   Did Stir Crazy pay the music licensing fees?

 2    A.   Yes, ma'am.

 3    Q.   And they paid that for the deejays, correct?

 4    A.   They paid for the license.

 5    Q.   For the deejays to play the music?

 6    A.   Yes.  The deejays don't pay nothing.

 7    Q.   Did the club also provide specialized computer software

 8    that downloaded songs to the house computer?

 9    A.   Yes.

10    Q.   Does Stir Crazy provide a sound mixing board and

11    expensive speakers?

12    A.   Yes.

13    Q.   Did Stir Crazy pay to upgrade the lighting at Stir Crazy?

14    A.   Yes.

15    Q.   And do you know approximately how much that cost?

16    A.   I don't have that number.

17    Q.   Was it about 20 to 30 thousand dollars?

18    A.   Could be.  Yep.

19    Q.   That sounds right?

20    A.   I don't want to give you a number that I don't have it

21    with me.

22    Q.   I'm going to ask to you turn to your April 10th, 2014

23    deposition which you previously stated you had played -- you

24    had taken, page 232 lines 2 to 5.

25    A.   232?
```

1    Q.   Yes.   Page 232.

2    A.   **(Complies.)   Okay.**

3    Q.   I'm sorry.   Let me back up a little so it's clear for

4    everyone.   Page 231, line 22, it was asked, "Why did the club

03:29   5    want to put in new, more economic lights?   Did the club want

6    to spend less on FP&L?

7          "Answer:   The club, no.   I just suggest them it is

8    time to upgrade.

9          "Question:   How much was the upgrade?

03:29  10          "I don't know.   20, 30 thousand dollars."

11          Is that --

12   A.   **That's what I told you at the beginning, I don't want to**

13   **be guessing number but if you see the answer, it says, I**

14   **don't know, 20 or 30.**

03:30  15   Q.   How much did the Stir Crazy house computers cost?

16   A.   **I can't recall.   Five, seven thousand.**

17   Q.   Somewhere between five and seven thousand?

18   A.   **I don't have that number with me, ma'am, but if you want**

19   **I can bring you the invoice next time but --**

03:30  20   Q.   Could it be as much as that, as much as five to seven?

21   A.   **Could be, yeah.**

22   Q.   Okay.   If you'll turn to your deposition again, page 171.

23   A.   **(Complies.)**

24   Q.   Starting at line 10.   The attorney asks, "In the last

03:31  25   first -- in the last first year how many different computers

```
  1    has the club had as house computers?

  2              "Answer:  Two, two or three.

  3              "Question:  How much were those computers?

  4              "The first one was -- the first one G5 is very

03:31 5    strong, like $5,000."

  6    A.   Okay.

  7    Q.   Does that refresh your recollection or do you want to

  8    explain that answer?

  9    A.   I answered your question.  It's about $5,000, same here.

03:31 10   Q.   So you agree with that cost, about five thousand, the

  11   house computer?

  12   A.   Yes, ma'am.

  13   Q.   How much did Stir Crazy spend to rewire the club sound

  14   system, install new amplifier and renovate expensive

03:32 15   speakers?

  16              I'm sorry, we're done with that deposition.  I'm

  17   not referring to it anymore.

  18   A.   I'm sorry, but I read there that it's like $10,000.

  19   Q.   Who paid for the sound system renovation?

03:32 20   A.   The club.

  21   Q.   Are you aware of Mr. Rosario bringing in any equipment to

  22   the club?

  23   A.   I don't work with him on his shift, so he bring his

  24   computer, but I don't remember what else he bring.

03:32 25   Q.   Would Mr. Rosario be able to perform as a deejay even if
```

FLOREZ (Direct Examination)

1   he didn't bring in his laptop?

2   A.  **Stir Crazy got the whole system ready to use if they want**

3   **it.**

4   Q.  Now, the parties have agreed regarding the number of

03:33  5   hours that Mr. Rosario worked.  And they agreed that he

6   worked four to five shifts per week; is that correct?

7   A.  **Yeah, he choose the schedule.**

8   Q.  But that's what he worked?

9   A.  **That's what he choose, yeah.**

03:33  10  Q.  Well, not what he -- I'm not asking you whether he chose

11  it or not.  I'm asking you that's what he worked.

12  A.  **Four or five shifts.**

13  Q.  And that would be -- on the weeks when he worked four

14  days it would be 34 hours, and on the weeks that he worked

03:33  15  five days it would be 42.5 hours, correct?

16  A.  **Correct, but not every week because -- can I explain?**

17         MRS. ROBBINS-BOBER:  Your Honor, the parties have

18  already stipulated to this.

19         THE COURT:  Well, if it's a stipulation then you

03:33  20  don't need to ask him questions.  We just publish the

21  stipulation.

22         MRS. ROBBINS-BOBER:  I would like that to be

23  published, Your Honor.

24         THE COURT:  All right.  We can do that.  But at an

03:34  25  appropriate time.

FLOREZ (Direct Examination)

1             MRS. ROBBINS-BOBER:  All right.  Thank you, Your

2    Honor.

3    BY MRS. ROBBINS-BOBER:

4    Q.  Did Stir Crazy keep records of Mr. Rosario's actual work

03:34  5    time each day or each week?

6    A.  **We have some records what days the deejays work.  Those**

7    **records are not accurate because they change it once in a**

8    **while if they want to take vacation, so those schedules is**

9    **not a hundred percent sure.**

03:34 10             **And we got a master schedule where I throw there**

11   **what the -- Joe Roppo, which is the head deejay he give it to**

12   **me.  But not necessarily those schedules is the actual**

13   **situation what happened on that date.**

14   Q.  So you kept schedules, but the schedules sometimes

03:35 15   change?

16   A.  **They change.  They change.**

17   Q.  And then the schedules that you had made weren't

18   necessarily corrected afterwards?

19   A.  **For the deejays, yes, ma'am.**

03:35 20   Q.  So if you went back and looked at the schedules, they

21   would not accurately reflect the deejay -- the days that some

22   of the deejays worked?

23   A.  **Yeah, because they made changes.  You know, they probably**

24   **take vacation or be sick or he got to attend something, so**

03:35 25   **they change it.**

FLOREZ (Direct Examination)

1    Q.   And the schedules, you said that they recorded days

2    worked.  Did they record the time, the arrival and departure

3    times of the deejays?

4    A.   **Not the time.**

03:35   5    Q.   So you don't have any records of how many hours a deejay

6    worked on a particular day?

7    A.   **Not that I recall.**

8    Q.   Did you -- I think you mentioned before you prepared a

9    document called the daily report and you would spend a couple

03:36   10   of hours on that each day; is that correct?

11   A.   **Yes.**

12   Q.   What was the purpose of the daily report?

13   A.   **To keep information about the business.**

14   Q.   What type of information?

03:36   15   A.   **You know, credit cards, deposits, liquor sales.**

16           **MRS. ROBBINS-BOBER:**  I would like to offer into

17   evidence Plaintiff's Exhibit 14 which is a daily report, and

18   if you'll turn to that.

19           (Thereupon, the aforementioned exhibit was

03:37   20   introduced.)

21   A.   **Which one?**

22   **BY MRS. ROBBINS-BOBER:**

23   Q.   It's Plaintiff's Exhibit 14.  And it's an excerpt of a

24   daily report from January 11th, 2012.

03:37   25          **MRS. ROBBINS-BOBER:**  And, Your Honor, I would like

FLOREZ (Direct Examination)

1     to offer that into evidence.

2              MR. McDONALD:  Is this the complete for that day?

3              MR. BOBER:  Yes.

4              MR. McDONALD:  No objection.

03:38  5         THE COURT:  All right.  Plaintiff's Exhibit 14 will

6     be admitted into evidence.

7              (Thereupon, the aforementioned exhibit was admitted

8     into evidence.)

9     BY MRS. ROBBINS-BOBER:

03:38  10   Q.  So if you'll take a look at the daily sales reports, is

11    this -- this is the type of report you're referring to that

12    you spent time preparing each day?

13    A.  **Yes, ma'am.**

14             THE COURT:  Are you going to refer to specific

03:38  15   numbers in that report, Ms. Bober?  I'm trying to decide if

16    the jury can see or not.

17             MRS. ROBBINS-BOBER:  No, I won't refer to numbers,

18    it's just to give a general idea of the information provided

19    in there.  The amounts aren't particularly --

03:39  20        THE COURT:  Let me ask the members of the jury, can

21    you read what's on the screen?

22             THE JURY:  No.

23             THE COURT:  I did not think so.  All right.  If you

24    refer to any particular entry you will need to magnify it

03:39  25   even more, so they can read what you're showing.

