```
 1          IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI
                 CASE NO. 13-CV-23429
 3     _____

 4     MITCHELL ROSARIO,
                         Plaintiff
 5          vs.                          Tuesday, January 27, 2015
       12425, INC., D/B/A STIR CRAZY;
 6     LAURA INSUA; MANUEL H. INSUA;
       AND HERIBERTO FLÓREZ,
 7                       Defendants.

 8     _____

 9        EXAMINATION OF HERIBERTO FLÓREZ - EXCERPT

10      BEFORE THE HONORABLE ALICIA M. OTAZO-REYES,

11     UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
       _____
12                   A P P E A R A N C E S
13
       FOR THE PLAINTIFF:    Samara Robbins Bober, ESQ
14                           Peter J.M. Bober, ESQ
                             Bober and Bober, PA\
15                           1930 Tyler Street
                             Hollywood, FL  33020
16                           (954) 922-2298
                             Samara@boberlaw.com
17                           Peter@boberlaw.com

18     FOR THE DEFENDANT:    DAVID M. McDONALD, ESQ
                             JARED McLUSKEY, ESQ
19                           McLuskey & McDonald
                             8821 SW 69th Ct
20                           Miami, FL  33156
                             (305) 662-6160
21                           Dmcdonald@mmlawmiami.com
                             Jared@mmlawmiami.com
22
       REPORTED BY:          GIZELLA BAAN-PROULX, RPR, FCRR
23                           United States Court Reporter
                             400 North Miami Avenue, Suite 8S32
24                           Miami  FL  33128
                             (305) 523-5294
25                           gizella_baan-proulx@flsd.uscourts.gov
```

FLOREZ (Direct Examination)

1                           <u>I N D E X</u>

2

3                         <u>*DIRECT*</u>    <u>*CROSS*</u>     <u>*REDIRECT*</u>    <u>*RECROSS*</u>

4    HERIBERTO FLÓREZ        3         50          84

5

6

7

8

9

10

11

12

13                  <u>P L A I N T I F F ' S   E X H I B I T S</u>

14

15   NUMBER                  MARKED           ADMITTED

16   8                                          98

17

18

19

20

21

22

23

24

25

FLOREZ (Direct Examination)

1          **P R O C E E D I N G S**

2        *(The following proceedings were held in open court.)*

3

4    *    *    *    *    *    *    *    *    *    *    *

5        *(Thereupon, proceedings were held but not transcribed.)*

6    *    *    *    *    *    *    *    *    *    *    *

7          Thereupon,

8                    **HERIBERTO FLÓREZ,**

9    having been previously duly sworn by the courtroom deputy,

10   testified as follows:

11

12                *DIRECT EXAMINATION (continued)*

13   **BY MRS. ROBBINS-BOBER:**

14   Q.  Good morning.

09:09  15   A.  **Good morning.**

16   Q.  Good morning, Mr. Flórez.

17   A.  **Good morning.**

18          **THE COURT:**  One moment, I'm sorry.  I remind you,

19   sir, you're still under oath.  Understood?

09:09  20          **THE WITNESS:**  Yes.

21          **THE COURT:**  All right.  Go ahead.

22   **BY MRS. ROBBINS-BOBER:**

23   Q.  I'd like to talk with you a little bit more specifically

24   about Manny Insua's involvement with Stir Crazy.

09:09  25          In around 1996, was Manny, Junior's name taken off

FLOREZ (Direct Examination)

|  |  |  |
|---|---|---|
|  | 1 | the liquor license? |
|  | 2 | A.  **Yes.** |
|  | 3 | Q.  And whose name was put on Stir Crazy's liquor license? |
|  | 4 | A.  **Laura Insua.** |
| 09:09 | 5 | Q.  And was his name taken off -- |
|  | 6 | MRS. ROBBINS-BOBER:  Excuse me one second.  May I |
|  | 7 | just confer with defense counsel, I want to make sure that -- |
|  | 8 | THE COURT:  Yes.  Yes. |
|  | 9 | **BY MRS. ROBBINS-BOBER:** |
| 09:10 | 10 | Q.  You mentioned that Manny Insua's name was taken off the |
|  | 11 | liquor license for legal reasons.  Do you know what that |
|  | 12 | reason was?  Was that because he had a felony conviction? |
|  | 13 | A.  **Yes.** |
|  | 14 | Q.  Did Stir Crazy pay Manny Insua as an employee? |
| 09:10 | 15 | A.  **He got a check by the company.** |
|  | 16 | Q.  And what was his yearly salary? |
|  | 17 | A.  **I don't know.** |
|  | 18 | Q.  Was it over $100,000? |
|  | 19 | A.  **It's in the payroll information.  You have those records,** |
| 09:10 | 20 | **right?** |
|  | 21 | Q.  Yes.  If you'll turn to page 90 of your deposition, lines |
|  | 22 | 5 through 23. |
|  | 23 | A.  **What line, ma'am?** |
|  | 24 | Q.  Well, page 90, at line 5 and 6.  You say Manuel, Junior |
| 09:11 | 25 | in 2010 was paid over a hundred thousand dollars in salary, |

FLOREZ (Direct Examination)

1    correct?

2           **THE COURT:**  Ms. Bober, Ms. Bober, Ms. Bober,

3    remember, do you remember having your deposition taken,

4    question and answer, line, page.

5    **BY MRS. ROBBINS-BOBER:**

6    Q.  Do you remember having your deposition taken on April

7    10th, 2014?

8    A.  **Yes, ma'am.**

9    Q.  And on page 90, lines 5 through 7:

09:11  10          "Question:  Manny, Junior in 2010 was paid over a

11    hundred thousand dollars in salary, correct?

12          "Answer:  Correct."

13          And then if you go to page 92, lines 9 through 25,

14    let me back up a little.  Line 7 through 25.

09:12  15          "Question:  Manuel, Junior, he was paid a salary in

16    2008, correct?

17          "Answer:  Correct.

18          "Question:  He was paid a salary in 2009, right?

19          "Answer:  Right.

09:12  20          "He was paid a salary in 2010?

21          "Answer:  Correct.

22          "Question:  He was paid a salary in 2011?

23          "Answer, yes."

24          So does this refresh your recollection that he was

09:12  25    paid about $100,000 in salary for his work at Stir Crazy?

FLOREZ (Direct Examination)

```
         1  A.  Yes.

         2  Q.  And just in comparison, as a general manner you're paid

         3  $52,000, correct?

         4  A.  Correct.

09:13    5  Q.  Did the Insua family decide how much to pay Manny,

         6  Junior?

         7  A.  His mother decided that she want to give that money to

         8  him to pay the salary to him.

         9  Q.  But they -- Laura and Manny discussed his salary,

        10  correct?

        11  A.  I don't know.

        12  Q.  Did you speak with Manny, Junior by phone, e-mail and in

        13  person about club business?

        14  A.  He worked in the club as a consultant so I had

09:13   15  communication with him.

        16  Q.  And the type of communication was by phone, e-mail?

        17  A.  Yes, ma'am.

        18  Q.  And in person, correct?

        19  A.  Correct.

09:13   20  Q.  Would you agree that you were in frequent contact with

        21  Manny, Junior regarding club business?

        22  A.  Yes.

        23  Q.  Based on the discussions you had with Manny, Junior, did

        24  you keep him informed -- was he informed of what was

09:14   25  happening at the club?
```

FLOREZ (Direct Examination)

1    A.   Not keeping informed but when I got -- I need to consult

2    something about the club, I reference to Junior.  Remember

3    that he start the business in 1986 and he handled the

4    business for, I don't know, seven, eight years, and I took

09:14    5    over the business when he transferred the license to his

6    mother.

7    Q.   So he had a lot of business experience, he was very

8    familiar with Stir Crazy, so you would go to him regarding

9    issues at Stir Crazy?

09:14    10    A.   He opened the business and he knows all about the

11    business.  So he's a good reference to talk to him.

12    Q.   And based on your discussions, you kept him informed with

13    what was going on in the club?

14    A.   Not informed, but when I need consult something about the

09:14    15    business, we talk in general.

16    Q.   He was aware, correct?

17    A.   Correct.

18    Q.   Would you consult with Manny, Junior about things to do

19    in the club and how often -- how to make the club more money?

09:15    20    A.   I don't know if I was clear, but I consult to him all the

21    time when I need, you know, help in something that got to be

22    with the business.

23    Q.   Including issues regarding making the club more

24    profitable, correct?

09:15    25    A.   Correct.

FLOREZ (Direct Examination)

1  Q.  Why did -- withdraw that.

2      Would Manny, Junior make recommendations to you

3  about promotions, happy hours, and specials for Stir Crazy?

4  A.  **Yes.**

09:15  5  Q.  Would you even discuss with Manny, Junior things like

6  lighting issues and upgrading the lighting?

7  A.  **Yes.  And also he owned the building, so he knows**

8  **everything about that**.

9  Q.  In fact, did Manny, Junior personally rebuild the deejay

09:15  10  booth and make club repairs?

11  A.  **Yes.**

12  Q.  And would you speak with Manny about the quality of the

13  dancers and how to keep them dancing at the club?

14  A.  **Yes.**

09:16  15  Q.  Did Manny, Junior tell you -- was Manny, Junior the one

16  who decided that work shifts at Stir Crazy should be eight

17  and a half hours long?

18  A.  **I said, I don't know if it was clear with my explanation,**

19  **but he opened the business in 1986.  So he put all those**

09:16  20  **rules, or you want to call rules, about the how to handle the**

21  **business and he copied from the other business when we**

22  **started in 1986.  So those rules I took it over, and that's**

23  **the way I continued the business.**

24  Q.  Okay.  But originally he's the one that decided the eight

09:16  25  and a half-hour shift and then you just carried that on when

FLOREZ (Direct Examination)

1    you become general manager?

2    A.   Correct.

3    Q.   Would Manny, Junior go to the club, visit the club?

4         MR. McDONALD:   Objection.  Put it in a timeframe.

09:17   5   BY MRS. ROBBINS-BOBER:

6    Q.   Well, all my questions relate, and I'll remind you again,

7    all my questions relate to September 2008 through September

8    2013.

9    A.   He transferred the license to his mother and he's now

09:17  10   president of the business all the time.  He come in once in a

11   while, not too often.

12   Q.   But he does come in?

13   A.   Yeah.  It's his property, too.  He comes in to see the

14   property.

09:17  15   Q.   Is it true that Stir Crazy has a video camera

16   surveillance system?

17   A.   Yes.

18   Q.   How many cameras are in that system?

19   A.   20, approximately 24 cameras.

09:17  20   Q.   And they are inside and outside of the club?

21   A.   Correct.

22   Q.   So like the stage can be monitored?

23   A.   Yeah.  Different --

24   Q.   The parking lot.  Is it basically all over the club?

09:18  25   A.   Yes, ma'am.

FLOREZ (Direct Examination)

1  Q.  Are the images from the video cameras, are they

2  accessible by phone?

3  A.  **Yes.**

4  Q.  Are you able to access the cameras by phone?

09:18  5  A.  **Yes.**

6  Q.  So even when you're not at the club, you're able to check

7  on things by looking at your phone?

8  A.  **Yes.**

9  Q.  Does -- is Manuel, Junior, does he also have access to

09:18  10  the video camera images by phone?

11  A.  **I don't know about the phone, but he have a system before**

12  **in his house.**

13  Q.  And do you know whether he has a system now?

14  A.  **He's not living in the farm -- in his house right now.**

09:18  15  Q.  Has he -- well, I'm not -- again, let me remind you, I'm

16  not talking about right now.  I'm talking about the period in

17  which Mr. Rosario seeks his wages.

18       So during that period, was Manny, Junior, did he

19  ever call you and say, why aren't more girls on stage or ask

09:19  20  you about things that he could only see if you were looking

21  at the video camera images?

22  A.  **No.  No.  I don't recall.**

23  Q.  You don't recall?  Was there a video monitor in the

24  deejay booth that displayed the video camera images?

09:19  25  A.  **Yes, ma'am.**

FLOREZ (Direct Examination)

1   Q.   Were deejays required to monitor those cameras?

2   A.   **No.**

3   Q.   To help out with the security at the club?

4   A.   **No.  No.**

09:19   5   Q.   They weren't required -- were they required to look at

6   the images for -- in case there's theft or a fight or maybe

7   the police are coming?

8   A.   **He's not required to see the cameras, but those cameras**

9   **got access to dressing room so they can call the dancers to**

09:20   10   **the stage and do.**

11   Q.   And he would call the dancers to the stage over the PA

12   system, correct?

13   A.   **What does it mean, PA system?**

14   Q.   Over the speakers --

09:20   15   A.   **Correct.**

16   Q.   -- at the club, correct?

17   A.   **Correct.**

18   Q.   So did deejays have -- were deejays supplied with a radio

19   in the deejay booth so they could communicate with managers?

09:20   20   A.   **If they need something, yeah, he can call the managers**

21   **from the radio.**

22   Q.   From the radio, correct?

23   A.   **Correct.**

24   Q.   And would someone -- would deejays use the radio they

09:20   25   were provided by Stir Crazy to inform managers regarding

FLOREZ (Direct Examination)

1   things they saw in the video cameras?

2   A.  **The radio is in the deejay like the cameras and the**

3   **telephone.  And for use, if you want to call the manager from**

4   **the radio, he is free to do it, he can do it.**

09:21   5   Q.  Have deejays called you and spoken -- told you something

6   suspicious that they wanted to bring to your attention that

7   they saw on the video cameras in the deejay booth?

8   A.  **If they call me?**

9   Q.  Yes.

09:21   10   A.  **No, they never call me from the radio.**

11   Q.  Have they called other managers?

12   A.  **Yes.**

13   Q.  So they have called other managers and informed them of

14   things they saw in the security camera that they wanted to

09:21   15   bring to the manager's attention, correct?

16   A.  **Correct.**

17   Q.  Did you meet with the Insua family to discuss what would

18   be good for the business when the business was slow?

19   A.  **Sometimes.**

09:21   20   Q.  When you spoke with Laura Insua about the club's books

21   and business, is her husband Manuel Insua always with her?

22   A.  **I meet always with Mr. Insua, but she's present at the**

23   **house.  You know, she's an 86, 87 year old lady.**

24   Q.  Does Laura Insua sign any legal papers regarding Stir

09:22   25   Crazy?

FLOREZ (Direct Examination)

1   A.   **Yeah**, **all the papers**.  **All the legal papers**.

2   Q.   Does Laura Insua update the club's bank account and

3   discuss the Stir Crazy's bank statements with you?

4   A.   **Mr. Insua do**.

09:22   5   Q.   So both Manuel Insua and his wife Laura Insua?

6           **MR. McDONALD:**  Objection.

7           **THE COURT:**  Yes, the objection is sustained.  That

8   was not his testimony.  You can ask again.

9   **BY MRS. ROBBINS-BOBER:**

09:22   10   Q.   Does Laura Insua update the club's bank account and

11   discuss bank statements with you?

12   A.   **Yes**.

13   Q.   And does Manuel Insua also --

14   A.   **Yes**.

09:23   15   Q.   -- discuss the bank statements and help update the bank

16   account?