```
 1            MRS. ROBBINS-BOBER:  Okay, Your Honor, and we will

 2    have a copy in the exhibits.

 3            THE COURT:  I understand, but as you're showing it

 4    in this fashion you're putting it in front of them, it would

 5    be appropriate for them to see what you're talking about.

 6            Maybe you can bring the screen a little closer.

 7            No, I mean physically move the screen.

 8    BY MRS. ROBBINS-BOBER:

 9    Q.   Do the daily sales reports have a place that indicate

10    which deejay was working on which shift?

11    A.   Correct.

12    Q.   And it generally shows the sales --

13    A.   Correct.

14    Q.   -- for the day.  Now the -- you mentioned that deejays

15    were also listed on schedules.  Would the daily reports

16    accurately reflect which deejay was working on a particular

17    shift?

18    A.   Yes.

19    Q.   The daily reports?  I know the daily reports would have a

20    place to indicate that a deejay worked, but was the

21    information always correct?  Was the deejay's name on the

22    daily reports, was that always correct?

23    A.   In this daily reports, yes.

24    Q.   Were there times when the daily report did not accurately

25    reflect which deejay was working?
```

FLOREZ (Direct Examination)

1    A.  **It could be put the wrong deejay.**

2    Q.  And when did you prepare the daily reports?

3    A.  **The next day.**

4    Q.  And so if you weren't there that night, how would you

03:42    5    know which deejay was working?

6    A.  **Normally the manager listed the names of the person that**

7    **worked that night.**

8    Q.  But there were times when a daily report would not

9    accurately reflect which deejay was working the night before;

03:42   10    is that correct?

11    A.  **I don't understand the question.**

12    Q.  Were there times when the daily report did not accurately

13    reflect which deejay was working on a shift?

14    A.  **If I got the wrong information, it could be wrong on the**

03:43   15    **daily report.**

16    Q.  But there are instances that that has happened?

17    A.  **That happened, that happened.**

18    Q.  Did it really matter to the sales -- to the daily report

19    which deejay was in that box?

03:43   20    A.  **No.**

21    Q.  So that information wasn't important to you because it

22    would not have any effect on the expenses that Stir Crazy

23    paid for that day; is that correct?  I mean --

24            **THE COURT:**  One moment.  You need to answer the

03:43   25    question.  What was the answer?  I'm sorry.

FLOREZ (Direct Examination)

1          THE WITNESS:  No, I don't understand the question

2     when it's too long, so confuse me.

3          THE COURT:  So say when you don't understand and

4     answer when you can.

03:44  5          THE WITNESS:  Okay.

6          THE COURT:  But sometimes I myself don't hear your

7     answer so I'm sure the jury doesn't hear it either.

8          THE WITNESS:  Okay.

9          THE COURT:  So let's go back, Madam Court Reporter,

03:44  10    and read the last question before I interrupted.

11          (Thereupon, the court reporter read back the

12     requested portion.)

13     A.  **Correct.**

14          THE COURT:  All right.  Move on.

03:44  15    **BY MRS. ROBBINS-BOBER:**

16     Q.  Besides the daily reports, there were also documents,

17     schedules that reflected which deejay worked on a particular

18     day, correct?

19     A.  **Correct.**

03:45  20    Q.  In these schedules, who would be on that schedule

21     where -- the deejays were on a schedule.  Which other job

22     positions would be on that schedule as well?

23     A.  **Okay.  We have -- I produce a daily -- a schedule, weekly**

24     **schedule.  And I receive from the deejay the schedule the**

03:45  25    **deejay, and my schedule I got the managers, securities,**

FLOREZ (Direct Examination)

1       bartenders, and we put there the information that Joe Roppo

2       give it to me about the deejays.

3       Q.   So that was like a master schedule?

4       A.   Like a master schedule.

03:45  5   Q.   And was there also like a separate schedule with just the

6       bartenders, managers and disc jockeys?

7       A.   No.  It's managers, securities, and bartenders.

8       Q.   But there was a schedule with deejays on them, right?

9       A.   On the deejays but that provide -- that coming from Joe

03:46  10  Roppo.

11      Q.   And who else was on the deejay schedule?

12      A.   Nobody else.

13      Q.   Again, I'm going to refer to your April 10th, 2014

14      deposition, page 29, starting at line 15 -- I'm just going to

03:46  15  move on.  Sorry about that.

16           The bartenders -- would you make -- would you make

17      the schedules for the managers, bartenders and the deejays on

18      your computer?

19      A.   Yes.

03:47  20  Q.   How often would you make the schedules?

21      A.   Every two weeks.

22      Q.   After you made the schedules, would you give the

23      schedules to the managers?

24      A.   Yes.

03:47  25  Q.   Did you approve the schedules for the deejays and have

1  final say over the schedules?

2  A.  **About the deejays, no.**

3  Q.  You said the deejays were on the schedule?

4  A.  **It's my schedule, but I don't control what days they want**

03:47  5  **to work or they don't want to work.  That's -- they do his**

6  **own schedule.**

7  Q.  If you'll turn to your April 10th, 2014 deposition,

8  line -- page 32, starting at line 4.  The question was asked

9  to you, "If Mr. Roppo testified at his deposition that you

03:48  10  had final approval of the schedules for deejays, was he

11  telling the truth?

12  "Answer:  He is telling the truth."

13  So do you agree that you had final approval over

14  the deejay schedules?

03:49  15  A.  **For me -- Joe Roppo give me the schedule they prepared.**

16  **For me it's okay, if they approve I don't have to approve.**

17  **They just decided what days they want to work.**

18  Q.  So you're changing your testimony from the deposition.

19  A.  **No, I'm not changing it.  I said that I approve whatever**

03:49  20  **Joe bring it to me.**

21  Q.  Are you able to remove a deejay from the schedule?

22  A.  **I'm sorry, the question?**

23  Q.  Are you able to take a deejay off the schedule?

24  A.  **No.  I can do it, but I never do that.**

03:49  25  Q.  If a deejay can't work a shift he's scheduled for, would

FLOREZ (Direct Examination)

1    you be informed and then instruct the head deejay, Joe Roppo,

2    to find a deejay to cover it?

3    A.    **Normally that work is they call Joe Roppo and they do the**

4    **changes between the deejays, and for me it's okay whoever**

03:50    5    **coming work that day.**

6    Q.    But you would be -- you would be informed?

7    A.    **Sometimes, not necessary.**

8    Q.    If you'll turn to page 118 of your April 10th, 2014

9    deposition at line -- I'm reading from line 19.

03:50    10          "Question:  If a deejay is sick, cannot come in,

11    Joe Roppo will let you know or another manager know about it,

12    correct?

13          "Correct.

14          "And then you will tell Joe Roppo to find a

03:51    15    different deejay to work that shift, correct?

16          "Answer:  Cover that shift.

17          "That's correct?

18          "That's correct."

19          So if a deejay cannot work a shift, do you agree

03:51    20    that you would be informed by Mr. Roppo, the head deejay, and

21    you would tell him to find another deejay to cover?

22    A.    **Yes.**

23          **MRS. ROBBINS-BOBER:**  I would like to offer into

24    evidence Plaintiff's Exhibit 9 which are schedules.

03:52    25          **THE COURT:**  Any objection, Mr. McDonald?

FLOREZ (Direct Examination)

1          MR. McDONALD:  I'm sorry.  No objection.

2          THE COURT:  Thank you.  Exhibit 9 will be admitted.

3          (Thereupon, the aforementioned exhibit was admitted

4    into evidence.)

03:53  5  BY MRS. ROBBINS-BOBER:

6    Q.  Have you had an opportunity to look at Plaintiff's

7    Exhibit 9 which is some computerized schedules?

8          MR. McDONALD:  Do you have --

9    A.  Yes.

03:53  10 BY MRS. ROBBINS-BOBER:

11   Q.  And can you please turn to January 9th, 2012?

12         THE COURT:  Well, Ms. Bober, how is he going to

13   find that in this pile of papers?

14         MRS. ROBBINS-BOBER:  I'm sorry.  Let me help you.

03:53  15 Thank you, Your Honor.

16         THE COURT:  If it has a Bates stamp --

17         MRS. ROBBINS-BOBER:  It has a Bates stamp number SC

18   039.

19   A.  (Complies.)

03:54  20 BY MRS. ROBBINS-BOBER:

21   Q.  Is this the type of schedule you are referring to?

22   A.  Yes.

23   Q.  And this is just an example of the schedule.  Who is on

24   this schedule?

03:54  25 A.  Managers and the deejays.

FLOREZ (Direct Examination)

1  Q.  And you don't -- in this case, we requested a copy of all

2  the schedules.  You don't have a record of all the schedules

3  for the five-year period where Mr. Rosario seeks wages; is

4  that correct?

03:55  5  A.  **Correct.**

6  Q.  Some schedules are missing?

7  A.  **Correct.**

8  Q.  And I would like, if you could, please, now turn to

9  plaintiff's exhibit, what's been marked on plaintiff's

03:55  10  exhibit list as Plaintiff's Exhibit 11, which is another type

11  of schedule.

12           (Thereupon, the aforementioned exhibit was

13  introduced.)

14           **MR. McDONALD:**  No objection.

03:56  15           **THE COURT:**  11 will be admitted.

16           **MRS. ROBBINS-BOBER:**  Thank you, Your Honor.

17           (Thereupon, the aforementioned exhibit was admitted

18  into evidence.)

19  **BY MRS. ROBBINS-BOBER:**

03:56  20  Q.  Is this another type of schedule for the deejays?

21  A.  **Deejays.**

22           **MR. McDONALD:**  Judge, I'm going to object.

23           **THE COURT:**  All right.  Are you objecting to the

24  exhibit now or are you objecting to the question?

03:56  25           **MR. McDONALD:**  Not to the exhibit, to the question

FLOREZ (Direct Examination)

1    whether the witness can even identify it or knows what it is.

2         THE COURT:  All right.  Exhibit 11 is composed of

3    several pages.  Ms. Bober, are you trying to get the witness

4    to testify regarding any particular page or all of the pages

03:57  5    in the exhibit?