17   A.   **Yes, ma'am**.

18   Q.   Do you believe that based on the information you provided

19   to her, that Laura is knowledgeable and aware of all aspects

09:23   20   of the club's business?

21   A.   **Yes**.

22   Q.   Was there anything regarding the club's business that you

23   kept private from Laura Insua?

24   A.   **No**.

09:23   25   Q.   From what you observed, did Manuel, Senior inform Laura

FLOREZ (Direct Examination)

```
     1   about club business, keep her in the loop?
     2           MR. McDONALD:  Objection.  Calls for hearsay.
     3           MS. BOBER:  I asked from what he observed.
     4           THE COURT:  Right.  From your observations, sir,
09:23  5   not what they said to each other.
     6   A.  Could you please repeat the question?
     7   BY MRS. ROBBINS-BOBER:
     8   Q.  Sure.  From what you observed, did Manuel Insua, Senior
     9   inform Laura Insua about club business?
09:24 10   A.  I guess, yes.  You know, Mr. Insua is all the time on top
    11   of the accounting and legal things for the business, and I
    12   guess they talk about the business.
    13   Q.  Since Laura Insua and Manuel Insua, Senior worked
    14   together, did -- regarding Stir Crazy business, did they
09:24 15   decide to just pay Manuel Insua, Senior a salary for the work
    16   they both did for the business?
    17           MR. McDONALD:  Objection.  Lack of foundation.
    18   Lack of -- calls for hearsay.
    19           THE COURT:  That was a very compound question.  I
09:24 20   think you could ask the same question in a more direct way.
    21   All right.  So try again.
    22   BY MRS. ROBBINS-BOBER:
    23   Q.  Did Manuel Insua receive a check for the work he -- wages
    24   for the work he did for Stir Crazy?
09:25 25   A.  Yes.  That's the owner's decision.
```

FLOREZ (Direct Examination)

1    Q.  And was the money that they paid to Manuel Insua, did

2    that cover the work that both Manuel and Laura Insua did for

3    Stir Crazy?

4    A.  **No.  That's a decision that they do.  I don't -- that's**

09:25   5    **not my -- I don't take decisions over that.  That's their own**

6    **decision.**

7    Q.  How much was Manuel Insua and -- how much was the check

8    for Manuel Insua for the services he provided, what was his

9    salary?

09:25  10          **MR. McDONALD:**  Objection.  This has been asked and

11   answered already.

12          **THE COURT:**  I'm sorry.  I thought the line of

13   questioning before was as to Manny, Junior.  And I think the

14   line of questioning here is for Manuel, Senior.

09:25  15          Am I understanding that correctly, Ms. Bober?

16          **MS. BOBER:**  No, this goes to Manuel, Senior's

17   salary, but I haven't yet asked the amount, and that's what

18   I'm asking now.

19          **MR. McDONALD:**  Then I withdraw.  I thought she was

09:26  20   talking about Junior.

21          **THE COURT:**  So now we're talking about Manuel,

22   Senior.

23          **MS. BOBER:**  Yes.

24          **THE COURT:**  Go ahead.

09:26  25   **BY MRS. ROBBINS-BOBER:**

FLOREZ (Direct Examination)

```
 1   Q.  How much was Manuel, Senior paid for -- how much was the
 2   check to Manuel, Senior for services provided to Stir Crazy
 3   yearly?
 4   A.  I'm not -- I don't have that number with me right now but
 5   in the payroll I provide to you early when we start this
 6   situation, you got the records so you can --
 7   Q.  Was it around $42,000?
 8   A.  I don't want to guess.  We can look at other payroll and
 9   I can give you that exact information.
10   Q.  Going back to your deposition from April 10th, 2014, page
11   91, line 7 through 14.
12           MR. McDONALD:  What page?  What page, Counsel?
13           MS. BOBER:  91.
14           MR. McDONALD:  Thank you.
15           MS. BOBER:  But let me --
16   A.  What line, ma'am?
17   BY MRS. ROBBINS-BOBER:
18   Q.  Actually, more directly let me go to page 119, line 17
19   through 19.  And starting at line 17 on page 119.
20           "Question:  So if I multiply that times 26, Manuel,
21   Senior is paid over 42 thousand dollars a year, correct?
22           "Answer:  Correct."
23           Does that refresh your recollection as to what
24   Manuel, Senior's salary was for his work at Stir Crazy?
25   A.  Yes.  You know, it would be easier if we can pull it out
```

09:26  5
09:26  10
09:27  15
09:27  20
09:27  25

FLOREZ (Direct Examination)

1    **the payroll records and we avoid all these questions and I**

2    **can give you the right amount.  You know, we're going back to**

3    **the deposition, but the records are there and I can give you**

4    **the right amount.**

09:28    5    Q.   No problem.  That's why I went back to the deposition,

6    and I'm refreshing your recollection now.

7    A.   **But we're going over and over on this.**

8    Q.   Let me ask you, do you consider Manuel, Senior your

9    supervisor?

09:28    10    A.   **Yes.**

11    Q.   Did you rely on Manuel, Senior's knowledge regarding

12    bookkeeping, accounting, and finances for the club?

13    A.   **Yes.**

14    Q.   And his financial wisdom, you relied on it?

09:28    15    A.   **I'm sorry, I can't hear you.**

16    Q.   Did you rely on his advice regarding Stir Crazy's

17    operations including payroll?

18    A.   **Yes.**

19    Q.   And Manuel, Senior was knowledgeable about all aspects of

09:29    20    the club's operations, correct?

21    A.   **In general.**

22    Q.   Including that deejays were paid no wages?

23    A.   **Yes.**

24    Q.   Do you recall that you learned that Stir Crazy -- that a

09:29    25    Stir Crazy deejay named Cruz Hernandez sent a letter to Stir

FLOREZ (Direct Examination)

```
 1    Crazy complaining about unpaid wages?
 2    A.  We received a letter from your firm about this lawsuit,
 3    yes.
 4    Q.  And regarding the deejay Cruz Hernandez, correct?
 5    A.  Correct.
 6    Q.  And do you recall if the letter was sent around August
 7    2013?
 8    A.  I don't remember the date, but it's got to be that date.
 9    Q.  You agree it was around August?
10    A.  Again, if I can see the records, I can give you the right
11    day, and I don't have it with me right now.
12            MS. BOBER:  Your Honor, I'm just going to show him
13    this to refresh his recollection.
14            THE COURT:  That's fine.
15            MS. BOBER:  (Complies.)
16    A.  (Reading) yes.
17    BY MRS. ROBBINS-BOBER:
18    Q.  So the letter is dated August 22nd, 2013, correct?
19    A.  Correct.
20    Q.  So did Mr. -- did Cruz Hernandez complain about his wages
21    before Mr. Rosario did?
22    A.  Yes.
23    Q.  I'd like you to turn in the trial exhibit note back to
24    Plaintiff's Exhibit 8.
25    A.  (Complies.)  Okay.
```

09:29  5
09:29  10
09:30  15
09:30  20
09:30  25

FLOREZ (Direct Examination)

```
 1    Q.  And this license agreement that I'm showing you, can you

 2    identify this?

 3    A.  Yes, ma'am.

 4    Q.  And what is this?

09:31  5   A.  It's a license agreement.

 6    Q.  And this was something between Stir Crazy and

 7    Mr. Rosario?

 8    A.  Yes.

 9    Q.  And I see -- now if you look at -- if you look at the

09:32 10   first paragraph, it says that Mr. Rosario's name is

11    handwritten in, correct?

12    A.  Correct.

13    Q.  And it says next to his name that he's a professional

14    dancer; does it say that?

09:32 15   A.  Yes.

16    Q.  Is Mr. Rosario a professional dancer because he signed

17    this agreement?

18    A.  No.  This is a license agreement general for the

19    employees.  But in this case, what applied to Mr. Rosario is

09:32 20   that he's responsible tor report his taxes to the IRS and pay

21    all the taxes, you know, concerning with the earning money --

22    the money that he make at the club.

23    Q.  That's the only thing that applied to him, that's why you

24    had him sign this agreement?

09:33 25   A.  Yes.
```

FLOREZ (Direct Examination)

1   Q.   This agreement -- now Mr. Rosario has been employed since

2   2001, correct?

3   A.   **Correct.**

4   Q.   And so this agreement is dated August 30th, 2013,

5   correct?

6   A.   **Correct.**

7   Q.   And that is after you received the letter from Cruz

8   Hernandez complaining about not being paid wages, correct?

9   A.   **Correct.  But this is the -- the reason that we do this**

09:33  10   **application on August 13th, nothing have to do with Mr. Cruz.**

11   **We just updating the information to make sure the phone is**

12   **okay.  And the address and general information.**

13   Q.   Where is Mr. Rosario's phone or address on this form?

14   A.   **In the other part of the application that you showed me**

09:34  15   **yesterday.**

16   Q.   But not on this form, there is no --

17   A.   **But this form coming attached with the other part of the**

18   **application.  It's not a separate.**

19   Q.   On line -- if you'll go where there's some numbered

09:34  20   sentences towards the middle of the form, if you look at line

21   2, it says that this lease -- regarding the agreement, it

22   says that the lessee will be self-employed exclusively and

23   will not be an employee of the lessor.

24          Is that what it says?

09:34  25   A.   **Yes, ma'am.**

FLOREZ (Direct Examination)

1    Q.  And that's what you had Mr. Rosario sign after you got

2    notice that another deejay was suing the club, correct?

3    A.  **Yeah.  But that's not -- that had nothing do with this,**

4    **with the application with the lawsuit.**

09:35    5    Q.  Didn't you have Mr. Rosario sign this licensing agreement

6    because you were worried that Stir Crazy deejays would try

7    and sue the club for wages?

8    A.  **That's not true.**

9    Q.  Didn't you have Mr. Rosario sign this document because

09:35   10    you wanted him to believe that he was an independent

11    contractor?

12    A.  **He have a -- we got another application older than this**

13    **when he signed the application.**

14    Q.  Well, that was not provided to the plaintiffs.

09:35   15    A.  **Okay.  But, you know, this is only for updating the**

16    **information.  Not because the lawsuit Mr. Cruz.**

17    Q.  This document is separate from the document that updates

18    his address and phone number, correct?

19    A.  **But they coming together.**

09:36   20    Q.  They come together because you stapled them together?

21    A.  **Correct.**

22    Q.  Whose idea was it to have the disc jockeys sign this

23    licensing agreement?

24    A.  **Me.**

09:36   25    Q.  Now, the parties have agreed that letter was sent to the

FLOREZ (Direct Examination)

1    attorney for Stir Crazy on September 13th, 2013 wherein

2    Mr. Rosario complained about his wages.  When do you claim

3    you first learned that Mr. Rosario had a legal dispute with

4    Stir Crazy?

09:36  5    A.   **I don't understand the question.**

6    Q.   Mr. Rosario sent a letter complaining about his wages to

7    the attorney for Stir Crazy, correct?

8    A.   **Correct.**

9    Q.   And the parties have stipulated that the attorney for

09:37  10   Stir Crazy received that letter on September 13th, 2013.

11   When do you claim that you first learned that Mr. Rosario had

12   a wage dispute?  Was it on September 13th or sometime after

13   that?

14   A.   **After that because I was out of town.  I was on a**

09:37  15   **vacation.**

16   Q.   Was it on September 21st, 2013?

17   A.   **In September 21st I guess I coming from my vacation, and**

18   **I have in my cellular a text message from Arlene Perez which**

19   **is secretary of David McDonald saying that we have a claim**

09:38  20   **about somebody last name Rosario.  That was it.  But on that**

21   **moment I don't know what was the claim for.**

22   Q.   So the text message --

23   A.   **No, not text message.  The message on my cellular.**

24   Q.   So it's a voicemail message?

09:38  25   A.   **Voicemail.**

FLOREZ (Direct Examination)

 1    Q.   Saying that there was another claim?

 2    A.   **A claim.**

 3    Q.   So it's a claim or another claim?

 4    A.   **I don't recall.  But I think it was a claim.**

09:38    5    Q.   And when she said another -- or if she didn't say

 6    another?

 7    A.   **No, she said a claim.**

 8    Q.   She didn't say another?

 9    A.   **A claim from somebody named Rosario.**

09:38   10    Q.   So she wasn't referring to Cruz Hernandez's?

11    A.   **No.**

12             MR. McDONALD:  Objection.  Calls for speculation.

13             THE COURT:  No speculation.  He can testify as to

14    what he received.

09:39   15    **BY MRS. ROBBINS-BOBER:**

16    Q.   When the attorney for Stir Crazy's secretary left you a

17    message, did she inform you that Mr. Rosario's legal dispute

18    was about overtime and minimum wages?

19    A.   **No.**

09:39   20    Q.   I'd like to refer back to your deposition on April 10th,

21    2014, page 271, lines 6 to 9.

22    A.   **270?**

23    Q.   271.  Lines 6 to 9.

24             "Question:  The secretary had left a message about

09:39   25    Mr. Rosario's attorney writing a letter about overtime and

FLOREZ (Direct Examination)

|      |    |                                                            |
|------|----|------------------------------------------------------------|
|      | 1  | minimum wages, correct?                                    |
|      | 2  | "Answer:  Correct.                                         |
|      | 3  | A.  **Can I explain something about this?**                |
|      | 4  | Q.  Yes.                                                    |
| 09:40 | 5 | A.  **Okay.  The -- when we do this deposition, it was April** |
|      | 6  | **10th, 2014.  And at that moment of the deposition, I know** |
|      | 7  | **already what was the claim about.  You understand?  When** |
|      | 8  | **Mr. Peter asked me about the lawsuit that Mr. Rosario he's** |
|      | 9  | **doing against to the club, at that moment at the deposition,** |
| 09:40 | 10 | **I know what was the claim about.**                      |
|      | 11 | Q.  Right.  But the question was what the secretary had left |
|      | 12 | as a message.  The question was the secretary had left a   |
|      | 13 | message about Mr. Rosario's attorney writing a letter about |
|      | 14 | overtime and minimum wages, correct.  And you said correct. |
| 09:41 | 15 | A.  **I repeat, in that moment at the deposition, I know what** |
|      | 16 | **was that happen.**                                       |
|      | 17 | Q.  Where were you when you received the message from the  |
|      | 18 | attorney -- sorry, the secretary for the attorney for Stir |
|      | 19 | Crazy?                                                      |
| 09:41 | 20 | A.  **The voice message?**                                 |
|      | 21 | Q.  Where were you?  Were you at work or were you at home? |
|      | 22 | A.  **I was out of town.  I was in Italy.**                |
|      | 23 | Q.  You were in Italy?                                      |
|      | 24 | A.  **And when I come in that weekend, you know, the message** |
| 09:41 | 25 | **start coming in, and that was when I received it.**      |

FLOREZ (Direct Examination)

1   Q.   But were you at work or were you at your house?

2   A.   **No, at my house.**

3   Q.   What did you do after you received the voicemail from the

4   secretary?

09:41   5   A.   **I called Augusto, the nighttime manager, who he spend**

6   **more time with Mr. Rosario, and the only Rosario we know is**

7   **him, so we going to check if that's the same person is suing**

8   **us.**

9   Q.   How long did you wait before you called Augusto?  Was it

09:42   10   about an hour?