6         MRS. ROBBINS-BOBER:  Your Honor, I am -- I would

7    like him to -- I'm not going to ask him questions about all

8    the pages, but I will ask him questions about one or two

9    pages and I'd like the entire exhibit admitted and the

03:57  10    Defendants did not have any objections on their -- on my

11    exhibit list when it was filed with the Court.

12         THE COURT:  All right.  I understand that the

13    exhibit has been admitted.  Now the questions regarding the

14    exhibit would be, the first question would be, does

03:57  15    Mr. Flórez recognize this and can he explain what it is.

16         MRS. ROBBINS-BOBER:  Absolutely.

17         THE COURT:  All right.

18    BY MRS. ROBBINS-BOBER:

19    Q.  Mr. Flórez, can you please take a look at Exhibit Number

03:57  20    11?

21    A.  Okay.  Any page?

22         THE COURT:  Mr. Flórez, just take all of the pages,

23    take all of the pages out of the binder and have a seat and

24    look them over.  And then be ready to answer the question.

03:58  25         Do you recognize?

         1              THE WITNESS:  Yes.

         2              THE COURT:  Next question.

         3    BY MRS. ROBBINS-BOBER:

         4    Q.  Can you please identify it?

03:58    5    A.  **Yes.**

         6    Q.  What is it?

         7    A.  **This looks like on the schedule that Joe Roppo, our head**

         8    **deejay prepared with the other deejays.**

         9    Q.  Is this something that -- is this schedule that the

03:58   10    deejays at Stir Crazy used?

        11    A.  **Joe Roppo prepared these documents.**

        12    Q.  But Stir Crazy produced this in this case.  Is this one

        13    of your records?

        14    A.  **I'm not sure, but I don't produce this.  This is Joe**

03:59   15    **Roppo produce these records.**

        16    Q.  Is this something that you have seen before?

        17    A.  **Yes.  It's all the time in the deejay, in the deejay**

        18    **booth.**

        19    Q.  So you know what this schedule is, correct?

03:59   20    A.  **Yeah.  That's what I explained earlier, that I got my**

        21    **schedule, but they do their own schedule.  And not**

        22    **necessarily this schedule got to be matched with the deejay**

        23    **schedule.**

        24    Q.  That schedule was --

03:59   25    A.  **This schedule was prepared by Joe Roppo.**

FLOREZ (Direct Examination)

1    Q.   And that's Plaintiff's Exhibit 11?

2    A.   **Okay.**

3    Q.   That's what you're referring to?

4    A.   **According with you, it's Exhibit 11.**

03:59    5    Q.   And whose -- but that's something that you review?

6    A.   **I not review this.  I just receive this and transfer to**

7    **here, but not necessary is what is here because they do**

8    **changes and you can see that Joe Roppo scratched some names**

9    **and put somebody else, so that's what I'm talking about**

04:00   10    **early.**

11    Q.   But you use information from that schedule to prepare

12    your daily reports?

13    A.   **It's not important information, but I put it there**

14    **because we got the space to put it there.  But, like I say**

04:00   15    **again, this is prepared for Joe Roppo, I don't produce this.**

16    Q.   But you look at them when you prepare your daily reports?

17    A.   **Yeah, I take a look.**

18    Q.   And who is listed on that schedule?

19    A.   **According with this, it's Joe, Joe Roppo and Mr. Mitch,**

04:00   20    **Andy, and somebody else named Ray.**

21    Q.   Are all those people you just referred to, are those

22    deejays?

23    A.   **They are deejays, correct.**

24    Q.   And this was to ensure that there was always one deejay

04:01   25    working per shift, correct?

FLOREZ (Direct Examination)

1    A.   **Correct.**

2    Q.   In this schedule, does it break up -- what are some of

3    the designations on the schedule?  What does the D and the N

4    refer to?

04:01    5         **THE COURT:**  The court reporter can't hear you if

6    you walk away from the microphone.  I know it's difficult.

7         **MRS. ROBBINS-BOBER:**  Sorry, Your Honor.

8    BY MRS. ROBBINS-BOBER:

9    Q.   On this schedule, do you know what the D and the N refer

04:01   10   to?

11   A.   **D is day and N is night.**

12   Q.   So if you go down the row of each deejay, the N would

13   mean that the deejay was scheduled to work the night shift

14   and a D would indicate that he's scheduled to work the day

04:02   15   shift; is that correct?

16   A.   **That's correct.**

17   Q.   And you -- I think you previously testified that these

18   schedules are not always accurate, correct?

19   A.   **Correct.  Because if you see -- sorry, can I explain?**

04:02   20   Q.   Yes.

21   A.   **You see Joe Roppo scratched the name here and put**

22   **somebody else to work the night or the day.**

23   Q.   Do some of the daily reports not match the schedules?

24   A.   **Because the explanation I give about the schedule.**

04:02   25   Q.   When you were -- if there is no deejay name in your daily

FLOREZ (Direct Examination)

 1    report, would you be able to tell me who had worked on a

 2    particular day, which deejay had worked on a particular day?

 3    A.  **Can you rephrase the question, please?**

 4    Q.  Are you able to go back with the records that you have

04:03  5    and tell me whether a deejay actually worked on a particular

 6    day?

 7    A.  **According with my daily reports, I can give you the name**

 8    **but not necessary got to be that he worked the day or the**

 9    **night.**

04:03 10    Q.  Do you agree that Stir Crazy is missing records from

11    March 18th, 2010 to December 31st, 2010?

12    A.  **Yes, I have a problem with my computer and I lost the**

13    **portion of data.**

14    Q.  I'd like to discuss with you now the role that the Insua

04:04 15    family played in Stir Crazy's operations.  Now we were

16    previously talking about this phrase, the Insua family,

17    correct?

18    A.  **Correct.**

19    Q.  And when you used that phrase, you were referring to the

04:04 20    three Insuas; is that right?

21    A.  **Right.**

22    Q.  And that would be?

23    A.  **Laura Insua, Manuel Insua, and Junior.**

24    Q.  Manny, Junior and Laura Insua, correct?

04:04 25    A.  **Correct.**

FLOREZ (Direct Examination)

 1  Q.  Would you agree that you discussed Stir Crazy business

 2  with the Insua family?

 3  A.  **Yes.**

 4  Q.  Did you discussions with the Insuas include how to make

04:04  5  money for the club?

 6  A.  **General conversation about the business**.

 7  Q.  Would it include how to make money for the club?

 8  A.  **Yes.**

 9  Q.  Did you report to the Insua family?

04:05  10  A.  **Yes.**

 11  Q.  Did you discuss the club's financials with Laura and

 12  Manuel Insua?

 13  A.  **Yes.**

 14  Q.  Would you meet in person with Manuel and Laura Insua to

04:05  15  discuss Stir Crazy business?

 16  A.  **Say again, please.**

 17  Q.  Did you meet in person with Laura and Manuel Insua to

 18  discuss Stir Crazy business?

 19  A.  **Yes.  They live really close to the business so for me**

04:05  20  **it's easy to go to their house and talk with the family.**

 21  Q.  Did you also meet with the Insuas at Stir Crazy?

 22  A.  **A long time ago.  They are very old right now and**

 23  **Mrs. Laura is very sick.**

 24  Q.  How frequently would you go to their house to meet with

04:06  25  the Insuas to discuss Stir Crazy business?

FLOREZ (Direct Examination)

1    A.  **I don't have a schedule to go to his house.  Once a week,**

2    **two times a week.**

3    Q.  Is it about one to two times a week?

4    A.  **It's not exactly.  I don't have a schedule to go there.**

04:06    5    Q.  But if you were going to come up with an average, would

6    you say it was once or twice a week?

7    A.  **If this is important for you, yes.**

8    Q.  Would you agree that about half the time you met --

9    remember, I'm talking about the time period September 2008 to

04:06   10    September 2012 -- '13, would you agree that about half the

11    time you met -- about half the time when you met with Manuel

12    and Laura Insua to discuss Stir Crazy business, about half

13    the time you would meet at Stir Crazy's office and the other

14    half of the time you would meet them at their house?

04:07   15    A.  **What's the question?**

16    Q.  Would you agree that about half the time you met Laura

17    and Manuel Insua at their house and the other half of the

18    time you met them at the office to discuss Stir Crazy

19    business?

04:07   20    A.  **Like I said before, she go to the office, the back office**

21    **that we got in the business, but now she's very sick and is**

22    **not -- she not going there anymore.**

23    Q.  I'm not talking about now.  I'm talking for that five

24    year period from September --

04:07   25    A.  **Yes.**

FLOREZ (Direct Examination)

        1   Q.   Let me finish my question.

        2           THE COURT:  Yes.  Mr. Flórez, for the sake of the

        3   court reporter and the record, you need to wait for Ms. Bober

        4   to finish her question.  I know she was kind of repeating her

04:08   5   question now so you finally got it.  But it has to be a clean

        6   record.

        7           THE WITNESS:  I'm sorry.

        8           THE COURT:  So go ahead and just ask the question

        9   as simply as possible.

04:08  10           THE WITNESS:  Please.

       11           THE COURT:  For this purpose.

       12           THE WITNESS:  Thank you.  I'm sorry.

       13   BY MRS. ROBBINS-BOBER:

       14   Q.   So about half the time you met the Insuas at their house

04:08  15   and half the time you met them at the office to discuss Stir

       16   Crazy business?

       17   A.   **Correct.**

       18   Q.   And you said you went about once or twice per week to

       19   their house?

04:08  20   A.   **Yes.**

       21   Q.   In addition to meeting Manuel Insua and Laura Insua to

       22   discuss club business, do you also speak with them by phone?

       23   A.   **Yes.**

       24   Q.   Who usually initiates the meetings with the Insua family?

04:09  25   Who usually -- do you call them or do they call you or is it

FLOREZ (Direct Examination)                81 of 107