11   A.   **I no remember.**

12   Q.   Do you remember what time of day on September 21st you

13   retrieved the voicemail from the secretary?

14   A.   **Any time in the afternoon.  I no recall.**

09:42   15   Q.   Was it about noon?

16   A.   **In the afternoon, ma'am.  I don't recall the time.**

17   Q.   At the time you spoke with Augusto Garcia, on September

18   21st, didn't you know that the complaint was about wages?

19   A.   **Not at that moment -- you.**

09:43   20   Q.   You didn't think -- did you think Mr. Rosario is a

21   deejay, Cruz Hernandez is a deejay, maybe they're complaining

22   about the same thing?

23   A.   **I don't know.  I don't know in that moment.  I don't know**

24   **what the complaint was.**

09:43   25   Q.   You didn't put two and two together?

FLOREZ (Direct Examination)

1    A.   **No.   Surprised me because Mr. Rosario never come to me**

2    **and say, hey, I want to be on payroll.   That for me was**

3    **complete surprise.**

4    Q.   So you were -- when you heard that Mr. Rosario was suing,

09:43    5    you thought you were surprised because he had never

6    complained about wages?

7    A.   **In that moment I don't know it was about wages, the**

8    **claim, in that moment.   The only thing I know is that he's**

9    **suing the club, but I don't know what's the details.**

09:44   10    Q.   Right.   You didn't know the details, you say, because you

11    hadn't seen the letter.   But can you tell me what was going

12    through your mind?   You had to be wondering why Mr. Rosario

13    had a legal dispute with the club, correct?

14    A.   **Correct.**

09:44   15    Q.   And you knew a deejay at the club had just complained

16    about wages, correct?

17    A.   **Correct.**

18    Q.   So were you thinking it could be about wages?

19    A.   **At that moment I don't know.**

09:44   20    Q.   When you spoke with Augusto, how long did your

21    conversation last, do you recall?   Was it about 20 minutes?

22    A.   **I don't recall, ma'am.   Couple minutes.**

23    Q.   If you'll look at, just to refresh your recollection,

24    since you're now saying you don't recall, your April 10th,

09:45   25    2014 deposition, page 268, lines 3 through 7.

FLOREZ (Direct Examination)

1          "Question:  And what did you and Augusto speak

2     about when you spoke to him on the phone?

3          "Answer:  Let's talk to Mitch tonight.

4          "Question:  How long did the conversation last?

09:45  5          "Answer:  20 minutes."

6          So was it a couple of minutes or 20 minutes that

7     you spoke to Augusto on the phone after being notified

8     Mr. Rosario had a legal dispute with the club?

9     A.  **Say 20 minutes.**

09:45  10    Q.  Did you talk about, with Augusto, what you thought

11    Mr. Rosario's legal dispute might be about?

12    A.  **We don't know what it was about.**

13    Q.  Did you talk about what you thought it might be about,

14    Mr. Flórez?  I'm not referring to the depo.

09:46  15    A.  **I'm sorry.  Say again.**

16    Q.  Did you talk about with Mr. -- with Augusto what you

17    thought Mr. Rosario's legal dispute might be about?

18    A.  **At that moment, we don't know what was about.**

19    Q.  I'm not asking whether you knew for a hundred percent

09:46  20    sure.  I'm asking you did you and Augusto talk about what you

21    thought it might be about?

22    A.  **In that moment we don't know what was the lawsuit about.**

23    **But we guessing, you know, probably that.**

24    Q.  You guess that it's probably about -- that it was

09:47  25    probably about wages, correct?

FLOREZ (Direct Examination)

1    A.   **Probably.  Probably, but we not a hundred percent.**

2    Q.   But that back and forth that occurred between you and

3    Augusto, this is probably about Mr. Rosario's wages?

4    A.   **Probably.**

09:47  5    Q.   So the answer is yes?

6    A.   **Probably.**

7    Q.   Yes, that exchange occurred, correct, between you and

8    Augusto?

9    A.   **We talk in general to see what could be, but we don't**

09:47  10   **know it's exactly for that particular wage salary.**

11   Q.   I'm sorry?

12   A.   **We not a hundred percent what about was the case because**

13   **I don't have the paper with me.  I was guessing, but I can't**

14   **give you an answer.**

09:47  15   Q.   So you and Augusto were guessing this might be about

16   wages when you spoke to him on the phone?

17   A.   **That's what you say.**

18   Q.   That's what Augusto said?

19   A.   **No, that's what you say.  My answer is we talk in**

09:48  20   **general, but we don't say that it was a hundred percent about**

21   **the salary.**

22   Q.   Right.  But there was some -- you and Augusto said

23   something to the effect that it -- maybe this is about wages,

24   correct?

09:48  25   A.   **I don't know.**

FLOREZ (Direct Examination)

1    Q.   You don't know?

2    A.   **I don't recall, ma'am.**

3    Q.   You don't recall.  Well, you just testified --

4    A.   **Yeah, but listen, in that moment when I was talking with**

09:48    5    **Augusto I don't have the paper from the lawyer.  So I can't**

6    **say it's about the wages or something else.**

7    Q.   I understand.  But another deejay at Stir Crazy had just

8    complained about wages.  You were notified that Mr. Rosario

9    had a legal dispute, according to you, with Stir Crazy.  You

09:48    10   called Augusto the nighttime manager and spoke with him for

11   20 minutes.  And during that call, did you guys say something

12   to the effect, I wonder if this is about Mr. Rosario's wages?

13   A.   **It could be.**

14   Q.   Well, it's a yes or no.

09:49    15   A.   **Yes.**

16   Q.   When did you terminate Mr. Rosario's services?

17   A.   **The same day.**

18   Q.   September 21st, 2013?

19   A.   **Yes.**

09:49    20   Q.   That was a Saturday night?

21   A.   **Yes.**

22   Q.   So the same day that you learned that Mr. Rosario had a

23   legal dispute, you terminated his services with Stir Crazy,

24   correct?

09:49    25   A.   **Correct.**

         1    Q.  Can you describe how you informed Mr. Rosario that his

         2    services were no longer needed at Stir Crazy?

         3    A.  **We meet Mr. Rosario in the parking lot at the club around**

         4    **8 o'clock when he come in to work and we just asked to him**

09:50    5    **that if he suing the company.  And he say yes.  And we just**

         6    **say that he can't work anymore and he left.  But even that**

         7    **moment he don't say what it was about the lawsuit.**

         8    Q.  And when you say we, are you -- who else was present?

         9    A.  **Me and Augusto, the other manager.**

09:50   10    Q.  So Augusto Garcia, the other manager, was present in the

        11    parking lot at Stir Crazy when you fired Mr. Rosario?

        12    A.  **Yes.**

        13    Q.  So are you telling me that after 12 years of working as a

        14    deejay at Stir Crazy, you fired him in the parking lot

09:50   15    because he had a legal dispute?

        16              **MR. McDONALD:**  Objection.  Asked and answered.

        17    It's repetitive of a previous testimony.

        18              **THE COURT:**  I will allow just this once and then

        19    move on.

09:51   20    A.  **Yes.**

        21    BY MRS. ROBBINS-BOBER:

        22    Q.  Did you -- after you confirmed with Mr. Rosario that he

        23    had a legal dispute, did you -- do you recall what you said

        24    to Mr. Rosario?

09:51   25    A.  **What was the question?**

FLOREZ (Direct Examination)

1   Q.   After you confirmed with Mr. Rosario that he had a legal

2   dispute, what did you say to Mr. Rosario?

3   A.   **I don't recall exactly, but we told him that, you know,**

4   **he can't work with us.**

09:51   5   Q.   Did you say something to the effect of, Mitch I guess,

6   this is the end.  There's nothing more to say?

7   A.   **Yes.**

8   Q.   After you and Augusto Garcia fired Mr. Rosario, did you

9   contact the Insuas regarding the firing?

09:52   10   A.   **I'm not exactly -- I'm not sure exactly, but I call him**

11   **anytime, same day or next day, to let them know to the**

12   **owners.**

13   Q.   Isn't it true that you called them, after about an hour

14   after firing Mr. Rosario, you called Manny, Junior and

09:52   15   Manuel, Senior?

16   A.   **Yes, probably.**

17   Q.   About an hour later?

18   A.   **Yes.**

19   Q.   Who did you call first?

09:52   20   A.   **I not recall.  I don't remember exactly, but we can see**

21   **the deposition.**

22   Q.   What did you speak about with Manny, Junior when you

23   called him and told him that Mr. Rosario had, in fact, been

24   fired?

09:53   25   A.   **Are you talking about Mr. Junior?**

FLOREZ (Direct Examination)

1    Q.   Manny, Junior, yes.

2    A.   **You know, because Manny, Junior knows very well Mitch,**

3    **they got a long-time relationship, everybody was, you know,**

4    **in shock about the situation.  Because, you know, we go,**

09:53   5    **sometimes we go to parties to -- for his kids in his house.**

6    Q.   I'm just asking about what you spoke to -- what Manny,

7    Junior said when you called him.

8              **MR. McDONALD:**  He should be able to finish his

9    testimony.  He was in the middle of an answer when she cut

09:53   10   him off.

11             **THE COURT:**  Well, the way to do it would have been

12   for him to answer the question and then explain it rather

13   than give the explanation first.

14             So, Mr. Flórez, if you need to repeat the question,

09:54   15   but answer the question first and then you can explain it.

16             All right.  Madam Court Reporter, could you read

17   the question that was asked?

18             (Thereupon, the court reporter read back the

19   requested portion.)

09:54   20   A.   **We talked about the surprise that we have about the**

21   **lawsuit with Mr. Rosario.**

22   BY MRS. ROBBINS-BOBER:

23   Q.   After you terminated Mr. Rosario, did you call Manuel,

24   Senior as well and tell him that you had done that?

09:55   25   A.   **Yes, ma'am.**

FLOREZ (Direct Examination)

1   Q.   And what did Manuel, Senior say to you?

2   A.   **I not recall exactly but -- I don't recall.**

3   Q.   Did you explain to Manuel, Senior that Mr. Rosario had

4   made a claim for overtime and minimum wages when you spoke to

09:55   5   him on the phone about an hour later?

6   A.   **In that moment, I not remember.  But I can say that it**

7   **wasn't a salary because I say again in that moment we don't**

8   **know what the claim was about.**

9   Q.   If you'll refer back to your deposition from April 10th,

09:55   10   2014, page 286, lines 11 through 18.

11          "Question:  You hung up with Manny, Junior" --

12   A.   **Hold on, please.  What line?**

13   Q.   Line 11 through 18.

14   A.   **Okay.**

09:56   15   Q.   "Question:  You hung up with Manny, Junior and

16   immediately called his father?

17          "Answer:  Yes.

18          "You then explained to Manny, Senior that

19   Mr. Rosario had made a claim for overtime and minimum wages,

09:56   20   correct?

21          "Answer:  Oh, my God, yes."

22   A.   **Okay.  Remember where I say that the deposition was like**

23   **a year later.  So on that moment at the deposition, I know**

24   **all the details on the facts about the lawsuit.  So that's**

09:57   25   **why the answer is that I know that the lawsuit was about the**

FLOREZ (Direct Examination)

1    salary.

2    Q.  When you spoke with Manuel, Senior on the phone, did you

3    tell him to let Laura Insua know that you had fired

4    Mr. Rosario?

09:57    5    A.  **I not remember but, you know, the owner, they got to know**

6    **what happened with the club or what's the legal situation.**

7                MR. McDONALD:  Can we put the screen down if it's

8    not being used?

9                THE COURT:  Is it being used?

09:57    10                MS. BOBER:  We can put to down.  That's fine.

11                MR. McDONALD:  (Complies.)

12    **BY MRS. ROBBINS-BOBER:**

13    Q.  If you'll turn to your deposition on April 10, 2014, page

14    274, line 25, continuing on to page 275, lines 1 through 6.

09:58    15    A.  **274?**

16    Q.  274 line 25.

17                "Question:  So later that night after you had

18    spoken to Mitch about his case, you spoke with both Manny,

19    Senior and Manny, Junior, correct?

09:58    20                "Answer:  Correct.

21                "Did you speak with Laura Insua about it?

22                "Answer:  No, I asked Mr. Insua to let her know to

23    Laura."

24                So does that refresh your recollection that when

09:58    25    you spoke with Manny, Senior and told him that you had fired

FLOREZ (Direct Examination)

1    Mr. Rosario, that you asked him to tell Laura, as well,

2    Insua?

3    A.  **So my answer is correct because I told Mr. Insua, so they**

4    **got to talk, you know, in the house about the lawsuit, I**

09:59  5    **guess.**

6    Q.  Well, that's why I went back to your deposition.  Before

7    you said you guessed that he told her.  And here it says that

8    you told him to tell her; is that correct?

9          Do you recall telling Mr. Insua, Senior to tell

09:59  10   Laura about the firing?

11         **MR. McDONALD:**  Your Honor, objection.  I think if

12   she just read the next sentence in this colloquy in the

13   deposition, it would clarify everything and we can move on.

14         **THE COURT:**  All right.  Read the next question and

09:59  15   answer from the deposition.

16   BY MRS. ROBBINS-BOBER:

17   Q.  Line 7 through 9:  "You assumed he would tell her?

18         "Answer:  I assumed because they are married.  His

19   wife, she is his wife."

09:59  20         Is that what you were saying?

21   A.  **Yeah, that's what I say, and I guess my answer was**

22   **correct.**

23   Q.  During your phone calls with Manuel, Senior, and Manny,

24   Junior, did either of them tell you it was wrong to fire

10:00  25   someone for asserting their legal rights?

FLOREZ (Direct Examination)

1  A.  **No.  We don't talk about that.**

2  Q.  Did Manny, Junior, Laura Insua or Manuel, Senior tell you

3  to give Mr. Rosario his job back?

4  A.  **No.**

10:00  5  Q.  Are you the general -- you're the general manager there,

6  and you were there when Mr. Rosario was fired.  Did you

7  personally ever contact Mr. Rosario to offer him his job

8  back?

9  A.  **On Monday --**

10:00  10  Q.  My question is, did you personally call Mr. Rosario or

11  communicate with him in any way to offer his job back?

12  A.  **No, but on Monday -- can I explain?**

13       THE COURT:  Yes, you may explain your answer.

14  A.  **On Monday, we meet with Rolando, the manager, and we call**

10:01  15  **him and we sent a text message the same day he can come back**

16  **to work, and the next day, but we never received an answer**

17  **from him.**

18  BY MRS. ROBBINS-BOBER:

19  Q.  Were you present -- you said we called him.  Were you

10:01  20  present?

21  A.  **I was present, yeah.**

22  Q.  And you said that the manager -- you said Rolando.  Is

23  that Rolando Quevedo?

24  A.  **Correct.**

10:01  25  Q.  Do you know whether Rolando Quevedo sent Mr. Rosario a

FLOREZ (Direct Examination)

1   text message about coming back to work?

2   A.   **Around 8:00 in the night.  I don't remember, but it was**

3   **around 8:00, 8:00 or 9:00.**

4   Q.   Did you see the text message with your own eyes?

10:02   5   A.   **Yes.**

6   Q.   Prior to Mr. Rosario complaining about his wages, did

7   Stir Crazy ever speak with a lawyer about their payroll

8   practices -- and I'm not asking about any conversations you

9   had with Mr. McDonald.