```
     1   a combination of both?
     2   A.   It's a combination.
     3   Q.   If there were a legal investigation at Stir Crazy, would
     4   you bring that to the Insua family's attention?
04:09 5   A.   Correct.
     6   Q.   Would you discuss with the Insua family anything that's
     7   going on in the club?
     8   A.   Something important.
     9   Q.   You only discuss important things?
04:10 10   A.   Yes.
    11   Q.   If you'll turn to your April 10th, 2014 deposition, page
    12   113, please.
    13   A.   (Complies.)  Okay.
    14   Q.   "Before you said you discussed anything going on the club
04:10 15   with the Insua family, correct?
    16        "Correct.
    17        So do you agree that you would discuss with the
    18   Insua family anything going on at the club?
    19        MR. McDONALD:  Let me object to the -- because the
04:11 20   testimony -- it's an incomplete reading of the line of
    21   questioning in the deposition.
    22        THE COURT:  And it does not even give the line
    23   number.
    24        MRS. ROBBINS-BOBER:  I apologize.  That's lines 1
04:11 25   through 3 of page 113.
```

FLOREZ (Direct Examination)

1        THE COURT:  Okay.  Is that a complete answer, the

2   answer that you read or was there an additional answer?

3        MRS. ROBBINS-BOBER:  I think that it's complete.

4   Mr. McDonald will have an opportunity to object --

04:11   5        THE COURT:  If that is was the full answer to the

6   question, then you can move on.

7   BY MRS. ROBBINS-BOBER:

8   Q.   I'll read starting again at line 4 through 8.  It says --

9   it asks, the attorney asks:

04:12  10             "Does that include --

11             "Answer:  Whatever relevant bring the attention

12   that they go -- they got to know.  Little things, you know, I

13   don't -- like somebody break a stool or whatever, not

14   something -- I'm sorry.  Like somebody break a stool or

04:12  15   whatever, no.  Something relevant."

16             So you would agree you would bring anything going

17   on in the club to the Insuas' attention and the things you

18   bring -- and the relevant things you would bring to their

19   attention?

04:12  20   A.   **Yes.**

21   Q.   On an ongoing basis, did you speak with the Insua family

22   about employee issues and problems with workers?

23   A.   **When it's something important, yes, I bring it to their**

24   **attention.**

04:13  25   Q.   But did you bring to their attention issues with

FLOREZ (Direct Examination)

```
         1    employees at the club?