10:02   10        MR. McDONALD:  We object because I'm not sure of

11   the timeframe she's referring to.

12        THE COURT:  Not only that, but I think the question

13   invades the attorney/client privilege when you're asking for

14   conversations.

10:03   15        I think if you ask a question did you consult on

16   this issue and put a timeframe on it, then I will allow the

17   question.

18   BY MRS. ROBBINS-BOBER:

19   Q.   Did you ever consult with an attorney about the club's

10:03   20   payroll practices?

21        MR. McDONALD:  Judge, I object.  Can we have a

22   timeframe?

23        THE COURT:  Timeframe, or are you still in that

24   five year timeframe?

10:03   25        MS. BOBER:  This is ever, and it goes to the

FLOREZ (Direct Examination)

```
          1   good -- the willfulness issue.

          2          THE COURT:  Ever?  Any time?

          3          MS. BOBER:  At any time.

          4          THE COURT:  Back 1986 to the present?

10:03     5          MS. BOBER:  Yes.

          6          THE COURT:  All right.  That's your timeframe.

          7   Excluding conversations with Mr. McDonald, correct?

          8          MS. BOBER:  Yes, correct.  Well --

          9          THE COURT:  Mr. Flórez.

10:03    10          THE WITNESS:  I don't know what is the question.

         11          MRS. ROBBINS-BOBER:  I won't -- can I confer with

         12   Mr. McDonald?

         13          THE COURT:  Yes.

         14   BY MRS. ROBBINS-BOBER:

10:04    15   Q.  Before Mr. Rosario asserted his complaint about his

         16   wages, did you ever consult with an attorney about Stir

         17   Crazy's pay practices?

         18   A.  No.

         19   Q.  Did Stir Crazy ever consult with an attorney about its

10:05    20   pay practices?

         21   A.  Not that I recall.

         22   Q.  Did Stir Crazy ever speak with the Department of Labor

         23   about whether dancers or anyone else at the club should be

         24   classified as an independent contractor or an employee?

10:05    25   A.  About the dancers?
```

FLOREZ (Direct Examination)

1    Q.   The dancers or anyone else.

2    A.   **Back like 22 years ago.**

3    Q.   Back 22 years ago, what happened?

4    A.   **Yeah.  We have a conversation with the labor department.**

10:06    5    Q.   And that conversation was only about the bartenders,

6    correct?

7    A.   **That's correct.**

8    Q.   So regarding anyone else who worked at the club, did you

9    have -- did you consult with the Department of Labor about

10:06   10    whether deejays should be treated as employees?

11   A.   **No.**

12   Q.   When Stir Crazy was investigated by the Department of

13   Labor for only the bartender issue, did you consult with the

14   three Insuas?

10:06   15        MR. McDONALD:  Objection.  She used the word

16   investigated.  He's never said that.

17        THE COURT:  Right.  Rephrase it.  I think the

18   question before was that you talked, did you talk to the

19   labor department.  There was no testimony of an

10:07   20   investigation.

21        If you want to lay a predicate, you may do so.

22   BY MRS. ROBBINS-BOBER:

23   Q.   Was Stir Crazy investigated about, did you say 22 years

24   ago, by the Department of Labor?

10:07   25   A.   **You're saying investigated?  No.  It wasn't investigated**

FLOREZ (Direct Examination)

1    by the Department of Labor.

2    Q.   Were you contacted by -- was Stir Crazy contacted by the

3    Department of Labor?

4    A.   **Yes.**

10:07   5    Q.   Regarding an issue with the bartender --

6    A.   **Correct.**

7    Q.   -- not being paid wages, correct?

8    A.   **Correct.**

9    Q.   Did you discuss the wage, the bartender wage issue with

10:07  10    the three Insuas?

11    A.   **On that moment, the administration was under Junior.**

12    Q.   So -- did you discuss the wage issue, the bartender wage

13    issue with Manny, Junior?

14    A.   **That was 22 years ago, ma'am.  I guess.**

10:08  15    Q.   If you'll turn to page 60, lines 2 through 17.

16           "Question:  When the club found out about it, did

17    you discuss it with the three Insuas?"

18    A.   **Hold on second, please.  What lines?**

19    Q.   Line 2 through 17 of page 60.

10:09  20    A.   **Okay.**

21    Q.   "Question:  When the club found out about it, did you

22    discuss it with the three Insuas?

23           "Answer:  Yes.

24           "Question:  You go by the nickname Eddy, correct?

10:09  25           "Answer:  Eddy.

FLOREZ (Direct Examination)

 1              "Question:  Because in some of the other

 2    depositions they referred to you as Eddy.

 3              "Answer:  That's correct.

 4              "Question:  That's for Heriberto Flórez?

10:09  5          "Answer:  Right.

 6              "Question:  So when you told the three Insuas that

 7    the Department of Labor received a complaint about the club,

 8    did you tell them anything else?

 9              "Answer:  To who?

10:10 10          "Question:  The three Insuas.

11              "Answer:  No."

12          MR. McDONALD:  Your Honor, could she read the next

13    question and answer to make that complete?

14          THE COURT:  All right.  Next question and answer,

10:10 15    please.

16    BY MRS. ROBBINS-BOBER:

17    Q.  "We went to a meeting, and we agreed" --

18          MR. McDONALD:  Counsel, you didn't read the

19    question, page 23 line 6.

10:10 20    BY MRS. ROBBINS-BOBER:

21    Q.  My question to the witness was:  "Did you discuss the

22    Department of Labor wage complaint with the three Insuas?"

23          MR. McDONALD:  But you stopped --

24          MRS. ROBBINS-BOBER:  You can address this.

10:10 25          MR. McDONALD:  Your Honor --

FLOREZ (Direct Examination)

1          **THE COURT:**  No colloquy between counsel.

2          **MRS. ROBBINS-BOBER:**  Well, I can read that.  That's

3    fine.

4    **BY MRS. ROBBINS-BOBER:**

10:11  5    Q.  Starting at line 19:  "We went to a meeting and we agreed

6    that whatever they say and we are going to do that point

7    today.

8          "Question:  When the Department of Labor contacted

9    you about the complaint, you said that you discussed this

10:11  10   with Laura Insua, Manuel Insua, Senior, and Manuel Insua,

11   Junior, correct?"

12          Is that what you wanted?

13          **MR. McDONALD:**  And then the answer, please.

14   **BY MRS. ROBBINS-BOBER:**

10:11  15   Q.  "Answer:  I can say that in the moment, in that

16   particular time Mr. Insua, Junior was a hundred percent

17   president and owner of the corporation and that we met with

18   Mr. Insua, and I went to the meeting with the labor

19   department, so they say, well, what we got to do we do it

10:11  20   until today."

21   A.  **I guess that answers your question.  That moment**

22   **Mr. Insua, Junior was a hundred percent president and owner**

23   **of the corporation.**

24   Q.  After you met with the DOL, back --

10:12  25   A.  **The D --**

FLOREZ (Direct Examination)

1    Q.   I'm sorry.  After you met with the Department of Labor --

2    A.   **Okay.**

3    Q.   -- regarding the bartender issue, the bartender

4    complaint, did Stir Crazy change how it was doing business

10:12  5    and put bartenders and dancers on the payroll?

6    A.   **Yeah.  We do the right corrections and put everything in**

7    **order to comply with the labor department.  And they agreed**

8    **and until today.**

9    Q.   Well, you said -- but then Stir Crazy decided to take the

10:13  10   dancers off payroll; is that correct?

11   A.   **We don't decide it.  They don't want it.  They decided**

12   **don't get paid.**

13   Q.   Who is they?

14   A.   **The dancers.**

10:13  15   Q.   Didn't you meet with the three Insuas, and they said they

16   were going to stop paying the dancers?

17   A.   **I don't remember.**

18   Q.   If you look at page 68, lines 5 through 14.

19       "The decision to take the dancers off payroll, was

10:14  20   that a decision that you discussed with the three Insuas?

21       "Answer:  You know, that's something that happened

22   that I can say that we meet and say we are going to stop but

23   that was slowly coming in.  The girls don't want checks and

24   we found the situation what we do we complied with the law.

10:14  25   The bartenders are on payroll."

A.  **That answers your question.**

Q.  Did you meet with the three Insuas and decide to take the

dancers off payroll?

A.  **Yeah.**

10:14   Q.  If the dancers didn't want a payroll check for whatever

reason, could you have paid them cash wages or not charge

house fees?

A.  **No.**

Q.  You can't pay a cash wage?

10:15   A.  **No.  We don't pay cash.**

Q.  But would that have relieved the issue regarding privacy

if you had paid them cash?

A.  **No, we don't pay cash, ma'am.**

        **MS. BOBER:**  I don't have any further questions.

10:15           **THE COURT:**  Thank you very much, Ms. Bober.  I

think maybe this would be a good time -- let me ask you,

Mr. McDonald, how long do you expect the cross-examination to

take?  More than 15 minutes?

        **MR. McDONALD:**  Yes.

10:16           **THE COURT:**  All right.  So instead of taking the

break at 10:30, we'll take it now at 10:15, a 15-minute

break, and then we do not interrupt Mr. McDonald.

        So, ladies and gentlemen of the jury, we will be in

recess until 10:30.  Thank you very much.

10:16           **THE CLERK:**  All rise.

1          (Thereupon, the jury was escorted out of the

2     courtroom.)

3          THE COURT:  We'll be in recess for 15 minutes.

4     Ms. Bober, I commend you, you did do a much more direct

10:17  5     examination this time.  Towards the end I think you were

6     having a little trouble finding your depo citations, but it's

7     obvious that you did take the Court's advice to heart, and I

8     commend you for that.

9          MRS. ROBBINS-BOBER:  Thank you.

10:17 10          MR. BOBER:  Your Honor, we had discussed the issue

11    this morning that I think you mentioned you'd prefer to

12    discuss during this break.

13          THE COURT:  Do we need to do it now or can it wait

14    until the lunch break?

10:17 15          MR. BOBER:  Well, I think it's timely.

16          THE COURT:  To do it now before the lunch break?

17          MRS. ROBBINS-BOBER:  There's an issue with our 1:00

18    o'clock witness regarding Mrs. Insua.

19          THE COURT:  All right.  Let's take five minutes

10:17 20    then, let everybody do a restroom break and then we'll come

21    right back in.

22          THE CLERK:  Court is in recess.

23          (Thereupon, a brief recess was taken from 10:17

24    a.m. to 10:22 a.m.)

10:24 25          THE COURT:  All right.  So the issue has to do with

1    Mrs. Insua?

2          MRS. ROBBINS-BOBER:  Yes, Your Honor.  We had set

3    that she'd be here at 1:00 p.m. but Mr. McDonald informed us

4    that she couldn't -- wouldn't be able to get her here today.

10:24  5    And as an accommodation, he offered if we have her here at

6    9:00 a.m. tomorrow, he would -- they would pay for the

7    translator and that -- we can agree to that as long as we're

8    not going to interrupt the witness on the stand, but we will

9    take her as the next witness after we finish whoever is on

10:24  10   the stand.

11          THE COURT:  So we'll finish with Mr. Flórez, and

12   then who comes next?

13          MR. BOBER:  Well, we have a translator coming.

14          MRS. ROBBINS-BOBER:  After Mr. Flórez I believe

10:25  15   we're going to call Manuel Insua, Senior, depending because

16   we have a translator coming for Augusto Garcia.  So we'll

17   take one of those.

18          MR. McDONALD:  It's at 1:00 o'clock, though,

19   correct?  We told Mr. Garcia to be here around 1:00.

10:25  20         MRS. ROBBINS-BOBER:  That's when we have our

21   translator.

22          THE COURT:  Hang on.  So we're going to go through

23   the rest of the morning, finish with Mr. Flórez, start with

24   Mr. Who?

10:25  25         MRS. ROBBINS-BOBER:  Manny, Junior.

1          **THE COURT:**  Junior.  All right.

2          **MRS. ROBBINS-BOBER:**  And then --

3          **THE COURT:**  And then in the afternoon we'll have?

4          **MRS. ROBBINS-BOBER:**  Augusto.

10:25  5   **THE COURT:**  Okay.

6          **MRS. ROBBINS-BOBER:**  Manuel, Senior, and then

7    because Laura cancelled we'll fill the time with Mr. Roppo.

8          **MR. McDONALD:**  Your Honor, I just saw that

9    there's -- I just gave Mr. Flórez the phone, because he

10:26  10  doesn't have one, to call Manuel, Senior because to make

11   sure -- they didn't -- I told them last night, but they

12   didn't tell him he needed to be here today.

13         So he's calling to tell him he needs to come today

14   because Mr. Flórez -- he's 87, also -- he has to drive from

10:26  15  Pinecrest and get him, so that's why he's using the call.  I

16   know he's got his testimony.

17         **THE COURT:**  So as soon as Mr. Flórez finishes his

18   testimony, he can go get Manuel, Senior, and we can start

19   then with Augusto if Manuel, Senior hasn't arrived?

10:26  20  **MRS. ROBBINS-BOBER:**  Yes, Your Honor.

21         **THE COURT:**  All right.  So then that's what we'll

22   do.  And then we have also Joe Roppo and then we'll start

23   tomorrow with Mrs. Insua.  Is everybody in agreement with

24   that?

10:26  25  **MRS. ROBBINS-BOBER:**  As long as we're not in the

48 of 100

1    middle -- yes.  As soon as, yes, we finish the testimony and

2    we may have to, depending on when we finish because I have my

3    translator at 1:00, whether we take Manuel, Senior or Augusto

4    first.

10:27   5         THE COURT:  Well, you'll need for Manuel, Senior to

6    be here in order to take him.

7         MRS. ROBBINS-BOBER:  Yes.

8         MR. McDONALD:  If they're not done with Manny,

9    Junior, I mean, I don't have a problem with them interrupting

10:27  10   and calling Augusto because they have an interpreter here.

11   It's up to them.

12        THE COURT:  Well, it's usually not a good idea to

13   interrupt witnesses.  It's okay to take them out of turn but

14   not to interrupt them.  So let's go with that plan and let's

10:27  15   make sure that Mr. Flórez, as soon as he's done with his

16   testimony -- well, within a reasonable time, to allow him to

17   be back here from Pinecrest at 1:00 o'clock.

18        MR. McDONALD:  Yes.

19        THE COURT:  All right.  All right.  And how long do

10:27  20   you expect your cross of Mr. Flórez to take, Mr. McDonald?

21        MR. McDONALD:  Maybe 30 minutes.

22        THE COURT:  30 minutes.  And you, Ms. Bober,

23   redirect?

24        MRS. ROBBINS-BOBER:  It depends on what his cross

10:28  25   is, but I don't expect that it will be longer than 30

1    minutes.

2              THE COURT:  Another 30 minutes for redirect?

3         MRS. ROBBINS-BOBER:  I don't expect.

4              THE COURT:  You might want to rethink that.

10:28    5         MRS. ROBBINS-BOBER:  That would be the absolute

6    outer limit, but I assume it will be shorter.