         2    A.  Yes, if it's something important, yes, I bring it to the

         3    attention of the owners.

         4    Q.  So there were some people working at the club who were

04:13    5    employees, correct?

         6    A.  Yes.

         7    Q.  So if there was an issue with an important issue with an

         8    employee at the club, would you bring that to the Insua

         9    family's attention?

04:13   10    A.  Correct.

        11    Q.  Do you also discuss with the Insua family on an ongoing

        12    basis any issues that -- I'm sorry.

        13         If something expensive at the club breaks and needs

        14    to be repaired, is that something you have spoken to the

04:14   15    Insua family about?

        16    A.  Correct.

        17    Q.  Did you discuss with the Insua family lawsuits against

        18    the club and injuries at the club?

        19    A.  Correct.

04:14   20    Q.  When it came to running the club, would you describe your

        21    role as literally being the right hand for the three Insuas?

        22    A.  Right.

        23    Q.  If the Insua family told you to do something, you would

        24    do it, correct?

04:14   25    A.  They're the owners.
```

FLOREZ (Direct Examination)

1   Q.   Did you at times send text messages to the three Insuas

2   regarding club business?

3   A.   **Not with -- yeah.  Sometimes.**

4   Q.   And did you discuss -- can you tell me about the

04:15   5   frequency?

6   A.   **No.  I got more, you know, they are 86 or 87 years old**

7   **and, you know, they're not into text message all the time,**

8   **but with Mr. Insua sometimes, yeah.**

9   Q.   You would text Mr. Manuel, Senior more?

04:15   10   A.   **Yes.**

11   Q.   And Manny?

12   A.   **And Manny.**

13   Q.   But not so much text message to Laura Insua?

14   A.   **She don't have a cellular.  I'm not sure.**

04:15   15   Q.   Do you discuss the club's banks statements with the three

16   Insuas?

17   A.   **Correct.**

18   Q.   Now we previously discussed the daily sales reports.

19   Who, if anyone, would you send the sales reports to?

04:15   20   A.   **Mr. Insua, Senior.**

21   Q.   Isn't it true you that you sent them to all three of the

22   Insuas?

23   A.   **I always send it to Mr. Insua, Senior.**

24   Q.   And you would send them by e-mail?

04:16   25   A.   **By e-mail, yes.**

FLOREZ (Direct Examination)

1   Q.   You would also send that to Insua, Junior as well,

2   correct?

3   A.   **Mostly to Mr. Insua.**

4   Q.   But you also sent it to Insua, Junior?

04:16   5   A.   **Yes.**

6   Q.   How often would you send the sales reports?  Was it every

7   week?

8   A.   **Every week.   Every two weeks.**

9   Q.   And, of course, if they wanted to see a sales report on a

04:16   10   particular day, they could just -- they can have access to

11   it?

12   A.   **Yes.**

13   Q.   In addition to sending the sales reports to the three

14   Insuas, would you discuss the reports with them and answer

04:17   15   any questions they had?

16   A.   **Yes.**

17   Q.   Did you discuss the sales reports with Laura Insua?

18   A.   **Not with her.**

19   Q.   Now going back to your April 10th, 2014 deposition, page

04:17   20   46, I'm going to read lines 2 to 11.

21          "Question:  You are telling me, you are testifying

22   you have never had a conversation with Laura Insua about the

23   financial reports?

24          Answer:  Yes.  I have had it.  But not as a daily

04:18   25   with Mr. Insua, Senior.

FLOREZ (Direct Examination)

1          "You are saying -- is it your testimony that you

2     speak to Laura Insua, but you speak to her husband more?

3          "Yes, because he's more on top of the accounting

4     and he represents her, too."

04:18    5          So I'll ask you again, would you also discuss the

6     financial reports with Laura Insua?

7     A.   **Okay.  When I go to his house, the family Insua, you**

8     **know, when we're talking about reports, she's there so all**

9     **the time.  She don't work.  So in the same table we discuss**

04:18   10    **about the daily report.  She bring me coffee.  We have a**

11    **coffee.  And she listens to the conversation.  And sometimes**

12    **she give you an opinion or whatever, but most of the time**

13    **it's with Mr. Insua.**

14    Q.   And when you discuss the family -- sorry -- the financial

04:19   15    reports with Manuel Insua, Senior, would he be representing

16    Laura Insua?

17    A.   **Yes.**

18    Q.   I think you mentioned before that Stir Crazy paid some of

19    its workers wages but not others.  Correct?

04:19   20    A.   **Correct.**

21    Q.   And you previously testified that deejays were not paid

22    wages?

23    A.   **Correct.**

24    Q.   And since the deejays were not paid wages, they would not

04:19   25    be listed on any of your payroll documents, correct?

        1    A.  **Correct.**

        2    Q.  You didn't report anything to the payroll company about

        3    deejays, right?

        4    A.  **Right.**

04:20   5    Q.  And does the -- isn't it true that the Insua family does

        6    Stir Crazy's payroll and decides what to pay people at Stir

        7    Crazy?

        8    A.  **Yes.**

        9    Q.  And that would include the three Insuas, correct?

04:20   10   A.  **The two Insuas because Laura is not in payroll.**

        11   Q.  Right.  Laura is not on payroll.  But they -- does the

        12   Insua family decide who should be on payroll?

        13   A.  **Yes.**

        14   Q.  Who prepares the payroll?

04:20   15   A.  **Me.**

        16   Q.  Did you provide payroll records to the Insua family?

        17   A.  **Every year when we're going to do the taxes, I prepare**

        18   **the payroll and I give it to -- we give it to the accounting.**

        19   Q.  But did you provide payroll records to the Insua family?

04:21   20   A.  **Every year.  They don't see that in a biweekly or every**

        21   **payroll they don't see.  They see it at the end of the year.**

        22   Q.  But, of course, if they called you up or came to the club

        23   and said, I want to see the payroll documents, they would

        24   have access to that?

04:21   25   A.  **It's available all the time.**

FLOREZ (Direct Examination)

1    Q.   Could the Insua family tell from the payroll records

2    which workers were receiving wages and which weren't?

3    A.   **No.  I decide.**

4    Q.   My question is, could they -- could the Insua family tell

04:21  5    by looking at the record payroll records who was receiving

6    wages and who was not?

7    A.   **I don't understand your question.**

8    Q.   Well, only the workers who were receiving wages were on

9    payroll, correct?

04:22 10    A.   **Correct.**

11    Q.   So if they looked at the payroll records they would be

12    able to see who was receiving wages, correct?

13    A.   **Correct.**

14    Q.   So if someone was on the payroll records, they would be

04:22 15    receiving wages, right?

16    A.   **Yeah, but they don't know who is on the payroll.  They**

17    **don't even meet those people.**

18    Q.   When an employee is on the payroll in addition to paying

19    wages, does Stir Crazy have to pay payroll taxes the

04:23 20    government?

21    A.   **Yes.**

22    Q.   Were those payroll taxes like, Medicare, FICA, social

23    security?

24    A.   **Yeah.  We have a company who process the whole thing and**

04:23 25    **pay the taxes to the government.**

FLOREZ (Direct Examination)

1  Q.  Is that about like one -- what would Stir Crazy's share
2  of the payroll taxes be, do you know?  Was it like 7.7
3  percent?
4  A.  **I don't know.  I can bring the payroll information, you**
04:23  5  **can see there, but we pay the portion, the Stir Crazy got to**
6  **pay to the government, we pay every payroll.**
7  Q.  And so since the deejays are not on the payroll, does
8  that mean Stir Crazy is not paying any payroll taxes on them,
9  correct?
04:24  10  A.  **Correct.**
11  Q.  And the same would go with the dancers?
12  A.  **Correct.**