7              THE COURT:  Right.  I think you want to avoid too

8    much repetition.

9              All right.  Let's --

10:28   10         MR. McDONALD:  My plan is not to recall him.  If I

11   can finish this today, I won't recall him unless something

12   comes up.

13              THE COURT:  Exactly.  That's fine.  All right.  So

14   you're both going to cross him and put on some of your direct

10:28   15   testimony with him?

16         MR. McDONALD:  Yes.  I mean, it's in the same topic

17   area as they covered though so --

18              THE COURT:  All right.  We have a couple of

19   minutes.

10:29   20         MR. McDONALD:  Yes.

21              THE COURT:  And then we'll bring the jury in.

22              (Thereupon, a brief recess was taken from 10:29

23   a.m. to 10:34 a.m.)

24              THE CLERK:  All rise, the Court is again in

10:34   25   session.

FLOREZ (Cross-Examination)

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:34 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:35 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 10:35 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 10:36 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 10:36 | 25 |

1   THE COURT:  If you can bring the jury in, please.

2   Thank you.

3         (Thereupon, the jury was brought into the

4   courtroom.)

5   THE COURT:  Thank you very much, ladies and

6   gentlemen.  Is it as cold in the jury room as it is in here?

7         THE JURY:  Yes.

8         THE COURT:  I actually have a sweater underneath to

9   keep me warm.  I do have a spare wrap for the ladies.  I

10  don't think the gentlemen would like to wear a wrap, so if

11  either one of you would like to use it, you're welcome to use

12  it.  But not much you can do about it right now.  All right.

13  Thank you very much.  Please be seated.

14        Mr. Flórez, I remind you, sir, you're still under

15  oath.

16

17                   CROSS EXAMINATION

18  BY MR. McDONALD:

19  Q.  Mr. Flórez, good morning.

20  A.  Good morning.

21  Q.  How long, again, have you been the general manager of

22  Stir Crazy?

23  A.  15 -- I've been working at Stir Crazy for the past 30

24  years.

25  Q.  And as the general manager, how long?

FLOREZ (Cross-Examination)

1    A.  **15.**

2    Q.  Your general managership, did that start after Mr. Insua

3    left the business as far as day-to-day operations?

4    A.  **Correct.**

10:36   5    Q.  Who runs the day-to-day operations at Stir Crazy from

6    2008 to 2013, the period that we're interested here in this

7    lawsuit?

8    A.  **Me.**

9    Q.  Are you there most every day?

10:37   10   A.  **Most every day, yes.**

11   Q.  In that five-year period, are you the -- you know, onsite

12   at Stir Crazy are you the highest level of decisionmaker,

13   like the final authority?

14   A.  **Correct.**

10:37   15   Q.  So all the managers, the bartenders, the security staff,

16   they report to you?

17   A.  **Correct.**

18   Q.  Is that right?  In that five year -- now, when Mr. Insua

19   was the owner and before he stepped away, was he involved in

10:37   20   the business on a day-to-day basis before?

21   A.  **Before, no.**

22   Q.  Back when he was the owner?

23   A.  **Yes.  Yes.  Of course.  Sorry.**

24   Q.  So he was coming in on a regular basis then?

10:37   25   A.  **Correct.**

FLOREZ (Cross-Examination)

```
         1   Q.  Now, the period that we're talking about here, the 2008
         2   to 2013 period, I want to talk to you about Mr. Insua's
         3   day-to-day involvement at the business at -- on Dixie Highway
         4   in Pinecrest.
10:37    5        How often did he come to the Stir Crazy?
         6        MRS. ROBBINS-BOBER:  I'm going to just object.  So
         7   we can keep everything clear, I would request that he refer
         8   to them as Manny, Junior and Manuel, Senior instead of
         9   Mr. Insua.
10:38   10        THE COURT:  That would be fine.  We have been
        11   calling him Manny, Junior and Manuel, Senior, and it's clear
        12   now that you were talking about Mr. Junior, Mr. McDonald,
        13   correct?
        14        MR. McDONALD:  That's correct.
        15   BY MR. McDONALD:
        16   Q.  Manny, Junior, in that timeframe, 2008 to 2013, how
        17   regularly did he actually come to Stir Crazy?
        18   A.  Once a month, not too often.
        19   Q.  Now, you told us that you talked to him on the phone
10:38   20   regularly, correct?
        21   A.  Correct.
        22   Q.  You called him to talk about the business?
        23   A.  About personal things, too, because we have a
        24   relationship for 30 years, you know.  We have been friends,
10:38   25   too.
```

FLOREZ (Cross-Examination)

|  |  |  |
|---|---|---|
|  | 1 | Q.   But in terms of day-to-day supervising of the bar, the |
|  | 2 | Stir Crazy, was he involved in that in that timeframe? |
|  | 3 | A.   **No.** |
|  | 4 | Q.   Was he coming in and telling bartenders to, you know -- |
| 10:39 | 5 | A.   **Not at all.** |
|  | 6 | Q.   -- take care of the bar or anything like that? |
|  | 7 | A.   **No.** |
|  | 8 | Q.   Telling managers how to do their job? |
|  | 9 | A.   **No.** |
| 10:39 | 10 | Q.   Is that something you did? |
|  | 11 | A.   **Yes.  Something I did.** |
|  | 12 | Q.   Now, the same thing with Laura Insua.  She's the title |
|  | 13 | owner.  She holds the liquor license? |
|  | 14 | A.   **Correct.** |
| 10:39 | 15 | Q.   And her husband, Manuel, Senior, he -- did his -- the |
|  | 16 | work that he did, describe the work that Manuel, Senior did |
|  | 17 | for or does for Stir Crazy. |
|  | 18 | A.   **The work he did for Stir Crazy, he help me with the** |
|  | 19 | **bookkeeping, taxes, legal things for the club.** |
| 10:39 | 20 | Q.   Is it more paperwork oriented? |
|  | 21 | A.   **Yes.** |
|  | 22 | Q.   Where does he do that work from? |
|  | 23 | A.   **His house.** |
|  | 24 | Q.   How old is he? |
| 10:40 | 25 | A.   **I guess 89.** |

FLOREZ (Cross-Examination)

Q.  And how old is Mrs. Insua again?

A.  **87.**

Q.  Do they get involved in the music selections of the deejays?

10:40  A.  **No, sir.**

Q.  Do they, you know, give instructions like we want more hip-hop?

A.  **No.**

Q.  Or reggaetone?

10:40  A.  **No, sir.**

Q.  Or anything like that?

A.  **No.**

Q.  They don't make a request for like a Beyoncé song or anything like that?

10:40  A.  **No, sir.**

Q.  Do you know if either one of -- Mr. Insua, Senior, Manuel Senior or Laura Insua, do you know if they have ever been to Stir Crazy when it was opened and operating?

A.  **No.**

10:40  Q.  You don't know?

A.  **No.  They -- when the business opened, they did not go inside.**

Q.  Now, you mentioned that you would sometimes meet with them at a back office?

10:40  A.  **Yes.  We got a back office.**

FLOREZ (Cross-Examination)

```
 1   Q.  When you meet with them, when do you usually do that,
 2   what time of day?
 3   A.  Once in a while before, like two years ago, more or less,
 4   you know, they getting old and they don't go there.  I don't
 5   meet with Mrs. Laura in the back.
 6   Q.  When you say the back, what is the back?
 7   A.  It's a back office separate from the building.
 8   Q.  I'm sorry, what did you say?
 9   A.  It's a back office that we rent separate from the
10   business.
11   Q.  It's not actually attached to where the bar is?
12   A.  No.  No.
13   Q.  Is that where your office is?
14   A.  Yes, sir.
15   Q.  And when you meet with them, is that where you meet with
16   them?
17   A.  No.  She come in to see me or we talk about something,
18   but, you know, that's it.
19   Q.  But when they were coming -- I know you said two years
20   ago they kind of stopped coming around.
21   A.  Yeah.
22   Q.  When they did come by, is that where they would meet with
23   you?
24   A.  Yes.
25   Q.  And what time of day was it?
```

FLOREZ (Cross-Examination)

1    A.  **Anytime, no schedule.**

2    Q.  So when you're in your back office, you're in a separate

3    building?

4    A.  **Yes.**

10:42  5    Q.  Is it in close proximity to the bar?

6    A.  **Around two hundred feet.**

7    Q.  But to physically go from your back office to the bar, do

8    you have to exit one door and go outside and enter into

9    another door?

10:42  10   A.  **Correct.**

11   Q.  What do you do, walk across the parking lot?

12   A.  **Across the parking lot.**

13   Q.  You know, the details, the operations inside the bar,

14   types of liquor you purchase, the amounts of liquor

10:42  15   purchased, are those the type of details, the day-to-day

16   details that Laura and Manuel, Senior get involved in?

17   A.  **No.**

18   Q.  Who handles that in the 2008 to 2013 timeframe?

19   A.  **Me, personally, a hundred percent.**

10:42  20   Q.  Let me ask you about the gentleman that's suing you,

21   Mr. Rosario.  Now, do you understand that you personally are

22   being sued in this case?

23   A.  **Yes, sir.**

24   Q.  You also understand that Stir Crazy is being sued, the

10:43  25   corporation, 12425, Inc.?

FLOREZ (Cross-Examination)

1    A.   **Yes.**

2    Q.   And are you aware that Manuel, Junior is being sued

3    personally?

4    A.   **Yes, sir.**

10:43    5    Q.   And also that Laura Insua is being sued personally?

6    A.   **Yes.**

7    Q.   Now, yesterday Mrs. Bober discussed whether you were --

8    whether Mr. Rosario ever worked at Stir Crazy in a capacity

9    other than as a disc jockey.

10:44   10    A.   **Yes.**

11    Q.   In my notes you said no, he never did.  All he did was a

12    deejay.

13    A.   **I forgot --**

14          MRS. ROBBINS-BOBER:  Your Honor, I object.  He

10:44   15    needs to state a timeframe.  If it's outside the five year

16    period, I would object to relevance.

17          THE COURT:  Right.  You may rephrase your question.

18    BY MR. McDONALD:

19    Q.   Was there a period of time where Mr. -- was there a

10:44   20    period of time where Mr. Rosario went on the payroll at Stir

21    Crazy?

22    A.   **Yes, and I remember a salary of $2,000, I don't recall**

23    **the date but he was on the payroll.**

24    Q.   Approximately, when was that?  Was it between 2008 and

10:44   25    2013?

FLOREZ (Cross-Examination)

1    A.   **Yes, I guess.**

2    Q.   In that timeframe, he was on the payroll?

3    A.   **He was on the payroll.**

4    Q.   Why?

10:45  5    A.   **Because he was doing part-time manager, and he see the**

6    **opportunity as a deejay he's making more money than the**

7    **manager, so he resigned to be a manager -- to be a deejay.**

8    Q.   You mean he resigned from the manager?

9    A.   **Yes.   Voluntary.**

10:45  10    Q.   And going back to -- while he was being a manager, did he

11    also then on other days serve as a deejay?

12    A.   **Yes.**

13    Q.   And when he was serving as a deejay, was he on the

14    payroll?

10:45  15    A.   **As a manager.**

16    Q.   No, no.  But when he was a deejay, the days that he

17    wasn't being a manager when he was being a deejay, was he on

18    the payroll?

19    A.   **No.**

10:45  20    Q.   So there was days of the week where he was the manager on

21    the payroll and days of the week where he was a deejay off

22    the payroll?

23    A.   **Correct.**

24    Q.   At any point in time, did Mr. Rosario ever come to you or

10:45  25    Stir Crazy and say, I want to be on the pay -- I want to be a

FLOREZ (Cross-Examination)

1    deejay, but I want to be on the payroll?

2  A.  **Never.**

3  Q.  Now, managers make a shift fee, correct?

4  A.  **Correct.**

10:46  5  Q.  Is it 150 dollars?

6  A.  **150 dollars per day.**

7  Q.  So if a manager works five days a week, 750 dollars a

8    week, correct?

9  A.  **Correct.**

10:46  10  Q.  Mr. Rosario opted out of that position to go back to the

11    deejay job that he had, correct?

12  A.  **Correct.**

13  Q.  And you were fine with that as far as Stir Crazy was fine

14    with that?

10:46  15  A.  **Yes.  And he's making more money as a deejay, probably**

16    **double or triple money.**

17  Q.  Do you actually monitor, you know, does he have to tell

18    you at the end of the day how much money he made from tips

19    from customers or dancers?

10:46  20  A.  **No.**

21  Q.  So you were asked about the Department of Labor inquiry

22    some 20 -- I think you said 20 years ago.

23  A.  **Probably.**

24  Q.  At that point in time, were the deejays and the dancers

10:47  25    independent contractors as they are today?

FLOREZ (Cross-Examination)

1    A.   **Yes.**

2    Q.   Did the Department of Labor ever instruct you to put the

3    deejays and dancers on the payroll at Stir Crazy?

4    A.   **No.**

10:47    5    Q.   At that time, did they examine your payroll practices

6    some 20 years ago?  Is that what part of that meeting was

7    about?

8    A.   **Yes, sir.**

9    Q.   Correct me if I'm wrong, the change they made was as to

10:47   10    bartenders?

11    A.   **Bartenders.**

12    Q.   Take them from tipped employees, from tipped to on the

13    payroll, correct?

14    A.   **Correct.**

10:47   15    Q.   And you complied?

16    A.   **Yes.  A hundred percent.**

17    Q.   Now, you were asked was there a time where you offered

18    that payroll, being put on the payroll to the dancers.  And

19    you said there was.

10:48   20    A.   **Yes.**

21    Q.   Were you being forced to do that by the Department of

22    Labor?

23    A.   **No.**

24    Q.   Something you just -- why did you do it?

10:48   25    A.   **We like to give the opportunity to be on payroll, but**

FLOREZ (Cross-Examination)

```
     1   they don't want to.
     2   Q.   Now, your payroll is handled by a company, an outside
     3   company?
     4   A.   Yes, sir.
10:48 5   Q.   How many people between 2008 and 2013, on average, how
     6   many people are on your payroll?
     7   A.   Between 16 and 20, more or less.
     8   Q.   Now it was alluded yesterday that the reason you didn't
     9   put the four disc jockeys on the payroll is because you
10:49 10  wanted to avoid payroll tax.
    11   A.   No.
    12   Q.   You pay payroll taxes for those 16 or 20?
    13   A.   Always.
    14   Q.   Were you trying to hold back on four individuals to --
10:49 15  when you already had 20 on your payroll, to avoid additional
    16   taxes?  Was that your reason?
    17   A.   No.
    18   Q.   Was that the motivation of Stir Crazy?
    19   A.   No.
10:49 20  Q.   When -- and Mr. Rosario was a deejay for 12 years,
    21   correct?
    22   A.   Correct.
    23   Q.   Always as an independent contractor?
    24   A.   Always.
10:49 25  Q.   When he started was he aware of that?
```

FLOREZ (Cross-Examination)

```
 1   A.  Yes.

 2           MS. ROBBINS-BOBER:  Object to the form.

 3   BY MR. McDONALD:

 4   Q.  That that was the scenario?

 5   A.  Yes.

 6   Q.  Was it explained to him?

 7           THE COURT:  One moment.  There was an objection.

 8   Go ahead.

 9           Ms. Bober, what was your objection?

10           MRS. ROBBINS-BOBER:  I object.  This is speculative

11   as to what Mr. Rosario was aware of.

12           MR. McDONALD:  I'll rephrase the question.

13           THE COURT:  Rephrase the question.

14   BY MR. McDONALD:

15   Q.  Was it explained to Mr. Rosario when he came to work at

16   Stir Crazy the procedure for paying deejays as independent

17   contractors?

18   A.  Yeah, he knows.

19   Q.  Does Stir Crazy explain that to all the deejays?

20   A.  All the deejays.

21   Q.  Now, are you familiar -- you've been in the adult

22   entertainment business now for 26 years.  Are you familiar

23   with the customs of the industry?

24   A.  Yes.

25   Q.  What is the custom of the adult entertainment industry as
```

FLOREZ (Cross-Examination)

1    far as deejays and being independent contractors?