13  Q.  So if a deejay were on Stir Crazy's payroll record, Stir
14  Crazy would have to pay taxes on the wages, correct?
04:24  15  A.  **Correct.**
16  Q.  And that would include taxes to the federal government?
17  A.  **All the taxes.**
18  Q.  All the taxes.  What other taxes do you have to pay to
19  your employees?
04:24  20  A.  **All the government requires to run a business.**
21  Q.  Would that be like --
22  A.  **To run a payroll.**
23  Q.  Unemployment tax?
24  A.  **FICA, unemployment, federal withholding.  You know, all**
04:25  25  **the taxes.**

FLOREZ (Direct Examination)

1   Q.   Would you also have to have Workers Compensation

2   insurance?

3   A.   **Yes.  Yes.**

4   Q.   For employees?

04:25   5   A.   **Yes.**

6   Q.   So financially, it would be a benefit to Stir Crazy to

7   call a deejay and the dancer an independent contractor; is

8   that correct?

9   A.   **Rephrase the question, please.**

04:25   10   Q.   Financially, money-wise calling someone an independent

11   contractor would save the club money in taxes, correct?

12   A.   **Not necessarily.  Because if you -- say like a deejay**

13   **made $400 every night, for us it would be better put in the**

14   **payroll, but they don't want it.  They want to be independent**

04:25   15   **contractor because they make more money as a deejay, and they**

16   **have to report it to the government.**

17   Q.   I'm not talking about what would be better for the

18   deejays.  I'm talking about the cost, if you paid deejays --

19   if Stir Crazy paid deejays' wages, you would also have to pay

04:26   20   taxes on those wages, correct?

21   A.   **Correct.**

22   Q.   And right now, since Stir Crazy does not pay deejays any

23   wages, you don't pay any taxes on the earnings that the

24   deejays made; is that correct?

04:26   25   A.   **Correct.**

FLOREZ (Direct Examination)

1  Q.  And you were involved in preparing Stir Crazy's tax

2  returns?

3  A.  **No.  The company prepared.**

4  Q.  But you helped provide -- you did the daily reports, you

04:26  5  helped provide the financial information, correct?

6  A.  **Yes.**

7  Q.  Who else was involved in preparing Stir Crazy's tax

8  returns?

9  A.  **Mr. Insua, Senior.**

04:27  10  Q.  And all of the Insuas had access to the financial

11  information that went into preparing the tax returns, the

12  three Insuas, correct?

13  A.  **Right.**

14  Q.  Let me ask you about the house fee Stir Crazy collected

04:27  15  from the house dancers and the deejays.  It was $25 from each

16  dancer, correct?

17  A.  **Correct.**

18  Q.  And $25 from each deejay that they had to pay to Stir

19  Crazy, correct?

04:27  20  A.  **Correct.**

21  Q.  Were the house fees paid in cash?

22  A.  **Yes.**

23  Q.  Were the house fees part of the daily report that you

24  sent to the three Insuas?

04:27  25  A.  **Yes.**

FLOREZ (Direct Examination)

1    Q.   Do you know whether Stir Crazy reported to the IRS the

2    house fees that it received from the dancers and the deejays?

3    A.   **Yes.**

4    Q.   You do know?

04:28   5    A.   **Yes.**

6    Q.   Did they?

7    A.   **I'm sorry?**

8    Q.   You do know whether they reported it?

9    A.   **We report it, yes.**

04:28   10   Q.   How many dancers did you say on average worked per

11   session?

12   A.   **Back there, like three or four years ago, we had 35, 30**

13   **dancers.**

14   Q.   Is that per day?

04:28   15   A.   **Yeah.   But now we slow down.   We have 10, 5.**

16   Q.   I'm not asking about now.   I'm asking about the time

17   period in question.   It was a significant amount of money

18   that Stir Crazy made from the deejays and dancers?

19   A.   **Yes, it's some kind of money.**

04:29   20   Q.   Would you say between the dancers and the deejays it was

21   maybe about 300,000 a year?

22   A.   **I don't know.   I don't have that number with me.**

23   Q.   Okay.   Well, I'm just going to hand, if the Court will

24   permit, a calculator so we can do the math.

04:30   25          MR. McDONALD:   I would object to that.   I mean,

 1    they can call an accountant if they need to call an

 2    accountant but --

 3              THE COURT:  Do you want him to do a calculation on

 4    your calculator?

04:30  5              MRS. ROBBINS-BOBER:  It's just multiplying a couple

 6    of numbers.

 7              THE COURT:  I think that I can take -- we can have

 8    an instruction on what a number times a number is.  I don't

 9    see -- I just don't see you giving him a calculator.  He

04:30 10    already said that it's approximate numbers.  I'm not going to

11    allow the calculation.  You can ask him the question in

12    another way.

13              MRS. ROBBINS-BOBER:  Okay, Your Honor.

14    BY MRS. ROBBINS-BOBER:

04:31 15    Q.  If it's 30 dancers per day, approximately, you're saying,

16    and each one paid $25, that would be about $750; would you

17    agree with that?

18    A.  **If you can do the math, yeah.**

19    Q.  And that would be $750 a day and Stir Crazy is open every

04:31 20    day of the week, correct?

21    A.  **Correct.**

22    Q.  So it would be $750 times 365, that would be about what

23    Stir Crazy made in house fees from the dancers, right?

24    A.  **Right.**

04:31 25    Q.  And the same thing would be true with respect to deejays,

FLOREZ (Direct Examination)

1   if they paid $25 per shift and they worked two shifts per

2   day, so it would be $50 per shift?

3   A.   **Yeah, but that number changed because Joe Roppo during**

4   **the day we have an agreement with him that he don't pay house**

04:32   5   **fees.  So that math is not accurate.**

6   Q.   So he -- because he was a head deejay --

7   A.   **Yes.**

8   Q.   -- and organizing the -- helping to organize the other

9   deejays, you didn't charge him a house fee?

04:32   10   A.   **That's correct.**

11   Q.   But if you were looking at what Mr. Rosario paid in house

12   fees, you would multiply the number of shifts he worked times

13   $25; is that correct?

14   A.   **That's correct.**

04:32   15   Q.   Did you have a discussion -- did you discuss with the

16   Insua family putting dancers on the payroll and then taking

17   them off?

18   A.   **No, I don't remember.**

19   Q.   Was there a point in time when the dancers were put on

04:33   20   the payroll and then taken off the payroll?

21   A.   **Yes.**

22   Q.   And what prompted Stir Crazy to take the dancers off the

23   payroll -- I'm sorry, to put the dancers on the payroll?

24   A.   **I don't remember.**

04:33   25   Q.   If you'll please turn to your April 10th, 2014

FLOREZ (Direct Examination)

deposition, page 57, starting at line 9, the question was

asked:

      "So at some point a decision was made to go from

having the dancers being paid nothing to having the dancers

going on payroll, correct?

      "Answer:  Correct.

      "Question:  Was that something that you discussed

with the three Insuas or was it something that you did

completely on your own?

      "Answer:  No, we talked about it.

      "Question:  To put them on the payroll?

      "Answer:  (Witness nods head).

      "Question:  That's a yes?

      "Answer:  Yes.

      "Question:  How did the subject of going from not

paying the dancers to starting to pay the dancers come up?

      "Answer:  Okay.  We got a complaint about 20 years

ago, a bartender to the labor department say that we got to

put the bartenders on payroll.  So we agree, and we offer

also to pay also payroll to the dancers, but we discontinued

because the dancers they don't want.  They want privacy.

They don't want checks.  They don't want anyone knows where

they work when they're going to do a W-2 or tax return that

they are strippers so, you know, they're strippers, so we

follow the bartenders and the dancers don't want a check.

FLOREZ (Direct Examination)

 1    They don't want -- they want privacy, they want -- they don't

 2    want everybody knows that they are strippers."

 3            So did you discuss with the Insua family putting

 4    dancers on payroll and taking them off?

04:36  5    A.   **Yes.**

 6    Q.   Did you have a conversation with Manny, Junior that some