2    A.  **They are independent contractors, and they are**

3    **responsible for their own taxes and they make money through**

4    **the dancers, the entertainment.**

10:50  5    Q.  But my question is, is that what is customary in the

6    industry?

7    A.  **Yes, that's normal.**

8         MRS. ROBBINS-BOBER:  Objection.  Lack of

9    foundation.  Irrelevant.

10:51 10        Objection.  This is lack of foundation, he's not an

11   expert, and it's irrelevant.

12        THE COURT:  Well, he's not testifying as an expert.

13   He's testifying, I think the predicate was laid, that

14   Mr. Flórez had worked in the entertainment business for 26

10:51 15   years.  That was the initial question.  He is in the

16   business.  He is qualified to testify about what is the

17   custom in the business.  That is not expert testimony.

18        Now, your other objection was relevance.  I don't

19   see that that's a proper objection.  We are here on the way

10:51 20   that Mr. Rosario was paid.  So I think the custom in the

21   business is relevant.  So the objections are both overruled.

22   BY MR. McDONALD:

23   Q.  The $25 rental fee that the deejay pays for the use of

24   the deejay booth at Stir Crazy, do you know if that is within

10:52 25   the custom of the industry that you work in?

FLOREZ (Cross-Examination)

1    A.   **Yes.**

2    Q.   And the same with the dancers?

3    A.   **Yes.**

4    Q.   They're also independent contractors?

10:52  5    A.   **They are independent contractors.**

6    Q.   Why just dancers and deejays?  Why are they treated as

7    independent contractors when everyone else is on the payroll?

8    A.   **That's normal in the industry, the entertainment.  And we**

9    **copy from there.**

10:52  10   Q.   It wasn't Stir Crazy's idea, is that what you're saying?

11   You copied it from what was being done?

12   A.   **Yes.**

13   Q.   You were shown some rules as an exhibit, Stir Crazy

14   rules.

10:53  15        **MRS. ROBBINS-BOBER:**  I think that's Plaintiff's

16   Number 10.

17        **MR. McDONALD:**  Do you have a copy?  Number 10,

18   Mr. Flórez.

19   **BY MR. McDONALD:**

10:54  20   Q.   Do you see Plaintiff's Exhibit Number 10?

21   A.   **Yes.**

22   Q.   What is Plaintiff's Exhibit Number 10?

23   A.   **It's a Stir Crazy showgirls, back bars, security rules**

24   **and procedures only.**

10:54  25   Q.   Is that -- anywhere in that document does the word disc

FLOREZ (Cross-Examination)

1    jockey or deejay appear?

2    A.  **No.**

3    Q.  Are there any rules on that document for disc jockeys or

4    deejays?

10:54  5    A.  **No.**

6    Q.  Those are procedures for the bartenders and the people

7    that help the bartenders?

8    A.  **For securities and back bars, yes.**

9    Q.  Generally, what do those rules cover?

10:54  10   A.  **You know, they got to wash the glasses, get the security**

11   **on the building, make sure no, you know, people not leaving**

12   **the premises with liquor, something like that.**

13   Q.  Why is that important to you, not leaving -- people

14   leaving the premises with liquor?

10:55  15   A.  **Got to keep the license, you know, in good conditions.**

16   Q.  Is that a law that you're not allowed to allow that to

17   happen?

18   A.  **Correct.**

19   Q.  Is that something that Stir Crazy takes seriously?

10:55  20   A.  **Yes.**

21   Q.  You have a liquor license, correct?

22   A.  **Yes.**

23   Q.  And can that be revoked?

24   A.  **Yes.**

10:55  25   Q.  Is Stir Crazy ever subject to inspections by either

FLOREZ (Cross-Examination)

1   Alcohol, Tobacco and Firearms or the State of Florida?

2   A.  **Yes.**

3   Q.  Are those -- are you always told when those inspections

4   are going to occur?

10:55   5   A.  **No.**

6   Q.  So how do they sometimes happen?

7   A.  **They just show up and they request information, invoices,**

8   **and something like that.**

9   Q.  Do you have to comply?

10:55   10   A.  **Yes, sir.**

11   Q.  Do you have to -- as general manager, do you do your best

12   to run the bar according to the law?

13   A.  **Yes.**

14   Q.  Do you have to -- what type of things are they concerned

10:56   15   about?

16   A.  **Drugs, you know, weapons, people leaving the building**

17   **drunk, so we on top of that.**

18   Q.  Weapons, let's say.  Do you have procedures to keep

19   weapons out of your bar?

10:56   20   A.  **Yeah, we got the security in the door who search every**

21   **customer.**

22   Q.  What's Responsible Vendors?

23   A.  **It's a company which we meet, we got meetings every three**

24   **months, I guess, where Stir Crazy pay for those meetings.**

10:56   25   **And --**

FLOREZ (Cross-Examination)

1     Q.   Where are they held?

2     A.   **I'm sorry?**

3     Q.   Where are the meetings held?

4     A.   **At Stir Crazy, and at different places, but we do our**

10:56   5     **meetings at Stir Crazy.**

6     Q.   What are those -- who attends those meetings?

7     A.   **Securities, managers, bartenders.**

8     Q.   Is Responsible Vendors an organization?

9     A.   **Yes.**

10:57   10    Q.   And do they send somebody to teach a class at Stir Crazy?

11    A.   **Correct.**

12    Q.   What's taught to the people that are on the payroll?

13    A.   **It's about the law, about liquor license, alcohol and**

14    **tobacco, and check IDs.**

10:57   15    Q.   Is it part of teaching your employees how to comply with

16    the law?

17    A.   **Correct.**

18    Q.   Make sure customers are not under age, doing things

19    illegally?

10:57   20    A.   **Correct.**

21    Q.   Things like that.  Are the deejays required to go to

22    those meetings?

23    A.   **No.**

24    Q.   How about the dancers?

10:57   25    A.   **No.**

FLOREZ (Cross-Examination)

                1   Q.   But everyone else is?

                2   A.   **Yes.**

                3   Q.   Everyone on the payroll goes to those meetings?

                4   A.   **Correct.**

    10:57       5   Q.   Has -- now, on direct examination you were asked about

                6   the days of the week that Mr. Rosario works.  And back in

                7   2008 to 2013, what were the general days of the week that he

                8   worked?

                9   A.   **He worked Wednesday, Thursday, Friday -- I mean,**

    10:58      10   **Thursday -- Wednesday, Thursdays and Fridays and Saturdays.**

               11   **Four days.**

               12   Q.   Day or night?

               13   A.   **Night.**

               14   Q.   What are the best days to work at Stir Crazy for a

    10:58      15   deejay?

               16   A.   **Those nights that he choose.**

               17   Q.   Does he get those days in part because of how long he's

               18   been there?

               19   A.   **Yes.**

    10:58      20   Q.   Now do you have deejays who work less days than four?

               21   A.   **Yes.**

               22   Q.   Give us an example of what other deejays do.

               23   A.   **We have deejays that work one, two days, and they got**

               24   **another place to work, you know, they another work, so they**

    10:59      25   **use it as a part-time at Stir Crazy.**

FLOREZ (Cross-Examination)

1   Q.   And Stir Crazy is okay with that, if the deejay works one

2   or two days?  Is there any requirement that deejays have to

3   work a full week?

4   A.   **No.**

10:59   5   Q.   In all your years as the general manager or even when you

6   were a manager, have you ever gone to a deejay with a song

7   list and said, Mr. or Mrs. Deejay, you must play these songs?

8   A.   **Never.**

9   Q.   Never?

10:59   10   A.   **Never.**

11   Q.   When you start, when the day starts, 12 noon you open; is

12   that correct?

13   A.   **Correct.**

14   Q.   Does the deejay have any responsibility for setup?

11:00   15   A.   **No.**

16   Q.   Other than getting their own equipment ready, do they

17   have any other duties inside the bar?

18   A.   **Nothing.**

19   Q.   At the end of the day at 5:00 when the bar closes, does

11:00   20   the deejay have to grab a mop and sweep?

21   A.   **Nothing.**

22   Q.   They just gather their stuff and go; is that right?

23   A.   **Correct.**

24   Q.   Do they have any duties outside of their music at Stir

11:00   25   Crazy either before or after the day is over?

FLOREZ (Cross-Examination)

1    A.   **No.**

2    Q.   Why -- why did you -- why do you say that you want, say,

3    high energy?  High energy music, why do you want that?

4    A.   **It's part of the business to keep everybody happy.**

11:00  5    Q.   And you were asked also about if a deejay could play hip-

6    hop all day long or nothing but Latin salsa or nothing but

7    sixties rock.  Why?  Why does that make no sense to you as a

8    bar owner to play just one type of music all day long?

9    A.   **You know, it's not normal in the night clubs.  You know,**

11:01  10   **all night Latin music is not could be the rule.**

11   Q.   Are there clubs in Miami that have a reputation of just

12   catering to one particular type of clientele?

13   A.   **No.**

14   Q.   Whether it be just a Latin club or just a different,

11:01  15   maybe an older club?  Are you familiar with that?  Are there

16   clubs that are just oriented towards one music type or one

17   clientele type?

18   A.   **Not that I know.**

19   Q.   What does Stir Crazy try to do as far as being a club for

11:01  20   all kinds of people?

21   A.   **Play different kind of music, you know, we mix the music.**

22   Q.   As far as the individual music songs played, do you have

23   any -- do you have any control over the deejays in that

24   respect?

11:02  25   A.   **No.**

FLOREZ (Cross-Examination)

```
         1    Q.   How does the deejay decide what to play, if you know?

         2    A.   You know, normally the dancers give to a list to the

         3    deejay what she prefers to dance, and that basically works

         4    like that way.

11:02    5    Q.   How does the deejay get the list from the dancer?

         6    A.   She will go to the deejay booth and give the list.

         7    Q.   And now when your bartenders and security come in, do

         8    they have to punch a clock?

         9    A.   No.

11:02   10    Q.   How do they check in and check out?

        11    A.   I mean, in the computer they check out.

        12    Q.   So a time clock?

        13    A.   It's not a time clock, but they sign in.

        14    Q.   On the computer?

11:02   15    A.   On the terminal, yeah.

        16    Q.   They have like a code or something?

        17    A.   Yes.   Everybody have a code.

        18    Q.   Does the deejay have to do that?

        19    A.   No.

11:02   20    Q.   Do the dancers have to do that?

        21    A.   No.

        22    Q.   They're the only ones who don't have to do that?

        23    A.   Yes.

        24    Q.   Does a deejay have to report to a manager when they

11:03   25    arrive?
```

FLOREZ (Cross-Examination)

```
       1    A.  Yes.

       2    Q.  Do they say, I'm here?

       3    A.  Yeah, I'm here.

       4    Q.  How about the dancers, do they report to managers?

11:03  5    A.  No.

       6    Q.  Who do they report to?

       7    A.  To the deejay.

       8    Q.  Why?

       9    A.  So they know who is coming in ready to dance.

11:03  10   Q.  Do you know why a deejay would want to play a song a

       11   dancer wants to dance to as opposed to just whatever they

       12   want to play?

       13           MRS. ROBBINS-BOBER:  Object to form.  Speculation.

       14           THE COURT:  First, let's divide the question into

11:03  15   two.  Does he know.

       16           MR. McDONALD:  I'll withdraw the question.

       17           THE COURT:  All right.  Try it in that fashion.

       18   BY MR. McDONALD:

       19   Q.  I'm going -- can a deejay accept a job working at a

11:04  20   private party?

       21   A.  Yes.  Everybody doing it.

       22   Q.  Can they do a Bar Mitzvah or a wedding?

       23   A.  Yes.

       24   Q.  If they want?

11:04  25   A.  If they want.
```

FLOREZ (Cross-Examination)

1    Q.  You don't make them do it?

2    A.  **No.**

3    Q.  Can they work at other clubs?

4    A.  **Yes.**

11:04  5    Q.  You were asked questions yesterday about the rotation,

6    the dancers' rotation.  And what does that mean, what is the

7    dancers' rotation?

8    A.  **You know, in the same way the dancers come in, they put**

9    **on the stage.**

11:04  10   Q.  Do the dancers want to go on the stage?

11   A.  **Yes.**

12   Q.  Why?

13        **MRS. ROBBINS-BOBER:**  Object to form.  Calls for

14   speculation.

11:04  15        **THE COURT:**  Wait, wait.  One moment.

16        State your objection.

17        **MRS. ROBBINS-BOBER:**  The objection is it calls for

18   speculation, do you know why dancers want to go on stage.

19        **THE COURT:**  All right.  Well, the question do you

11:05  20   know why is not speculative because he either knows or

21   doesn't know.  The question why would be speculative, right?

22        **MRS. ROBBINS-BOBER:**  Yes, Your Honor.

23        **THE COURT:**  But the same question can be phrased in

24   a different fashion to get to the same end result.

11:05  25        **MR. McDONALD:**  I'll rephrase.

FLOREZ (Cross-Examination)

```
 1              THE COURT:  So maybe you can stay away from the

 2   whys and we can move along.

 3   BY MR. McDONALD:

 4   Q.   Do you know why?

 5   A.   Yeah, they make more money.

 6   Q.   By going on stage?

 7   A.   More often, yeah.

 8   Q.   So do -- what is the rotation?  What's the purpose for

 9   having a rotation when each dancer goes on stage?

10   A.   So to give them the opportunity for everybody to make

11   money.

12   Q.   What happens if the rotation isn't followed?  What

13   happens among the dancers?

14   A.   The particular dancer is not going to make the same

15   money.

16   Q.   Do you ever have disputes between dancers or dancers and

17   deejays if the rotation is not being followed?

18   A.   Yes.

19   Q.   Are you aware or do you know if when a dancer does better

20   financially if is it customary for the dancer to then tip the

21   deejays better?

22   A.   Yes.

23   Q.   Similarly, are there nights where the dancer does not do

24   well when there's not a lot of customers and the tip -- they

25   don't pay the deejays as well?
```

11:05  5
11:05  10
11:06  15
11:06  20
11:06  25

FLOREZ (Cross-Examination)

1    A.   **No.**

2    Q.   Why is that?

3    A.   **They pay the deejays all the time.**

4    Q.   Do you ever make accommodations as far as the rental fee

11:07  5    or the house fee that you collect on slow nights?