 7    dancers working at Stir Crazy would receive wages and others

 8    would work without receiving pay from Stir Crazy?

 9    A.   **I don't remember.**

04:37  10   Q.   If you'll turn to your deposition, again, page 76, lines

11    14 through 20.

12            MR. McDONALD:  I'm sorry, what page, Counsel?

13            MRS. ROBBINS-BOBER:  76.

14            MR. McDONALD:  What line?

04:37  15           MRS. ROBBINS-BOBER:  14 through 20.

16    BY MRS. ROBBINS-BOBER:

17    Q.   The question asks:

18            "Question:  And Manuel Insua, Junior knows that

19    some people in the club are employees and some people are

04:38  20   independent contractors, correct?

21            "Correct.

22            "And this is something that you discussed with him

23    correct?

24            "Yes."

04:38  25           Does that refresh your recollection as to you

FLOREZ (Direct Examination)

1    discussing with Manny, Junior that some people would receive

2    wages and others would not?

3    A.   **Yes.**

4    Q.   Did -- so based on these discussions, did Manny, Junior

04:39   5    know that deejays like plaintiff, Mr. Rosario, were paid no

6    wages?

7              **THE COURT:**  Is there a question?

8              **MRS. ROBBINS-BOBER:**  Yes.

9    **BY MRS. ROBBINS-BOBER:**

04:39  10    Q.   The question is did Manny, Junior know that the deejays

11    like the plaintiff, Mitchell Rosario, were paid no wages?

12    A.   **Yes.  I called him and let him know about the lawsuit.**

13    Q.   Not about the lawsuit.  I'm talking about for the time

14    that Mr. Rosario's working at Stir Crazy.  Manny, Junior was

04:40  15    aware that the deejays, including the Plaintiff, were paid no

16    wages, correct?

17    A.   **Correct.**

18    Q.   Now from what you observed, is it correct that while

19    Manny, Junior was building up the business, he decided to

04:40  20    treat some employees, some workers as employees and others as

21    independent contractors?

22    A.   **Yes.**

23    Q.   Have you had discussions with Manuel Insua, Manuel,

24    Senior and Laura Insua regarding the number of dancers

04:41  25    working at the club?

1    A.   **Sometimes.**

2    Q.   And have they questioned you about that?

3    A.   **Not really.**

4    Q.   If you'll turn to page 48 of your April 10th, 2014

04:42   5    deposition, lines 1 through 11, please?

6             **MR. McDONALD:**  What line?

7             **MRS. ROBBINS-BOBER:**  1 through 11.

8    BY MRS. ROBBINS-BOBER:

9    Q.   "Question:  Why have you discussed the number of girls

04:42   10   that work at the club with the three Insuas?"

11            **MR. McDONALD:**  Let me object to the improper

12   impeachment.

13            **THE COURT:**  Let hear the answer.

14   BY MRS. ROBBINS-BOBER:

04:42   15   Q.   "Okay, say not happen too often but number of girls are

16   low.  They may ask me why we don't have too many girls.  You

17   know, that one of the -- that's one of the questions that

18   they say."

19            **THE COURT:**  And what are you trying to impeach

04:43   20   here, Ms. Bober?

21            **MRS. ROBBINS-BOBER:**  Yes, I asked him have you

22   questioned -- have Manuel, Senior, Manny, Junior, and Laura

23   Insua discussed the number of dancers working, and then I

24   asked him have they questioned you about that it and

04:43   25   Mr. Flórez said that they haven't questioned him about it.

1     **MR. McDONALD:**  I would object.  I believe his

2    testimony was different than that.

3         **THE COURT:**  All right.  Let's go back to the

4    question and let's have the court reporter read back that

04:43   5    question.

6         (Thereupon, the court reporter read back the

7    requested portion.)

8         **THE COURT:**  All right.  So I'll allow the question

9    about the deposition.  Go on, Ms. Bober.

04:44  10    **BY MRS. ROBBINS-BOBER:**

11    Q.  Can you tell me why from a financial perspective the

12    Insua family would be concerned if there were too few

13    dancers?

14         **MR. McDONALD:**  Objection, form.  Objection, Your

04:44  15    Honor, calls for a speculation as to what others might think.

16         **THE COURT:**  I don't think it's speculation with

17    Mr. Flórez being the general manager of the concern.  So if

18    you know, sir, can you answer that question?

19    A.  **Could you please repeat the question?**

04:45  20    **BY MRS. ROBBINS-BOBER:**

21    Q.  My question was, why would the Insua family be concerned

22    that there are too few dancers, and let me elaborate a

23    little.

24         What effect would having too few dancers have --

04:45  25    what impact would having too few dancers at Stir Crazy have

FLOREZ (Direct Examination)

| | | |
|---|---|---|
| | 1 | on the club financially? |
| | 2 | MR. McDONALD:  Objection. |
| | 3 | THE COURT:  That was about three or four questions. |
| | 4 | MRS. ROBBINS-BOBER:  Okay, I'll break it up. |
| 04:45 | 5 | THE COURT:  Just bring it down to just one simple |
| | 6 | question, please. |
| | 7 | BY MRS. ROBBINS-BOBER: |
| | 8 | Q.  What financial impact would having too few dancers at the |
| | 9 | club have on the club? |
| 04:45 | 10 | A.  Okay.  The business, our business is liquor and |
| | 11 | entertainment and having two dancers is not a good business. |
| | 12 | Q.  So the club would make less money if they would have less |
| | 13 | dancers? |
| | 14 | A.  Yes. |
| 04:46 | 15 | Q.  So the Insua family would be concerned if there were too |
| | 16 | few dancers because it would have -- it would mean there was |
| | 17 | -- maybe the business was not doing well; is that correct? |
| | 18 | A.  Correct. |
| | 19 | Q.  Who decided to have the dancers and deejays pay house |
| 04:46 | 20 | fees? |
| | 21 | A.  That was from a long time.  I take it like that way. |
| | 22 | Q.  Well, how long ago was that decision made? |
| | 23 | A.  I don't remember. |
| | 24 | Q.  Was it about 10 or 15 years ago? |
| 04:46 | 25 | A.  Could be. |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | Q.  And you don't recall who started, who made the decision        |
|       | 2  | regarding the house fees?                                          |
|       | 3  | A.  **No.**                                                        |
|       | 4  | Q.  If you will turn to page 254 of your deposition.               |
| 04:47 | 5  | A.  **54?**                                                        |
|       | 6  | Q.  254.                                                           |
|       | 7  | A.  **(Complies.)**                                                |
|       | 8  | Q.  Starting on line 21, and I will be reading to page 255,        |
|       | 9  | lines 1 to 3.                                                      |
| 04:47 | 10 |      "Question:  So at one point there was no house fee            |
|       | 11 | and then the house fee began it was $25?                           |
|       | 12 |      "Yes."                                                        |
|       | 13 |      **MR. McDONALD:**  I object.  This is improper                |
|       | 14 | impeachment again.                                                 |
| 04:47 | 15 |      **THE COURT:**  I'm going to let the question and             |
|       | 16 | answer go through so I can decide if it is or if it's not.         |
|       | 17 |      Just let Ms. Bober read, I think it's a full page             |
|       | 18 | and a half of deposition.                                          |
|       | 19 |      Go ahead, ma'am.                                              |
| 04:48 | 20 |      **MRS. ROBBINS-BOBER:**  So let me start over.                |
|       | 21 | **BY MRS. ROBBINS-BOBER:**                                         |
|       | 22 | Q.  Starting at line 20, going on page 254.                        |
|       | 23 |      "So at one point there was no house fee and then              |
|       | 24 | when the house fee began it was $25?                               |
| 04:48 | 25 |      "Yes.                                                         |

FLOREZ (Direct Examination)