6    A.   **Yeah.  Yes.**

7    Q.   What do you do on a slow night when the dancers and the

8    deejays are not doing as well financially?

9    A.   **We don't charge the house fee to the dancer so that way**

11:07  10   **she can pay the deejay.**

11   Q.   What is the customary minimum that a dancer gives a

12   deejay?

13   A.   **Ten dollars.**

14   Q.   I want to talk about the evening when you came back from

11:08  15   your vacation, you had a message that there had been a claim

16   by someone named Rosario against Stir Crazy.  You were shown

17   a letter regarding Cruz Hernandez --

18   A.   **Yes.**

19   Q.   -- written to Stir Crazy, a lawyer writing on his behalf;

11:08  20   is that right?

21   A.   **Yes.**

22   Q.   The law firm that was writing on behalf of Cruz Hernandez

23   was who?

24   A.   **Bober and Bober.**

11:08  25   Q.   That's Mr. Rosario's lawyers?

FLOREZ (Cross-Examination)

1    A.   **Same company.**

2    Q.   And that's dated what?

3    A.   **August 22nd, 2013.**

4    Q.   Was Cruz Hernandez working for Stir Crazy on August 22nd,

11:08    5    2013?

6    A.   **No.**

7    Q.   When had he stopped working?

8    A.   **Around 18 months.**

9    Q.   18 months before?

11:08    10    A.   **From now.  I don't recall exactly the time.**

11    Q.   Why did he stop?

12    A.   **We terminated his service with Stir Crazy.**

13    Q.   Why did you terminate his service?

14    A.   **Because he was working in another club which is not a**

11:09    15    **problem for us.  He can work anywhere, but not only that, he**

16    **offering a hundred dollar our dancers to go to dance or to**

17    **work at his place, his new place that he's working.**

18    Q.   So he was recruiting the dancers to leave you?

19    A.   **Correct.  He offered them money.**

11:09    20    Q.   I think you said, and at that point you felt you didn't

21    want to have an independent contractor relationship with him

22    anymore?

23    A.   **Correct, and we terminated his service.**

24    Q.   So had he been gone from Stir Crazy for quite a while

11:09    25    when you got that letter that he was suing you for back

FLOREZ (Cross-Examination)

1  wages?

2  A.  **Yes, sir.**

3  Q.  Claiming to be an employee?

4  A.  **Yes, sir.**

11:09  5  Q.  Was he ever on the payroll?

6  A.  **No.**

7  Q.  Was he always an independent contractor?

8  A.  **Always.**

9  Q.  So you come back on the 21st of September 2013.  When you

11:10  10  met with Mitchell Rosario, were you yelling at him?

11  A.  **No, not at all.**

12  Q.  Were you pointing your finger at him?

13  A.  **No.**

14  Q.  Were you raising your voice?

11:10  15  A.  **No, I'm not that kind of person.**

16  Q.  How did you feel that somebody who worked for you for 12

17  years was now suing you?

18  A.  **I was in shock to receive that notice.**

19  Q.  Had he ever talked to you before taking the action to

11:10  20  come to you with the grievance that he had?

21  A.  **Never.**

22  Q.  Now, in addition to him working at Stir Crazy as a

23  deejay, did you develop a personal relationship with him?

24  A.  **Yes.**

11:10  25  Q.  And September 21st, 2013, what did you believe the status

FLOREZ (Cross-Examination)

```
          1   of your relationship with him was?

          2   A.  It was, you know, it was good.

          3   Q.  Did you consider him to be friend?

          4   A.  Yes.

11:11     5   Q.  Did you ever do anything with him outside of Stir Crazy?

          6   A.  No, but we meet at the owner's house and couple parties

          7   that he throw for the kids, so we got some kind of relation.

          8   Q.  Had he ever been to your house?

          9   A.  No.

11:11    10   Q.  When you were working, did you have a cordial

         11   relationship with him?

         12   A.  Yes.  Yes.

         13   Q.  I mean, did you ever argue or have a fight?

         14   A.  No.

11:11    15   Q.  Anything like that?  Do you have any reason or know any

         16   reason why you weren't given the courtesy of any advance

         17   notice prior to getting a suit?

         18          MRS. ROBBINS-BOBER:  I object to this line of

         19   question.  There's no obligation for a notice.  There's no

11:11    20   obligation for an employee to complain.

         21          THE COURT:  All right.  But it's a legitimate line

         22   of questioning because of the prior inquiry into what

         23   Mr. Flórez knew regarding the claim.

         24          So the question may be answered.

11:12    25          Read the question again, Madam Court Reporter.
```

FLOREZ (Cross-Examination)

```
          1              (Thereupon, the court reporter read back the
          2   requested portion.)
          3   A.  No.
          4   BY MR. McDONALD:
11:12     5   Q.  Now, Mr. Rosario, did he work that Saturday evening,
          6   September 21st?
          7   A.  No.
          8   Q.  His next day that he normally would be a deejay would be
          9   when?
11:12    10   A.  I believe that was next Wednesday.
         11   Q.  The following Wednesday?
         12   A.  Yes, sir.
         13   Q.  Prior to that Wednesday, did you communicate to
         14   Mr. Rosario that he could come back to work as a deejay?
11:13    15   A.  Yes.  Yes.
         16   Q.  How did you communicate that to him?
         17   A.  I meet with the other manager, Rolando, in my back
         18   office.
         19   Q.  Rolando is Rolando Quevedo?
11:13    20   A.  Quevedo, correct.
         21   Q.  He's a manager?
         22   A.  He's a nighttime manager.
         23   Q.  So you met with him?
         24   A.  So I meet with him and we, with his phone, we send the
11:13    25   text message and we call Mr. Rosario offering his job to come
```

FLOREZ (Cross-Examination)

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | **back to work.**                                                  |
|       | 2  | Q.   Did you ever get a call back?                                 |
|       | 3  | A.   **Never.**                                                    |
|       | 4  | Q.   Did he ever show up to work?                                  |
| 11:13 | 5  | A.   **Never.**                                                    |
|       | 6  | Q.   Did he ever send you an e-mail?                               |
|       | 7  | A.   **Nothing.**                                                  |
|       | 8  | Q.   Any response at all?                                          |
|       | 9  | A.   **Nothing.**                                                  |
| 11:13 | 10 | Q.   Were you in the room when Rolando made the call?             |
|       | 11 | A.   **Yes.**                                                      |
|       | 12 | Q.   Now Rolando Quevedo, you said he is a nighttime manager?     |
|       | 13 | A.   **He sat nighttime, however, we use for the day, too.**       |
|       | 14 | Q.   Is he still employed?                                         |
| 11:14 | 15 | A.   **No.**                                                       |
|       | 16 | Q.   When did his employment end?                                 |
|       | 17 | A.   **Close to -- before December.**                              |
|       | 18 | Q.   Of?                                                           |
|       | 19 | A.   **2014.**                                                     |
| 11:14 | 20 | Q.   So after Mr. Rosario left in 2014, Rolando stayed until      |
|       | 21 | the end of 2014?                                                   |
|       | 22 | A.   **Yes.  August, September.**                                  |
|       | 23 | Q.   Now let me have you look at what's previously been marked    |
|       | 24 | as Plaintiff's Exhibit 8 and 7.                                   |
| 11:14 | 25 |          **MR. McDONALD:**  Your Honor, may I approach?           |

FLOREZ (Cross-Examination)

1          THE COURT:   Yes.

2    BY MR. McDONALD:

3    Q.   Look at Plaintiff's Exhibit 13.  Do you see it?

4    A.   **Yes.**

11:15  5    Q.   Can you take it out of the notebook, Plaintiff's 13.

6    Looking at Plaintiff's Exhibit 13, is there another page?

7    A.   **Yeah.   Three pages.**

8    Q.   Okay.  Taking a look at Plaintiff's Exhibit 13, you said

9    it's a three-page document; is that right?

11:16  10   A.   **Correct.**

11   Q.   What is page 1?

12   A.   **It's a Stir Crazy application.**

13   Q.   You were showed by counsel Mr. Rosario's application

14   dated, I believe it was August 30, 2013?

11:16  15   A.   **Correct.**

16   Q.   And you also showed the license agreement dated the same

17   day, correct?

18   A.   **Correct.**

19   Q.   And you said they were all part of the same document?

11:16  20   A.   **Yes, sir.**

21   Q.   Now, did you have Mr. Rosario sign that because you had

22   gotten a letter eight days earlier from the Bober Law Firm on

23   behalf of your former deejay, Cruz Hernandez?

24   A.   **No.**

11:16  25   Q.   Looking at Exhibit 13, what is that?

1    A.  Well, the three pages?

2    Q.  Yes.

3    A.  It's the application, the license agreement, and a copy

4    of his driver's license.

11:17  5    Q.  For who?

6    A.  This is Joe Roppo.

7    Q.  And Joe Roppo is the --

8    A.  Deejay, head deejay.

9    Q.  He had been with you how long?

11:17  10   A.  21 years.

11   Q.  What's the date of the application?

12   A.  This was signed December 17th, 2012.

13   Q.  Is that the same type of application you were shown

14   regarding Mr. Rosario?

11:17  15   A.  Yes.

16   Q.  And the second page of that exhibit is that -- what is

17   that?

18   A.  The licensing agreement signed November 16th, 2013.

19   Q.  Actually, look on the license agreement under where it

11:17  20   says in witness whereof, what's the date there at the bottom?

21   A.  December 2012.

22   Q.  December what?

23   A.  I can't see -- 17.

24   Q.  And then look at the application, what's the date on the

11:18  25   application?

        1    A.   **December 17, 2012.**

        2    Q.   Same date?

        3    A.   **Yes, sir.**

        4    Q.   You said November 16, 2013.  And if I can show you maybe

11:18   5    a better copy of that, what is the date next to Mr. Roppo's

        6    signature?

        7    A.   **November 16th, 2013.**

        8    Q.   Is that a '13 or is that is a '93?

        9    A.   **I'm sorry.  '93.**

11:18  10    Q.   Do you know if that's the date Mr. Roppo started working

       11    at Stir Crazy?

       12    A.   **Correct.**

       13    Q.   Now in December -- so the application and the license

       14    agreement Mr. Roppo completed is dated 2012?

11:18  15    A.   **Yes.**

       16    Q.   Now you hadn't had any notices from the Bober Law Firm

       17    about any other employees prior to December 17th, 2012; is

       18    that right?

       19    A.   **Right.**

11:19  20    Q.   Is this the same document Mr. Rosario filled out?

       21    A.   **Yes, sir.**

       22    Q.   And I believe -- why do you update?  Why do you get new

       23    information?  Why do you do it ever periodically?

       24    A.   **Because the contact change, the person who can call if**

11:19  25    **anything happen, any incident happen so we can call somebody,**

1    his family, his wife or anybody.

2    Q.  Part of the reason for redoing the license is to

3    reiterate the terms of the relationship?

4    A.  Yes.

11:19    5         MR. McDONALD:  I think, Your Honor, I have no

6    further questions.

7              THE COURT:  All right.  Thank you.

8              Redirect?

9

10              *REDIRECT EXAMINATION*

11    BY MRS. ROBBINS-BOBER:

12    Q.  You previously testified on cross that deejays could work

13    part-time if they wanted to.  Is that what you said?

14    A.  Yes.

11:21    15    Q.  But you also testified, previously testified that there

16    are -- because the night shift/day shift, there are 14 shifts

17    per week, correct?

18    A.  Correct.

19    Q.  And during this time when Mr. Rosario was working, there

11:21    20    were times when there were only three deejays, correct?

21    A.  Correct.

22    Q.  So if you divide that, if you divide 14 up divided by 3,

23    that would require each deejay to work three to four,

24    sometimes five shifts per week; is that right?

11:21    25    A.  That's right.

FLOREZ (Redirect Examination)

1  Q.  So you couldn't have three deejays all working part-time,

2  right?

3  A.  **Not all the time.  We sometimes have five or more**

4  **deejays.**

11:21  5  Q.  Well, did you have -- when did you -- when during the

6  2008 through 2013 period did you have five deejays working at

7  once?

8  A.  **I not recall right now, but we used to have more deejays.**

9  Q.  But you don't recall the names?

11:22  10  A.  **Yeah, I recall the names.  I guess --**

11  Q.  Do you recall the five deejays who were all working at

12  once?

13  A.  **Some periods, yes.**

14  Q.  When were five deejays working all at once?

11:22  15  A.  **I don't remember right now, ma'am.**

16  Q.  Besides the music you said -- on cross you were asked

17  whether the deejays had any duties outside of playing the

18  music and you said no.  Isn't it true that when the deejays

19  worked the morning shift they had to turn on the lights and

11:22  20  set things up?

21  A.  **That's part of the deejays, you know, be on top of the**

22  **lights and the music.**

23  Q.  The lighting for the club, correct?

24  A.  **Turn the lights for the club, yeah.**

11:23  25  Q.  And they had a phone in their phone booth, they answered

FLOREZ (Redirect Examination)

 1   the public phone, correct?

 2   A.  **If they wanted.**

 3   Q.  And they sent e-mails to Manny, Junior regarding the

 4   arrival times of the dancers so he can know if there was an

11:23   5   adequate number of dancers and make sure that the house

 6   collected the house fees?

 7   A.  **Okay.  Remember -- you're referring to Mr. Insua, Junior?**

 8   Q.  Yes.

 9   A.  **Remember that after he opened the business, he opened the**

11:23   10   **Stir Crazy as a business and he implant all the regulations**

 11   **or rules for the club.  So one of the rules was that he want**

 12   **to know how many girls are in the building back there.**

 13   Q.  But that was one of the duties of the deejay that was

 14   outside just playing music, correct?

11:24   15   A.  **Correct.**

 16   Q.  And also monitoring the video cameras to help with

 17   security and communicate with managers via the handheld

 18   radio, that would be outside of the music playing as well,

 19   correct?

11:24   20   A.  **Yeah, but that's not the duties that he have to do.  I**

 21   **told you earlier, like I guess yesterday I told you the**

 22   **cameras is for business security, not for the deejays.**

 23   Q.  But there's only one deejay in the deejay booth, correct?

 24   A.  **And a manager, too, in the building.**

11:24   25   Q.  The manager hangs out in the deejay booth?

FLOREZ (Redirect Examination)

1   A.   **I told you yesterday, yes.**

2   Q.   But it's located in the deejay booth, the monitors,

3   correct?

4   A.   **You know, that's our business.  We can put it anywhere.**

11:24   5   Q.   The managers don't stay in the deejay booth the whole

6   time, correct?

7   A.   **Not a hundred percent, but they -- you know, they're free**

8   **to stay anywhere in the building.**

9   Q.   And a deejay's provided with a radio to communicate with

11:25   10   the managers when the managers are not in the deejay booth

11   and let them know what, if they see anything suspicious on

12   the video camera, correct?

13   A.   **We don't provide a radio to the deejay.  The radio is**

14   **right there and -- and the deejay, the deejay is part of the**

11:25   15   **building.**

16   Q.   The radio is in the deejay booth, correct?

17   A.   **Correct.**

18   Q.   And deejays have used it to communicate with management

19   regarding issues they see on the security camera, correct?