```
         1              "Question:  You mentioned a moment ago that we
         2     decided to make a house fee.  Can you tell me who you were
         3     talking about when you said we?
         4              Answer:  The Insua family."
04:48    5              So my question is who decided to have the dancers
         6     and the deejays pay the house fees?
         7              THE COURT:  One moment, Ms. Bober.  What was the
         8     question, Madam Court Reporter, prior to the reference to the
         9     deposition testimony?
04:49   10              (Thereupon, the court reporter read back the
        11     requested portion.)
        12              THE COURT:  All right.  Go ahead.  The impeachment
        13     question is allowed.  Go ahead, Ms. Bober.  Ask your next
        14     question.
04:49   15     BY MRS. ROBBINS-BOBER:
        16     Q.  So does this refresh your memory regarding who decided to
        17     have the dancers and the deejays pay the house fee?
        18     A.  Yes.
        19     Q.  And that would be you and the three Insuas, the Insua
04:49   20     family, correct?
        21     A.  Correct.
        22     Q.  And deejays, Stir Crazy required the deejays to pay a
        23     house fee if they wanted to work at Stir Crazy, correct?
        24     A.  Yes.
04:50   25     Q.  Did the Insua family decide how much to pay the managers,
```

FLOREZ (Direct Examination)

1    including you, at Stir Crazy?

2    A.   **Yes.**

3    Q.   Who originally decided your manager salary?

4    A.   **The owners.**

04:50  5    Q.   And when you say the owners --

6    A.   **I mean, the family.**

7    Q.   The Insua family?

8    A.   **Yes.**

9    Q.   Including Manny Insua, correct?

04:50  10   A.   **Yes.**

11   Q.   Did Laura Insua have authority to set the general

12   manager's salary?

13   A.   **Yes.**

14   Q.   Is it true that the Insua family told you how much you

04:50  15   could spend on personnel costs each month?

16   A.   **Yes.**

17   Q.   And I know this is a personal question so I don't mean to

18   pry, it's just that it's relevant to the case, how much are

19   you paid as a general manager?

04:51  20   A.   **I receive a check for $2,000 every two weeks.**

21   Q.   Are you paid about $52,000 a year?

22   A.   **Yes, ma'am.**

23   Q.   And did you ever get bonuses?

24   A.   **Yes.**

04:51  25   Q.   And who makes the decision regarding your bonuses?

1    A.   **The family Insua.**

2    Q.   And why would they give you a bonus, what would be the

3    reason?

4    A.   **Good employee.**

04:51   5    Q.   Would it be because Stir Crazy it was profitable?

6              **MR. McDONALD:**  Objection.  Calls for speculation.

7              **THE COURT:**  It is speculation in the sense that

8    it's asking what the motivation is for the other -- for the

9    decisionmaker, who is not Mr. Flórez.

04:52   10             You can ask when he receives the bonus if there is

11   a relationship with the profit, but not what the owners are

12   thinking.

13             **MRS. ROBBINS-BOBER:**  Thank you, Your Honor.

14   BY MRS. ROBBINS-BOBER:

04:52   15   Q.   Did you notice any type of pattern with respect to

16   bonuses as to when you would get a bonus?  Was it --

17   A.   **I'm confused with the question.**

18   Q.   Let me rephrase it.  If you got a bonus, would it be

19   because the club was doing well financially?

04:52   20   A.   **It's up to the owners.**

21   Q.   But was there any type of pattern to it?

22   A.   **We have a good year, so I can have a bonus.**

23   Q.   So if the club had a good year financially, you usually

24   would get a bonus; is that correct?

04:52   25   A.   **That's correct.**

| | |
|---|---|
| 1 | Q.  So did Manuel, Senior and Manny, Junior receive a salary |
| 2 | from Stir Crazy? |
| 3 | A.  **Yes.** |
| 4 | Q.  Were you involved in the decision as to how much to pay |
| 04:53  5 | Manuel Insua, Senior and Manny, Junior? |
| 6 | A.  **No.** |
| 7 | Q.  So the Insua family, including Laura, would tell you how |
| 8 | much to pay Manny, Junior and Manuel Insua, Senior, correct? |
| 9 | A.  **Correct.  She's the owner.** |
| 04:53  10 | Q.  The Insua family decided that they weren't going to pay |
| 11 | the deejays and the dancers wages, correct? |
| 12 | A.  **I don't understand the question.** |
| 13 | Q.  The decision not to pay dancers and deejays, that was a |
| 14 | decision by the Insua family, correct? |
| 04:54  15 | MR. McDONALD:  Objection.  This is repetitive. |
| 16 | THE COURT:  It is -- it appears repetitive, |
| 17 | Ms. Bober. |
| 18 | MRS. ROBBINS-BOBER:  I'll move on. |
| 19 | THE COURT:  I believe I will allow the answer to |
| 04:54  20 | that question and then move on, please. |
| 21 | Did you understand the question, Mr. Flórez? |
| 22 | THE WITNESS:  Could you repeat it? |
| 23 | THE COURT:  Let's have the court reporter repeat |
| 24 | the last version of the question. |
| 04:55  25 | (Thereupon, the court reporter read back the |

          1    requested portion.)

          2    A.   **Correct.**

          3         **THE COURT:**  It's about five minutes to 5:00.

          4    Whenever you can come to a good stopping point, that would be

04:55     5    a good time to break for the day.

          6         **MRS. ROBBINS-BOBER:**  This is the perfect place to

          7    stop.

          8

          9

         10      (Thereupon, the above portion of the trial was concluded.)

         11

         12                    *          *          *

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1 <u>**C E R T I F I C A T E**</u>

2

3        I hereby certify that the foregoing is an accurate

4 transcription of the proceedings in the above-entitled

5 matter.

6

7      3-10-2015

8 _____          _____

9 DATE COMPLETED          GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25