11:25   20   A.   **If they want to use it, they're free to do it.**

21   Q.   And with respect to the control over the music, you

22   previously testified that the Stir Crazy would speak to

23   deejays about not playing songs with too many bad words,

24   correct?

11:26   25   A.   **Yes, that was me.**

FLOREZ (Redirect Examination)

1   Q.  And not playing too much of one kind of music like Latin

2   or rap?

3   A.  **We like to -- I'm not a deejay, I'm not a professional**

4   **deejay, but they mix the music and they play the music from**

11:26   5   **the list of the girls whatever they want to dance.  I'm not**

6   **involved in that situation.**

7   Q.  But as a general parameter, management communicated to

8   deejays not to play too much of one type of music because you

9   wanted to attract everyone, correct?

11:26   10   A.  **Correct.**

11          THE COURT:  Ms. Bober, I think we had a couple of

12   gentlemen come in.  I don't know if you want to invoke the

13   rule.

14          MR. McDONALD:  One is a witness.

11:26   15          THE COURT:  Okay.

16          MRS. ROBBINS-BOBER:  Thank you.

17          THE COURT:  Of course.

18   BY MRS. ROBBINS-BOBER:

19   Q.  And you spoke on your cross-examination when Mr. McDonald

11:27   20   was examining you about deejays breaking the rotation.  Did

21   management sometimes tell deejays to break the rotation?

22   A.  **No.**

23   Q.  Are you aware of whether deejays ask permission from the

24   managers before breaking the rotation?

11:27   25   A.  **I don't know.  They are the deejays.  They do their**

FLOREZ (Redirect Examination)

1    **rotation, they are not supposed to break the rotation, but**

2    **they did once in a while.**

3    Q.   But have you observed or are you aware of deejays asking

4    managers' permission to break the rotation?

11:27   5    A.   **No.**

6    Q.   If a deejay breaks the rotation, calls a girl out of

7    turn, the dancer gets on stage earlier, and I guess you said

8    has an opportunity to make more money, do the dancers get

9    upset about that if another dancer has been put ahead of

11:28   10   them?

11   A.   **Yes.**

12   Q.   So breaking the rotation causes problems among the

13   dancers, correct?

14   A.   **Correct.**

11:28   15   Q.   And if the dancers are unhappy, that's a problem for the

16   club, correct?

17   A.   **Correct.**

18   Q.   So the club did not like for the deejays to break the

19   rotation; is that right?

11:28   20   A.   **Yes.**

21   Q.   And if that happened, the club would speak with the

22   deejay and tell them not to do it, correct?

23   A.   **When that happened, yes.**

24   Q.   Now, you testified that Mr. Hernandez, he was terminated

11:28   25   from the club because he was working at another club; is that

FLOREZ (Redirect Examination)

1   right?

2   A.   **No, that's not right.**

3   Q.   Was he terminated because he was working at another club

4   and you feel like he was soliciting other dancers?

11:29   5   A.   **That was the reason.**

6   Q.   You felt like he was working for the competition, in

7   other words?

8   A.   **No.   He was working for another club which, you know,**

9   **he's free to do it and it's not a problem for us.   But the**

11:29   10   **problem that we terminated his services with the club is**

11   **because he offering money to our dancers to go to work at his**

12   **place.**

13   Q.   Now, you're the general manager at Stir Crazy but if the

14   Insuas told you to do something --

11:29   15   A.   **Sorry?**

16   Q.   -- if the Insuas, the three Insuas, the Insua family,

17   Manny, Junior, Manuel, Senior, Laura, if they told you to do

18   something you would do it, correct?

19   A.   **Like what?**

11:30   20   Q.   Something regarding the running of Stir Crazy.

21   A.   **Can you give me an example?**

22   Q.   Well, aren't they the owners?

23   A.   **I'm sorry?**

24   Q.   They're the owners.

11:30   25   A.   **Correct.   But give me an example.**

FLOREZ (Redirect Examination)

1    Q.   If they told you to do something regarding running the

2    business regarding how to play -- how to pay employees.

3    A.   **They're the owners.   I got follow to the rules.**

4    Q.   They have the final say, correct?

11:30    5    A.   **In what?**

6    Q.   Regarding running, how they want to run the business,

7    regarding marketing, promotions, things like that?

8    A.   **Not because -- I handle the business a hundred percent.**

9    **They don't have -- they don't do decisions inside the club.**

11:30   10    **I do the decisions.**

11    Q.   But you speak to them, with them regarding what's going

12    on in the club?

13    A.   **Of course.**

14    Q.   And if they -- at the end of the discussion if they tell

11:31   15    you to do something regarding the club, you would do it?

16    A.   **She's the owner so I've got to listen to her.**

17    Q.   Do you know the date, the year that Mitch Rosario was a

18    manager?

19    A.   **I don't have it with me, those records, ma'am.**

11:31   20    Q.   It could have been a even longer time ago, correct?

21    A.   **Some time ago.**

22    Q.   And he wasn't a -- you didn't make him a full-time

23    manager?

24    A.   **It was part-time.**

11:32   25    Q.   So you were having him -- you were having him fill in as

FLOREZ (Redirect Examination)

```
         1   a manager and also doing his deejay duties, correct?
         2   A.  He wants to -- he wants to be a manager, he start doing
         3   manager as a deejay, yeah, as a deejay and as a manager, but
         4   he see the opportunity to make more money as a deejay, so he
11:32    5   resigned as a manager and be independent contractor.
         6   Q.  But Mr. Rosario never worked as just a manager, correct?
         7   That position was never given to him to work full-time as a
         8   manager, right?
         9   A.  He was a part-time.
11:32   10   Q.  Because you needed someone to cover because you were
        11   short on management staff; isn't that right?
        12   A.  I not remember what was the reason but he was a part-time
        13   manager.
        14   Q.  And he was having to do his deejay duties and management
11:32   15   duties at the same time, correct?
        16   A.  No, ma'am.  One day could be a manager and two or three
        17   days he could be a deejay.
        18   Q.  So if he worked as a manager it was only doing the
        19   manager duties on that shift?
11:33   20   A.  Correct.  I'm sorry, deejays made more money than the
        21   managers.
        22   Q.  And when you talked about meeting with the Insuas you
        23   said in the last two years they didn't go into the club as
        24   much.  So to make up for that, would you -- you would visit
11:33   25   them more at their home, correct?
```

FLOREZ (Redirect Examination)

1  A.  **Correct.**

2  Q.  And when you said they didn't go into the club much, that

3  would be during hours, correct?

4  A.  **Correct.**

11:34  5  Q.  And so they would come in before 12:00 p.m. when the club

6  opened; would that be correct?

7  A.  **When she usually come in, she come in in the morning.**

8  Q.  So if someone is a night deejay they probably would not

9  see Laura Insua in the club much?

11:34  10  A.  **They don't know the employees.**

11  Q.  And when we talked about -- when you talked about the

12  employees that you had on payroll versus the employees that

13  you didn't have on payroll, it was more than just four

14  deejays who were not on payroll, there were also many, many

11:34  15  dancers not on payroll, correct?

16  A.  **That's normal in our kind of business.**

17  Q.  My question is at Stir Crazy there were a lot of dancers

18  working there who were not on payroll, correct?

19  A.  **Correct.**

11:35  20  Q.  And your testimony was that there were about 30 dancers

21  per day; is that correct?

22  A.  **Average.**

23       MR. McDONALD:  Objection.

24  BY MRS. ROBBINS-BOBER:

11:35  25  Q.  About how many people did you have on payroll on average

FLOREZ (Redirect Examination)

| | |
|---|---|
| 1 | during the time period we're talking about? |
| 2 | A.   **Between 16 and 20.** |
| 3 | Q.   16 and 20? |
| 4 | A.   **Right now.** |
| 11:35   5 | Q.   So if you have about 30 dancers plus four deejays not on |
| 6 | payroll, that would be more than half the people working |
| 7 | there who are not on payroll? |
| 8 | A.   **They are independent contractors.  They are not** |
| 9 | **employees.** |
| 11:36   10 | Q.   Are you able to -- you testified that about the custom of |
| 11 | the industry not putting deejays on payroll.  Are you able to |
| 12 | name other clubs by name? |
| 13 | A.   **No.  Not right now.** |
| 14 | Q.   You can't name a single club? |
| 11:36   15 | A.   **It's normal in the industry that we have.** |
| 16 | Q.   Now you talked about how Mr. Insua, I'm sorry, Manny, |
| 17 | Junior didn't physically come into the club that much; is |
| 18 | that correct? |
| 19 | A.   **That's correct.** |
| 11:36   20 | Q.   But the club has the video surveillance that's accessible |
| 21 | by phone, correct? |
| 22 | A.   **Correct.** |
| 23 | Q.   And you communicated with him by phone, text and e-mail, |
| 24 | correct? |
| 11:37   25 | A.   **Correct.** |

FLOREZ (Redirect Examination)

1   Q.   Going back to deejay duties regarding music, the deejay

2   duties, I'm sorry, and how you had previously testified that

3   their only duty was to play music, didn't they also have to

4   promote the club specials, events, things of that sort?

11:37   5   A.   **Yeah, they do.**

6   Q.   And that helps -- the goal of the deejays reminding

7   customers to buy drinks was to increase the club's revenue,

8   correct, the liquor revenue, correct?

9   A.   **Yes.**

11:38   10   Q.   And the promotions were something that management told

11   the deejays to announce, correct?

12   A.   **That's normal that the deejays announce the specials and**

13   **the promotions.**

14   Q.   But management put up a piece of paper in the deejay

11:38   15   booth listing what the promotions would be, and then the

16   deejays would announce those, correct?

17   A.   **Yes.**

18   Q.   Are you aware of any other deejay work that Mr. Rosario

19   did outside of Stir Crazy during the time period in question,

11:39   20   2008 to 2013?

21   A.   **Can you make it short, the question, please?**

22   Q.   Sure.  Are you aware -- during the time period in

23   question, are you aware of Mr. Rosario working as a deejay

24   for anyone else?

11:39   25   A.   **I don't know.  What I know is that they do parties, they**

FLOREZ (Redirect Examination)

|       | 1  | **go deejay weddings and 15 years, private parties.  Joe Roppo** |
|-------|----|----|
|       | 2  | **do.** |
|       | 3  | Q.   But are you aware of Mr. Rosario working anywhere else? |
|       | 4  | A.   **I don't know.** |
| 11:39 | 5  | Q.   Well, it's a yes or no. |
|       | 6  | A.   **No.** |
|       | 7  | Q.   Are you aware? |
|       | 8  | A.   **No, I'm not aware.** |
|       | 9  | Q.   Are you aware of any deejays being counselled by |
| 11:40 | 10 | management about breaking the rotation? |
|       | 11 | A.   **Say again, please.** |
|       | 12 | Q.   Are you aware of managers speaking with deejays and |
|       | 13 | telling them not to break the rotation? |
|       | 14 | A.   **Not me.** |
| 11:40 | 15 | Q.   Not you but other managers? |
|       | 16 | A.   **Could be, yes.** |
|       | 17 | Q.   So you are aware that managers would speak to deejays and |
|       | 18 | tell them don't break the rotation of the dancers? |
|       | 19 | A.   **Yes.** |
| 11:41 | 20 | Q.   Regarding the Department of Labor investigation, just to |
|       | 21 | clarify because based on the cross, the Department of Labor |
|       | 22 | only was investigating -- I'm sorry, the Department of Labor |
|       | 23 | contacted you because of a complaint about a bartender and |
|       | 24 | that was the only thing you discussed with the Department of |
| 11:41 | 25 | Labor, correct? |

FLOREZ (Redirect Examination)

```
        1   A.   That's correct.
        2   Q.   So they didn't review and approve your payroll practices
        3   as to everybody else?
        4   A.   I not remember, but whatever they asked to do, we do it,
11:41   5   and that was 22 years ago to today and we don't have any
        6   other situation with labor department.
        7   Q.   So whatever they asked you to do, you did it, but you
        8   don't remember what they asked you to do?
        9   A.   I remember they asked because the problem was with the
11:42  10   bartender.  So we put all the bartenders on payroll and we
       11   complied with the law.
       12   Q.   So and that was my question.  Thank you.
       13        Do you have a copy of the text message from Rolando
       14   supposedly offering Mitch his job back?
11:42  15   A.   I don't have it with me.  I don't know if Mr. David have
       16   it.
       17   Q.   You testified that deejays kind of come and go.  How long
       18   has Mr. Roppo being working there, the head deejay?
       19   A.   21 years.
11:43  20   Q.   Since about 1993?
       21   A.   Approximately, yes.
       22   Q.   And Mitch was working there for 12 years?
       23   A.   That's correct.
       24   Q.   And Cruz Hernandez, another deejay, did he work there for
11:43  25   about six years?
```

1   A.   **I don't remember Cruz Hernandez.  He worked for six**

2   **months, one year.  I not recall exactly the frame time.**

3   Q.   And Mr. McDonald on his direct had referred to

4   Plaintiff's Exhibit 8, I believe.  And I would like to offer

11:43   5   that to be admitted into evidence.

6            **MR. McDONALD:**  I thought it already was.  I thought

7   five to 11 were admitted.  I thought we did.

8            **THE COURT:**  Well, I don't have a notation here 8

9   being offered but if you're offering it and there's no

11:44   10   objection, then --

11            **MR. McDONALD:**  No objection.

12            **THE COURT:**  Plaintiff's Exhibit 8 is admitted.

13            (Thereupon, the aforementioned exhibit was admitted

14   into evidence.)

15   **BY MRS. ROBBINS-BOBER:**

16   Q.   And you mentioned that you worked the day shift, correct?

17   A.   **Correct.**

18   Q.   So you're not aware of what the managers at night -- you

19   wouldn't have been able to personally observe what the

11:44   20   managers at night would tell Mitch, correct?

21   A.   **I don't understand the question.**

22   Q.   Since you mostly worked the day shift?

23   A.   **Right.**

24   Q.   You weren't present at night when Mitch mostly worked the

11:45   25   night shift, correct?

FLOREZ (Redirect Examination)

1    A.   **Correct.**

2    Q.   So you might not be aware of all the contact managers had

3    with Mr. Rosario regarding instructions on how he should

4    perform his job; is that correct?

11:45   5    A.   **That's correct.   But I had communication with the other**

6    **managers.**

7              MRS. ROBBINS-BOBER:   That's all the plaintiffs

8    have.

9              THE COURT:   Thank you very much.

11:45   10             MRS. ROBBINS-BOBER:   Thank you.

11             THE COURT:   You're excused, Mr. Flórez.   Thank you

12   very much.

13             THE WITNESS:   Thank you.

14   *     *     *     *     *     *     *     *     *     *     *

15        *(Thereupon, proceedings were held but not transcribed.)*

16   *     *     *     *     *     *     *     *     *     *     *

17

18

19        (Thereupon, the above portion of the trial was concluded.)

20

21                         *          *          *

22

23

24

25

1        **C E R T I F I C A T E**

2

3            I hereby certify that the foregoing is an accurate

4   transcription of the proceedings in the above-entitled

5   matter.

6

7       3-10-2015

8   _____        _____

9   DATE COMPLETED          GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25